## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF HAWAIʻI;
STATE OF ILLINOIS; STATE OF
MARYLAND; STATE OF MICHIGAN;
STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY;
STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF
OREGON; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF
WASHINGTON; and STATE OF
WISCONSIN

                       *Plaintiffs,*

    v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; MARCO RUBIO, in his official
capacity as Secretary of State; UNITED
STATES DEPARTMENT OF STATE; LORI
CHAVEZ-DeREMER, in her official capacity
as Secretary of Labor; UNITED STATES
DEPARTMENT OF LABOR; PAMELA J.
BONDI, in her official capacity as Attorney
General of the United States; UNITED
STATES DEPARTMENT OF JUSTICE; and
UNITED STATES OF AMERICA,

                       *Defendants.*

No. 1:25-cv-13829

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The State of California, the Commonwealth of Massachusetts, the State of Arizona, the

State of Colorado, the State of Connecticut, the State of Delaware, the State of Hawaiʻi, the State

of Illinois, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New York, the State of North Carolina, the State of Oregon, the State of Rhode Island, the State of Vermont, the State of Washington, and the State of Wisconsin ("Plaintiff States") allege as follows:

## INTRODUCTION

1.    Congress created the H-1B visa program to address "specific labor shortages" and meet "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found."[1] The program has garnered widespread support over the past decades as a tool for addressing specific shortages of skilled professionals; indeed, President Trump recently advocated for the H-1B program.[2]

2.    H-1B visas do not just support the needs of the private sector. Facing a nationwide shortage of teachers, nurses, physicians, researchers, engineers, and other vital workers, state and local agencies and public-serving institutions like universities, schools, and hospitals have turned to H-1B workers to provide education, healthcare, and other services.

3.    Without access to skilled overseas workers, public schools would be forced to subject American children to larger class sizes, public research centers would lack staffing to support cutting-edge research, and hospitals would lose capacity to treat seriously ill patients. These concerns are particularly acute in rural areas and communities with relatively limited wealth and resources, where state and local governments and other service providers face even greater difficulties in recruiting the skilled workers required to support their missions.

---

[1] H.R. Rep. No. 101-723 (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6721, 1990 WL 200418.

[2] Dan Gooding & Gabe Whisnant, *Donald Trump Says Bringing in Foreign Workers Is 'MAGA,'* Newsweek (Nov. 19, 2025), https://www.newsweek.com/donald-trump-immigration-h1b-visa-maga-deportation-workers-11076200.

4.    While governments and other service providers hope for these devastating nationwide labor shortages to abate, they have turned to the H-1B visa program as a reliable and consistent stopgap, permitting them to make necessary plans for hiring, training, student enrollment, investments in institutional infrastructure, and other activities critical to their continued operation.

5.    That public institutions have come to rely on the H-1B program follows directly from Congress's longstanding efforts to ensure that public institutions benefit from the program. Congress first created the predecessor to the modern H-1B program in 1952. In the decades that followed, Congress repeatedly adjusted and refined the program. In so doing, Congress was particularly responsive to the needs of public- and nonprofit-sector employers, exempting many of them from the cap on the number of H-1B visa holder employees imposed on other employers and in some instances providing for reduced fees in connection with H-1B petitions. In the program's nearly 75-year history, Congress has never shown any intent to discontinue the H-1B visa program or to make it effectively inaccessible to government and non-profit employers.

6.    To the contrary, fees for H-1B petitions are subject to the same safeguards as other immigrations fees, which ensure that employers can rely on H-1B petitions without fear of arbitrary or dramatic changes in the costs associated with hiring H-1B workers. Under the Administrative Procedure Act ("APA"), unless Congress provides otherwise, changes in H-1B visa fees must be made through a transparent notice-and-comment process that requires the government to consider the public's ideas and concerns. Congress has also mandated more specifically that visa fees be kept to a level commensurate with the federal government's costs in processing applications. *See* 8 U.S.C. § 1356(m). These congressional mandates have been particularly important to public- and nonprofit-sector employers, which desperately need H-1B

workers but are unable to absorb significant added costs.

7.      On September 19, 2025, President Trump upended Congress's H-1B visa program by announcing a $100,000 supplemental fee to be imposed on H-1B petitions. *See* Proclamation 10,973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 24, 2025) ("Proclamation").[3] In contrast to the most recent revisions to the H-1B fee schedule—which the Department of Homeland Security ("DHS") published on January 31, 2024, following a lengthy notice-and-comment process pursuant to the APA—the President's Proclamation was made without any notice to or input from affected parties or other members of the public.

8.      The Proclamation makes various overtures to domestic economic policy goals to justify the unprecedented $100,000 fee. But the Proclamation gives no indication that the President gave any consideration to how the fee would affect Plaintiff States and their ability to provide their residents access to education, healthcare, and other basic human needs. It focuses instead on supposed abuses of the H-1B visa program within the private sector. And the Proclamation's statements about the program are completely at odds with the President's statements just a few weeks ago emphasizing the need for and value of H-1B visas to address specific shortages in the United States labor market.

9.      Defendants' implementation of the Proclamation has been similarly flawed. Defendants have haphazardly issued—and revised and reissued—various documents (collectively, "the Policy") to implement the $100,000 fee. Defendants have not once solicited public comment on the Policy. And none of the Policy's substance reflect the reasoned decisionmaking required by law.

---

[3] Available at https://www.federalregister.gov/documents/2025/09/24/2025-18601/restriction-on-entry-of-certain-nonimmigrant-workers.

10.     The Policy plainly violates the APA. Congress "enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). The act "was the culmination of a 'comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers.'" *Id.* (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–671 (1986)). In issuing and implementing the Policy, Defendants exceeded the bounds of that fundamental statute in at least three ways.

11.     First, Defendants failed to adhere to the APA's procedural requirements. The APA requires an agency to pursue notice-and-comment rulemaking in promulgating a legislative rule like the Policy. *See* 5 U.S.C. § 553. Defendants flouted that requirement, and the Policy must accordingly be held unlawful and set aside. *See id.* § 706(2)(D).

12.     Second, the Policy exceeds the fee-setting authority conferred by Congress and tramples on the intricate structure created by the Immigration and Nationality Act of 1952 ("INA") and subsequent legislation. It is thus contrary to statute in violation of the APA. *See id.* § 706(2)(C).

13.     Third, the Policy is arbitrary and capricious in multiple senses: not only is it ungrounded from careful consideration of relevant concerns, but it reflects policy goals of the President that were so fleeting that he no longer appears to maintain them even as the Policy remains in effect. In this regard, the Policy violates the APA. *See id.* § 706(2)(A).

14.     In addition to violating the APA, the policy is also *ultra vires* because it usurps Congress's constitutional authority to set immigration policy and to raise revenues.

15.     Plaintiff States now bring this action to protect their ability to provide for the

fundamental needs of their residents in spite of the difficulties imposed by nationwide labor conditions. The Court should hold unlawful and set aside the Policy so that Plaintiff States can continue to fulfil their most basic obligations.

## JURISDICTION AND VENUE

16.    This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the United States Constitution and the APA, 5 U.S.C. §§ 701–706.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are the United States and its agencies and officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this district.

## PARTIES

18.    Plaintiff State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta. The Attorney General is the chief legal representative of the state and is authorized to pursue this action by California State Constitution, article V, section 13.

19.    Plaintiff Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

20.    Plaintiff State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state in the United States of America. The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in federal court[.]" Ariz. Rev. Stat. § 41-193(A)(3); *see* Ariz. Const. art. V, § 1(A).

21.     Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

22.     Plaintiff State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

23.     Plaintiff State of Delaware is a sovereign state in the United States of America. The Attorney General of Delaware is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

24.     Plaintiff State of Hawaiʻi, represented by and through its Attorney General, Anne E. Lopez, is a sovereign state in the United States of America. The Attorney General is Hawaiʻi's chief legal officer and chief law enforcement officer and is authorized by Hawaiʻi Revised Statues § 28-1 to pursue this action.

25.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul. As the chief legal officer of Illinois, Attorney General Raoul is authorized to act on its behalf in this matter.

26.     Plaintiff State of Maryland is a sovereign state in the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

27.     Plaintiff State of Michigan is a sovereign state in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

28.     Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's proprietary, sovereign, and quasi-sovereign interests.

29.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

30.     Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew J. Platkin, who is the chief law enforcement officer of New Jersey.

31.     Plaintiff State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

32.     Plaintiff State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

33.     Plaintiff State of Oregon is a sovereign state in the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is Oregon's chief law enforcement officer and is authorized to act on behalf of the State in this matter.

34.     Plaintiff State of Rhode Island is a sovereign state in the United States of America. The Attorney General of Rhode Island is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

35.     Plaintiff State of Vermont is a sovereign state in the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

36.     Plaintiff State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code 43.10.

37.     Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

38.     Defendant Kristi Noem is the Secretary of Homeland Security. She is named in her official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Secretary of Homeland Security.

39.     Defendant United States Department of Homeland Security is a cabinet agency in the executive branch of the federal government with responsibility for implementing laws and policies concerning the adjudication of H-1B visa petitions. The Proclamation assigns the responsibility for implementing the Proclamation.

40.    Defendant Marco Rubio is the Secretary of State. He is named in his official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Secretary of State.

41.    Defendant United States Department of State is a cabinet agency in the executive branch of the federal government. The Proclamation assigns the Department responsibility for implementing the Proclamation.

42.    Defendant Lori Chavez-DeRemer is the Secretary of Labor. She is named in her official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Secretary of Labor.

43.    Defendant United States Department of Labor is a cabinet agency in the executive branch of the federal government.

44.    Defendant Pamela J. Bondi is the Attorney General. She is named in her official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Attorney General.

45.    Defendant United States Department of Justice is a cabinet agency in the executive branch of the federal government.

46.    Defendant United States of America is a sovereign nation. *See* 5 U.S.C. § 702 ("The United States may be named as a defendant in any [APA] action, and a judgment or decree may be entered against the United States.").

# LEGAL BACKGROUND

## I.     The H-1B Visa Program

### A.     Congress has consistently exercised its constitutional prerogative to control immigration policy.

47.     Article I, section 8, clause 4 of the United States Constitution provides that Congress shall establish a "uniform Rule of Naturalization." "The [Supreme] Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (noting that the Supreme Court "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens"); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (observing that "[p]olicies pertaining to the entry of aliens" are "entrusted exclusively to Congress"); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (discussing "the complete and absolute power of Congress" and "the plenary power of Congress" over immigration policy).

48.     Pursuant to its constitutional authority, Congress enacted the INA, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)); *see also Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 561 (N.D. Cal. 2020) ("Congress has created a complex, highly reticulated set of immigration laws and regulations" and has "continued to establish policy regarding immigration in the United States.")

49.     Congress originally created a predecessor version of the H-1B program in 1952. Since then, Congress has legislated extensively, enacting a comprehensive scheme to allow U.S. employers to hire skilled workers from around the world to fill jobs in critical areas, while still protecting the interests of workers in the United States and preventing abuse of the system.

50.     The primary goal of the modern H-1B program is to "balance the short term employment demands of employers with the need to train and educate the new generation of American workers." H.R. Rep. No. 101-723 (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6725, 1990 WL 200418. In service of that goal, Congress has repeatedly addressed concerns about misuse of the H-1B program and impact on U.S. workers by enhancing enforcement, increasing penalties, and requiring employers to pay specific fees to hire an H-1B worker. *See, e.g.*, H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, § 426, 118 Stat. 2809, 3357-58 (2004) (imposing certain anti-fraud fees).

51.     In short, Congress has expressly exercised its authority over immigration and naturalization to direct the nation's policy for the admission of this category of noncitizen workers by constructing a program that addresses the needs of the American economy while protecting American workers. In doing so, Congress bound the executive branch to follow the plan it set forth. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

**B.     Congress created the H-1B visa program to address shortages in the United States labor market.**

52.     Congress created the H-1B visa program to address "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which

domestic personnel cannot be found and the need for other workers to meet specific labor shortages." H.R. Rep. No. 101-723 (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6721, 1990 WL 200418; *see also U.S. v. Patnaik*, 125 F.4th 1223, 1225 (9th Cir. 2025) ("The Immigration and Nationality Act . . . authorizes employers to 'request H-1B status for nonimmigrant foreign workers in specialty occupations' that American workers cannot fill." (quoting *U.S. v. Prasad*, 18 F.4th 313, 316 n.2 (9th Cir. 2021) (citing 8 U.S.C. § 1101(a)(15)(H)(i)(b)). The H-1B classification traces back to the INA of 1952, which established an "H visa" for "an alien having a residence in a foreign country which he has no intention of abandoning who is of distinguished merit and ability and who is coming temporarily to the United States to perform temporary services of an exceptional nature requiring such merit and ability." Pub. L. No. 82-414, § 101(a)(15)(H), 66 Stat. 163, 168 (1952).

53.    The Immigration Act of 1990 amended the INA and created the H-1B nonimmigrant classification still in effect today, allowing an employer in the United States to petition to hire a nonimmigrant worker in a "specialty occupation" in the United States for a maximum duration of six years. Pub. L. No. 101-649, 104 Stat. 4978; *see* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(g)(4); 8 C.F.R. § 214.2(h)(1)(i). A "specialty occupation" is an occupation that requires "(A) theoretical and practical application of a body of highly specialized knowledge and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii).

54.    Today, H-1B workers are employed across the country by a wide variety of employers, including state government agencies that rely on H-1B workers to address labor shortages affecting the public sector.

55.    To protect the domestic labor force, Congress has capped H-1B visa approvals for most private employers (excluding certain government and nonprofit employers) at 65,000 per year, with another 20,000 holders of advanced degrees. 8 U.S.C. § 1184(g).

56.    Certain employers, however, are exempt from the H-1B cap. Specifically, the H-1B cap does not apply to institutions of higher education, or a related or affiliated nonprofit entity, nonprofit research organizations, or governmental research organizations. 8 U.S.C. § 1184(g)(5). These employers are referred to as "cap-exempt."

57.    To obtain an H-1B visa for a worker, an employer in the United States subject to the H-1B cap must enter an annual lottery that is generally held in March of each year for employment starting at the beginning of the federal fiscal year in October. 8 C.F.R. § 214.2(h)(8)(iii). Cap-exempt employers who have formally established their cap-exempt status do not need to register or participate in the annual lottery and may file petitions with the United States Citizenship and Immigration Services ("USCIS") using Form I-129, Petition for Nonimmigrant Worker at any time. *See Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting Other Nonimmigrant Workers*, 89 Fed. Reg. 103,054, 103,183 (Dec. 18, 2024).

58.    Unlike the H-1B employees of employers who must participate in the lottery, H-1B employees of cap-exempt employers have more flexibility on their start dates. *See id*. (stating that "petitioners that qualify under the cap exemptions will also benefit from not having to wait for H-1B cap season to commence employment. This may allow approved petitioners to have their H-1B workers commence employment earlier, prior to the beginning of the fiscal year on October 1").

59.     Since its inception, Congress has continually tailored the H-1B visa program to carry balance employers' labor needs with the interests of American workers to ensure that they are not wrongfully displaced.[4] To that end, employers seeking to hire H-1B workers—including cap-exempt employers—must pay certain fees and make certain attestations to the Department of Labor ("DOL") aimed at protecting U.S. workers and H-1B workers. *See* 8 U.S.C. § 1182(n)(1).

60.     Specifically, an employer must submit a labor condition application in which the petitioning employer attests to DOL that the position will pay the greater of (1) the actual wage level paid by the employer to all other individuals with similar experience and qualifications; or (2) the prevailing wage for that occupational classification. *See* 8 U.S.C. § 1182(n)(1)(A). The employer must also state that it will provide working conditions for the position that will not adversely affect the working conditions of workers similarly employed; that there is not a strike or lockout in the course of a labor dispute in the occupational classification of the H-1B worker at the place of employment; and that the employer has provided certain forms of notice regarding the position. 8 U.S.C. § 1182(n)(1)(A)–(D). DOL then reviews and certifies the employer's application. 20 C.F.R. § 655.730(b). Once certified, the employer files a Form I-129 petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. *See* 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i)–(2)(i)(A).

---

[4] *See*, *e.g.*, Muzaffar Chrishti & Stephen Yale-Loehr, *The Immigration Act of 1990: Unfinished Business a Quarter-Century Later*, Migration Policy Institute Issue Brief (July 2016), https://www.migrationpolicy.org/sites/default/files/publications/1990-Act_2016_FINAL.pdf; *see also*, American Competitiveness and Workforce Improvement Act of 1998, Pub. L. No. 105-277, §§ 411-15, 112 Stat. 2681, 2681-642 (1998); H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, § 422, 118 Stat. 2809 (2004).

## II.    Legislative and Regulatory Scheme for H-1B Fees

61.    When petitioning for an H-1B worker, employers are required to pay certain fees. Some are statutory fees set by Congress. *See* 8 U.S.C. § 1356(m); 8 U.S.C. § 1184(c)(9)–(13). Others are USCIS "adjudication" fees set by notice-and-comment rulemaking pursuant to pursuant to Congress's grant of authority to DHS to promulgate regulations and charge fees to ensure recovery of full costs to provide services. *See* 8 U.S.C. § 1103(a)(3); 8 U.S.C. § 1356(m). These fees are to be paid by the petitioning employer, not by the H-1B worker. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C).

### A.    Congress has consistently exercised its power over H-1B visa fees and to exempt employers serving the interests of the public.

62.    On numerous occasions, Congress has passed statutes specifying fees associated with H-1B petitions.

63.    In 1998, through the American Competitiveness and Workforce Improvement Act ("ACWIA"), Congress required certain H-1B petitioners to pay an education and training fee of $500 to address concerns about the potential adverse impact of the H-1B program on domestic workers and possible abuse of the program. *See* Pub. L. No. 105-277, § 414, 112 Stat. 2681, 2681-652; *see also* 144 Cong. Rec. S10877–78 (daily ed. Sept 24, 1998) (statement of Sen. Abraham). The ACWIA fee revenue is placed into funds for scholarships, grants, and training programs to help U.S. workers and students and to fund DOL's administration and enforcement of the program. 8 U.S.C. § 1356(s). Colleges, universities, and non-profit research institutions are exempt from this fee. 8 U.S.C. § 1184(c)(9)(A).

64.    In 2000, Congress increased the education and training fee from $500 to $1,000. *See* Pub. L. No. 106-311, 114 Stat. 1247. At the same time, Congress exempted universities and nonprofit research institutions from the H-1B cap. American Competitiveness in the Twenty-First

Century Act of 2000, Pub. L. No. 106-313, § 103, 114 Stat. 1251, 1252 (2000). Congress reasoned

that such an exclusion from the H-1B cap was necessary, in part, because

> [b]y virtue of what they are doing, people working in universities are necessarily immediately contributing to educating Americans. The more highly qualified educators in specialty occupation fields we have in this country, the more Americans we will have ready to take positions in these fields upon completion of their education.

S. Rep. No. 106-260, at 21–22 (2000.)

65.     The education and training fee in the ACWIA expired in 2003. In the H-1B Visa

Reform Act of 2004, Congress revived the fee, increasing it from $1,000 to $1,500 for employers

with 26 or more employees and reducing it to $750 for all other employers. Pub. L. No. 108-447,

§ 422, 118 Stat. at 3353.

66.     The H-1B Visa Reform Act of 2004 also added a new $500 fraud prevention and

detection fee (anti-fraud fee) to be paid by the employer with all initial H-1B petitions. Employers

that are exempt from the H-1B education and training fee are still subject to the anti-fraud fee.

Pub. L. No. 108-447, § 426, 118 Stat. at 3357–58 (2004).

67.     In 2010, Congress mandated that the filing fee and anti-fraud fee be increased by

$2,000 for those employers with 50 or more employees in the United States, where more than 50%

of their employees are on H-1B or L-1 nonimmigrant status[5] (often referred to as "50/50

employers"). Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010).

68.     In 2016, Congress increased the fee for 50/50 employers to $4,000 for each H-1B

petition in addition to the other filing and petition fees ("Public Law 114-113 Fee," lso known as

---

[5] The L-1 nonimmigrant status allows a U.S. employer to temporarily transfer an individual that is in a capacity that is managerial, executive, or involves specialized knowledge to an office in the United States. 8 U.S.C. § 1101(a)(15)(L).

the "border security fee" or "9-11 response fee"). Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 402(g), 129 Stat. 2242, 3006 (2015).

69.    In the 2020 Emergency Stopgap USCIS Stabilization Act ("USCIS Stabilization Act"), Congress authorized USCIS to establish and collect premium processing fees, *i.e.*, additional fees for expedited processing for certain immigration benefit types, including H-1B petitions. Pub. L. No. 116-159, § 4102, 134 Stat. 739 (2020); 8 U.S.C. § 1356(u). The USCIS Stabilization Act authorized DHS to adjust premium processing fees on a biennial basis to keep pace with inflation. 8 U.S.C. § 1356(u)(3)(C). The premium processing fee, which is currently $2,805 for H-1B petitions, is an optional fee that can be paid by those seeking an expedited decision on an H-1B petition for various reasons, such as petitioning employers seeking to fill a critical role quickly or beneficiaries facing the expiration of a current visa status.

**B.    Congress delegated limited authority to USCIS to set visa-related adjudication fees pursuant to 8 U.S.C. § 1356(m).**

70.    Congress explicitly limits the scope of DHS's authority to set visa-related adjudication fees. Under INA § 286(m) (8 U.S.C. § 1356(m)), Congress has limited the fees that DHS may charge for adjudication and naturalization services to those that (1) "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and (2) "recover any additional costs associated with the administration of the fees collected." Pursuant to this directive, DHS has set H-1B fees through notice-and-comment rulemaking, justifying fee increases based on administrative expenses. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (stating that an "increase from $10 to $215" in the lottery registration fee "may appear to be exorbitant" but was necessary to "cover the expenses of the H-1B registration program").

71.    To ensure that its filing fees accurately recover the full costs of providing the services rendered, pursuant to the Chief Financial Officers Act ("CFO Act"), USCIS reviews the fees it charges every two years. 31 U.S.C. § 902(a)(8).

72.    The fees prescribed in the regulations that are not set or limited by statute may be adjusted for inflation, but not more than once per year, and only by publication of a rule in the Federal Register. 8 C.F.R. § 106.2(d).[6]

73.    Under this statutory authority, DHS has historically promulgated regulations for adjudication fees for H-1B petitions through the notice-and-comment rulemaking process. Only when Congress has specifically prescribed that the agency need not go through the APA process to change fees has DHS foregone notice-and-comment rulemaking.[7]

**C.    The current visa-related adjudication fees set pursuant to DHS's circumscribed delegation of authority are fractions of the fee implemented by the Policy.**

74.    DHS has adjusted H-1B adjudication fees several times, most recently in 2024, by means of a notice-and-comment rulemaking process pursuant to the APA.

75.    On January 31, 2024, DHS implemented revised fees for the adjudication of immigration applications, including H-1B petitions ("January 2024 rule"), recognizing that the INA requires "USCIS fees to be based on total costs for USCIS to carry out adjudication and naturalization services." *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit*

---

[6] The regulation does not explicitly require that the agency go through the notice-and-comment rulemaking process for inflation adjustments to fees that are not set or limited by statute. *See* 8 C.F.R. § 106.2(d); *see also infra* note 12.

[7] For example, in 2023, DHS published a rule effective February 2024 increasing premium processing fees without going through the notice-and-comment requirements under the APA, citing 8 U.S.C. 1356(u)(3)(C), which provides that "the provisions of section 553 of Title 5 shall not apply to an adjustment authorized under [section 286(u)(3)(C) of the INA, 8 U.S.C. § 1356(u)(3)(c)]." 8 U.S.C. 1356(u)(3)(C); *Adjustment to Premium Processing Fees*, 88 Fed. Reg. 89,539-02 (Dec. 28, 2023).

*Request Requirements*, 89 Fed. Reg. 6194, 6288 (Jan. 31, 2024). This was the first major adjustment of immigration benefit fees since 2016. *See U.S. Citizenship and Immigration Fee Schedule,* 81 Fed. Reg. 73,292 (Oct. 24, 2016) (adjusting USCIS immigration benefits fee schedule for the first time in more than 6 years, increasing fees by a weighted average of 21 percent).[8]

76.    Typically, DHS considers many factors when increasing its adjudication fees, including the ability to pay for small employers and non-profits. For example, under the January 2024 rule, the basic filing fee for Form I-129 (Petition for a Nonimmigrant Worker, filed in connection with H-1B visa petitions) was increased from $460 to $780.[9] The fee, however, remained at $460 for small employers and nonprofits. *See USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 Fed. Reg. 6194, 6291 (Jan. 31, 2024); 8 C.F.R. § 106.2(a)(3)(i).

77.    The January 2024 rule also established a new $600 "Asylum Program Fee" to be paid by employers who file certain petitions, including Form I-129, "in order to maintain lower fees for other immigration benefit requestors than if these asylum costs were spread among all other fee payers." 89 Fed. Reg. 6194*, 6208 (Jan. 31, 2024). DHS again considered employers' ability to pay, and the fee was reduced to $300 for small employers and waived for nonprofit organizations. *See id*.; 8 C.F.R. § 106.2(c)(13).

---

[8] USCIS published a final rule in 2020 (*USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788 (Aug. 03, 2020) that was enjoined by a federal court before it was implemented. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 549 (N.D. Cal. 2020).

[9] Additionally, a $50 discount is available if the I-129 is filed electronically. 8 C.F.R. § 106.1(g).

78.     Lastly, the January 2024 rule created a non-refundable H-1B registration fee of $215 per beneficiary for petitioners to enter the H-1B lottery.[10] 8 C.F.R. § 106.2(c)(11). Cap-exempt employers are not required to file this registration or pay the H-1B registration fee.

79.     Thus, following the January 2024 rule and prior to the Proclamation, regulatory and statutory fees for an H-1B petition included the following:

a.    A $780 petition fee, $460 for small employers and nonprofits, set via noticed rulemaking.[11] 8 C.F.R. § 106.2(a)(3).

b.    A $215 H-1B Registration Process fee for employers subject to the H-1B cap, set by noticed rulemaking. 8 C.F.R. § 106.2(c)(11).

c.    An Asylum Program Fee of $600 or $300 for a small employer, set by noticed rulemaking. Non-profits are exempt from this fee. 8 C.F.R. § 106.2(c)(13);

d.    An ACWIA fee, set by Congress, of either $1,500 or $750. 8 U.S.C. § 1184(c)(9)(A)–(B); 8 C.F.R. § 214.2(h)(19); 8 C.F.R. § 106.2(c)(4). Cap-exempt employers are exempt from this fee. 8 C.F.R. § 214.2(h)(19)(iii).

e.    A fraud prevention and detection fee, set by Congress, of $500 for certain H-1B petitions. 8 U.S.C. § 1184(c)(12)(A)–(C); 8 C.F.R. § 106.2(c)(5)(i).

---

[10] Employers subject to the H-1B cap seeking to file H-1B petitions must electronically register each person for whom they plan to file an H-1B petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). After the initial registration period closes, USCIS then runs a lottery to select the beneficiaries that may file an H-1B petition.

[11] A "small employer" is defined under the Code of Federal Regulations as a "firm or individual that has 25 or fewer full-time equivalent employees in the United States, including any affiliates and subsidiaries." 8 C.F.R. § 106.1(f)(1). "Non-profit" is defined as "not-for-profit primary or secondary educational institutions, or institutions of higher education, as defined in section 101(a) of the Higher Education Act of 1965, 20 U.S.C. § 1001(a); organizations organized as tax exempt under the Internal Revenue Code of 1986, section 501(c)(3), 26 U.S.C. § 501(c)(3); or governmental research organizations as defined under 8 C.F.R. § 214.2(h)(19)(iii)(C)." 8 C.F.R. § 106.1(f)(2).

      f.      A $2,805 "premium processing fee" if the sponsoring employer elects to have a petition processed within a shorter timeframe, set by noticed rulemaking.[12] 8 U.S.C. § 1356(u)(3); 8 C.F.R. § 106.4.

      g.      A $ 4,000 Public Law 114-113 Fee, set by Congress, for 50/50 employers. 8 C.F.R. § 106.2(c)(8).[13]

80.     In total, an employer filing an initial H-1B petition would pay between $960 to $7,595 in regulatory and statutory fees,[14] at least one or two orders of magnitude less than the $100,000 fee announced in the Proclamation.

### III.    INA Sections 212(f) and 215(a)

81.     The Proclamation invokes two provisions of the INA: sections 212(f) and 215(a), 8 U.S.C. §§ 1182(f) and 1185, respectively.

82.     Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides:

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

83.     This provision delegates to the President authority to impose immigration restrictions to advance interests in foreign relations or national security. However, "Congress' delegation of authority in the immigration context under Section 1182(f) does not afford the

---

[12] DHS published a final rule, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023. *See Adjustment to Premium Processing Fees*, 88 Fed. Reg. 89,539 (Dec. 28, 2023). The adjustment increased premium processing fees for H-1B petitions from $2,500 to $2,805.

[13] Collection of this fee is scheduled to end on September 30, 2027. 8 C.F.R. § 106.2(c)(8).

[14] For example, a nonprofit organization that is cap-exempt would pay a $460 petition fee, and a $500 anti-fraud fee ($460 + $500 = $960), while a non-exempt employer could potentially pay upwards of $7,595 ($780 petition fee + $1500 ACWIA fee + $500 anti-fraud fee + $215 lottery registration fee + $600 asylum program fee + $ 4000 Public Law 114-113 Fee).

President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners." *Nat'l Assoc. of Mfrs.*, 491 F. Supp. 3d at 563.

84.     Section 215(a) of the INA provides that it is unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policymaking authority stemming from this provision "substantially overlap[s]" with the President's authority under Section 212(f). *Trump v. Hawaii*, 585 U.S. 667, 693 n.1 (2018).

85.     The President's authority under Section 212(f) to restrict noncitizens from entering the United States is not unlimited. The Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Hawaii*, 585 U.S. at 689. Other courts that have considered the scope of Section 212(f) have held that that provision does not delegate to the President the authority to depart from INA as enacted. *See, e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020) (holding the Section 212(f) does not grant the President power to "effectively rewrit[e] provisions of the INA" or "eviscerate[] the statutory scheme"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d. 19, 80 (D.D.C. 2025) (Section 212(f) "cannot plausibly be read to authorize the President . . . to supplant" the express provisions of the INA).

86.     The President lacks "authority to alter the rules" created by Congress, or to render other INA provisions "dead letters." *Refugee & Immigrant Ctr. for Educ. & Legal Servs.*, 793 F. Supp. 3d. at 81, 85. "[T]here must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative." *Nat'l Assoc. of Mfrs.*, 491 F. Supp. 3d at 563.

87.    A prerequisite for restricting entry into the United States under Section 212(f) is that the President "find[] that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). While the Proclamation alleges abuses of the H-1B visa program by the information technology industry, it provides no other basis for the broad imposition of a fee across all employment sectors, including for public employers. The Proclamation provides no findings showing that the existing statutory scheme for preventing and penalizing abuse is inadequate.

88.    The Proclamation also fails to identify the "class of aliens" that will be the subject of the $100,000 fee. *See Hawaii*, 585 U.S. at 687, 688 (acknowledging that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f)). The only noncitizens identified in the Proclamation whose entry (according to the Proclamation) would be detrimental to the United States are noncitizens "whose petitions are [not] accompanied or supplemented by a payment of $100,000." The Proclamation would include all H-1B applicants, regardless of the employment they are seeking, their respective qualifications for employment, the economic and public benefit of their employment, or the need they are fulfilling in the industry in which they work.

89.    Congress has carefully crafted the H-1B visa system to meet the needs of the domestic economy. While the executive branch has "the fundamental authority . . . to manage our nation's foreign policy and national security affairs," *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020), the President is not afforded the same deference when "executive action under § 1182(f) is taken for reasons grounded in domestic policy, and not on international affairs and national security," *Young v. Trump*, 506 F. Supp. 3d 921, 942 (N.D. Cal. 2021). An executive action does not implicate the President's foreign affair powers "simply because [it] affects immigrants," and

the President's "power is more circumscribed when he addresses a purely domestic economic issue." *Doe #1*, 957 F.3d at 1067 (citing *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1279 (9th Cir. 2020)).

## FACTUAL ALLEGATIONS

### I.    The Policy

**A.    President Trump prompts promulgation and implementation of the Policy by issuing the Proclamation.**

90.    On September 19, 2025, President Trump issued the Proclamation. The Proclamation's preamble asserts—without evidence—that some employers have abused the H-1B program, which purportedly has undermined the U.S. economy and significantly harmed American workers, by artificially suppressing wages, "resulting in a disadvantageous labor market for American citizens," and making it more challenging for college graduates to find jobs, "allowing employers to hire foreign workers at a significant discount to American workers." The preamble specifically focuses on the information technology sector, noting that IT firms "in particular have prominently manipulated the H-1B system, significantly harming American workers in computer-related fields."

91.    The Proclamation further alleges that these abuses "present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields," and that it is therefore "necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." The Proclamation, however, fails to offer any specific factual basis for these assertions, nor does it provide an explanation as to why a broadly applied fee increase, without regard to employer or industry, is necessary.

92.    The Proclamation contains five sections. Sections 1 through 3 invoke the President's purported authority and direct the Secretary of Homeland Security to impose the new $100,000 fee. *See Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027, 46,028–46,029 (Sept. 19, 2025).

93.    Section 1 is entitled "Restriction on Entry."[15] Subsection 1(a) cites the President's discretionary authority to limit immigration under sections 212(f) and 215(a) of the Immigration and Nationality Act[16] to impose a $100,000 fee on all petitions for visas under the H-1B program. This subsection states that the requirement goes into effect on September 21, 2025, and expires after twelve months if not extended. Subsection 1(b) directs the Secretary of Homeland Security to enforce the Proclamation and further directs the Secretary of State to issue guidance "to prevent the misuse" of H-1B visas by foreign nationals with employment beginning before October 1, 2026.

94.    Subsection 1(c) grants the Secretary of Homeland Security broad discretion to waive the $100,000 fee for any "individual alien," "company," or "industry" where such waiver is "in the national interest." Concerningly, neither the Proclamation nor any subsequent materials issued by DHS provide rules, standards, clarification, or guidance for what constitutes "national interest" or how such exceptions may be applied. In light of the importance of H-1B visas to many employers, such exemptions—or the withholding of exemptions—could easily be used to reward behavior favoring the administration and to coerce compliance with the administration's agenda. The administration's efforts to shape the behavior of public universities, research facilities, and schools has already been the subject of considerable litigation.

---

[15] *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027, 46,028–46,029 (Sept. 19, 2025).

[16] Codified at 8 U.S.C. §§ 1182(f), 1185(a).

95.    Section 2 of the Proclamation, entitled "Compliance," requires that employers, prior to filing an H-1B petition, obtain documentation showing payment of the $100,000 fee, and requires that the Secretary of State verify receipt of payment of the $100,000 fee. It further directs DHS and the Department of State to "coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation."

96.    Section 3 of the Proclamation—"Scope and Implementation of Restriction on Entry"—states that the Proclamation's restriction on entry shall apply only to nonimmigrants who enter or attempt to enter the United States after the effective date of the Proclamation. It further states that no later than 30 days following the completion of the H-1B lottery that immediately follows the Proclamation, the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President a recommendation on whether the $100,000 fee should be extended beyond its initial 12-month period.

97.    While the Proclamation purports to address concerns related to the technology sector, it fails to discuss the role of H-1B visas in alleviating worker shortages in other human service sectors like education and healthcare. The Proclamation also fails to address the relationship between H-1B employment and broader national interests.

**B.    President Trump and his administrations have ignored the role of H-1B visas in public sector employment, while espousing conflicting positions on the value of the H-1B program and justification for the Proclamation and Policy.**

98.    Before executing the Proclamation and during its ongoing implementation, President Trump and other administration officials have offered conflicting statements regarding H-1B visas and their role in the nation's labor market and economy, while neglecting the role of

H-1B visas in public- and nonprofit-sector employment—indeed, in any economic sector outside of the technology sector.

99.     To the knowledge of Plaintiff States, no representative of the administration has publicly addressed the role of H-1B visas in alleviating nationwide teacher and healthcare worker shortages and ensuring that residents of Plaintiff States—or any States—have access to basic human services.

100.    Prior to his election and during his first presidential term, President Trump made various statements criticizing the program. In 2016, he stated: "I will end forever the use of the H-1B as a cheap labor program, and institute an absolute requirement to hire American workers first for every visa and immigration program. No exceptions."[17] Subsequently, in 2017, President Trump signed the "Buy American and Hire American" executive order, directing DHS to review and propose reforms on the H-1B program. Exec. Order No. 18837, 82 Fed. Reg. 18,837 (Apr. 18, 2017).

101.    More recently, President Trump acknowledged the importance of the H-1B program to fill labor needs due to the lack of skilled labor in the United States. For example, in 2024 then President-elect Trump stated: "I have many H-1B visas on my properties. I've been a believer in H-1B. I have used it many times. It's a great program."[18] Just last month, he reiterated that H-1B workers are necessary to domestic labor and industry, stating that "we're not going to

---

[17] Donald J. Trump, Statement by Donald J. Trump on Position on Visas (Mar. 03, 2016), archived at https://www.presidency.ucsb.edu/node/314461.

[18] Jon Levine, *Trump Supports Immigration Visas Backed by Musk: 'I Have Many H-1B Visas on My Properties*,*' N.Y. Post* (Dec. 28, 2024), https://nypost.com/2024/12/28/us-news/donald-trump-backs-h-1b-visa-program-supported-by-elon-musk.

be successful if we don't allow people that invest billions of dollars in plants and equipment to bring a lot of their people from their country to get that plant open, operating and working."[19]

102.    Although the Proclamation asserts that H-1B visa employers have abused the program and driven down wages, the Proclamation fails to offer any evidence for this proposition, much less that it extends to public- or nonprofit-sector employers. The Proclamation also contains no assertion that the purported "abuse" is present outside of the IT sector (thereby warranting the breadth of the Policy). Moreover, statements made by President Trump and administration officials do not evince consideration of how the fee would impact public sector or nonprofit employers.

103.    For example, in announcing the Proclamation, statements by Secretary of Commerce Howard Lutnick suggest that the administration did not consider impacts outside the private sector and, in particular, large technology companies:

> The whole idea is no more will these *big tech companies, or other big companies* train foreign workers. They have to pay the government $100,000, then they have to pay the employee. So it's just not economic. If you're going to train somebody, you are going to train one of the recent graduates from one of the great universities across our land. Train Americans. Stop bringing in people to take our jobs. That's the policy here. $100,000 a year for H-1B visas and *all of the big companies* on board.[20]

104.    Secretary Lutnick's statements further demonstrated a lack of knowledge of the fees already set by Congress to protect American workers: "Stop the nonsense of letting people just come into the country on these visas that were given away for free." *Id.*

---

[19] Dan Gooding & Gabe Whisnant, *Donald Trump Says Bringing in Foreign Workers is 'MAGA,' Newsweek* (Nov. 19, 2025), https://www.newsweek.com/donald-trump-immigration-h1b-visa-maga-deportation-workers-11076200.

[20] *Trump Signs Order That Adds $100k Annual Fee to H-1B Visas for High-Skilled Workers*, PBS News (Sep. 20, 2025), https://www.pbs.org/newshour/politics/trump-signs-proclamation-that-adds-100k-annual-fee-to-h-1b-visas-for-high-skilled-workers (emphasis added).

105.    But later, in November 2025, during an interview with Fox News, President Trump acknowledged the necessity of the H-1B program to "bring in talent" and recognized that "[y]ou don't have certain talents and people have to learn—you can't take people off an unemployment line and say 'I'm going to put you into a factory where we're going to make missiles.'"[21]

### C.    Defendants implemented the Policy without observing required procedures or considering the enormous disruption it would cause.

106.    The terms of the Proclamation require that implementation and enforcement be carried out by the named Defendants.[22] Following the announcement of the Proclamation, USCIS eventually issued written documents addressing whether the H-1B visa fee would apply to preexisting H-1B visa holders, how payment of the $100,000 of the fee should be made, and how employers could seek an exception to the fee.

107.    Initially, Secretary Lutnick stated at the announcement of the Proclamation that the fee would be an annual cost: "If you have a very sophisticated engineer and you want to bring them in . . . then you can pay $100,000 a year for your H-1B visa."[23] These statements and the resulting lack of clarity as to the application of the Policy caused widespread chaos and confusion in the immediate aftermath of the announcement. This was especially true for current H-1B visa

---

[21] *See* Siladitya Ray, *Trump Defends Need for H-1B Visas in Fox News Interview*, Forbes (Nov. 12, 2025), https://www.forbes.com/sites/siladityaray/2025/11/12/you-dont-have-certain-talents-trump-defends-need-for-h-1b-visas-in-fox-news-interview.

[22] *See* Section I.A., *supra*.

[23] Barbara Ortutay & Seung Min Kim, *Trump Signs Proclamation Adding $100k Annual Fee for H-1B Visa Applications*, AP News (Sep. 19, 2025), https://apnews.com/article/h1b-visa-trump-immigration-8d39699d0b2de3d90936f8076357254e.

holders traveling internationally and for prospective employers unsure about whether the fee applied to them.[24]

108.    To address confusion from foreign nationals who had been granted H-1B visas but had not yet entered or had temporarily left the United States, USCIS published a memorandum dated September 20, 2025 ("September Memorandum"), and a Frequently Asked Questions document dated September 21, 2025 ("FAQ"), directing that the Proclamation's effect is limited to visa petitions that had not yet been filed.[25]

109.    In addition, on September 20, 2025, White House Press Secretary Karoline Leavitt stated that the $100,000 fee is a one-time fee that applies only to new visas, and not renewals, contradicting Secretary Lutnick's earlier statements.[26]

110.    On October 20, 2025, USCIS issued a second memorandum ("October Memorandum"), clarifying that the fee applies to new petitions filed on or after September 21, 2025, "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa"; new petitions that request "consular notification, port of entry notification, or pre-flight inspection for an alien in the United States"; and new petitions for change of status, amendment, or extension where the USCIS has determined that the individual is not eligible for the request.[27]

---

[24] Aditya Soni & Echo Wang, '*Fast and Furious': H-1B Workers Abroad Race to US as Trump Order Sparks Dismay, Confusi*on, Reuters (Sep. 21, 2025), https://www.reuters.com/sustainability/ sustainable-finance-reporting/fast-furious-h-1b-workers-abroad-race-us-trump-order-sparks-dismay-confusion-2025-09-21.

[25] U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B* (Sep. 20, 2025), https://www.uscis.gov/sites/default/files/document/ memos/H1B_Proc_Memo_FINAL.pdf; Press Release, U.S. Citizenship and Immigration Services, *H-1B FAQ* (Sep. 21, 2025), https://www.uscis.gov/newsroom/alerts/h-1b-faq.

[26] Karoline Leavitt (@PressSec), X (Sept. 20, 2025, 4:16 PM), https://x.com/PressSec/status/ 1969495900478488745.

[27] U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations*, https://www.uscis. gov/working-in-the-united-states/h-1b-specialty-occupations.

111.    The additional guidance also stated that petitions not subject to the $100,000 fee include: (a) any petition filed before September 21, 2025; (b) any petition filed before September 21 where a beneficiary already holds a valid H-1B visa, or will apply for a visa based on an approved petition that was filed before September 21 (even if approved afterward); and (c) any new petition filed on or after September 21 requesting an amendment, change of status, or extension of stay for a beneficiary who is physically present in the United States when USCIS approves the request. *Id.*

112.    As of this filing, Plaintiff States understand the Policy to include the September and October Memoranda, FAQ, and any non-public rules implementing the $100,000 fee announced in the Proclamation.

## II.    Harms to Plaintiff States

113.    Plaintiff States, their agencies, and their political subdivisions hire H-1B workers to fill critical vacancies in education, healthcare, and other specialized fields where worker shortages are prevalent. Other nonprofit providers of core services to Plaintiff States' residents, organizations like hospitals, also rely on H-1B workers to recruit essential workers in the face of a labor shortage. The Policy will cause irreparable harm to the Plaintiff States by curtailing their ability to fill critical roles in their institutions. The resulting shortages, both within and outside Plaintiff States' institutions and agencies, will impact Plaintiff States' operations, systems, and services in healthcare, education, and other essential areas.

### A.    The Policy will harm primary and secondary education.

114.    The United States faces a nationwide teacher shortage. For example, in the 2024–2025 school year, 74% of school districts reported having trouble filling open positions,

particularly in special education, physical sciences, ESL or bilingual education, and foreign languages.[28]

115.    This shortage is particularly acute in areas that face difficulty attracting skilled educators. Due to the difficulty in filling vacant teaching positions, local educational agencies ("LEAs") nationwide, including public-school districts, often turn to the H-1B visa program to fill vital educator roles that cannot be filled by domestic workers.[29]

116.    Educators are the third-largest occupation using H-1B visas—nearly 30,000 educators in total were the subject of H-1B petition approvals in FY 2024.[30] In fiscal year 2025, over 500 K-12 public school districts employed more than 2,300 H-1B visa holders nationwide.[31] Rural areas are particularly dependent on H-1B workers.[32] As an Alaska superintendent observed with respect to the Proclamation, "[w]ith a pen stroke, we possibly have ruined the future of

---

[28] *See* Press Release, National Center for Education Statistics, *Most U.S. Public Elementary and Secondary Schools Faced Hiring Challenges for the Start of the 2024–25 Academic Year* (Oct. 17, 2024), https://nces.ed.gov/whatsnew/press_releases/10_17_2024.asp; Jenny Brundin, *$100,000 Visa Fee Could Stifle Colorado Schools' Ability to Hire International Teachers—Who Were Helping Fill Gaps,* Colorado Public Radio (Oct. 3, 2025) ("While headlines focus on whether foreign workers displace U.S. tech workers, schools face a different reality: a chronic teacher shortage exacerbated by low wages and a polarized political culture.").

[29] *See* Madeleine Ngo, *Trump's H-1B Visa Fee Could Strain Universities and Schools*, N.Y. Times (Oct. 8, 2025), https://www.nytimes.com/2025/10/08/us/politics/trump-h-1b-visa-fee-universities.html; Carrie Jung, *How Are Some Districts Responding to the Teacher Shortage? With H-1B Visa*s, WBUR News (May 18, 2023), https://www.wbur.org/news/2023/05/18/bilingual-teachers-recruitment-framingham-visas.

[30] *See* U.S. Citizenship and Immigration Services, *Characteristics of H-1B Specialty Occupation Workers Fiscal Year 2024 Annual Report to Congre*ss (Apr. 29, 2025), https://www.uscis.gov/sites/default/files/document/reports/ola_signed_h1b_characteristics_congressional_report_FY24.pdf.

[31] *See* National Education Ass'n, *NEA Data Brief: H-1B Visas in Public School Districts* (Oct. 8, 2025), https://www.nea.org/resource-library/nea-data-brief-h-1b-visas-public-school-districts.

[32] Sequoia Carrillo, *Many Rural Schools Rely on International Teachers. Trump's Visa Changes Threaten That*, NPR (Oct. 15, 2025), https://www.npr.org/2025/10/15/nx-s1-5552240/trump-visa-cuts-schools-interational-teachers.

education for Alaska students."[33] A South Dakota superintendent remarked, "[w]e've hired the H-1B teachers because we quite simply don't have other applicants for those positions. So they're certainly not taking jobs from Americans. They're filling jobs that otherwise just simply would not get filled."[34]

117.    Ultimately the effects of the Policy will be felt in schools nationwide. A Colorado superintendent observed, "I think we're shutting down, maybe, having the best teachers in front of kids, because that's what this—intentionally or unintentionally—may do."[35]

118.    California public school districts are affected by the nationwide teacher shortage and face the same challenges recruiting qualified educators. According to the California Department of Education, "there is currently an extensive shortage of qualified educators in the state."[36] For the 2023–2024 school year, 89 California LEAs[37] requested 317 H-1B visas for teachers.[38] Of these, 287 visas were granted.[39] The number of visas requests has increased

---

[33] Brian Venua, *The White House Raised the Cost of H-1B visas. Alaska Schools Could Face Major Consequences*, Alaska Public Media (Sept. 29, 2025), https://alaskapublic.org/news/2025-09-29/the-white-house-raised-the-cost-of-h1b-visas-alaska-schools-could-face-major-consequences.

[34] Sarah Raza, *Trump's $100,000 H-1B Visa Fee Threatens Rural Schools and Hospitals Reliant on Immigrant Workers*, PBS (Oct. 8, 2025), https://www.pbs.org/newshour/politics/trumps-100000-h-1b-visa-fee-threatens-rural-schools-and-hospitals-reliant-on-immigrant-workers.

[35] Anna Merod, *Hiring Foreign Teachers? What to Look Out for as Trump Targets H-1B Visas*, K-12 Dive (Oct. 2, 2025), https://www.k12dive.com/news/h-1b-visa-fee-impact-schools-teacher-shortages/795034.

[36] Cal. Dep't of Educ., *Report to the Legislature: Teacher Credentialing: Teacher Preparation Outside of the United States and H-1B Work Visas* at 3 (November 2024), https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.cde.ca.gov%2Fci%2Fpl%2Fdocuments%2Flegrpt2024-h1b.docx.

[37] California LEAs include school districts and charter schools.

[38] Cal. Dep't of Educ., s*upra* note 36, at 1.

[39] *Id.*

consistently over the past six years, with the exception of the 2020–2021 school year, when a significant number of schools were closed and in-person instruction was dramatically curtailed.[40]

119.    According to the California Department of Education, "California LEAs embody the type of employer that may benefit from [the H-1B] program."[41] Teachers on H-1B visas are required to obtain and keep in good standing all licenses, certifications, or authorizations required.[42] Like other employers, LEAs are required to submit a labor condition application to confirm that teachers on H-1B visas are paid consistently with domestic workers with similar education, credentials, and experience.[43]

120.    Public schools within the Commonwealth of Massachusetts rely on H1-B visas to fill critical positions. The availability of H-1B visas ensures that Massachusetts public schools can provide adequate educational programming for their students and meet the needs of their students.

121.    Likewise in Delaware, in the 2023–2024 school year, at least eight Delaware LEAs requested 33 H-1B visas for their Dual Language Immersion ("DLI") programming, which represents 15.2% of all of Delaware's DLI teachers. All of these visa applications were granted.

122.    The State of Illinois is also experiencing a teacher and school staffing shortage. In the 2023–2024 school year, 3,864 teaching positions alone remained unfilled.[44] The majority of school districts reported that the teaching and staffing shortage was compounded by few applicants

---

[40] *Id.* at 7.

[41] *Id.* at 2–3.

[42] *Id.* at 3.

[43] *Id.*

[44] Illinois State Board of Education et al., *Educator Shortage Report: Academic Year 2024-2025*, at 2, 5 (2025), *available at* https://iarss.org/wp-content/uploads/2025/03/IWERC-Educator-Shortage-SY25-250313.pdf.

and underqualified individuals seeking positions, particularly in rural and urban areas.[45] Many anticipate that these needs will continue to grow in their districts.[46]

123.    Some districts in Illinois have successfully recruited international teachers to fill these vacancies.[47] Unfortunately, rising H-1B visa costs are already disrupting international recruitment to address staffing needs. For example, Chicago Public Schools ("CPS"), one of the largest school districts in the United States, actively uses the H-1B program to hire specialized staff who are primarily educators. CPS frequently targets positions that are difficult to fill locally, including bilingual teachers (typically for Spanish and Mandarin Chinese), special education teachers, math teachers, computer science teachers, and bilingual speech-language pathologists. CPS currently employs 82 H-1B visa holders, including 58 teachers, clinicians, or service providers in school-based roles, and 24 highly-skilled technical workers in the central office who provide critical district-wide services.

124.    As of December 8, 2025, CPS has 711 teacher vacancies, including 446 in high need subject areas. The average length of time required to fill high need vacancies is nearly five months. Despite interest from at least 15 candidates who reside outside of the United States, CPS cannot pursue these applicants because of the $100,000 fee for H-1B visas. Moreover, the fee prevents CPS from rehiring former CPS international teachers who have returned to their home country or who have already successfully completed their 212(e) home residency requirements from a J-1 cultural exchange program. In addition, confusion and vagueness around the

---

[45] *Id.* at 4, 13–14, 38, 59.

[46] *Id.* at 16, 23, 30, 34.

[47] *Id.* at 52, 62, 64.

applicability of the $100,000 fee has also required CPS to decline at least 20 candidates who are present in the United States.

125.    In short, the $100,000 fee has effectively eliminated CPS's use of the H1-B visa program as a viable recruitment pipeline for specialized roles (like bilingual and special education teachers) that are essential for serving Chicago's diverse student population and meeting legal mandates. The result is that critical vacancies remain open, leading to increased class sizes, reduced course offerings, and greater reliance on temporary staff. Disadvantaged students are disproportionately impacted, as they are statistically more likely to attend schools with high vacancy rates.

126.    CPS is not the only school district impacted in Illinois. Rockford Public Schools District #205 has four certified teachers with current H-1B visas. Though Rockford has a teacher shortage, the $100,000 fee halted progress on approximately four teachers that school district would have sponsored, impacting its plan to employ teachers that are licensed bilingual teachers.

127.    Similarly, the State of Maryland faces persistent K-12 teacher shortages. There were more than 1,600 teacher vacancies across Maryland's public-school systems at the start of the 2024–2025 school year.[48] Teacher retention is also a significant challenge: on average, about 10% of Maryland's public-school teachers do not return each year.[49] Currently, more than 10% of Maryland's teacher workforce consists of conditionally licensed teachers, who hold a bachelor's

---

[48] *See* Rachel Hise & Alex Reese, *Teacher Recruitment, Development, and Retention*, Maryland State Department of Education (Jan. 28, 2025), https://marylandpublicschools.org/stateboard/Documents/2025/0128/AM/Teacher-Recruitment-Development-and-Retention-A.pdf.

[49] *See* Carey M. Wright, State Superintendent of Schools, *Educator Workforce Data Update* at 6 Maryland State Department of Education (Feb. 25, 2025), https://marylandpublicschools.org/stateboard/Documents/2025/0225/Educator-Workforce-Overview-A.pdf.

degree but have not yet completed the requirements for professional licensure.[50] These teaching shortages and retention issues have led some Maryland public school systems—including the Baltimore City Board of School Commissioners ("BCBSC"), which oversees Baltimore City Public Schools; Prince George's County Public Schools; and Montgomery County Public Schools—to rely heavily on H-1B visa teachers to fill critical positions in hard-to-staff schools.[51]

128.    BCBSC, which serves more than 76,000 pre-kindergarten through 12th grade students, has long relied on highly qualified teachers employed through the H-1B visa program to meet chronic staffing shortages, particularly in hard-to-fill subject areas such as math, science, special education, and English as a Second Language or English Language Development. BCBSC's use of H-1B visa teachers has been driven not by preference, but by necessity: Baltimore City's schools face persistent teacher vacancies, high turnover, and difficulty attracting enough qualified teaching candidates despite sustained domestic recruitment efforts. BCBSC currently sponsors 80 H-1B visa holders, including 78 teachers. These teachers are an essential part of BCBSC's ability to provide legally required educational services to Maryland students.

129.    BCBSC already has begun active recruitment to staff schools for the 2026–2027 school year, and it intends to and has made progress toward hiring approximately 58 new educators who would teach in the school system through the H-1B visa program. However, BCBSC is unable to afford the H-1B visa fee imposed under the Policy and will be unable to hire these highly qualified candidates if the Policy is not enjoined. Losing access to this pathway for hiring qualified teachers would create a grave risk that more Baltimore City classrooms would go unstaffed for the 2026–2027 school year, student-to-teacher ratios would rise, course offerings may be reduced, and

---

[50] *Id*. at 10, 15.

[51] *See* U.S. Citizenship and Immigration Services, H-1B Employer Data Hub, https://www.uscis.gov/tools/reports-and-studies/h-1b-employer-data-hub (last visited Dec. 8, 2025).

Baltimore City, students and families who depend on qualified public-school teachers would not get the resources and attention they deserve.

130.    Likewise, New Jersey has faced a years-long teacher shortage, resulting in increased class sizes, overburdened teachers, and less diverse curricula.[52] This shortage is only expected to worsen, given the substantial decline in provisional teacher certifications relative to the number of professionals permanently exiting the teaching profession.[53]

131.    Thus, like many Plaintiff States, New Jersey has turned to H-1B visas to help address the teacher shortage in K-12 education. For example, in New Jersey, the Camden County School District passed a resolution in 2022 to utilize the H-1B visa program to fill months long vacancies, with a focus on foreign language positions.[54] Camden County's Superintendent Katrina McCombs stated that the "H-1B visa program that we're launching is just one of the ways that we are trying to make sure that we are wrapping support around our students who are non-native English speakers."[55]

---

[52] Nikita Biryukov, *New Jersey School Districts Still Face Teacher Shortages As New School Year Begins*, N.J. Monitor (Sept. 3, 2024), https://newjerseymonitor.com/2024/09/03/new-jersey-districts-still-face-teacher-shortages-as-new-school-year-begins.

[53] Daniel Douglas, Ann Obadan, Marjory F. Palius & Stephanie Walsh, *New Jersey's Teacher Workforce Landscape: 2024 Annual Report*, Heldrich Center for Workforce Development at Rutgers University at 24, https://www.nj.gov/education/rpi/docs/2024_New_Jersey_Teacher_Workforce_Landscape_Annual_Report.pdf

[54] Norris McLaughlin P.A., *New Jersey School District Votes to Utilize H-1B Program for Teaching Vacancies*, Nat'l L. Rev. (Mar. 3, 2022), https://natlawreview.com/article/new-jersey-school-district-votes-to-utilize-h-1b-program-teaching-vacancies.

[55] *Id.*

132.    USCIS data indicates that Camden is one of many schools petitioning for H-1B educators. Approximately 20 K-12 school systems in New Jersey secured at least one H-1B approval in 2025 alone.[56]

133.    Arizona also struggles with a critical and persistent teacher shortage, with over 1,000 teachers resigning since July 2025 and 4,200 teaching positions remaining vacant.[57] These positions often go unfilled, are covered by staff not fully certified for their positions, or require existing staff to provide coverage.[58] In order to address growing need and lack of recruitment success, Arizona public schools rely on international educators. Ten percent of Maricopa Unified School District's certified staff, and 26% of all its teachers, are international.[59] Arizona public schools requested 130 H-1B visa approvals in 2025.[60] Superior Unified School District superintendent affirmed that he does not "even have candidates to speak with and interview . . . [their] only choice is hiring international teachers."[61]

134.    Because of the reliance by LEAs on H-1B visas to fulfill core educational needs, the Policy will cause significant harm to LEAs and to the students and communities they serve.

---

[56] *See* USCIS, H-1B Employer Data Hub, *supra* note 51.

[57] *See* Ariz. Dep't of Educ., *Arizona Teacher Shortage Impact Fall 2025 Report* (2025), https://www.azed.gov/sites/default/files/2025/11/AZ_Teacher_Shortage_Impact_Fall_2025_Report_September_2025_Data.pdf

[58] Susan Kemper Patrick, Tiffany S. Tan, & Samuel Comai, *2025 Update: Latest National Scan Shows Teacher Shortages Persist*, Learning Policy Institute (Jul. 15, 2025), https://learningpolicyinstitute.org/blog/2025-update-latest-national-scan-shows-teacher-shortages-persist.

[59] Erica Little, *Short on Teachers, Pinal Districts Increasingly Turn to International Educators*, PinalCentral (Aug. 21, 2025), https://www.pinalcentral.com/free-access/short-on-teachers-pinal-districts-increasingly-turn-to-international-educators/article_0173fed6-06f1-42d7-93d7-0283e343671c.html.

[60] National Education Association, *NEA Data Brief: H-1B Visas in Public School Districts* (Oct. 8, 2025), https://www.nea.org/resource-library/nea-data-brief-h-1b-visas-public-school-districts.

[61] Little, *supra* note 59.

LEAs typically do not have excess funds available to pay an additional $100,000 for each H-1B visa petition.

135.    As a result, LEAs are faced with a difficult choice: leave educator roles unfilled or divert money from other needs to pay the fee required under the Policy. But even that difficult choice is fraught with uncertainty, as the shifting iterations of the Policy and shifting positions of the administration make it impossible for educational administrators to have confidence in their hiring plans, budgets, and strategic plans.

136.    The Policy will cause irreparable harm to Plaintiff States' school systems, which already face hiring difficulties in ensuring their schools are adequately staffed. As a result, school systems will be unable to provide essential services to students, with larger class sizes, less individualized attention for students, and cuts to programs and course offerings. All of these effects lead to diminished academic development and learning loss at critical stages in childhood development. Such harms can never be fully remedied.

**B.    The Policy will harm the higher education and research facilities, in turn harming the States more broadly.**

137.    American colleges and universities depend on H-1B visas to recruit world-class educators and researchers to teach students and to conduct cutting-edge research in the sciences, medicine, and other fields.

138.    As of June 30, at least 930 colleges and universities employ personnel on H-1B visas.[62] More than half of these institutions are public four-year universities, and more than 10% are medical schools.[63]

---

[62] *See* Katherine Knott, *Higher Ed's H-1B Visas in 4 Charts*, Inside Higher Ed (Sept. 29, 2025), https://www.insidehighered.com/news/government/2025/09/29/4-charts-breaking-down-h-1b-visas-and-higher-ed.

[63] *See id.*

139.    According to a review by *Inside Higher Ed* of the 304,000 H-1B visas issued in fiscal year 2025 as of September 2025, fully 5.5% (16,733) were issued in the higher education sector.[64]

140.    Large research universities may employ hundreds of H-1B personnel to support their research and education missions. For example, as of September 2025, the University of Michigan received 359 approved H-1B visas for FY 2025, the University of Wisconsin-Madison, 232, the University of Maryland 230, and the University of California, San Francisco, 210.[65]

141.    Similarly, other public universities in Plaintiff States employ H-1B personnel, many in positions that are difficult to fill such as in science, technology, engineering, and mathematics ("STEM") fields. For example, in California, California State University ("CSU"), the largest public university system in the United States, employs around 550 faculty and staff on H-1B visas. In Connecticut, the University of Connecticut alone has 133 active and current employees on H-1B visas, and Connecticut's State College and University System has 36. In Minnesota, Minnesota State Colleges and Universities employ 62 H-1B personnel across ten of its campuses. In New Jersey, Rutgers University secured 152 H-1B approvals in 2025; New Jersey Institute of Technology, 39; and Rowan University, 30.[66] Across New York, the State University of New York ("SUNY") employs 693 employees on H-1B visas, many who serve students in rural and suburban areas of New York state. Of these, 396 are faculty members, 110 are health sciences and clinical faculty, and 90 are medical residents. And in New York City, the City University of

---

[64] *See id.*

[65] *See id.*

[66] *See* USCIS, H-1B Employer Data Hub, *supra* note 51.

New York ("CUNY") employs more than 125 faculty on H-1B visas. In Rhode Island, the University of Rhode Island employs 58 H-1B visa holders and Rhode Island College employs 9.

142.    Congress intentionally designed the H-1B visa program to facilitate the development of higher education and research capacity in order to benefit the nation more broadly. As referenced above, in exempting certain visas related to higher education from the standard cap on total annual H-1B visas, Congress observed that professionals in higher education bring significant benefits to the nation as a whole.[67]

143.    Harms to higher education will negatively affect the nation, including Plaintiff States, by stymying critical research and developments. According to an analysis by the Federal Reserve Bank of Richmond, "[e]ven though pay is lower, the workers hired by universities and research institutes often play an outsized role in advancing innovation and academic research. Curtailing their access to H-1Bs could therefore have ripple effects well beyond the nonprofit sector itself."[68]

144.    Because higher education institutions are generally government or non-profit entities, they are incapable of absorbing an additional $100,000 for each H-1B hire. Within the University of California system, for example, roughly half of H-1B personnel earn less than $100,000 in salary each year. Accordingly, the fee would dramatically increase personnel costs.

145.    Plaintiff States' institutions will be significantly harmed by the Policy.

146.    For example, in California, the University of California, the world's largest public academic research system, employs over 1700 individuals on H-1B visas, representing about 0.6%

---

[67] S. Rep. 106-260, 21-22 (Apr. 11, 2000).

[68] See Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025), https://www.richmondfed.org/publications/research/economic_brief/2025/eb_25-39.

of its workforce. Almost a quarter of these personnel are located at the University of California, San Francisco, a dedicated health sciences university and home to one of the most highly regarded medical schools in the word. These employees across UC's campuses are integral to UC's core operations, with most H-1B personnel directly involved in educating students and conducting research. Twenty-four percent are faculty, 30% are researchers, 19% are postdoctoral scholars, medical interns or residents, and 30% are other academics like researchers or librarians. Collectively, they sustain UC's strategic capacity in teaching, research, and public service, directly reinforcing UC's long-term institutional mission and impact.

147.    Likewise, California State University employs individuals on H-1B visas in faculty positions where it is often difficult to find qualified applicants within the United States, such as in STEM fields, or where the number of Ph.D. candidates who are U.S. citizens has not increased to meet workforce demands, resulting in a lower portion of U.S. citizens in the applicant pool for faculty job postings compared to international applicants.[69]

148.    However, the fee imposed by the Policy will make it difficult for CSU to fill vacant positions in hard-to-fill areas by placing a financial burden on CSU campuses. CSU campuses may in some cases be forced to stop sponsoring H-1B applicants resulting in less course offerings, a greater service workload on faculty if vacancies cannot be filled, and increased class sizes, particularly in STEM courses. The Policy has already begun to impact CSU's ability to recruit and hire international job candidates for vacant positions. For example, some CSU campuses had job offers pending that have not been accepted and will likely be recalled due to the exorbitant fee imposed by the Policy. Similarly, some CSU campuses that had made job offers to international

---

[69] *See* National Center for Science and Engineering Statistics (NCSES), *Doctorate Recipients from U.S. Universities: 2024 Data Tables,* NSF 25-349, tbl. 1-6 (Aug. 2025), https://ncses.nsf.gov/surveys/earned-doctorates/2024.

applicants that were accepted, are unsure if they will be able hire applicants because they do not have funding to pay the $100,000 fee.

149.    The Commonwealth of Massachusetts's public colleges and universities frequently rely on H-1B visa holders to fill faculty, researcher, and staff roles, including through the hiring of medical residents who attend the University of Massachusetts Chan Medical School. The University of Massachusetts currently sponsors more than 340 H-1B faculty, staff, and researchers, and intends to hire additional staff, faculty, and researchers through the H-1B program. However, the fee imposed under the Policy will make doing so cost prohibitive. Eliminating access to H-1B faculty, staff, and researchers for the University of Massachusetts would cause immediate institutional harm given a much narrowed applicant pool which would render it all the more difficult for the University of Massachusetts to employ individuals necessary to support the University's research activities and educational offerings.

150.    In Connecticut, the University of Connecticut ("UConn") endeavors to engage with and hire the most qualified candidates, a pool that is often exceedingly small in specialized fields. These workers contribute to the process of training students and moving science forward whether through direct teaching, research, or professional administration. When the applicant most capable of filling the role is a foreign national, the H-1B visa allows UConn to hire qualified applicants even when they are difficult to find among U.S. nationals, particularly in research-intensive and highly technical fields like STEM fields. The H-1B visa fee would harm the residents of the State of Connecticut and the public in general because public institutions cannot pay these high fees, but still have a direct responsibility to provide world-class teaching and research to educate the next generation. Connecticut's public research university, UConn, cannot cover the cost of the $100,000 fee for new applicants. Similarly, Connecticut's State College and University System

has 4 additional faculty with anticipated H-1B visa requests, which will be directly impacted as the public system cannot cover the cost of the $100,000 fee for new applicants. This fee jeopardizes ongoing and future research projects, potentially leaving science and building classes understaffed, leading to lower enrollment to UConn.

151.    The State of Maryland faces similar circumstances. Maryland's public colleges and universities frequently rely on H-1B visa holders to fill faculty and researcher roles that require certain advanced degrees or certain highly specialized expertise or training. Institutions within the University System of Maryland ("USM"), which comprises 12 public universities, currently sponsor more than 530 H-1B faculty, staff, and researchers, most focused in engineering, computer science, biomedical research, and other STEM fields where the U.S. labor market does not supply adequate candidates. Maryland's public colleges and universities use the H-1B program because it enables them to maintain competitive academic departments, sustain grant-funded research, and offer programs essential to the State of Maryland's workforce pipeline.

152.    USM colleges and universities intend to hire additional staff, faculty, and researchers through the H-1B program. However, the fee imposed under the Policy will make doing so cost prohibitive. Eliminating access to H-1B faculty, staff, and researchers for USM colleges and universities would cause immediate institutional harm, including loss of active research projects, diminished grant competitiveness, and reduced course offerings. The resulting harm to the public would also be substantial: Maryland's innovation economy, medical research ecosystem, and STEM workforce development would all be weakened by the universities' inability to employ the qualified instructors and researchers the H-1B program currently enables them to retain.

153.    Illinois also faces similar harmful impacts given financial constraints on its public higher education institutions. The University of Illinois at Chicago ("UIC") would be disproportionately impacted, both in Chicago and downstate. It has the fifth highest number of H-1B visa holders in the education sector education nationally, with 292 active H-1B visa holders—267 in Chicago, 19 in Peoria, and 6 in Rockford. Next year, UIC anticipates a need to sponsor at least 25 new H-1B visa applicants for fiscal year 2026, but the $100,000 fee per applicant would strain university resources tremendously. Even institutions with smaller needs, like the University of Illinois at Springfield ("UIS") will be impacted by the $100,000 fee. UIS currently has 18 active H-1B visa holders, 15 of whom were initially sponsored within the past two years.

154.    In Hawaiʻi, the University of Hawaiʻi at Mānoa, the largest campus in the University of Hawaiʻi ("UH") system, has 95 H-1B workers, most in STEM positions that are otherwise difficult to fill. UH has two new recent hires that the $100,000 fee will apply to, where it is unclear how the fee will even be paid for. In addition, the Research Corporation of the University of Hawaiʻi ("RCUH"), a public instrumentality that, among other things, hires staff to support UH projects, employs 55 H-1B workers. As a result of the Policy, RCUS is not initiating new applications because it does not have funding to pay the $100,000 fee.

155.    In Oregon, Oregon's flagship universities consistently depend on H-1B visa holders to fill faculty, researcher, and staff roles. For example, Oregon State University currently sponsors more than 150 H-1B faculty, researchers, and staff, and intends to hire additional faculty, researchers, and staff through the H-1B program. Eliminating access to H-1B faculty, researchers, and staff would inflict significant institutional harm, depriving students of critical educational opportunities. This will acutely impact Oregon State University's ability to continue to provide its students with world-class education in STEM fields. Many of OSU's H-1B faculty, researchers,

and staff specialize in STEM fields where the U.S. labor market does not supply enough qualified candidates. Likewise, the University of Oregon currently sponsors more than 50 H-1B faculty, researchers, and staff. The University of Oregon relies on these H-1B faculty, researchers, and staff not only to provide education to its students, but also to expand community access to scientific innovation and research developments. The University of Oregon already struggles to pay the existing fee, thus the increased financial burden threatens to leave critical positions unfilled and impede the University of Oregon's public-serving mission. The salary for the majority of employees hired through the H-1B program are less than the $100,000 fee. Due to tight budgets, Oregon universities would be incapable of absorbing an additional $100,000 for each H-1B hire.

156.    In Washington, approximately 485 H-1B visa holders are employed across more than 30 of Washington's state agencies, public universities, and public colleges. Washington's public colleges and universities frequently rely on H-1B visa holders to fill faculty, researcher, and staff roles. For example, the University of Washington sponsored over 200 H-1B visas last academic year; these sponsorships were primarily within the School of Medicine and Colleges of Arts and Sciences and Engineering, and about 50 included some element of clinical training or patient care. Additionally, Washington State University employs over 100 H-1B visa holders, with those holders primarily filling highly specialized areas of education and research including in agriculture, human and natural resources sciences, and engineering fields.

157.    The $100,000 fee for new H-1B applications will likely have a major and ongoing impact in Washington, particularly in higher education. Many public universities and colleges will simply be unable to hire for specialized positions due to a lack of qualified American candidates and lack of funding to cover the new H-1B fee. As a result, those universities and colleges may not be able to meet requirements for very niche areas and programs. Classes will not be able to be

offered. Laboratories will sit empty. Research output will be decreased. The institutes of higher education will lose their competitive edge, particularly in the areas of artificial intelligence, cybersecurity, and medical fields, which will likely have a cascading effect on the State of Washington and its citizens. That loss of competitive edge is likely to translate to a loss of student applicants for educational programs, which will in turn perpetuate the cycle.

        **C.**      **The Policy will diminish access to healthcare.**

158.    The H-1B visa program is a critical pathway to hiring healthcare workers to fill staffing shortages nationwide. Plaintiff States' agencies, public healthcare centers, public hospitals and private hospitals and healthcare providers rely on the H-1B visa program to hire healthcare personnel such as physicians, surgeons, and nurses, particularly in institutions serving low-income and working-class neighborhoods.[70]

159.    Approximately 8,492 H-1B visas went to workers in medicine and health occupations in the 2024 fiscal year;[71] and many of these medical professionals serve Plaintiff States' residents. These H-1B workers have been critical in ensuring access to care when healthcare professional shortages continue to increase in the United States.

160.    Hospitals in Plaintiff States have the overarching goals of providing high-quality, affordable, and accessible care to all patients, advancing public health, and improving the health of their communities.

---

[70] *See* Fran Smith, *The Health Divide: Trump's New H-1B Visa Fee Could Worsen America's Doctor Shortage,* USC Annenberg (Oct. 13, 2025), https://centerforhealthjournalism.org/our-work/insights/health-divide-trumps-new-h-1b-visa-fee-could-worsen-americas-doctor-shortage.

[71] In FY 2024, 141,205 initial employment H-1B petitions were granted. *See* USCIS, *Characteristics of H-1B Specialty Occupation Workers Fiscal Year 2024 Annual Report to Congress, supra* note 30, at 3.

161.    The loss of H-1B medical workers will harm communities around the United States. The American Medical Association ("AMA") has expressed grave concerns about the impact of the $100,000 requirement on the availability and quality of medical care in the United States. In a September 25, 2025, letter to Secretary Noem urging DHS to exempt foreign-trained physicians from the fee, the AMA, along with more than 50 national specialty societies and state medical associations, noted that the United States is projecting a shortfall of 86,000 physicians by 2036.[72] The National Center for Health Workforce analysis projects an even greater physician shortage of 187, 130 by 2037.[73]

162.    By 2036, the United States will be short 50,440 psychiatrists.[74] In 2024, about 61.5 million adults in the U.S. had a mental illness, yet roughly 48% received no treatment.[75] This shortage of healthcare professionals, including psychiatrists, affects patients' ability to find care and places a greater burden on mental health care providers.

---

[72] *Letter to Kristi Noem from National Medical Societies and State Medical Associations* (Sept. 25, 2025), https://searchlf.ama-assn.org/letter/documentDownload?uri=/unstructured/binary/letter/LETTERS/lfimg.zip/Sign-on-Letter-Restriction-on-Entry-of-Certain-Nonimmigrant-Workers-Proclamation-9-25-25.pdf.

[73] National Center for Health Workforce Analysis, *State of the U.S. Health Care Workforce, 2024* (Nov. 2024), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/state-of-the-health-workforce-report-2024.pdf.

[74] Health Resources and Services Administration, *Health Workforce Projections* (Nov. 2024), https://bhw.hrsa.gov/data-research/projecting-health-workforce-supply-demand.

[75] Substance Abuse and Mental Health Svc. Admin., *Key Substance Use and Mental Health Indicators in the United States: Results from the 2024 National Survey on Drug Use and Health* (July 2024), https://www.samhsa.gov/data/sites/default/files/reports/rpt56287/2024-nsduh-annual-national-report.pdf.

163.    This shortage is especially concerning because America's population is aging, increasing the likelihood that our nation will lack sufficient doctors to care for older adults, many of whom suffer increased rates of chronic disease and have other complex medical needs.[76]

164.    Just as H-1B medical workers are critical to filling physician shortages, they are just as critical in the nursing profession. The National Center for Health Workforce Analysis projects a shortage of 207,980 full-time equivalent registered nurses ("RNs").[77] This same report also analyzed which states would have the largest projected shortages of RNs. Among those states is California, which is facing a projected shortage of 65,000 RNs by 2037.

165.    Nationwide, many Americans already do not have access to primary care services. In the United States, approximately 75 million people live in a primary care Health Professional Shortage Area ("HPSA") and 122 million people live in a mental health HPSA.[78]

166.    The AMA letter to Secretary Noem explains that the fee endangers access to quality care for some of the Americans who most need it.[79] Of the 23% of physicians in the United States who are foreign trained, 65% practice in medically underserved areas or HPSAs and of those, 46% practice in rural areas.[80]

167.    Without access to H-1B physicians and nurses, hospitals will be forced to reduce capacity in ICUs, emergency rooms, and surgical units. Wait times will increase and patient

---

[76] *See* National Center for Health Workforce Analysis, *State of the U.S. Health Care Workforce 2024, supra* note 73, at 3.

[77] National Center for Health Workforce Analysis, *Nurse Workforce Projections*, *2022-2037* (Nov. 2024), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/nursing-projections-factsheet.pdf.

[78] *See* National Center for Health Workforce Analysis, *State of the U.S. Health Care Workforce 2024, supra* note 73, at 2.

[79] *See Letter to Kristi Noem, supra* note 72.

[80] *Id.*

outcomes will worsen, especially in rural and inner-city communities which are already medically underserved.

168.     Indeed, hospitals and other health care facilities that hire H-1B workers are generally public or non-profit entities and are unable to afford the fee mandated in the Policy. As the President of the AMA explained, "[i]f a hospital needs 50 foreign residents, and it's $100,000 each for each one, that's $5 million, and that's not going to happen . . . . There will be shortages."[81] The consequences, he explained, are that "spots at hospitals will not be filled. Wait times will go up, and people will wait even longer at emergency departments."[82] The fee, coupled with cuts in health insurance subsidies and reduced Medicaid payments, will exacerbate the financial stress many hospitals are already experiencing.[83]

169.     These harms will be felt throughout the States.

170.     For example, in Connecticut, UConn Health currently has 58 employees on H-1B visas, and in 2025 alone, UConn has filed 39 H-1B petitions, up since 2023. UConn Health, the State's only public academic medical center, is committed to improving the health and wellness of those especially living in underserved communities.

171.     New Jersey has particularly struggled with shortages of primary care doctors, with one of the lowest concentrations of primary care physicians in the country with roughly 17 doctors

---

[81] Roni Caryn Rabin, *Medical Groups Warn Against Visa Fees for Foreign Doctors*, N.Y. Times (Sept. 26, 2025), https://www.nytimes.com/2025/09/26/health/trump-h1b-visa-fee-doctors.html.

[82] *Id*.

[83] *Id*.

per 100,000 people.[84] New Jersey is also facing a significant shortage of nurses, with a projected 12% shortage of nurses by 2035.[85]

172.    Foreign-born healthcare workers have played an important role in addressing those shortages. A significant percentage of New Jersey's healthcare workforce is comprised of foreign-born workers, including those on H-1B visas. For instance, in 2021, 32% of New Jersey's healthcare workforce, 37% of its physicians and surgeons, and 32% of its registered nurses were noncitizens born abroad.[86] New Jersey also has nine medical residency programs that sponsor H-1B Visas.

173.    The same is true for New York, where 36% of the healthcare workforce is comprised of foreign-born workers, including H-1B visa holders. Additionally, 33% of its physicians and surgeons, and 27% of its registered nurses are noncitizens born abroad.[87] New York also has 193 medical residency programs that sponsor H-1B visas.

---

[84] *See Primary Care in New Jersey: Findings and Recommendations to Support Advanced Primary Care*, New Jersey Healthcare Quality Institute (Jan. 2024), https://www.njhcqi.org/wp-content/uploads/2024/01/Primary-Care-Report_2024_v11.pdf.

[85] American Assoc. of Colleges of Nursing, *Fact Sheet: Nursing Shortage* (May 2024), https://www.aacnnursing.org/Portals/0/PDFs/Fact-Sheets/Nursing-Shortage-Factsheet.pdf.

[86] *See* Jeanne Batalova, *Immigrant Health-Care Workers in the United States*, Migration Policy Institute (Apr. 7, 2023), https://www.migrationpolicy.org/article/immigrant-health-care-workers-united-states-2021. In this article, the term "immigrants" refers to census data on individuals who were not U.S. citizens at birth, including naturalized citizens, lawful permanent residents, and other noncitizens including those on H-1B visas. *See* https://view.officeapps.live.com/op/view.aspx? src=https%3A%2F%2Fwww.migrationpolicy.org%2Fsites%2Fdefault%2Ffiles%2Fsource_charts %2FImmigrantShareHealthWorkersByOccupationAndState2021.xlsx&wdOrigin=BROWSELINK.

[87] *Id.*

174.    New York hospitals also face pervasive nursing shortages as New York is projected to face a shortage of almost 40,000 nurses by 2030.[88]

175.    So too, Arizona faces a critical shortage of primary care physicians, and will need 493 additional primary care physicians by 2035 to erase current shortages.[89] Obstetrics and gynecology physicians are also in short supply, with approximately 400 OB-GYNs responsible for the entire state's needs.[90] Of applicants to an Arizonan women's health clinic, approximately 75% were H-1B visa holders.[91]

176.    In 2019, noncitizens made up 14.2% of Arizona's healthcare workers, and 25.8% of all physicians and surgeons.[92] Foreign-born healthcare workers are exceedingly qualified, with 26.2% of foreign-born persons with professional and doctorate decrees working in healthcare occupations that did not require this level of education.[93]

177.    Rhode Island is also experiencing severe workforce shortages within the health care sector. The Rhode Island Department of Labor and Training has projected 75,596 open positions in the health care field between 2022 and 2032, including 25,554 openings for health care

---

[88] *See* Center for Health Workforce Studies, *A $51 Million Investment in New York's Nursing Workforce Aims to Bolster Staff Well-Being, Patient Care* (May 14, 2025), https://www.chwsny.org/a-51-million-investment-in-new-yorks-nursing-workforce-aims-to-bolster-staff-well-being-patient-care.

[89] Ariz. Dep't of Health Servs., *Arizona Medically Underserved Areas – Biennial Report* at 21-22 (Oct. 2024), https://www.azdhs.gov/documents/prevention/health-systems-development/data-reports-maps/reports/azmua-biennial-report.pdf.

[90] Michael Castillo, *Arizona women's health clinics sound alarm over new visa fees for foreign doctors,* AZFamily (Oct. 21, 2025), https://www.azfamily.com/2025/10/22/arizona-womens-health-clinics-sound-alarm-over-new-visa-fees-foreign-doctors.

[91] *Id.*

[92] American Immigration Council, *The Growing Demand for Healthcare Workers in Arizona* (Sept. 2025), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/09/growing_demand_healthcare_workers_arizona.pdf.

[93] *Id.*

practitioners and technical occupations.[94] Rhode Island has witnessed significant health care workforce shortages that continue to grow while the supply of workers shrinks, mirroring national trends. Registered nurses and physicians are among the occupations that will see substantial demand between 2022 and 2032.[95] One study estimated there are nearly 700 primary care providers for Rhode Island's population of 1.1 million, which is roughly one clinician for every 1,700 people.[96] The researchers estimated nearly 300 additional physicians are needed to cover the state.[97] In the 2025 fiscal year, 121 H-1B visas were approved for Rhode Island's health care industry.[98]

178.    These problems are especially acute in rural and low-income areas. A 2023 study by the National Bureau of Economic Research found that foreign-born and trained doctors help serve rural and low-income communities without reducing the employment of U.S.-trained physicians.[99] The study notes that while about 20% of the U.S. population lives in rural areas, only about 11% of physicians practice in these locations; and disparities in access to physicians

---

[94] R.I. Executive Office of Health & Human Servs., *Rhode Island Health Care System Planning: 2024 Foundational Report* (Dec. 2024), https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2025-02/ Chapter%2010%20-%20Health%20Care%20System%20Planning%20Foundational%20Report% 20-%20December%202024.pdf.

[95] *Id.*

[96] Alexandra Leslie, *Hundreds More Physicians Needed to Address RI Primary Care Shortage, Experts Say,* WPRI (Feb. 19, 2025) https://www.wpri.com/target-12/hundreds-more-physicians-needed-to-address-ri-primary-care-shortage-experts-say/

[97] *Id.*

[98] *See* USCIS, *H-1B Employer Data Hub*, *supra* note 51.

[99] Breno Braga, Gaurav Khanna & Sarah Turner, *Migration Policy and the Supply of Foreign Physicians: Evidence from the Conrad 30 Waiver Program*, Nat'l Bureau of Econ. Research Working Paper No. 32005 (Dec. 2023), https://www.nber.org/system/files/working_papers/ w32005/w32005.pdf.

contribute to disparities in population health.[100] After examining the data, the study concluded that foreign-born doctors were not "crowding out" U.S. born physicians, but rather that foreign-born physicians were filling essential gaps in coverage, particularly in rural areas.[101]

179.    A recent study by Mass General Brigham found that the percentage of H-1B sponsored physicians was nearly two times higher in rural areas compared with urban counties, and nearly four times greater in counties with higher poverty rates.[102] The study's authors found that "foreign healthcare workers fill critical gaps in health systems such as primary care and rural health, and millions of Americans depend on them to receive timely and high-quality care."[103]

180.    In California, access to specialists and primary care providers in rural areas is already extremely limited and is projected to worsen as physicians retire and these communities struggle to attract new doctors. According to a study by the National Institute of Health, 64.1% of International Medical Graduates practiced in medically underserved areas, with 45.6% of those practicing in a rural area.[104] About 11.4 million Californians, about one quarter of California's population in 2024, live in federally designated Primary Care HPSAs.[105]

---

[100] *Id.*

[101] *Id.* at 3.

[102] Mass General Brigham, *Study Shows Increase of H-1B Visa Fees Will Most Impact Rural and High-Poverty Counties* (Press Release, Oct. 30, 2025), https://www.massgeneralbrigham.org/en/about/newsroom/press-releases/increase-of-h1-b-visa-fees-will-impact-rural-and-high-poverty-counties.

[103] *Id.*

[104] Srikrishna Malayala et al., *Medically Underserved Areas and International Medical Graduates (IMGs) in the United States: Challenges During the COVID-19 Era*, 11 J. of Community Hosp. Internal Med. Perspectives 458 (2021).

[105] California Health Care Foundation, *New Survey Highlights Worsening Shortage of Physicians in Rural California* (June 26, 2025) https://www.chcf.org/resource/new-survey-highlights-worsening-shortage-physicians-rural-northern-california.

181.    And in 2023, 25% or 120,957 of active physicians in California were age 65 or older or older.[106] The number of new graduates practicing in California will not be adequate to replace all physicians who will reach retirement age during the coming decade.[107]

182.    In Minnesota, for every 100,000 people in metropolitan areas, there are close to 33 family medicine physicians. In stark contrast, rural areas only have 2.5 physicians for every 100,000 people. In internal medicine, per 100,000 people, there are around 31 physicians in metropolitan areas and 0.2 in rural areas. There are similarly striking disparities across other specialties such as pediatrics, psychiatry, general surgery, obstetrics and gynecology. Almost 1 in 3 rural physicians in Minnesota plan to leave the workforce within the next 5 years.[108]

183.    New York similarly struggles with a shortage of primary care physicians in the rural regions of the state. In sixteen of New York's rural counties, there are four primary care physicians for every 10,000 people.[109]

184.    The fee will harm both public and private hospitals who rely on the H-1B program to hire researchers to staff critical medical research projects. One study found that 80% of nephrology fellowship programs, which provide specialty training after residency, had J-1 or H-1B visa holders among their clinical or research fellows.[110]

---

[106] Ass'n of Am. Med. Colleges, *U.S. Physician Workforce Dashboard,* https://www.aamc.org/data-reports/report/us-physician-workforce-data-dashboard (last accessed on Nov. 12, 2025)

[107] Healthforce Center at UCSF, *Annual Report: Update on California's Physician Workforce* (Dec. 2024), https://healthforce.ucsf.edu/sites/g/files/tkssra14981/files/doc/2024-annual-ret_californias-physician-workforce_final-reviewed_accessibility-checked.pdf.

[108] Agency for Healthcare Research and Quality, National Healthcare Quality and Disparities Report Chartbook on Rural Healthcare (Nov. 2021), https://www.ahrq.gov/sites/default/files/wysiwyg/research/findings/nhqrdr/chartbooks/2019-qdr-rural-chartbook.pdf.

[109] *See* N.Y. State Comptroller, *The Doctor Is . . . Out: Shortages of Health Professionals in Rural Areas* (Aug. 2025), https://www.osc.ny.gov/files/reports/pdf/rural-health-shortages.pdf.

[110] Smith, *supra* note 70.

185. A shortage of qualified researchers will force hospitals to eliminate projects aimed at developing new treatments and therapies, severely limit the availability of clinical trials to assess the safety and efficacy of new treatments and stymie the Plaintiff State's ability to remain on the forefront of medical innovation that improves and protects the well-being of its residents.

186. For example, at the University of Illinois Chicago ("UIC") in Illinois, the $100,000 fee would significantly impact the University's ability to fill critical positions not only in healthcare, but in research and teaching, with a particular impact on dentistry and pharmacy. The majority of UIC's H-1B visa holders are in the applied health colleges for medicine, dentistry, pharmacy, applied health sciences, and nursing, as well as within the UI Health system, with 187 active visa-holders total; 59 visa holders are in clinical and patient-facing positions. The clinical positions are spread throughout Illinois, with 45 in Chicago, eleven in Peoria, and 3 in Rockford. In addition, UIC has fifteen pending H-1B visa applications for positions in Chicago and Peoria. Seven of the impacted positions are clinical and patient-facing.

187. The H-1B visa fee's impact on healthcare professionals will cause cascading harm throughout the Plaintiff States. For Plaintiff States with state healthcare providers (such as Illinois and Connecticut), those providers will be unable to employ sufficient healthcare professionals. As a result, the Plaintiff State institutions will suffer, as insufficient staffing levels will harm their ability to provide adequate services to residents.

188. Similarly, Plaintiff States without state healthcare providers will also face harm from shortages of healthcare professionals. Shortfalls in doctors and nurses, absent the ability of healthcare providers to fill these vacancies with qualified foreign doctors, will render it more difficult for Plaintiff States' residents to obtain the regular medical care they need. These shortages

will in turn cost Plaintiff States' insurance programs as more residents need to rely on emergency medical care in lieu of routine appointments.

## CAUSES OF ACTION

### Count 1—Against All Defendants
### Administrative Procedure Act, 5 U.S.C. §706(2)(D):
### Acts Not in Observance of Procedure Required by Law

189.    Plaintiff States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

190.    DHS is an "agency" as defined by the APA, 5 U.S.C. § 551(1), and the Policy is a final agency action subject to review under the APA. *See Bennett v. Spear*, 520 U.S. 157, 177–78 (1997) (holding that a final agency action (1) "must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow" (internal citations and quotation marks omitted).

191.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

192.    The Policy—including the September and October Memoranda, FAQ, and any non-public rules implementing the $100,000 fee announced in the Proclamation—is a legislative rule because it "'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)); *see also Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (observing that legislative rules "purport[] to impose legally binding obligations or prohibitions on regulated parties").

Specifically, the Policy imposes a requirement that a fee of $100,000 be paid when an H-1B petition is filed, subject to limited exceptions not relevant here.

193.    That an agency action is taken to implement an executive order does not exempt it from the requirements of the APA. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

194.    When promulgating legislative rules, federal agencies must follow the APA's procedures for notice-and-comment rulemaking. "First, the agency must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553(b)). Next, "the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments'" and must consider and respond to "significant comments." *Id.* (quoting 5 U.S.C. § 553(c)). "When the agency promulgates the final rule, it must include in the rule's text 'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)). Finally, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date," 5 U.S.C. § 553(d), except, as relevant here, as otherwise provided by the agency for good cause found and published with the rule, *id*. § 553(d)(3).

195.    As recently as last year, USCIS has engaged in the robust notice-and-comment process required by the APA in setting its fee schedule for H-1B and other visas. *See USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194, 6194–6400 (Jan. 31, 2024). "It is, of course, black-letter administrative law that ordinarily an agency that promulgates a rule [using notice and comment] must use the same procedure to revoke that rule." *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020)

196.    USCIS's prior adherence to required procedures in setting the H-1B fee schedule underscores the agency's obligation to engage in notice-and-comment rulemaking in revising that schedule by adding the novel $100,000 fee.

197.    Here, however, the agency has failed to engage in any of the APA's requirements for rulemaking. No public notice was given before Defendants issued documents implementing the Policy, nor was public notice given in advance of the underlying Proclamation. No opportunity has been given for interested members of the public to comment on a proposed rule. And no concise statement has been given for the Policy's general purpose; indeed, USCIS has continued to tweak the policy while affected parties are faced with new questions after each version. Moreover, the agency failed to wait at least 30 days before enacting the Policy and made no statement of good cause.

198.    Defendants' failures to comply with required APA procedures violate 5 U.S.C. § 553(b)–(d) and § 706(2)(D).

### Count 2—Against All Defendants
### Administrative Procedure Act, 5 U.S.C. §706(2)(C):
### Acts in Excess of Statutory Authority

199.    Plaintiff States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

200.    A court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

201.    In reviewing an agency's actions under § 706(2)(C), a court must interpret the scope of an agency's statutory authority without deference to the agency's own interpretation. "[B]y directing courts to 'interpret constitutional and statutory provisions' without differentiating between the two, [the APA] makes clear that agency interpretations of statutes—like agency

interpretations of the Constitution—are *not* entitled to deference." *Loper Bright*, 603 U.S. at 371

(quoting 5 U.S.C. § 706). "Under the APA, it thus "remains the responsibility of the court to decide

whether the law means what the agency says." *Id.* at 392 (quoting *Perez v. Mortgage Bankers

Assn.*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

202.    DHS's authority to assess fees in connection with H-1B visas is circumscribed by

8 U.S.C. § 1356(m), which requires that fees be limited to a level commensurate with agency costs

for "adjudication and naturalization services" and administrative costs.

203.    The $100,000 fee assessed under the Policy bears no connection to any costs borne

by USCIS. By the Proclamation's own terms, the Policy is intended as an intervention into

domestic economic policy rather than an effort to recover costs.

204.    In the Proclamation, President Trump claims authority under Sections 212(f) and

215(a) of the INA to establish a $100,000 fee for H-1B petitions.

205.    Neither statute confers upon any of Defendants the power to act outside of

Congress's comprehensive scheme for immigration generally, or to exceed the limits imposed by

8 U.S.C. § 1356(m) specifically.

206.    No provision of the INA or any other statute grants any agency the authority to set

fees associated with H-1B visas with the aim of advancing domestic economic goals.

207.    Because it exceeds the fee-setting authority delegated by Congress, the Policy

violates 5 U.S.C. § 706(2)(C).

### Count 3—Against All Defendants
**Administrative Procedure Act, 5 U.S.C. §706(2)(A):**
**Arbitrary and Capricious Acts**

208.    Under the APA, a court must "hold unlawful and set aside" final agency action that

is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

209.    In formulating a policy, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

210.    "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

211.    An agency changes its position when it acts inconsistently with an earlier position. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 (2025). "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221–22 (2016). In such a situation, the agency is required to provide "a more detailed justification" for the change in position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

212.    Defendants claim to have based the Proclamation on domestic economic policy considerations which Congress never intended to be a basis for the establishment of H-1B fees, including the general need to raise revenues—a power vested in Congress exclusively.

213.    Defendants have also failed to consider the statutory scheme enacted by Congress in connection with the H-1B program, including provisions enacted by Congress with the aim of preventing abuse of the H-1B visa program.

214.    Defendants have failed to consider alternative means of addressing domestic economic policy concerns or concerns about abuse of the H-1B visa program that are consistent with the authority granted to them by Congress.

215.    Defendants have failed to consider the important concerns that the H-1B program addresses, including grave shortages of physicians, nurses, teachers, civil engineers, and other providers of basic human services. The Proclamation underlying the Policy focuses solely on the technology sector without considering "the interests of the United States," 8 U.S.C. § 1182(f), more broadly.

216.    Defendants have failed to consider the ability of government and not-for-profit employers to absorb the $100,000 fee demanded under the Policy.

217.    Defendants have departed from the existing fee schedule, produced through the required notice-and-comment procedure only last year, without giving a reasoned explanation for the departure.

218.    Defendants have rolled out the Policy in an incoherent and inconsistent manner.

219.    The Policy is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

### Count 4—Against All Defendants
### Separation of Powers:
### Acts *Ultra Vires*

220.    Plaintiff States reallege and incorporate by reference the allegations contained in the preceding paragraphs.

221.    Under the Constitution, Congress exercises "plenary power" over immigration policy. *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("The Court without exception has

sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of [policies pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (discussing "the complete and absolute power of Congress" and "the plenary power of Congress" over immigration policy).

222.    Under its constitutional authority, Congress enacted the INA, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)).

223.    As part of this scheme, Congress has established the H-1B visa program to ensure that U.S. employers could hire highly skilled workers necessary to their operations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b) (defining H-1B program requirements).

224.    Congress also has the exclusive constitutional authority to raise revenue. *See* U.S. Const. art. I § 7, cl. 1; *id.* § 8, cl. 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643 (1952) (Jackson, J., concurring) ("Congress alone controls the raising of revenues and their appropriation.")

225.    Pursuant to its authority over immigration policy and its authority to raise revenue, Congress has provided for the assessment of fees in connection with H-1B visa petitions and other immigration visa applications in two ways. First, Congress has fixed certain fees by statute. *See,*

*e.g.,* 8 U.S.C. § 1356(u)(3) (establishing premium processing fees at $1500 and $2500). Second, Congress has delegated to the Executive Branch carefully circumscribed authority to establish a fee schedule for H-1B petitions. *See id*. § 1356(m); *see also USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194, 6288 (Jan. 31, 2024) (identifying 8 U.S.C. § 1356(m) as authority for USCIS's authority to engage in rulemaking to establish a fee schedule).

226.    Congress's fee-setting delegation to USCIS requires "[t]hat fees for providing adjudication and naturalization services" be limited to "a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). USCIS has recognized that Congress has limited its collection of fees to those "based on total costs for USCIS to carry out adjudication and naturalization services," 89 Fed. Reg. at 6288, and it has sought to comply with these limitations by setting H-1B registration fees based on actual costs, *id.* at 6289.

227.    By its own terms, the Policy is not based on or limited by the cost-based factors that Congress has required the Executive Branch to consider in setting H-1B fees. The Executive Branch usurped Congress's authority over immigration and revenues by enacting the Policy outside of the boundaries delimited by Congress.

228.    In the Proclamation, President Trump claims authority under Sections 212(f) and 215(a) of the INA to establish a $100,000 fee for H-1B petitions.

229.    Neither statute confers upon any of Defendants the power to act outside of Congress's comprehensive scheme for immigration generally, or to exceed the limits imposed by 8 U.S.C. § 1356(m) specifically.

230.    With Section 212(f), Congress has delegated to the President power to impose immigration restrictions in support of foreign policy or national security interests. But that power does not extend to taking actions that directly contradict any provisions of the INA or comprehensive scheme implemented by Congress.

231.    More specifically, Section 212(f) does not confer authority to impose conditions or restrict immigration for the purpose of advancing domestic economic policy. By its own terms, the Proclamation is intended solely to advance domestic economic aims.

232.    Section 212(f) also does not confer upon the President authority to raise revenue outside of existing delegations of carefully limited authority permitting the executive branch to impose fees in connection with visa applications.

233.    Section 215(a) confers authority that "substantially overlap[s]" with the authority conferred by Section 212(f). *Hawaii*, 85 U.S. at 693 n.1.

234.    The Policy exceeds the carefully and explicitly limited fee-setting authority delegated to the executive branch by Congress. *See* 8 U.S.C. § 1356(m).

235.    Moreover, the Policy usurps Congress's exclusive and plenary constitutional authority to set immigration policy and to raise revenues.

236.    Neither Section 212(f) nor Section 215(a) confer upon the executive branch authority to breach this existing separation of powers.

237.    The Policy is an *ultra vires* act and unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their

favor and grant the following relief:

I.      Declare that the Policy is unlawful because it exceeds the executive branch's constitutional and statutory authority;

II.     Pursuant to the APA, vacate and set aside the Policy and any other actions intended to give effect to the Proclamation;

III.    Enjoin Defendants from taking any actions with respect to Plaintiff States, their agencies, or their political subdivisions intended to give effect to the Proclamation or Policy;

IV.     Award Plaintiff States reasonable attorney's fees and costs; and

V.      Grant Plaintiff States any other relief that the Court may deem just and proper.

December 12, 2025

Respectfully submitted.

**ROB BONTA**
 *Attorney General of California*

 /s/ James E. Richardson
MICHAEL L. NEWMAN*
 *Senior Assistant Attorney General*
MARISSA MALOUFF*
JAMES E. STANLEY*
 *Supervising Deputy Attorneys General*
DENISE LEVEY*
LORRAINE LOPEZ*
JAMES E. RICHARDSON*
JEANELLY OROZCO ALCALÁ*
 *Deputy Attorney General*
Office of the Attorney General
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6341
james.richardson@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
 *Attorney General of Massachusetts*

 /s/ Gerard J. Cedrone
Michelle Pascucci (BBO No. 690889)
 *State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
 *Deputy State Solicitor*
Julia S. Canney (BBO No. 717328)**
 *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the*
 *Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
 *Attorney General of Arizona*

 /s/ Joshua G. Nomkin
JOSHUA G. NOMKIN*
 *Assistant Attorney General*
Office of the Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
 *Attorney General of Colorado*

 /s/ David Moskowitz
DAVID MOSKOWITZ*
 *Deputy Solicitor General*
NORA PASSAMANECK*
 *Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
 *Attorney General of Connecticut*

 /s/ *Francesca Testa*
FRANCESCA TESTA\*
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5210
francesca.testa@ct.gov

*Counsel for the State of Connecticut*


**ANNE E. LOPEZ**
 *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
DAVID D. DAY\*
 *Special Assistant to the Attorney General*
KALIKOʻONĀLANI D. FERNANDES\*
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*


**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
IAN R. LISTON\*
 *Director of Impact Litigation*
VANESSA L. KASSAB\*
 *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**KWAME RAOUL**
 *Attorney General of Illinois*

 /s/ *Aleeza Strubel*
ALEEZA STRUBEL\*
 *Complex Litigation Counsel*
ELIZABETH MORRIS\*
 *Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
(312) 814-3000
aleeza.strubel@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

/s/ *Virginia A. Williamson*
VIRGINIA A. WILLIAMSON*
  *Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Counsel for the State of Maryland*

**DANA NESSEL**
  *Attorney General of Michigan*

/s/ *Neil Giovanatti*
NEIL GIOVANATTI*
  *Assistant Attorney General*
Michigan Department of the Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
  *Attorney General of Minnesota*

/s/ *Joseph R. Richie*
JOSEPH R. RICHIE*
  *Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
  *Attorney General of Nevada*

/s/ *K. Brunetti Ireland*
K. BRUNETTI IRELAND*
  *Chief of Special Litigation*
MELINA MENEGUIN LAVERENZA*
  *Assistant Attorney General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
 *Attorney General of New Jersey*

 /s/ *Max G. Lesser*
MAX G. LESSER*
 *Deputy Attorney General*
MELINA MENEGUIN LAVERENZA*
 *Assistant Attorney General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 575-6143
max.lesser@law.njoag.gov

*Counsel for the State of New Jersey*

**JEFF JACKSON**
 *Attorney General of North Carolina*

 /s/ *Daniel P. Mosteller*
LAURA HOWARD*
 *Chief Deputy Attorney General*
DANIEL P. MOSTELLER*
 *Associate Deputy Attorney General*
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State North Carolina*

**LETITIA JAMES**
 *Attorney General of New York*

 /s/ *Zoe Levine*
ZOE LEVINE*
 *Special Counsel for Immigrant Justice*
VICTORIA OCHOA*
 *Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(212) 416-8329
zoe.levine@ag.ny.gov

*Counsel for the State of New York*

**DAN RAYFIELD**
 *Attorney General of Oregon*

/s/ *Thomas H. Castelli*
THOMAS H. CASTELLI*
 *Senior Assistant Attorney General*
Oregon Department of Justice
100 S.W. Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
  *Attorney General of Rhode Island*

/s/ *Kyla Duffy*
KYLA DUFFY*
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

/s/ *Sara L. Wilmot*
SARA L. WILMOT*
  *Assistant Attorney General*
KATE S. WORTHINGTON*
  *Assistant Attorney General*
7141 Cleanwater Drive S.W.
P.O. Box 40111
Olympia, WA 98504
(360) 709-6470
sara.wilmot@atg.wa.gov

*Counsel for the State of Washington*

**CHARITY R. CLARK**
  *Attorney General of Vermont*

/s/ *Jonathan T. Rose*
JONATHAN T. ROSE*
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
  *Attorney General of Wisconsin*

/s/ *Faye B. Hipsman*
FAYE B. HIPSMAN*
  *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
(608) 264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

\* application for admission *pro hac vice* forthcoming
\*\* admission pending