# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

      *PLAINTIFFS,*

   v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

      *DEFENDANTS.*

No. 1:25-cv-13829-LTS

# MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 2

    I.     The H-1b Program is a Comprehensive Scheme Based on Congress's Plenary Authority over the Admission Of Noncitizens to the United States .......... 2

    II.    Congress has Exercised its Authority Over the Admission of Noncitizens in Setting and Regulating Fees Associated with H-1B Petitions. ........................... 3

    III.   The $100,000 H-1B Fee Policy was Created without Congressional Authorization and Outside of the Statutory Scheme Created by Congress. ........... 5

Summary Judgment Standard ............................................................................................... 6

Argument .............................................................................................................................. 7

    I.     Plaintiffs Have Standing to Challenge The Policy, which will cause Concrete Harms to their Educational Institutions and Health Systems. ................. 7

    II.    Plaintiffs are Entitled to Summary Judgment because The Policy Violates the Constitution's Separation of Powers and is *Ultra Vires*. ................................ 10

        A.    The Policy usurps Congress's Plenary Power Over the Admission of Noncitizens. ....................................................................................... 11

        B.    The Policy usurps Congress's Exclusive Power to Raise Revenue Through Taxation. .................................................................................... 13

        C.    Neither Section 212(F) Nor Section 215(A) Authorizes the Executive Branch to Upend the H-1B Program Created by Congress ................................................................................................... 15

    III.   Plaintiffs are Entitled to Summary Judgment because The Policy Violates the Administrative Procedure Act ............................................................... 17

        A.    The Policy is Final Agency Action. ...................................................... 17

        B.    Defendants' Promulgation of The Policy Did Not Observe the Procedure Required by Law .............................................................. 18

        C.    The Policy exceeds Statutory Authority. ............................................... 19

        D.    The Policy is Arbitrary and Capricious. ................................................ 19

            1.    Defendants failed to acknowledge—let alone grapple with—the Policy's significant divergence from past agency practice. ...................................................................................... 20

            2.    Defendants failed to consider the Plaintiffs' reliance interests. ..................................................................................... 21

            3.    Defendants grounded the policy on impermissible considerations. ........................................................................... 21

    IV.   Plaintiffs are Entitled to the Relief They Seek .................................................... 22

        A.    Plaintiffs are Entitled to a Declaratory Judgment. ................................. 22

**TABLE OF CONTENTS**
**(continued)**

                                                                    **Page**

      B.      Plaintiffs are Entitled to Vacatur of The Policy.........................................22

Conclusion ...................................................................................................................23

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ass'n of Am. Univs. v. DOD*
   792 F. Supp. 3d 143 (D. Mass. 2025) ....................................................................23

*Ass'n of Am. Univs. v. NSF*
   788 F. Supp. 3d 106 (D. Mass. 2025) ......................................................................7

*Associated General Contractors of Mass. v. Boston Dist. Council of Carpenters*
   642 F. Supp. 1435 (D. Mass. 1986) .......................................................................22

*Bennett v. Murphy*
   166 F. Supp. 3d 128 (D. Mass. 2016) ......................................................................6

*Biden v. Nebraska*
   600 U.S. 477 (2023)..............................................................................................7, 17

*Chamber of Com. v. DHS*
   No. 25-cv-3675, 2025 WL 3719234 (D.D.C. Dec. 23, 2025) ............................6, 16

*Chamber of Com. v. Reich*
   74 F.3d 1322 (D.C. Cir. 1996)................................................................................18

*Chamber of Com. v. Whiting*
   563 U.S. 582 (2011)..................................................................................................2

*City of Providence v. Barr*
   954 F.3d 23 (1st Cir. 2020)......................................................................................19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
   603 U.S. 799 (2024) (Kavanaugh, J., concurring) .................................................22

*Cousins v. Sec'y of U.S. Dep't of Transp.*
   880 F.2d 603 (1st Cir. 1989)....................................................................................19

*DHS v. Regents of the Univ. of California*
   591 U.S. 1 (2020)..............................................................................................20, 21

*Doe #1 v. Trump*
   957 F.3d 1050 (9th Cir. 2020) ................................................................................15

*eBay Inc. v. MercExchange, LLC*
   547 U.S. 388 (2006)................................................................................................22

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*FCC v. Consumers' Rsch.*
   606 U.S. 656 (2025) ................................................................................................14, 16

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ............................................................................................................20

*FCC v. Prometheus Radio Project*
   592 U.S. 414 (2021) ............................................................................................................19

*Galvan v. Press*
   347 U.S. 522 (1954) ............................................................................................................11

*Global Nurse Force v. Trump*
   No. 4:25-cv-8454 (N.D. Cal.) ............................................................................................6

*Harrington v. Chao*
   280 F.3d 50 (1st Cir. 2002) ................................................................................................22

*Housatonic River Initiative v. EPA*
   75 F.4th 248 (1st Cir. 2023) ..............................................................................................21

*Kleindienst v. Mandel*
   408 U.S. 753 (1972) ........................................................................................................1, 11

*Littlefield v. Dep't of Interior*
   656 F. Supp. 3d 280 (D. Mass. 2023) ..............................................................................6

*Massachusetts v. NIH*
   770 F. Supp. 3d 277 (D. Mass. 2025) ..........................................................................8, 10

*Massachusetts v. NIH*
   No. 25-1343, 2026 WL 26059 (1st Cir. Jan. 5, 2026) ....................................................8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ........................................................................................................20, 21

*N.H. Hosp. Ass'n v. Azar*
   887 F.3d 62 (1st Cir. 2018) ................................................................................................18

*Nat'l Assn of Mfrs. v. DHS*
   491 F. Supp. 3d 549 (N.D. Cal. 2020) ............................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page

*Nat'l Cable Television Ass'n, Inc. v. United States*
    415 U.S. 336 (1974) .................................................................................11, 13, 14

*New York v. Trump*
    133 F.4th 51 (1st Cir. 2025) .................................................................................18

*Oceanic Steam Nav. Co. v. Stranahan*
    214 U.S. 320 (1909) .................................................................................11, 12

*Perez v. Mortg. Bankers Ass'n*
    575 U.S. 92 (2015) .................................................................................18

*Pres. & Fellows of Harvard Coll. v. DHS*
    788 F. Supp. 3d 182 (D. Mass. 2025) .................................................................................8, 10

*President & Fellows of Harvard Coll.*, 788 F. Supp. at 196-97 ....................................................16

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*
    793 F. Supp. 3d 19 (D.D.C. 2025) .................................................................................15

*Skinner v. Mid-Am. Pipeline Co.*
    490 U.S. 212 (1989) .................................................................................13, 14

*Sw. Airlines Co. v. FERC*
    926 F.3d 851 (D.C. Cir. 2019) .................................................................................21

*Taylor v. Am. Chemistry Council*
    576 F.3d 16 (1st Cir. 2009) .................................................................................6

*Trump v. Hawaii*
    585 U.S. 667 (2018) .................................................................................15, 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
    578 U.S. 590 (2016) .................................................................................17

*Util. Air Regul. Grp. v. EPA*
    573 U.S. 302 (2014) .................................................................................17

*Young v. Trump*
    506 F. Supp. 3d 921 (N.D. Cal. 2021) .................................................................................21

TABLE OF AUTHORITIES
(continued)

Page

STATUTES

5 U.S.C.
    § 553.................................................................................................................18
    § 553(b)–(d)......................................................................................................18
    § 703.................................................................................................................22
    § 704...........................................................................................................17, 18
    § 706(2).............................................................................................................22
    § 706(2)(A).......................................................................................................19
    § 706(2)(A)–(C)..................................................................................................6
    § 706(2)(C).......................................................................................................19
    § 706(2)(D).......................................................................................................18

8 U.S.C.
    1356(m)............................................................................................................13
    §106.2(c)(13)......................................................................................................5
    § 1101(a)(15)(H)(i)(b).........................................................................................2
    § 1182(f).................................................................................................15, 16, 21
    § 1182(n)(1)........................................................................................................3
    §§ 1184.............................................................................................................12
    § 1184(i)(1).........................................................................................................3
    § 1184(c)(1)........................................................................................................3
    § 1184(c)(9)(A)...............................................................................................4, 12
    § 1184(g)(1)(A)...................................................................................................3
    § 1184(g)(4).......................................................................................................2
    § 1185(a)(1)......................................................................................................15
    § 1356(m).............................................................................4, 5, 12, 14, 15, 19, 21
    § 1356(u)(3)(C)..................................................................................................5
    § (g)(5)(A)-(B)................................................................................................3, 12

28 U.S.C. § 2201(a).............................................................................................22

Administrative Procedure Act...........................................................................2, 6

American Competitiveness and Workforce Improvement Act.................................4

H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, div. J., § 422, 118 Stat.
    2877, 3353.........................................................................................................4

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ...........................2

## TABLE OF AUTHORITIES
### (continued)

<b>Page</b>

Immigration and Nationality Act
  § 212................................................................................................................16
  § 212(f)................................................................................2, 5, 11, 15, 16, 19
  § 215(a)..............................................................................2, 5, 11, 15, 16, 19

Immigration and Nationality Act.......................................................1, 2, 12, 15, 17

Pub. L. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952) ..................................2

Pub. L. No. 105-277, § 414, 112 Stat. 2681, 2681-652 (1998) ..................................4

Pub. L. No. 106-311, 114 Stat. 1247 ................................................................4

Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 ............................................4

Pub. L. No. 114-113, § 402(g), 129 Stat. 2242, 3006 ............................................4

118 Stat. § 426 ....................................................................................4

### CONSTITUTIONAL PROVISIONS

U.S. Const. Article I, § 8, cl. 1....................................................................13

### COURT RULES

Fed. R. Civ. P. 56(a)...............................................................................6

### OTHER AUTHORITIES

8 C.F.R.
  § 103.2(a)(1)........................................................................................3
  § 106.2(c)(11)......................................................................................4
  § 106.2(d)............................................................................................5
  § 214.2(h)(1)(i).....................................................................................2
  § 214.2(h)(1)(i)-(2)(i)(A).........................................................................3
  § 214.2(h)(4)(ii)...................................................................................3

20 C.F.R. § 655.730(b) ............................................................................3

89 Fed. Reg. at 6288 ...............................................................................13

89 Fed. Reg. at 6289 ...............................................................................13

90 Fed. Reg. at 46,028 .........................................................................5, 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027
    (Sept. 24, 2025)..............................................................................1, 2, 5, 6, 14, 15, 16, 18, 21

S. Rep. No. 106-260 (2000) ..................................................................................................3

*USCIS Fee Schedule and Changes to Other Immigration Benefit Request*
    *Requirements*, 89 Fed. Reg. 6194, 6288 (Jan. 31, 2024) ...........................................12, 14, 19

**INTRODUCTION**

Congress created the H-1B program so that American employers could fill highly specialized roles that are essential to our country's prosperity and welfare. Exercising its "plenary power to make rules for the admission of aliens," *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972),[1] Congress carefully constructed the program to meet the nation's changing needs, including by enacting safeguards that protect American workers and make H-1B visas more readily accessible to universities, hospitals, and other employers that serve the public good.

The twenty Plaintiff States have come to rely on the H-1B program. Faced with historic, nationwide shortages of teachers, nurses, physicians, and other vital workers, Plaintiffs use H-1B visas to hire sufficient personnel for their public institutions so they can provide their residents with education, healthcare, and other core services. H-1B hiring has been particularly crucial in supporting those efforts in rural and low-income communities, where recruiting can be especially difficult, and in meeting the needs of vulnerable populations like students with disabilities.

Almost overnight, Defendants effectively took away this statutory tool. On September 19, 2025, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 24, 2025) ("Proclamation"), directing Defendants to immediately impose a $100,000 tax on all applications for H-1B visas. The defendant agencies subsequently carried out that order, undertaking a series of agency actions (collectively, the "Policy") to implement this new surcharge. For cash-strapped state and local agencies, the effect is devastating: a $100,000 payment is often greater than the salary of the position to be filled, and it is orders of magnitude greater than the existing cost of an H-1B petition. The Policy is, in other words, a death knell for the H-1B program.

It is also unlawful. The Administration's extortionate demands for money, quite literally out of the budgets used to accommodate students with special needs and treat life-threatening illnesses, usurps Congress's exclusive powers over immigration policy and raising revenue. For those who cannot afford the new payment, large portions of the Immigration and Nationality Act

---

[1] Internal citations and quotation marks are omitted unless otherwise noted.

("INA") are effectively nullified. For those who can, their money is now funding an account in a constitutional no man's land. No statute permits this power-grab: Sections 212(f) and 215(a) of the INA—the only provisions Defendants cite as granting them the power to enact the Policy— do not come close to authorizing a unilateral overhaul of the congressionally-created H-1B program. In short, the Policy is *ultra vires*.

In addition, the Policy violates the APA. Beyond plainly exceeding Defendants' statutory powers, the Policy's promulgation also violated the APA's procedural dictates: despite the Policy's predictable harms to schools, hospitals, universities, and other state and local agencies, no members of the public were given any opportunity to comment before the Policy went into effect. And the policy is plainly arbitrary and capricious; nothing in the Administrative Record— *see* Doc. No. 84—including the Proclamation, shows any awareness of, or even interest in, the harm posed to Plaintiffs and Americans nationwide. Defendants have, in short, violated the basic principles of reasoned decisionmaking.

The Policy is unlawful, and Plaintiffs are entitled to summary judgment.

## BACKGROUND

### I.    THE H-1B PROGRAM IS A COMPREHENSIVE SCHEME BASED ON CONGRESS'S PLENARY AUTHORITY OVER THE ADMISSION OF NONCITIZENS TO THE UNITED STATES.

Congress enacted the INA in 1952 to "establish[] a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011). As part of that statutory scheme, Congress created the "H visa" classification to permit the admission of temporary specialty workers to the United States. *See* Pub. L. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952).

The H-1B visa took roughly its current form with the passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. Under the statute's H-1B provisions, an employer in the United States may petition to hire a nonimmigrant worker in a "specialty occupation" for up to six years. *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(g)(4); 8 C.F.R. § 214.2(h)(1)(i). The

statute defines a "specialty occupation" as one that requires "(A) theoretical and practical application of a body of highly specialized knowledge and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii).

Congress has imposed several limitations on H-1B visas to protect the domestic labor force. For example, Congress caps H-1B visa approvals for most private employers at 65,000 per year, though this "cap" does not apply to institutions of higher education and government or nonprofit research organizations. 8 U.S.C. § 1184(g)(1)(A), (g)(5)(A)–(B). Congress reasoned that this exemption from the H-1B cap was necessary in part because "people working in universities are necessarily immediately contributing to educating Americans," and "[t]he more highly qualified educators in specialty occupation fields we have in this country, the more Americans we will have ready to take positions in these fields upon completion of their education." S. Rep. No. 106-260, at 21–22 (2000). Employers seeking to hire H-1B workers— including "cap-exempt" employers—must also pay fees and make certain attestations to the Department of Labor ("DOL"). *See* 8 U.S.C. § 1182(n)(1). For example, an employer must submit a "labor condition application" in which it attests that the position will pay the greater of (1) the actual wage level paid by the employer to all other individuals with similar experience and qualifications; or (2) the prevailing wage for that occupational classification. *See id.* § 1182(n)(1)(A). DOL then reviews and certifies the employer's application. 20 C.F.R. § 655.730(b). Once certified, the employer files a Form I-129 petition with Department of Homeland Security ("DHS") agency U.S. Citizenship and Immigration Services ("USCIS") to classify the foreign worker as an H-1B nonimmigrant. *See* 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i)–(2)(i)(A).

## II.    CONGRESS HAS EXERCISED ITS AUTHORITY OVER THE ADMISSION OF NONCITIZENS IN SETTING AND REGULATING FEES ASSOCIATED WITH H-1B PETITIONS.

Congress has played a direct and active role in superintending the fees associated with H-1B petitions. In 1998, through the American Competitiveness and Workforce Improvement Act

("ACWIA"), Congress required certain H-1B petitioners to pay a fee of $500 to address concerns about the potential adverse impact of the H-1B program on domestic workers and possible abuse of the program. *See* Pub. L. No. 105-277, § 414, 112 Stat. 2681, 2681-652 (1998). Higher education and nonprofit or government research institutions were exempted. *Id.* § 414, 112 Stat. at 2681-651 (codified at 8 U.S.C. § 1184(c)(9)(A)). In 2000, Congress increased this fee to $1,000. *See* Pub. L. No. 106-311, 114 Stat. 1247.

When the ACWIA fee expired in 2003, Congress revived it through the H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, div. J., § 422, 118 Stat. 2877, 3353. The act increased the fee to $1,500 for employers with 26 or more employees, but it maintained the exemption for higher education and nonprofit or government research institutions and reduced the fee to $750 for all other employers. *See id.* The act also added a new $500 anti-fraud fee to be paid by the employer with each initial H-1B petition. *Id.* § 426, 118 Stat. at 3357-58.

In 2010, Congress increased the filing fee and anti-fraud fee by $2,000 for those employers with 50 or more employees in the United States, where more than 50% of their employees are on H-1B or L-1 nonimmigrant status ("50/50 employers"). Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487. And in 2015, Congress increased the fee for 50/50 employers to $4,000 for each H-1B petition in addition to the other filing and petition fees. Pub. L. No. 114-113, § 402(g), 129 Stat. 2242, 3006.

Congress limits the executive branch's delegated authority to set visa-related adjudication fees beyond those just described. Under 8 U.S.C. § 1356(m), the fees that DHS may charge for adjudication and naturalization services are limited to those that "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and "recover any additional costs associated with the administration of the fees collected." Pursuant to that authority, DHS has previously set several H-1B fees through notice-and-comment rulemaking, including a fee that cap-subject employers must pay to register a prospective H-1B worker for the annual lottery, 8 C.F.R. § 106.2(c)(11); a filing fee for Form I-129 submitted by the petitioner, *id.* § 106.2(a)(3); and an

"asylum program fee," *id.* §106.2(c)(13). By statute, all fee adjustments (apart from adjustments for inflation) must be made through notice-and-comment rulemaking. *See* 8 U.S.C. § 1356(m), (u)(3)(C); 8 C.F.R. § 106.2(d).

### III.   THE $100,000 H-1B FEE POLICY WAS CREATED WITHOUT CONGRESSIONAL AUTHORIZATION AND OUTSIDE OF THE STATUTORY SCHEME CREATED BY CONGRESS.

Disregarding the statutory framework just described, President Trump issued the Proclamation last September. Invoking Sections 212(f) and 215(a) of the INA, 8 U.S.C. §§ 1182(f), 1185(a), but with no mention of 8 U.S.C. § 1356(m), Sections 1 through 3 of the Proclamation demand the imposition of a $100,000 fee on all petitions for H-1B visas and direct the Secretary of Homeland Security to enforce the new fee. Subsection 1(c) purports to grant the Secretary of Homeland Security broad discretion to waive or impose the fee for any "individual alien," "company," or "industry" "in the national interest." The Proclamation makes no reference to employment by state and local governments, or to the vital role H-1B workers play in serving Americans' fundamental needs. Instead, the Proclamation invokes amorphous and by now boilerplate "national security" interests and concerns specific to the technology sector before concluding:

> It is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers.

90 Fed. Reg. at 46,028.

Following the announcement of the Proclamation, USCIS implemented the fee through a series of written documents—the Policy—that formally implement the $100,000 payment and set forth its details and mechanics, including whom the fee applies to, how payment of the $100,000 fee is to be made, and how employers can seek an exception to the fee. For example, USCIS published a memorandum on September 20, 2025 ("September Memorandum"), and a Frequently Asked Questions document on September 21, 2025 ("FAQ"), specifying which visas would be subject to the fee. Doc. No. 84-3 at 3-5. And on October 20, 2025, USCIS issued a

second memorandum ("October Memorandum"), clarifying that the fee applies to new petitions filed on or after September 21, 2025, "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa"; new petitions that request "consular notification, port of entry notification, or pre-flight inspection for an alien in the United States"; and new petitions for change of status, amendment, or extension where USCIS has determined that the individual is not eligible for the request. *Id.* at 7-8. As of this filing, Plaintiffs understand the Policy to include the September and October Memoranda, the FAQ, the revised fee schedule and payment web site administered by USCIS (*Id.* at 9-15), parallel guidance from the Department of State and U.S. Customs and Border Protection in the Administrative Record (Doc. Nos. 84-1 at 11, 84-2 at 1-12), and any non-public rules implementing the $100,000 fee announced in the Proclamation.[2]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). "A genuine issue of fact exists where the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009). The non-moving party must "present affirmative evidence" to support any alleged dispute of fact. *Bennett v. Murphy*, 166 F. Supp. 3d 128, 143 (D. Mass. 2016).

For APA claims, "the traditional Rule 56 standard does not apply; rather, a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Littlefield v. Dep't of Interior*, 656 F. Supp. 3d 280, 290 (D. Mass. 2023). Under the APA, a court must set aside agency action that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). Therefore, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine

---

[2] In addition to this lawsuit, Plaintiffs are aware of two other actions in which courts are considering the lawfulness of the Policy. *See Global Nurse Force v. Trump*, No. 4:25-cv-8454 (N.D. Cal.); *Chamber of Com. v. DHS*, No. 25-cv-3675, 2025 WL 3719234 (D.D.C. Dec. 23, 2025) (granting summary judgment to the federal defendants), *appeal docketed*, No. 25-5473 (D.C. Cir.).

whether the agency action was . . . unlawful." *Ass'n of Am. Univs. v. NSF*, 788 F. Supp. 3d 106, 121 (D. Mass. 2025).

## ARGUMENT

Plaintiffs have standing to bring their claims because the Policy will cause tangible harms to state instrumentalities. And Plaintiffs are entitled to summary judgment on those claims because the Policy exceeds the Executive Branch's authority and violates the APA.

**I.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE POLICY, WHICH WILL CAUSE CONCRETE HARMS TO THEIR EDUCATIONAL INSTITUTIONS AND HEALTH SYSTEMS.**

A state has standing to seek judicial review of a federal policy so long as the challenged policy causes the state to suffer an "injury in fact" that is "fairly traceable" to the policy and "likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). Plaintiffs satisfy these requirements: the Policy has inflicted—and will continue to inflict—concrete harms on Plaintiffs' public educational institutions and health systems.

First, the Policy will harm state educational institutions. Institutes of higher learning, including public colleges and universities, rely on H-1B visas to hire professors, researchers, medical residents, and other professionals to teach classes, conduct research, provide patient care, and run other essential programs. Exs. AZ-1 ¶3, 4; CA-1 ¶¶8-9; CA-2 ¶9-11; CO-1 ¶8; CT-1 ¶8; HI-1 ¶8; HI-2 ¶¶7, 9; IL-1 ¶¶7-9; MD-1 ¶8; MD-2 ¶8; MA-1 ¶8; MN-1 ¶7; NJ-1 ¶15; NY-1 ¶¶7, 9; NY-2 ¶12, 13, 17; NY-3 ¶8; NV-1 ¶¶6, 8; OR-2 ¶8; RI-1 ¶8; VT-1 ¶¶8-9; WA-2 ¶¶5-6; WA-3 ¶6; WA-4 ¶¶15-16.[3] The requirements for these positions are demanding, particularly for faculty and research positions, and vacancies often attract only a limited number of applicants with the necessary qualifications. Exs. CA-2 ¶¶20, 22; CO-1 ¶¶9, 16; CT-1 ¶¶9, 16; HI-2 ¶¶15-16, 18; IL-1 ¶¶14-17; MA-1 ¶¶14-16; MD-1 ¶¶11, 18; MD-2 ¶17; MN-1 ¶14; NJ-1 ¶¶23-25; NY-1 ¶16; NY-2 ¶25; NV-1 ¶¶10-11; OR-1 ¶¶14, 16; OR-2 ¶16; VT-1 ¶¶17-20; WA-1 ¶¶17-18; WA-2 ¶17; WA-3 ¶17; WA-4 ¶¶16-17; WA-5 ¶17. As a result, applicants requiring H-1B visas often make up a substantial percentage of the applicants—or, at times, are the *only* qualified

---

[3] "Ex." refers to exhibits to the Declaration of James E. Richardson filed with this motion.

candidates. *See* Exs. CO-1 ¶17; HI-3 ¶16; MD-1 ¶19; MD-2 ¶18 (only nuclear medicine specialist at University of Maryland, Baltimore is retiring, but Canadian nuclear medicine specialist was only qualified candidate and offer is now on hold); NJ-1 ¶24; NV-1 ¶11; OR-1 ¶14; OR-2 ¶17 (search for curator of art museum has led to one failed search, only one candidate met requirements in second round and required H-1B sponsorship); RI-1 ¶¶15-16; VT-1 ¶19; WA-2 ¶21; WA-3 ¶15; WA-4 ¶17. For example, an October 2024 search by the University of Massachusetts Medical School sought to hire a Senior Research Scientist for Neurology, a position requiring extensive educational and research experience; of the 37 applications received, only one met the qualifications, and that individual required H-1B sponsorship. Ex. MA-1 ¶15. The Policy thus injures Plaintiffs' public colleges and universities by forcing them to either shoulder a $100,000-per-visa fee—an unaffordable amount for many institutions—or else leave critical positions unfilled to the detriment of research and learning opportunities. *See* Exs. OR-1 ¶17 (mechanical engineering department unable to hire an international academic with expertise in the AI field, resulting in research cancelled and a class withdrawn); AZ-1 ¶5; CA-1 ¶12 (potentially disrupting University of California's mission by imposing an estimated annual cost of $61.2 million); CO-1 ¶¶ 16, 19; HI-1 ¶¶15-16; HI-2 ¶¶15-16, 19; IL-1 ¶¶18, 20; MD-2 ¶20 (forced to withdraw job offer due to fee); MA-1 ¶¶9, 18; MN-1 ¶17; NJ-1 ¶¶25-28; NY-1 ¶¶18, 19 (as many as 30 faculty roles may remain unfilled due to the fee), 20 (may have to pay $100,000 to "avoid jeopardizing the accreditation of a critical program"); NY-2 ¶27; NV-1 ¶14; OR-1 ¶¶19, 21; OR-2 ¶¶19-20; RI-1 ¶¶17-18; VT-1 ¶¶20-21; WA-2 ¶¶22, 24; WA-3 ¶¶22-24; WA-4 ¶¶21a, 22-23; WA-5 ¶23-25; WI-1 ¶¶16-18; *see also Massachusetts v. NIH*, 770 F. Supp. 3d 277, 320 (D. Mass. 2025)), *aff'd*, No. 25-1343, 2026 WL 26059 (1st Cir. Jan. 5, 2026) (recognizing the injuries that stem from "loss of human capital and talent"*); Pres. & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182, 209–10 (D. Mass. 2025) (irreparable harm where Harvard's "inability to host these prospective visa holders would halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care").

These injuries are not just limited to postsecondary institutions; the Policy will also harm Plaintiffs' primary and secondary schools. In recent years, Plaintiffs have experienced shortages of teachers and aides within their public schools, with numerous unfilled vacancies, particularly in rural or underserved communities. *See* Exs. NC-1 ¶¶10 ("[T]he statewide teaching position vacancy rate [in North Carolina] as of September 1, 2024 was approximately 7.5 percent," concentrated in rural and impoverished areas), 11; AZ-2 ¶¶5-7; AZ-3 ¶¶7-9; AZ-4 ¶¶4-5, 7-8; CA-3 ¶9; CA-4 ¶¶15-16; CO-2 ¶¶22-23, 27; DE-1 ¶¶14-15, 17; IL-2 ¶¶9-11; IL-3 ¶¶14-16; NC-2 ¶¶10, 15. Plaintiffs rely on H-1B visas to fill these vacancies. AZ-2 ¶¶7-8; AZ-3 ¶11; AZ-4 ¶¶5, 7, 9; CA-3 ¶10; CA-4 ¶17; CO-2 ¶¶25, 28, 30-35; DE-1 ¶¶16, 18-19; IL-2 ¶11; IL-3 ¶¶15, 17; NC-1 ¶11 ("[W]ithout H-1B visa holders, there would be no math teachers . . . ."); NC-2 ¶¶14-15. For example, just this year, North Carolina employed at least 1,100 H-1B visa holders in its schools in rural and impoverished areas of the State, particularly "where vacancies are higher and qualified domestic workers are less inclined to live." Ex. NC-1 ¶11. As with Plaintiffs' institutes of higher education, Plaintiffs' elementary and high schools must pay $100,000 or leave critical positions unfilled. *See* Exs. AZ-2 ¶¶10-11; AZ-3 ¶13; AZ-4 ¶11; CA-3 ¶13; CA-4 ¶¶22-23; CO-2 ¶38; IL-2 ¶¶12-13, 16; IL-3 ¶22; MD-3 ¶¶13-15; NC-1 ¶14; NC-2 ¶17. For those districts that are unable to afford the fee—and must therefore leave positions vacant—the result is increased class sizes and cuts to essential programs for students, including coursework centered on English as a second language, science, and special education; as a result, not only are students deprived of learning opportunities and staff overburdened, but it is challenging or impossible for school districts to satisfy their legal obligations. *See* Exs. AZ-2 ¶11; AZ-3 ¶14 (noting class sizes would increase "dramatically" and risk of losing "music, band, chorus, art, physical education, and library" altogether); AZ-4 ¶¶11-12; CO-2 ¶38; DE-1 ¶21; IL-2 ¶13; IL-3 ¶22; MD-3 ¶¶15-16; NC-1 ¶¶14, 15 (as a result of the fee, North Carolina may be unable to satisfy federal education requirements); NC-2 ¶17.

Second, the Policy will harm state-run public-health systems. Many Plaintiffs rely on H-1B visas to hire doctors, nurses, researchers, and other healthcare providers at their public hospitals

9

and research institutions; without H-1B visas, these institutions could not fill critical vacancies. *See* Exs. IL-1 ¶12; MD-2 ¶18; MI-1 ¶21; MN-2 ¶¶9-11; NJ-2 ¶¶10, 18; NY-2 ¶¶12, 14, 16, 18 (hospital hired twelve clinical lab technologists using the H-1B process after unsuccessful efforts to fill positions locally); NY-3 ¶¶11, 15; WA-1 ¶19; WA-2 ¶¶26-27; WI-1 ¶16. The importance of H-1B visas to public hospitals and research institutions is particularly acute in rural areas, where international candidates are often the only applicants for key positions. *See* Exs. NY-2 ¶¶13-15; WA-1 ¶15, 18; MI-1 ¶¶24, 28; MN-2 ¶7, 10. In this context, too, Plaintiffs' institutions face the injuries described above: payment of $100,000 per visa or leaving key vacancies unfilled. *See* Exs. CT-2 ¶¶22-26; MD-2 ¶18; MI-1¶¶25-27; NJ-2 ¶¶16-18; NY-2 ¶26-27; NY-3 ¶¶19-21; WA-1 ¶¶19-22. As but one example, the University of Washington paid the $100,000 fee to hire a single H-1B applicant for a transplant surgeon to support the entire region. Ex. WA-1 ¶21. The facility was forced to choose between filling this essential role or foregoing other necessary infrastructure or employees. *Id*. The University of Wisconsin School of Medicine and Public Health "relies heavily on international hospitalist to address physician shortages" and the inability to hire through the H-1B program would be "devastating." Ex. WI-1 ¶16. At the same time, continuing to hire H-1B reliant applicants would be financially ruinous, costing the university an additional $4.3 million each year. *Id.* The consequences of unfilled positions in this area are stark: empty posts mean States are unable to provide essential medical care to patients and pursue vital research projects. *See Massachusetts*, 770 F. Supp. 3d at 320 ("[T]he suspension of ongoing clinical trials and the resulting threats to patients' lives represents a dire risk of a quintessentially irreparable nature."). And these injuries are not confined to the institutions themselves. As a session of this Court recently recognized, harms like these "do not only impact the Plaintiff states and institutions, but the communities and people they serve." *Id.* at 325.

## II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE POLICY VIOLATES THE CONSTITUTION'S SEPARATION OF POWERS AND IS *ULTRA VIRES*.

An *ultra vires* claim will lie where "an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Harvard*, 798 F. Supp. 3d at

133. Such a situation arises here. The Constitution confers upon Congress alone the powers to regulate the admission of noncitizens, *Kleindienst*, 408 U.S. at 766, and to levy taxes, *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("*NCTA*"). The Policy usurps both. By demanding a $100,000 payment in connection with H-1B applications, the Policy undermines Congress's goal of ensuring that American employers—including government and nonprofit employers—can benefit from the contributions of noncitizen workers. More specifically, the Policy effectively nullifies Congress's directive that fees set by the executive branch be limited to those necessary to recover the costs of administering the program. It also imposes an unauthorized tax, extracting revenue from Plaintiffs and other employers toward domestic policy aims without a delegation of authority from Congress. While Defendants claim that Sections 212(f) and 215(a) of the INA authorize the Policy, neither provision allows the executive branch to eviscerate Congress's design or impose a tax. The Court should hold the Policy to be *ultra vires*.

A.    **The Policy usurps Congress's Plenary Power Over the Admission of Noncitizens.**

The Constitution confers upon Congress "plenary power to make rules for the admission of aliens." *Kleindienst*, 408 U.S. at 766; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of [policies pertaining to the entry of noncitizens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."). In other words, "Congress has the power . . . to prescribe the terms and conditions on which [noncitizens] may come in," and it merely "commit[s] the enforcement of such conditions and regulations to executive officers." *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 335 (1909).

For nearly 75 years, Congress has exercised that constitutional authority by regulating the admission of specialty workers to the United States. Legislating on this issue has required Congress to make careful judgments about the proper balance between the goals of admitting uniquely skilled noncitizen workers, protecting the domestic workforce, and accommodating the

unique needs of government and nonprofit employers. Congress's ultimate judgments on this score are encapsulated in the INA, which provides the exclusive "terms and conditions," *id.* at 335, under which nonimmigrant workers in "specialty occupations" may be granted H-1B visas, *see* 8 U.S.C. § 1184 (setting the conditions for admission of non-immigrant aliens, including those on H-1B visas), § 1101(a)(15)(H)(i)(b) (establishing H-1B visa category by reference to "specialty occupations"), § 1184(i) (defining "specialty occupation").

These statutory provisions reflect a clear congressional concern for the needs of public-sector and nonprofit employers. For example, although the INA caps the issuance of H-1B visas at 65,000 per year, the cap does not apply to an H-1B worker who "is employed (or has received an offer of employment) at an institution of higher education . . . , or a related or affiliated nonprofit entity [or] at a nonprofit research organization or a governmental research organization." *Id.* § 1184(g)(5)(A)-(B). Along similar lines, the statute makes an extra 20,000 H-1B visas available to workers who have obtained graduate degrees at American universities. *See id.* § 1184(g)(5)(C).

The INA provisions governing H-1B visas also reflect careful attention to—and close congressional control over—the fees associated with H-1B visa petitions. As discussed above (*see* Background, Part II-B), Congress has repeatedly imposed and modified fees by statute (although it has exempted certain government and nonprofit employers from the full amount due from other employers, again displaying a special solicitude for those entities). *See, e.g.*, 8 U.S.C. § 1184(c)(9)(A). Congress has also given the executive branch only limited authority to assess "adjudication fees," allowing DHS to charge only an amount "that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* § 1356(m).

Hewing to this statutory authority and to the APA, USCIS has promulgated fees in only limited instances, and only through the required notice-and-comment process. *See above* (Background, Part II); *USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194, 6288 (Jan. 31, 2024) ("2024 Rulemaking") (identifying 8

U.S.C. § 1356(m) as authority to engage in rulemaking to establish a fee schedule). At the end of the most recent notice-and-comment process, in 2024, USCIS itself recognized that "8 U.S.C. 1356(m)[] requires USCIS fees to be based on the total costs for USCIS to carry out adjudication and naturalization services, which could be affected by the amount of time required to process requests," 89 Fed. Reg. at 6288, and it complied with these limits by setting H-1B registration fees based on actual costs, *id.* at 6289.

The Policy effectively wipes out Congress's efforts, replacing a carefully balanced statutory structure with a pay-to-play scheme that makes H-1B visas available only to employers who can afford an additional $100,000 tax per employee (or who are favored by the Administration to receive an entirely discretionary exemption). In other words, the Policy nullifies Congress's framework for the H-1B program by reducing the H-1B availability to one criterion: whether an employer can afford to pay over $100,000 per petition. The payment requirement makes no allowance for the nature of the employer, whether its hiring of H-1B workers advances the public interest, or whether the employer has abused the H-1B system in the past—all considerations central to the INA's provisions. And Congress's efforts to balance goals like not overburdening public interest employers are superfluous if the fees dictated by statute amount to a rounding error compared to the Administration's new demand for $100,000.

In arrogating Congress's exclusive policymaking authority over the admission of noncitizens, Defendants violated the Constitution's separation of powers.

## B.    The Policy usurps Congress's Exclusive Power to Raise Revenue Through Taxation.

In addition to power over the admission of noncitizens, the Constitution vests solely in Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1; *see also NCTA*, 415 U.S. at 340 (describing "Congress [as] the sole organ for levying taxes"). Congress may delegate its taxation power to the executive branch, but "Congress must indicate clearly its intention" to do so. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989).

While the Administration has generally referred to the $100,000 levy as a "payment," for constitutional purposes it is a tax falling within Congress's exclusive power. To be sure, not all payments to the government are taxes; the Supreme Court has recognized that charges that bestow "a reciprocal benefit on the [payor], not shared by other members of society" do not constitute "taxes." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 676 (2025). The slate of adjudication fees that USCIS has imposed pursuant to 8 U.S.C. § 1356(m), described in Part II-B of the Background above, are an excellent example of this kind of non-tax fee. As required by statute and documented in the agency's most recent rulemaking, *see* 2024 Rulemaking, those adjudication fees are set at a level commensurate with the agency's costs in adjudicating visas; in other words, they recoup the costs of providing "a reciprocal benefit" to the H-1B petitioner. By contrast, the new $100,000 fee is unrelated to any benefit conferred, which the Proclamation— the centerpiece of the Administrative Record—itself affirms. Instead, the Policy is a self-styled "immediate response" to "[t]he severe harms that the large-scale abuse of [the H-1B] program has inflicted on our economic and national security." 90 Fed. Reg. at 46,028. [I]n light of the public policy or interest served," in other words, the Policy "make[s] the assessment heavy . . . to discourage the activity." *NCTA*, 435 U.S. at 341. As the Supreme Court has made clear, "[s]uch assessments are in the nature of 'taxes' which under our constitutional regime are traditionally levied by Congress." *Id.*[4]

Here, Congress has not "indicate[d] clearly its intention" to delegate taxation authority to the executive branch. *Skinner*, 490 U.S. at 224. To the contrary, Congress has explicitly limited the executive branch's authority to raise payments to recouping "reciprocal" fees—that is, fees "based on total costs for USCIS to carry out adjudication and naturalization services." 2024 Rulemaking at 6288. For that reason, too, the Policy is *ultra vires*.

---

[4] Even if the Court were to determine that the $100,000 payment is not a tax, it is still subject to judicial review of whether Congress delegated authority to collect a payment. *See Consumers' Rsch.*, 606 U.S. at 677; *see below* Part III-C.

C.    **Neither Section 212(F) Nor Section 215(A) Authorizes the Executive Branch to Upend the H-1B Program Created by Congress.**

The Administrative Record supporting the Policy cites only the Proclamation for legal authority. The Proclamation, in turn, cites Sections 212(f) and 215(a), but neither provision confers authority to override any portion of the INA or to impose a novel tax on H-1B petitioners.

Generally speaking, the cited provisions grant the President the ability to suspend or restrict entry of noncitizens in certain circumstances. Section 212(f) permits the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate" upon "find[ing] that [their] entry into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Section 215(a), for its part, makes it unlawful for any noncitizen to enter or leave the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). The two provisions—which "substantially overlap[]"—have historically been used to "suspend[] entry in response to a diplomatic dispute or policy concern" relating to specific nationalities or countries. *Trump v. Hawaii*, 585 U.S. 667, 683 n.1, 687 (2018). Never before, however, have these provisions been invoked to impose onerous charges unconnected to the cost of processing immigration applications, in direct violation of 8 U.S.C. § 1356(m). And such a use of those statutes is clearly impermissible, for several reasons.

First, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA," *Hawaii*, 585 U.S. at 689, and other courts have held that Section 212(f) does not permit the executive to "effectively rewrit[e] provisions of the INA" or to "eviscerate the statutory scheme." *Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020); *see also Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 80 (D.D.C. 2025) (Section 212(f) "cannot plausibly be read to authorize the [executive] to supplant" provisions of the INA). As described above, however, the Policy does just that. The same principle applies to Section 215(a), too. *See Hawaii*, 585 U.S. at 683 n.1.

15

Second, Section 212(f) applies only to a limited "sphere"—namely, "the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa)," which the Court distinguishes from the sphere of "visa issuance." *Id.* at 695.[5] The Policy adds a visa issuance requirement—a payment imposed on domestic employers—rather than restricting the admissibility of any class of noncitizens. Similarly, courts have held that "Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners," as the Proclamation underlying the Administrative Record explicitly claims to do. *Nat'l Assn of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 563 (N.D. Cal. 2020); *see also President & Fellows of Harvard Coll.*, 788 F. Supp. at 196–97. Once again, the same conclusions apply with respect to Section 215(a). *See Hawaii*, 585 U.S. at 683 n.1.

Third, the executive's power to levy a tax or fee must be delegated by Congress. *See Consumers' Rsch.*, 606 U.S. at 674–75. Sections 212(f) and 215(a) contain no such delegation. And even if those statutes arguably delegated such authority, "Congress [must] set out an 'intelligible principle' to guide what it has given the agency to do." *Id.* at 673. "The guidance needed is greater . . . when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue.'" *Id.* A $100,000 fee for every H-1B petition will undoubtedly "affect the entire national economy," but nothing in Sections 212(f) or 215(a) guide the scope, implementation, or permissibility of such a fee.

Fourth, the major questions doctrine prohibits reading Sections 212(f) and 215(a) to confer the authority claimed by the administration—for the first time in the statute's history. Never in its history has Section 212(f) been invoked to "impose a monetary form of restriction." *Chamber of Com. of United States v. DHS*, No. 25-CV-3675 (BAH), 2025 WL 3719234, at *16 (D.D.C. Dec. 23, 2025) (discussing Defendants' concession of this fact). "When an agency claims to

---

[5] "Section 1182 [INA § 212] defines the pool of individuals who are admissible to the United States. Its restrictions come into play at two points in the process of gaining entry (or admission) into the United States. First, any alien who is inadmissible under § 1182 . . . is screened out as ineligible to receive a visa. Second, . . . a visa does not entitle an alien to enter the United States if, upon arrival, an immigration officer determines that the applicant is inadmissible under [the] law—including § 1182(f)." *Id.*

discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Much as in *Biden v. Nebraska*, where the Court held that the executive branch lacked authority to cancel student debt because Congress had knowingly declined to do so, here "Congress is not unaware of the" actual and potential abuse of the H-1B program, as demonstrated by the INA provisions aimed at such abuses. 600 U.S. at 503. Here, Defendants' "assertion of administrative authority has conveniently enabled [them] to enact a program that Congress has chosen not to enact itself." *Id.*

### III.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE POLICY VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.

#### A.    The Policy is Final Agency Action.

The APA provides for judicial review of "final agency action." 5 U.S.C. § 704. To determine whether an agency action is "final" within the meaning of § 704, a court asks (1) whether the action "mark[s] the consummation of the agency's decisionmaking process" and (2) whether the action is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

Both conditions are easily met here. As is clear from Defendants' memoranda implementing the Policy, H-1B petitions must be accompanied by a $100,000 fee, or else be rejected. The "decisionmaking process" is therefore complete—*i.e.*, there is nothing "tentative or interlocutory" about the agency's pronouncement. *Id.* at 597. And from this decision flows an unavoidable "legal consequence": an H-1B petition without a $100,000 payment will be rejected, and any related visa will be denied. *Id.* Accordingly, Defendants' imposition of a required $100,000 fee with every H-1B application constitutes a final agency action subject to judicial review under § 704.

17

The fact that the Policy stems from a presidential proclamation does not affect its reviewability under § 704. In *New York v. Trump*, 133 F.4th 51 (1st Cir. 2025), the First Circuit explained that, even if an executive order or similar presidential directive is not reviewable, a district court may review and set aside the actions of an agency and its officials undertaken pursuant to such an executive order or directive. *Id.* at 70 n. 17; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question"). Here, the Policy is composed of multiple, discrete, non-presidential acts, as set forth in above. *See* Background, Part III-B.

### B. Defendants' Promulgation of The Policy Did Not Observe the Procedure Required by Law.

The Policy was enacted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because Defendants failed to comply with the APA's requirements for notice-and-comment rulemaking. In promulgating "legislative rules"—*i.e.*, those that have "the force and effect of law," an agency must comply with the APA's notice-and-comment requirements. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015); *see* 5 U.S.C. § 553; *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (legislative rule "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself"). The Policy is a legislative rule because it imposes new obligations on filers of H-1B visa petitions— obligations that are nowhere specified in statute or regulation. Here, however, the agency has failed to engage in any of the APA's requirements for rulemaking. *See* 5 U.S.C. § 553(b)–(d). Defendants gave no public notice and no opportunity for interested members of the public to comment before implementing the Policy. *See id.* § 553(b)–(c) (requiring notice and an opportunity to comment). Moreover, Defendants issued the Policy with immediate effect— without articulating any "good cause" for doing so. *See id.* § 553(d) (providing that "a substantive rule shall be made not less than 30 days before its effective date," unless, *inter alia*,

an agency publishes a statement of "good cause"). These failures stand in contrast to the extensive rulemaking process historically undertaken by USCIS to set fees, most recently in 2024. *See* 2024 Rulemaking discussed above (Part II-A, B). Accordingly, the Policy violates the APA and should be set aside.

**C.    The Policy exceeds Statutory Authority.**

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C); *see also Cousins v. Sec'y of U.S. Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir. 1989). "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.*

As explained in Part II of the Argument above, Defendants enacted the Policy without authorization from Congress. While the executive branch is permitted to set some fees for H-1B petitions, these cannot exceed "a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m). The Policy exceeds that statutory authority. As explained above, the Policy likewise exceeds any statutory authority conferred by Sections 212(f) and 215(a) of the INA, which do not authorize the imposition of substantial payment not otherwise authorized by Congress. For these reasons, too, the Policy violates the APA.

**D.    The Policy is Arbitrary and Capricious.**

Under the APA, a court must "hold unlawful and set aside" final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency decision fails this test if

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants violated these principles in three ways. First, they failed to acknowledge that the Policy represents a significant divergence from past practice or offer any justification for that shift. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Second, they "entirely failed to consider" Plaintiffs' significant reliance interests. *State Farm*, 564 U.S. at 43; *see DHS v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). And third, they "relied on factors which Congress has not intended [them] to consider" by basing the Policy on domestic economic policy considerations and failing to consider Congress's statutory scheme. *State Farm*, 463 U.S. at 43.

### 1.    Defendants failed to acknowledge—let alone grapple with—the Policy's significant divergence from past agency practice.

While an agency may modify its policies, the APA "ordinarily demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC,* 556 U.S. at 515. Defendants failed to do that here. Congress has set certain fees associated with H-1B petitions and delegated to the executive limited authority to set H-1B-related fees through notice-and-comment rulemaking. *See above*, Background, Part II. Pursuant to that delegation, Defendants formulated a fee schedule through the required notice-and-comment process just two years ago. *See above*, Argument, Part II-A. In adopting the Policy, however, Defendants departed from the existing fee schedule without acknowledging the gravity of the change—let alone providing a sufficient explanation for the departure. That unexplained departure was impermissible: because defendants were "not writing on a blank slate," they were "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S.

at 33; *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) (explaining that an agency may not "gloss over or swerve from prior precedents without discussion").

### 2.    Defendants failed to consider the Plaintiffs' reliance interests.

Defendants also "entirely failed to consider" or address the significant reliance interests at stake. *See Regents*, 591 U.S. at 30, 33. As contemplated by Congress' longstanding policies, Plaintiffs have made hiring decisions under H-1B programs to respond to shortages of physicians, nurses, teachers, and other providers of necessary services. Yet the Proclamation is solely focused on the impact of the Policy on tech companies, not government entities, and the Administrative Record lacks any consideration of how the Policy will affect government entities. This failure to consider the implications of the Policy show that the Defendants were not "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30; *see also Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (a "more detailed justification" for a change in policy may be required when an agency's prior policy has "engendered serious reliance interests").

### 3.    Defendants grounded the policy on impermissible considerations.

Lastly, Defendants have "relied on factors which Congress has not intended it to consider" by basing the Policy on economic policy considerations. *State Farm*, 463 U.S. at 43. Defendants acknowledge that they based the Proclamation on domestic economic policy considerations[6]— including the need to raise revenues, a power vested in Congress exclusively. *See above*, Part II-A. But Congress never intended such concerns to underlie the establishment of H-1B fees set by executive agencies—and certainly not onerous charges intended solely to advance domestic policy goals without even the pretense of a connection to agency costs. *See* 8 U.S.C. § 1356(m) (authorizing fees based solely on administrative costs). Congress crafted the H-1B visa system to

---

[6] While the executive branch is entitled to deference with respect to foreign policy and national security, that same deference does not apply when "executive action under § 1182(f) is taken for reasons grounded in domestic policy, and not on international affairs and national security." *Young v. Trump*, 506 F. Supp. 3d 921, 942 (N.D. Cal. 2021).

meet the needs of the domestic economy through statutory mechanisms. The Defendants have disregarded these considerations in clear violation of the APA.

## IV.    PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK.

### A.    Plaintiffs are Entitled to a Declaratory Judgment.

The APA authorizes declaratory relief to Plaintiffs. 5 U.S.C. § 703 ("The form of proceeding for judicial review . . . include[s] actions for declaratory judgments[.]"); 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). Plaintiffs seek judicial declaration that the Policy is unlawful in violation of the APA and the Constitution. In considering whether declaratory relief is appropriate, courts consider whether "an actual controversy exists," and whether such relief would "serve a useful purpose in either clarifying and settling legal relations or finally ending the controversy giving rise to the proceedings." *Associated General Contractors of Mass. v. Boston Dist. Council of Carpenters*, 642 F. Supp. 1435, 1441 (D. Mass. 1986). Here, both considerations are met: an actual controversy exists because Plaintiffs remain at risk of Defendants' enforcing the Policy against them, and a declaration that the Policy is unlawful would prevent its enforcement. For these reasons, declaratory relief should be granted.

### B.    Plaintiffs are Entitled to Vacatur of The Policy.

The APA authorizes courts to "hold unlawful and set aside agency action" that is arbitrary and capricious, contrary to law, or otherwise violative of the APA. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of an unlawful agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826–27 (2024) (Kavanaugh, J., concurring); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately."). Because the Policy violates the APA, it should be vacated.

And, to the extent vacatur does not provide Plaintiffs sufficient relief, they are entitled to a permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (four-

factor test for permanent injunction). For the reasons stated in Part I of the Argument above, Plaintiffs' universities, schools, and agencies have suffered and will continue to suffer irreparable harm absent a permanent injunction. Moreover, the balance of hardships sharply favors an injunction, as Plaintiffs' institutions must choose between paying an exorbitant fee and cutting other programs and services. By contrast, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Ass'n of Am. Univs. v. DOD*, 792 F. Supp. 3d 143, 181 (D. Mass. 2025).

## CONCLUSION

For the reasons stated above, Plaintiff States respectfully request that the Court grant their motion and enter judgment in Plaintiffs' favor**.**

February 6, 2026

Respectfully submitted.

**ROB BONTA**
 *Attorney General of California*

 /s/ *James E. Richardson*
Michael L. Newman*
 *Senior Assistant Attorney General*
Marissa Malouff*
James E. Stanley*
 *Supervising Deputy Attorneys General*
Denise Levey*
Lorraine Lopez*
Jeanelly Orozco Alcalá*
James E. Richardson*
*Deputy Attorneys General*
300 S. Spring St., Suite 1702
 Los Angeles, CA 90013
(213) 269-6341
james.richardson@doj.ca.gov

**ANDREA JOY CAMPBELL**
 *Attorney General of Massachusetts*

 /s/ *Julia S. Canney*
Michelle Pascucci (BBO No. 690889)
Nita K. Klunder (BBO No. 689304)
 *State Trial Counsels*
Gerard J. Cedrone (BBO No. 699674)
 *Deputy State Solicitor*
Julia S. Canney (BBO No. 717328)
 *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2851
julia.s.canney@mass.gov

**KRISTIN K. MAYES**
 *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
Joshua G. Nomkin*
 *Assistant Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

**PHILIP J. WEISER**
 *Attorney General of Colorado*

 /s/ *David Moskowitz*
David Moskowitz*
 *Deputy Solicitor General*
Nora Passamaneck*
 *Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

**WILLIAM TONG**
 *Attorney General of Connecticut*

 /s/ *Francesca Testa*
Francesca Testa*
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5210
francesca.testa@ct.gov

**ANNE E. LOPEZ**
 *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**ANTHONY G. BROWN**
 *Attorney General of Maryland*

 /s/ *Virginia A. Williamson*
Virginia A. Williamson*
 *Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston*
 *Director of Impact Litigation*
Vanessa L. Kassab*
 *Deputy Attorneys General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
 vanessa.kassab@delaware.gov

**KWAME RAOUL**
 *Attorney General of Illinois*

 /s/ *Aleeza Strubel*
Aleeza Strubel*
 *Complex Litigation Counsel*
Elizabeth Morris*
 *Deputy Chief, Special Litigation Bureau*
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
(312) 814-3000
aleeza.strubel@ilag.gov

**DANA NESSEL**
 *Attorney General of Michigan*

 /s/ *Neil Giovanatti*
Neil Giovanatti*
 *Assistant Attorney General*
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

**KEITH ELLISON**
 *Attorney General of Minnesota*

 /s/ *Joseph R. Richie*
Joseph R. Richie*
 *Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us


**AARON D. FORD**
 *Attorney General of Nevada*

 /s/ *K. Brunetti Ireland*
K. Brunetti Ireland*
 *Chief of Special Litigation*
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov


**JENNIFER DAVENPORT**
 *Acting Attorney General of New Jersey*

 /s/ *Max G. Lesser*
Max G. Lesser*
 *Deputy Attorney General*
Melina Meneguin Layerenza*
 *Assistant Attorney General*
25 Market Street
Trenton, NJ 08625
(609) 575-6143
max.lesser@law.njoag.gov


**LETITIA JAMES**
 *Attorney General of New York*

 /s/ *Zoe Levine*
Zoe Levine*
 *Special Counsel for Immigrant Justice*
Victoria Ochoa*
 *Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(212) 416-8329
zoe.levine@ag.ny.gov


**JEFF JACKSON**
 *Attorney General of North Carolina*

 /s/ *Daniel P. Mosteller*
Daniel P. Mosteller*
 *Associate Deputy Attorney General*
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov


**DAN RAYFIELD**
 *Attorney General of Oregon*

 /s/ *Thomas H. Castelli*
Thomas H. Castelli*
 *Senior Assistant Attorney General*
100 S.W. Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

26

**PETER F. NERONHA**
*Attorney General of Rhode Island*

/s/ *Kyla Duffy*
Kyla Duffy*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov

**NICHOLAS W. BROWN**
*Attorney General of Washington*

/s/ *Sara L. Wilmot*
Sara L. Wilmot*
*Assistant Attorney General*
Kate S. Worthington*
*Assistant Attorney General*
7141 Cleanwater Drive S.W.
P.O. Box 40111
Olympia, WA 98504
(360) 709-6470
sara.wilmot@atg.wa.gov

* admitted *pro hac vice*

**CHARITY R. CLARK**
*Attorney General of Vermont*

/s/ *Jonathan T. Rose*
Jonathan T. Rose*
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

**JOSHUA L. KAUL**
*Attorney General of Wisconsin*

/s/ *Faye B. Hipsman*
Faye B. Hipsman*
*Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707
(608) 264-9487
faye.hipsman@wisdoj.gov