# Exhibit HI-3

## **DECLARATION OF LEONARD R. GOUVEIA, JR.**

1. I am a resident of the State of Hawaiʻi. I am over the age of eighteen.

2. I am currently employed by the Research Corporation of the University of Hawaiʻi (RCUH) as its Executive Director.

3. As the Executive Director of RCUH, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by RCUH's employees and I believe that information to be true.

4. RCUH maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at the RCUH.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

### **RCUH and Its Hiring**

6. RCUH is a public instrumentality that supports research, development, and training in Hawaiʻi, with a focus on the University of Hawaiʻi. RCUH hires personnel and procures goods and services for the University of Hawaiʻi, state agencies, and private non-profits. RCUH supports approximately 4,100 research and training projects by employing around 2,500 individuals.

7. Each year, RCUH hires approximately 1,300 employees. The vast majority of its new hires are affiliated with the University of Hawaiʻi, although RCUH will also hire for other government employers and nonprofits.

### **Impact of the H-1B Policy on RCUH Hiring**

8. RCUH relies on the H-1B visa program to fill employment vacancies. Today, RCUH employs approximately 55 individuals who hold H-1B visas, of whom 50 are affiliated

1

with University of Hawai'i projects. RCUH needs to continue to rely on the H-1B visa process to fill vacant positions as necessary and appropriate to support research in the State of Hawai'i.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of RCUH to hire qualified applicants. In fact, it has already done so.

10. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe RCUH's hiring practices. RCUH does not and has not used the H-1B visa program to hire "lower-paid, lower-skilled" employees. To the contrary, RCUH strictly complies with all federal prevailing wage requirements, and in practice, most RCUH projects compensate at rates that exceed the required prevailing wage. Further, RCUH actively monitors compensation practices to ensure internal equity. In the event that any pay inequities arise between H-1B employees and similarly situated non-foreign workers, RCUH addresses such inequities through appropriate compensation adjustments, consistent with policy, funding availability, and applicable regulations. Many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; of the approximately 55 H-1B visa holders currently employed by RCUH, over 50% are Astronomers, Scientists, Biologists, and Researchers specializing in their

fields and holding advanced degrees. All H-1B visa holders employed by RCUH possess at least a Master's Degree, with most jobs requiring PhD Degrees and specialized experience, knowledge, and abilities and skills.

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to RCUH twice over: RCUH is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." RCUH has not and does not intend to rely on "outsourcing companies" to fill employment vacancies. To the best of my knowledge, RCUH has never relied on an outsourcing company for hiring, let alone one that was accused of fraud by any state or federal agency.

14. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, RCUH must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for non-productive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

3

15. RCUH operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

16. Many positions for which RCUH hires (particularly those in science, technology, and research) have highly technical and specialized requirements. For example, these positions require applicants to, *inter alia*, possess advanced research capabilities and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that RCUH can consider. Positions may go unfilled. The result will be the frustration of RCUH's ability to employ the individuals necessary to support critical research, development, and training in Hawai'i.

17. Given the highly specialized nature of many positions and the limited number of eligible candidates, RCUH often vies to hire a handful of eligible applicants. In such situations, RCUH must compete with private universities and other employers, many of which have more expansive financial resources than does RCUH, which is a public instrumentality. RCUH's inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these important positions.

18. The fee imposed by the Policy will preclude RCUH from hiring individuals outside of the United States who require an H-1B visa to work within the United States. As a result, RCUH is currently not initiating new H-1B applications.

19. RCUH does not receive general-fund appropriations from the Hawai'i State Legislature. Instead, RCUH relies on the project sponsor—in other words, the University of Hawai'i, a state agency, or a private non-profit—to fund the position for a specific project. To cover the operational expenses of RCUH's hiring and procurement services, RCUH receives a

small fee collected from the expenditures run through RCUH to support its core team. RCUH is not a for-profit organization.

20. Because of this funding structure, RCUH does not have surplus funds to pay the $100,000 fee. Instead, funds to cover the $100,000 fee must come directly from the project sponsor. That decision is largely outside the control of RCUH.

21. For the 50 H-1B employees working on projects affiliated with the University of Hawaiʻi, the average annual salary is approximately $83,000. The Policy's $100,000 fee is more than the average annual salary. When fringe benefits are included, the average annual cost per position is about $112,000, just slightly more than the $100,000 fee. Accordingly, the Policy's $100,000 fee could reduce the length of time for which an employee can be hired by about a year.

22. The Policy will have a significant and irreparable impact on RCUH, the University of Hawaiʻi, state agencies, and private non-profits that use RCUH's services. RCUH requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of January, 2026, in Honolulu, Hawaiʻi.

_____
Leonard R. Gouveia, Jr.
Research Corporation of the
University of Hawaiʻi
1601 East-West Road
Honolulu, HI 96848