# Exhibit MD-1

## DECLARATION OF DAVID L. DI MARIA

I, David L. Di Maria declare as follows:

1.    I am a resident of the State of Maryland. I am over the age of eighteen.

2.    I am currently employed as Vice Provost for Global Engagement at the University of Maryland, Baltimore County ("UMBC"), a constituent institution of the University System of Maryland, the State of Maryland's public system of higher education.

3.    As Vice Provost for Global Engagement of UMBC, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UMBC's employees, and I believe that information to be true.

4.    UMBC maintains business records in the ordinary course of business, which include, inter alia, records concerning hiring at UMBC.

5.    I submit this Declaration in support of the States' Motion for Summary Judgment.

## UMBC and Its Hiring

6.    During the current 2025–2026 academic year, UMBC enrolls 13,530 students and employs more than 2,000 full- and part-time employees who study, work, and/or conduct research at the undergraduate, graduate, postgraduate, and doctoral levels.

7.    UMBC must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its students.

## Impact of the H-1B Policy on UMBC Hiring

8.    UMBC relies on the H-1B visa program to fill employment vacancies,

1

particularly for highly technical and specialized positions. Today, UMBC employs approximately 90 faculty and staff who are holders of H-1B visas. UMBC must continue to rely on the H-1B visa process to recruit and hire qualified individuals to fill vacant positions for staff and faculty.

9.     The largest number of current UMBC employees who hold H-1B visas work within the Goddard Earth Sciences Technology and Research II Center and the Center for Space Sciences Technology, which account for 48% of UMBC's total federally funded research portfolio. In addition, there are a significant number of H-1B visa holders working at UMBC in such functions as Computer Science and Electrical Engineering, Information Systems, Physics, Mathematics and Statistics and Mechanical Engineering.

10.     I understand that earlier this year, the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee with any new petition for an H-1B visa (the "Policy").

11.     UMBC cannot pay the $100,000 fee imposed by the Proclamation, which will preclude it from hiring individuals outside of the United States who require an H-1B visa to work within the United States. As a result, the Policy will adversely impact UMBC's ability to hire qualified applicants. In fact, it has already done so.

12.     On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas, "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

13.    The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UMBC's hiring practices. UMBC does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, nearly all of UMCB's employees currently in possession of H-1B visas have highly specialized training and advanced degrees. Of the approximately 90 H-1B visa holders currently employed by UMBC, 95% of those employees are faculty, post-doctoral employees, or medical residents holding terminal degrees.

14.    The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to UMBC. It is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

15.    The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." UMBC has not relied on and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, UMBC has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

16.    In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers, which predate the Proclamation. For example, for every

3

employee hired through the H-1B visa program, UMBC must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9034 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

17.    UMBC operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

18.    Many vacant UMBC faculty or post-doctoral positions—particularly those in science, technology, engineering, and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants to, among other things, possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that UMBC can consider. This would seriously hamper UMBC's ability to employ the individuals necessary to support the research activities and educational offerings it provides to its students.

19.    In highly technical fields, such as Earth and space sciences, UMBC's hiring draws from a relatively small global scientific community of experts suited to fulfill a highly specialized research need. As a result, applicant pools have historically been small. The Policy has further limited the talent pipeline, compounding the difficult of attracting and hiring the strongest candidates for these roles.

4

20.    Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities compete to hire from among a handful of eligible applicants. In such situations, UMBC must compete with private universities, some of which have more expansive financial resources than UMBC, which is a public institution. UMBC's inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

21.    Depending on experience and specialty, full-time faculty at UMBC are typically paid an average salary of $120,171. UMBC is not able to pay the $100,000 fee imposed by the Policy, which would prohibitively increase the costs necessary to hire new candidates requiring an H-1B visa.

22.    The Policy has started to have a significant and irreparable impact on UMBC beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Chemistry & Biochemistry and Computer Science & Electrical Engineering—historically, subject matters for which UMBC has had to turn to candidates who will require an H-1B visa—will soon post vacancies and expect to hire new candidates for Fall 2026. UMBC requires relief from the fee imposed by the Policy or else it will be critically undermined in hiring for these essential positions.

**Impact of the Policy on Student Enrollment**

23.    In addition to adversely impacting UMBC's ability to hire, the Policy will also likely reduce the number of international students who apply to attend UMBC and thus will adversely impact the revenues that UMBC receives from tuition each year.

24.    International students are an integral part of the student population—at all levels—who attend UMBC. Currently, 4.9% of undergraduate students and 41.4% of

5

graduate students at UMBC are from outside of the United States.

25.     Tuition and fees at UMBC—as at many public universities—are much lower for Maryland residents (currently $ 13,689 per year for undergraduates and $17,262 for graduate students) than for out-of-state residents (currently $ 32,745 per year for undergraduates and $27,126 for graduate students). International students pay out-of-state tuition (with certain, limited exceptions) and must show advance proof of funding sufficient for a full academic year, according to United States student visa regulations. In addition, because international students are ineligible for need-based federal and state aid, they are much more likely to pay full tuition than domestic students. Accordingly, the tuition and fees received from international students constitute a significant source of revenue for UMBC and serve to subsidize the costs of educating domestic students, ensuring that UMBC can continue to provide affordable in-state tuition for Maryland residents and scholarships to students who may otherwise lack the financial resources to attend college.

26.     Many international students attend UMBC with the expectation that they will be able to secure temporary employment in the United States following graduation. Moreover, as I understand it, many U.S. employers rely on a stable pipeline for STEM workers.

27.     The fee imposed by the Policy will make it much more difficult for U.S.-trained scientists and engineers to return to the United States as they are reasonably likely to assess that U.S. employers will not be able to hire as many workers requiring H-1B visas as in previous years.  In fact, it has been reported to me by student counselors abroad, that the Policy and the $100,000 fee are already deterring prospective students from seeking an

education in the United States, including at UMBC.

28.    Already, UMBC is seeing impacts on the number of international graduate students seeking admission. At this time last year, UMBC received 1,060 applications from international students for master's degree programs and 1,126 applications for doctoral degree programs for Fall 2025. This year, following the issuance of the Policy, only 227 international students have applied to master's degree programs and 506 applied to doctoral degree programs for Fall 2026, with the greatest declines seen in STEM fields.

29.    Applications for many of UMBC's STEM graduate programs for Fall 2026 are due on May 19, 2026. Unless the Policy and $100,000 fee are set aside, it is unlikely that UMBC will be able to continue to enroll adequate numbers of international students to support teaching, research, and economic development within our state and region.

30.    The decline in the number of international students resulting from the Policy will harm UMBC by reducing the amount of tuition and fees that it receives per year, thereby adversely impacting UMBC's budget and its ability to provide affordable in-state tuition and merit-based scholarships.

31.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 05 day of February 2026, in Baltimore, Md.


/s/ David L. Di Maria

David L. Di Maria
Vice Provost for Global Engagement
University of Maryland, Baltimore County
1000 Hilltop Circle, Administration Building 225, Baltimore, MD 21250