# Exhibit NC-1

## **DECLARATION OF MAURICE O. GREEN**

I, Maurice O. Green, declare as follows:

1. I am a resident of the State of North Carolina. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief. As to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I serve as the elected North Carolina Superintendent of Public Instruction and have been in this position since January of 2025. Before I was elected to this office, I served as a district superintendent, deputy superintendent, chief operating officer, and school board attorney for local school districts in North Carolina for a total of 15 years.

3. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. As the North Carolina Superintendent of Public Instruction, I have personal knowledge of the matters set forth below or, with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from the records of the North Carolina State Board of Education and the North Carolina Department of Public Instruction, as compiled by others within the organization.

### State Background

4. The North Carolina Superintendent of Public Instruction is a position created by the North Carolina Constitution. N.C. Const. art. III, sec. 7. The duties of my position include serving as secretary and chief administrative officer to the North Carolina State Board of Education (State Board). N.C. Const. art. IX, sec. 4. The State Board is established by the North Carolina Constitution to "supervise and administer the free public school system, and the educational funds provided for its support . . . ." N.C. Const. art. IX, sec. 5. In addition to

1

serving as Secretary to the State Board, my duties include establishing, organizing, and overseeing the North Carolina Department of Public Instruction (NCDPI). See N.C. Gen. Stat. §115C-21.

5. The State Board is the State Education Agency (SEA) for North Carolina for purposes of implementing federal law. NCDPI, under my leadership, oversees the day-to-day administration and supervision of the North Carolina public school system. *See* N.C. Gen. Stat. §§ 143A-44.3; 115C-21. That system includes 100 county school districts, 15 city school districts, and 213 charter schools. In addition, the system includes several specialty schools, such as laboratory schools operated by universities, schools for the deaf and blind, and one regional school. The State considers each school district, charter school, or specialty school a Local Education Agency (LEA) for purposes of implementing federal law and allocating federal resources. *See, e.g.*, N.C. Gen. Stat. § 115C-106.3(11). The State's public schools serve approximately 1.5 million students in Pre-Kindergarten through Grade 12.

6. NCDPI regularly collects information regarding teacher vacancy rates and related data from LEAs across the State.

**The Policy**

7. Earlier this year, the United States Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with certain new petitions for an H-1B visa (the "Policy").

8. As described below, the Policy will inflict significant harm upon North Carolina's efforts to provide a high-quality education to all children. The North Carolina State Constitution provides that the people of our State "have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, sec. 15. The North Carolina

Supreme Court has interpreted this provision to guarantee the right to every North Carolinian of a "sound basic education." *Leandro v. State*, 346 N.C. 336, 345, 488 S.E.2d 249 (1997).

9.  On September 19, 2025, United States President Donald Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." Upon information and belief, I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

### Teacher Shortage in North Carolina and Role of H-1B Workers

10. North Carolina faces a significant teacher shortage, with the most common shortages in elementary education, special education, math, and science. The statewide teaching position vacancy rate as of September 1, 2024, was approximately 7.5 percent. Much of that shortage is concentrated in LEAs in rural and impoverished areas of the State. For example, Washington County Schools in northeastern North Carolina had vacancy rate at the beginning of the 2024-2025 school year at 21.3 percent, Nash County Public Schools had a vacancy rate of 11.3 percent, and Bertie County Schools and Halifax County Schools each had a vacancy rate of around 10.5 percent.

11. The H-1B program has been an important tool to fill vacancies where hiring a domestic worker has been challenging. Based on the latest available data, North Carolina LEAs employed at least 1,100 H-1B visa holders at the beginning of the 2025-2026 school year. These workers are, unsurprisingly, disproportionately located LEAs in rural and impoverished areas of the State where vacancies are higher and qualified domestic workers are less inclined to live. Bertie County Schools employs 23 H-1B visa holders, which constitute 19 percent of its 127

teachers. The Bertie County Assistant Superintendent for Human Resources noted that, without H-1B visa holders, there would be no math teachers at Bertie High School. Nash County Public Schools currently employs the most H-1B visa holders of any LEA at 89, which constitutes approximately 16 percent of its teacher workforce. Halifax County Schools, with 75 H-1B visa holders in a teaching workforce of 183, had the highest percentage of any school district at 41 percent. Alpha Academy, a charter school in Fayetteville, had the highest percentage of any LEA, with 45 out of 69 teachers, or 65 percent of its teacher workforce, holding an H-1B visa.

12.    At the beginning of the 2024-2025 school year, 43 percent of all teachers hired across the state were hired on some form of alternative license. These alternative licenses allow workers to temporarily serve in teaching roles while working toward full licensure in North Carolina. All teachers holding an alternative license were domestic workers. By contrast, all H-1B visa holders who teach in North Carolina are hired as a fully licensed teacher, which is a condition of obtaining the visa. As the numbers above demonstrate, many of our LEAs with high vacancy rates rely on H-1B visa holders to fill licensed teacher positions. Thus, H-1B visa holders are a critical component of fulfilling our constitutional obligation to provide a "sound basic education" for all students. *See Leandro*, 346 N.C. at 345, 488 S.E.2d at 249.

### Substantial and Irreparable Harm

13.    The $100,000 fee for new H-1B petitions will cause irreparable harm and jeopardize programs and services that support millions of young people across the State.

14.    Given current budget restraints, if the Policy remains in place, North Carolina LEAs will in most, if not all cases, be unable to pay the fee in the absence of additional funding. The $100,000 fee is more than twice the annual salary of a beginning teacher in North Carolina ($41,000 for the 2025-2026 school year). As a result, LEAs would not be able to use the H-1B

visa program to fill critical vacancies. The most likely consequences of this, in the absence of any remedial measures to address the shortage of domestic workers, is that LEAs will leave positions vacant, fill positions with unqualified or under-qualified substitute teachers, offer fewer courses in important subjects such as math and science, increase class sizes, or cut training and other efforts to make teachers more effective.

15. As noted above, LEAs in North Carolina currently employ at least 1,100 H-1B visa holders, all of whom are fully licensed teachers. We expect a continuation in such hiring practices if the Policy is rescinded or enjoined by this Court. If, however, the Policy remains in place, North Carolina LEAs will be unable to hire new H-1B visa workers subject to the policy, and it will have a detrimental impact on our public schools. The loss such an important pipeline for fully licensed teachers will cause irreparable harm to teaching and learning at a time when students are still recovering from the learning loss inflicted by the COVID-19 pandemic. Furthermore, to the extent H-1B visa holders are employed as special education or English as a Second Language teachers, North Carolina LEAs may be unable to fulfill federal requirements to provide a free appropriate public education under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.*, or help English learners achieve English proficiency under the English Language Acquisition, Language Enhancement, and Academic Achievement Act, 20 U.S.C. § 6811 *et seq.* That could lead to the loss of millions of dollars in federal funding.

16. Finally, the loss of H-1B visa holders will undermine the efforts of the State Board and NCDPI to make North Carolina public schools the best in the nation, as outlined in the 2025-2030 strategic plan, *Achieving Educational Excellence*. That plan calls for, among other objectives, increasing standardized test scores, improving four-year cohort high school graduation rates, and expanding opportunities for dual enrollment in college courses. Highly

5

qualified, fully licensed international teachers holding H-1B visas are an essential part of achieving those objectives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2026, at Raleigh, North Carolina.

_____
Maurice O. Green

6