# Exhibit WI-1

## DECLARATION OF FRANCES VAVRUS

I, Frances Vavrus, declare as follows:

1.    I am a resident of the State of Wisconsin. I am over the age of eighteen.

2.    I am Vice Provost and Dean at the University of Wisconsin-Madison ("UW-Madison") in Madison, Wisconsin. I have held that position since July 31, 2023. Prior to this position, I served as Professor and Chair in the Department of Organizational Leadership, Policy, and Development at the University of Minnesota-Twin Cities, and, in the latter role, worked on the recruitment of international employees.

3.    I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UW-Madison personnel, and could testify thereto.

4.    UW-Madison maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at UW-Madison.

5.    I submit this Declaration in support of the States' Motion for Summary Judgment.

6.    I am familiar with the presidential proclamation of September 19, 2025, Restriction on Entry of Certain Nonimmigrant Workers (the "Proclamation"). I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000. In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions as specified in the updated USCIS guidance on October 20, 2025. I understand that last year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy").

1

7.     UW-Madison, the flagship institution of the University of Wisconsin System, is a public land-grant university, enrolling over 51,000 students. UW-Madison contributes to critical research and innovation in numerous fields, including all areas of medicine and the health sciences, biology, business and marketing, engineering, public health, and other fields. Such work has led to advancements like the following:

    a.   Developing technologies for sustainable energy through the integration of mechanical and chemical engineering, advancing renewable energy innovation, and building connections between academia and industry.

    b.   Researching economic theory and computer science with a focus on AI and data-driven systems in insurance and business fields.

    c.   Conducting research to develop and apply machine learning and AI methods for consumer insights and valuation.

8.     Each year, on average, UW-Madison hires approximately 4,902 new employees (including faculty, limited, academic staff, university staff, post-degree, and graduate appointments). UW-Madison must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 51,000 students.

9.     UW-Madison participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

10.    As of January 13, 2026, UW-Madison has 369 employees in H-1B status, with 137 of them holding teaching titles (*i.e.*, professor, clinical professor, lecturer). In the 2025 calendar year, 35 UW-Madison-sponsored H-1B petitions with notification to a U.S. consulate or inspection

facility were initiated; for the calendar years 2021-2025, UW-Madison began, on average, 43 H-1B petitions with notification to a U.S. consulate or inspection facility.

11. As it has in the past, UW-Madison intends to submit H-1B petitions in the next year and in future years. But for the Proclamation, UW-Madison reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

12. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UW-Madison's hiring practices. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training, advanced degrees, and expertise. For example:

a. Employees in H-1B status are vital to medical research initiatives and patient care in the UW-Madison School of Medicine and Public Health (SMPH). These employees hold faculty, scientist, and researcher appointments that bring specialized expertise that enhances SMPH's ability to innovate and develop new therapies and treatments. Some employees in H-1B status at SMPH are faculty physicians, who are crucial to delivering patient care and teaching the next generation of physicians. They offer diverse perspectives and expertise that enrich our healthcare services, particularly in subspecialties where there is a shortage of qualified American practitioners. Some of them are doing award-winning longitudinal research on neurocognitive aging that integrates the study of hearing, vision, motor skills, and other functions in people from age 50 onward.

3

b.  In the UW-Madison School of Pharmacy, employees in H-1B status are doing groundbreaking interdisciplinary research that benefits rural and urban residents. One example is the design and implementation of equitable, digitally enabled health interventions using insights from behavioral science, implementation science, and design science with the goal of ensuring that digital health innovations are effective and accessible for all.

13.     In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation.  For example, for every employee hired through the H-1B visa program, UW-Madison must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E).  The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

14.     UW-Madison operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

15.     Many vacant UW-Madison faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials.

16.     If UW-Madison cannot provide H-1B sponsorship for employees in positions for which qualified American workers are not available, UW-Madison's research and patient care will

4

be severely hampered. For example, if SMPH cannot employ faculty physicians in H-1B status due to the cost-prohibition brought on by the Policy, the quality of patient care could be impacted. The absence of these international physicians could strain our ability to maintain service levels in certain departments. For instance, our division of hospital medicine relies heavily on international hospitalists to address physician shortages. The inability to access this population of talent could lead to longer waiting times for patients and limit our capacity to provide timely interventions, ultimately affecting overall patient care. While forgoing employment of individuals through the H-1B visa program would be devastating to UW-Madison's ability to further its research, teaching, and patient care missions, the same is true for continuing to submit H-1B petitions under the terms of the Policy. Based on UW-Madison's average number of 43 H-1B petitions with notification to a U.S. consulate or inspection facility beginning each year, the Policy would require UW-Madison to pay approximately $4,300,000 per year in additional fees.

17.     The Policy thus places UW-Madison in a very difficult position of choosing between alternatives that are each harmful to the university's ability to conduct the work that is key to its mission. UW-Madison cannot simultaneously pay the fees for the petitions it reasonably anticipates it would submit but for the Policy and maintain its current research initiatives and other priorities. For example, UW-Madison's new research initiative known as RISE— Research Innovation and Scholarly Excellence—would be significantly compromised because a key part of the initiative is the hiring of the best researchers in the world in the areas of AI, sustainability, virology, and the health span. The inability to hire the very top scholars and scientists regardless of their country of origin will harm our efforts at producing research for the public good and preparing the next generation of scientists. It is also not feasible or sustainable for UW-Madison to use other revenue sources to fund petition fees at the anticipated level of $4,300,000. As a non-

5

profit institution, UW-Madison reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, UW-Madison does not generate the level of surplus necessary to cover these fees without impacting core academic priorities such as educational programs and financial aid support for students.

18.  Paying these fees, even if it were possible, would require reductions in key investments supporting UW-Madison's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain UW-Madison's academic excellence. So even if UW-Madison could "cover" these new fees, it could do so only by negatively affecting other critical goals central to the institution's mission.

19.  In addition to disrupting the programs from which UW-Madison would divert funds to cover the Policy's fees, the task of revamping UW-Madison's budget to account for these unanticipated fees would require significant effort due to the recent launch of a new budget model. With implementation set for FY 27, the necessity of finding more than $4 million to cover the anticipated H-1B fees would set back this important budget transformation process.

20.  There would also be additional, longer-term cumulative and cascading effects, even if the Policy only remains in effect for one year. One of these effects is that these highly- skilled doctors, scientists, and scholars will go to other countries, and we will lose the opportunity to benefit from their human capital in making medical breakthroughs, research innovations, and academic advancements. Moreover, it can take more than one year to get a research laboratory ready for a new faculty member, and we must be able to plan several years in advance for new hires to get the space and equipment necessary for their work. Even a one-year fee imposition would significantly set back the research enterprise at UW-Madison.

6

21.     Disruptions to UW-Madison's research will also have negative effects in the Madison area, the state of Wisconsin, and the broader region. Some employees in H-1B status conduct research that directly contributes to the Wisconsin Idea, namely, that research conducted on our campus ought to benefit the lives of the state's residents. Those whose research increases dairy production, improves medical care, advances entrepreneurship in the state's corporate sector, and enriches K-12 education help to stimulate the Wisconsin economy and improve the health and wellbeing of the population. The opportunity cost from ceasing H-1B sponsorship for potential employees is great, and our state and nation will be paying the price for years to come should UW-Madison have to make the difficult choice of not submitting H-1B petitions owing to the prohibitive cost for our public institution.

22.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5 th day of ~~January,~~ February 2026, in Madison, Wisconsin

/s/ Frances Vavrus

Frances Vavrus
Vice Provost and Dean
University of Wisconsin-Madison
Office of the Provost, Bascom Hall
500 Lincoln Drive
Madison, WI 53706