# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

        Plaintiffs,

    v.

KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*, *et al.*,

        Defendants.

Civil Action No. 1:25-cv-13829-LTS

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT AND THEIR MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

I.     The Executive's Broad Authority .............................................................................2

II.    H-1B Nonimmigrant Classification ..........................................................................3

III.   Presidential Proclamation 10973 ..............................................................................5

IV.   Agency Guidance and Memoranda ...........................................................................6

V.    Procedural History ....................................................................................................8

STANDARD OF REVIEW ..................................................................................................8

ARGUMENT .......................................................................................................................9

I.     Plaintiffs' Challenges to the Proclamation Are Not Justiciable ...............................9

II.    Plaintiffs Lack a Cause of Action ...........................................................................11

       A.    Plaintiffs Cannot Challenge the Proclamation or its Implementation Under the APA ...........................................................................................................11

              1.    The Proclamation is Not Reviewable Under the APA, and its Implementation Does Not Create Reviewable Agency Action.............11

              2.    There is No Final Agency Action ...........................................................14

              3.    Any Agency Action Would be Committed to Agency Discretion ........15

       B.    Plaintiffs Fail to State an *Ultra Vires* Claim ....................................................15

III.   Plaintiffs' Claims Fail on the Merits .......................................................................18

       A.    The Proclamation Does Not Impermissibly Regulate Domestic Conduct ......18

       B.    The Proclamation and Implementing Memoranda Do Not Override the INA .................................................................................................................19

       C.    The Proclamation is Not a Tax and Does Not Violate the Taxing Clause ......23

       **D.**      **Notice and Comment Rulemaking was Not Required**......................................**26**

       **E.**      **The Proclamation is Not Arbitrary and Capricious**...........................**28**

**IV.**    **Defendants Department of Justice and Department of Labor Should be Dismissed 30**

**V.**    **Plaintiffs Are Not Entitled to Relief** ...............................................................**30**

       **A.**      **Vacatur Is Inappropriate** ................................................................**30**

       **B.**      **Plaintiffs Have Not Established that they are Entitled to an Injunction** ........**32**

**CONCLUSION** ..................................................................................................................**35**

# TABLE OF AUTHORITIES

## CASE LAW

*Abourezk v. Reagan,*
   785 F.2d 1043 (D.C. Cir. 1986) ...................................................................... 10, 26

*Adams v. Vance,*
   570 F.2d 950 (D.C. Cir. 1978) .............................................................................. 34

*Allen v. Milas,*
   896 F.3d 1094 (9th Cir. 2018) ............................................................................... 15

*Am. Biosecience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001) .............................................................................. 9

*Am. Foreign Serv. Ass'n v. Trump,*
   No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ...................... 15, 16, 18

*Ancient Coin Collectors Guild v. CBP,*
   801 F. Supp. 2d 383 (D. Md. 2011) ....................................................................... 12

*Ashcroft v Iqbal,*
   556 U.S. 662 (2009)................................................................................................. 9

*Associated Fisheries v. Daley,*
   127 F.3d 104 (1st Cir. 1997).................................................................................... 9

*Bailey v. Drexel Furniture Co.,*
   259 U.S. 20 (1922)................................................................................................. 23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).......................................................................................... 9, 30

*Bennett v. Spear,*
   520 U.S. 154 (1997)............................................................................................... 14

*Biden v. Nebraska,*
   600 U.S. 477 (2023)............................................................................................... 26

*Biden v. Texas,*
   597 U.S. 785 (2022)......................................................................................... 14, 22

*Bradford v. United States DOL,*
   101 F.4th 707 (10th Cir. 2024) ........................................................... 13, 27, 28, 29

*Cboe Futures Exch., LLC v. SEC,*
    77 F.4th 971 (D.C. Cir. 2023) ................................................................. 31

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................... 13

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948) ................................................................................ 14

*Coney Island Prep v. HHS,*
    506 F. Supp. 3d 203 (S.D.N.Y. 2020) .................................................... 33

*Conservation Law Foundation v. Evans,*
    360 F.3d 21 (1st Cir. 2004) ............................................................... 28, 29

*Ctr. for Biological Diversity v. United States Int'l Dev. Fin.Corp.,*
    77 F.4th 679 (D.C. Cir. 2023) ................................................................ 28

*Dakota Cent. Tel. Co. v. State of S. Dakota ex rel. Payne,*
    250 U.S. 184 (1919) ................................................................................ 17

*Dalton v. Specter,*
    511 U.S. 462 (1994) ..................................................................... 11, 15, 16

*Department of State v. Muñoz,*
    602 U.S. 899 (2024) ............................................................................ 9, 10

*Depianti v. Jan-Pro Franchising Int'l, Inc.,*
    873 F.3d 21 (1st Cir. 2017) .................................................................... 32

*Detroit Int'l Bridge Co. v. Canada,*
    189 F. Supp. 3d 85 (D.D.C. 2016) .............................................. 14, 15, 26

*Doe #1 v. Biden,*
    2 F.4th 1284 (9th Cir. 2021) ............................................................ 19, 21

*Doe #1 v. Trump,*
    984 F.3d 848 (9th Cir. 2020) ............................................................ 19, 21

*Doe Co. v. Cordray,*
    849 F. 3d 1129 (D.C. Cir. 2017) ........................................................... 33

*Doe v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) ............................................................... 21

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
   606 U.S. 656 (2025) ................................................................ 24

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ........................................................... 10, 17

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................ 11

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) .................................................... 16

*Gonzalez v. United States*,
   284 F.3d 281 (1st Cir. 2002) ..................................................... 9

*Goodluck v. Biden*,
   104 F.4th 920 (D.C. Cir. 2024) ................................................ 34

*Haag v. United States*,
   589 F.3d 45 (1st Cir. 2009) ..................................................... 32

*Haig v. Agee*,
   453 U.S. 280 (1981) ................................................................ 17

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ........................................................... 17, 20

*Henderson v. Mayor of New York*,
   92 U.S. 259 (1875) ................................................................. 24

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ................................................................. 28

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025) .................................................. 31

*Indep. Meat Packers Ass'n v. Butz*,
   526 F.2d 228 (8th Cir. 1975) ................................................... 13

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................................ 11

*Learning Res., Inc. v. Trump*,
   No. 24-1287, 2026 U.S. LEXIS 714 (2026) ............................ 24, 25, 26

*Lovgren v. Lock,*
701 F.3d 5 (1st Cir. 2012) ................................................................. 9

*Make The Rd. N.Y. v. Wolf,*
962 F.3d 612 (D.C. Cir. 2020) .......................................................... 27

*Maryland v. King,*
567 U.S. 1301 (2012) ........................................................................ 34

*Matushkina v. Nielsen,*
877 F.3d 289 (7th Cir. 2017) ............................................................ 11

*Merrion v. Jicarilla Apache Tribe,*
455 U.S. 130 (1982) .......................................................................... 25

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) .......................................................................... 32

*Murphy v. United States,*
45 F.3d 520 (1st Cir. 1995) ................................................................. 9

*N.H. Hosp. Ass'n v. Azar,*
887 F.3d 62 (1st Cir. 2018) .............................................................. 27

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025) ............................................................. 13

*NFIB v. Sebelius,*
567 U.S. 519 (2012) .......................................................................... 23

*Nken v. Holder,*
556 U.S. 418 (2009) .......................................................................... 34

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ............................................................................ 15

*Nuclear Regul. Comm'n (NRC) v. Texas,*
145 S. Ct. 665 (2025) ........................................................................ 18

*Chamber of Com. of United States v. United State Department of Homeland Sec.,*
No. 25-cv-3675 (BAH), 2025 U.S. Dist. LEXIS 265244 (2025) ..................................... *passim*

*Pacito v. Trump,*
No. 2:25-cv-00255-JNW, 2026 WL 620449 (9th Cir. Mar. 5, 2026) ................................ 21, 23

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015)................................................................................................ 27

*President & Fellows of Harvard Coll. v. United States Dep't of Homeland Sec.,*
  798 F. Supp. 3d 182 (D. Mass. 2025) ............................................................ 8, 21

*Puerto Rico v. United States,*
  490 F.3d 50 (1st Cir. 2007) .............................................................................. 14

*Rahmani v. Yellen,*
  No. 24-0285 (RC), 2024 WL 1701681 (D.D.C. Apr. 19, 2024)......................... 11

*Refugee and Immigrant Center for Education and Legal Services v. Noem,*
  793 F. Supp. 3d 19 (D.D.C. 2025) ................................................................... 21

*Ross-Simons of Warwick, Inc. v. Baccarat,* Inc.,
  102 F.3d 12 (1st Cir. 1996) .............................................................................. 33

*S.F. Real Estate Inv'rs v. Real Estate Inv. Tr.,*
  692 F.2d 814 (1st Cir. 1982) ............................................................................ 33

*Saavedra Bruno v. Albright,*
  197 F.3d 1153 (D.C. Cir. 1999) ....................................................................... 15

*Sale v. Haitian Centers Council, Inc.,*
  509 U.S. 155 (1993)..................................................................................... 23, 30

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020)........................................................................................... 11

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953)........................................................................................... 17

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ..................................................................... 12, 29

*Shinseki v. Sanders,*
  556 U.S. 396 (2009)........................................................................................... 28

*Sierra Club v. Env't Prot. Agency,*
  955 F.3d 56 (D.C. Cir. 2020) ........................................................................... 14

*Skinner v. Mid-American Pipeline Co.,*
  490 U.S. 212 (1989)........................................................................................... 24

*Smith v. Turner*,
    48 U.S. 283 (1849) ........................................................................................................ 24

*Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.),*
    263 F. Supp. 2d 140 (D. Mass. April 30, 2003) ...................................................... 30

*Town of Weymouth v. Mass. Dep't of Envtl. Prot.,*
    961 F.3d 34 (1st Cir. 2020) .......................................................................................... 31

*Trump v. CASA, Inc.*,
    145 S. Ct. 145 (2025) .............................................................................................. 30, 34

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ......................................................................................... *passim*

*Trump v. Orr*,
    223 L.Ed.2d 180 (2025) ......................................................................................... 26, 29

*Thein v. Trump*,
    No. 25-2369 (SLS), 2026 LX 38164 (D.D.C. Jan. 23, 2026) .............................. 24

*Tulare County v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ................................................................ 11, 12, 13

*Ulstein Maritime, Ltd. v. United States*,
    833 F.2d 1052 (1st Cir. 1987) ...................................................................................... 35

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ...................................................................... 10, 20, 24, 28

*United States v. George S. Bush & Co., Inc.*,
    310 U.S. 371 (1940) .............................................................................................. 29, 30

*United States v. Ju Toy*,
    198 U.S. 253 (1905) ...................................................................................................... 11

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................................................................... 31

*Waithaka v. Amazon.com*,
    404 F. Supp. 3d 351 (D. Mass. 2019), *aff'd*, 966 F.3d 10 (1st Cir. 2020) ........... 31

*Webster v. Doe*,
    486 U.S. 592 (1988) ...................................................................................................... 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................. 10, 20

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ................................................................................ 17

## STATUTES

5 U.S.C. § 553(a)(1) .................................................................................. 27

5 U.S.C. § 553(b)(A) ............................................................................ 26, 27

5 U.S.C. § 553(b)(B) .................................................................................. 27

5 U.S.C. § 701(a)(2) .................................................................................. 15

5 U.S.C. § 702(1) ...................................................................................... 15

5 U.S.C. § 703 .......................................................................................... 31

5 U.S.C. § 704 .......................................................................................... 14

5 U.S.C. § 706(2)(A) ................................................................................... 8

5 U.S.C. § 706(2)(C) ................................................................................... 8

5 U.S.C. § 706(2)(D) ................................................................................... 8

8 U.S.C. § 1101 .......................................................................................... 2

8 U.S.C. § 1101(a)(4) .................................................................................. 2

8 U.S.C. § 1101(a)(15)(H)(i)(b) ............................................................. 1, 3, 5

8 U.S.C. § 1101(a)(4) .................................................................................. 2

8 U.S.C. § 1181 .......................................................................................... 2

8 U.S.C. § 1182(a)(7)(A)(i) ......................................................................... 2

8 U.S.C. § 1182(B)(i)(II) ............................................................................ 2

8 U.S.C. § 1182(f) ............................................................................... *passim*

8 U.S.C. § 1184(c)(1) .................................................................................. 3

8 U.S.C. § 1184(c)(12) ................................................................................................ 22

8 U.S.C. § 1184(g)(1) .................................................................................................... 4

8 U.S.C. § 1184(g)(1)(A) ............................................................................................... 4

8 U.S.C. § 1184(g)(5)(A) ............................................................................................... 4

8 U.S.C. § 1184(g)(5)(B) ............................................................................................... 4

8 U.S.C. § 1184(g)(5)(C) ............................................................................................... 4

8 U.S.C. § 1184(i)(1) ................................................................................................. 3,

8 U.S.C. § 1185(a) .................................................................................................. 3, 18

8 U.S.C. § 1185(a)(1) .......................................................................................... 1, 3, 16

8 U.S.C. § 1185 .......................................................................................................... 27

8 U.S.C. § 1185(d) ....................................................................................................... 2

8 U.S.C. § 1201(g) ....................................................................................................... 2

8 U.S.C. § 1201(h) ....................................................................................................... 2

8 U.S.C. § 1225(a) ....................................................................................................... 2

8 U.S.C. § 1356(e)(3) .................................................................................................. 22

8 U.S.C. § 1356(m) ..................................................................................................... 22

8 U.S.C. § 1356(u) ...................................................................................................... 22

8 U.S.C. § 1356(u)(1) .................................................................................................. 22

8 U.S.C. § 1361 .......................................................................................................... 23

## FEDERAL REGULATIONS

8 C.F.R. § 214.2(h)(8)(iii) ............................................................................................. 4

8 C.F.R. § 214.2(h)(8)(iii)(A)(1) ................................................................................... 4

8 C.F.R. § 214.2(h)(8)(iii)(A)(5)-(6) ............................................................................. 4

8 C.F.R. § 214.2(h)(4)(iii)(B)(1) ................................................................. 5

8 C.F.R. § 214.2(h)(9)(i) ........................................................................... 5

8 C.F.R. § 214.2(h)(10)(ii) ........................................................................ 5

8 C.F.R. § 214.2(h)(11) ............................................................................. 5

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a) ................................................................................. 8

## FEDERAL REGISTER

85 Fed. Reg. 34,353 ......................................................................... 19, 21

90 Fed. Reg. 46,027 .................................................................. 1, 5 12, 34

90 Fed. Reg. 46,028 ....................................................................... 1, 30

90 Fed. Reg. 46,028-29 ......................................................................... 6

90 Fed. Reg. 46,029 .............................................................................. 14

## MISCELLANEOUS

U.S. Dep't of Labor, *H-1B Program* Available at www.dol.gov/agencies/whd/immigration/h1b
    (last visited Feb. 9, 2026) ................................................................... 3

## INTRODUCTION

For decades companies have exploited the H-1B nonimmigrant worker visa program by importing lower-paid, lower-skilled alien workers—thereby artificially depressing wages and employment opportunities for skilled U.S. citizens. Responding to this pervasive abuse of the H-1B system, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation").

The President found that "the unrestricted entry" into the country of certain H-1B temporary workers "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages[.]" *Id.* Based on these findings, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to adopt temporarily "reasonable rules, regulations, and orders" and/or to restrict temporarily "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under 8 U.S.C. § 1101(a)(15)(H)(i)(b) "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000—subject to the exceptions set forth" in the Proclamation. 90 Fed. Reg. at 46,028.

§ 1182(f) vests the President with extraordinarily broad discretion to suspend the entry of aliens whenever he finds their admission "detrimental to the interests of the United States." § 1185(a)(1) permits the President to adopt "reasonable rules, regulations, and orders … as the President may prescribe" with no prerequisites. The Proclamation is a lawful exercise of the President's authority to restrict the admission of aliens into the United States. The Court should therefore deny Plaintiffs' summary judgment motion and enter summary judgment for Defendants, or in the alternative dismiss the complaint for failure to state a claim, for the following reasons.

First, Plaintiffs claims are foreclosed by the longstanding doctrine of consular nonreviewability, which bars judicial review of the Executive's discretionary determination to

restrict the entry of aliens. Second, Plaintiffs lack causes of action under the Administrative Procedure Act ("APA"). The President is not subject to suit under the APA and that cannot be circumvented by challenging an agency's ministerial implementation of the President's authority. There is also no final agency action apart from the Proclamation and the authority is completely discretionary. Third, Plaintiffs lack an *ultra vires* claim. A statutory claim cannot be turned into a constitutional one and Plaintiffs can point to no clear statutory prohibition that was violated. Fourth, the Proclamation readily satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and 1185(a)(1) and does not conflict with any provision of the INA. The Proclamation simply adds an additional restriction on the entry of a class of aliens to further a key national interest: protecting American workers and national security. Fifth, the Proclamation does not impose a tax and even if it did, it was well within Congress's sweeping delegation in § 1182(f) to impose "any restriction he may deem appropriate." Sixth, notice and comment rulemaking was not required and the Proclamation cannot be reviewed as arbitrary and capricious. Finally, Plaintiffs' broad request for relief is unmoored for the alleged harms. At bottom, the Proclamation is well within the President's sweeping authority as another court has already ably held. This Court should grant Defendants judgment.

## BACKGROUND

### I.    The Executive's Broad Authority

Under the INA, ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. A visa is typically necessary, but not sufficient, for admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4). The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also

accorded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). The Supreme Court has thus "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* § 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times since its passage.

## II.    H-1B Nonimmigrant Classification

The INA provides for the classification of qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b); 1184(c)(1) (the "H-1B program"). A specialty occupation is defined as an occupation that requires (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum qualification for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b.

By statute, H-1B petitions fall into two broad categories: cap-subject petitions and cap-exempt petitions. Cap-subject petitions are counted against the strict numerical limitations created by Congress, which for any fiscal year after 2003 is 65,000 ("Regular Cap"), with an additional 20,000 for individuals who have earned a master's or higher degree from a United States institution of higher education ("Master's Cap"). *See* 8 U.S.C. § 1184(g)(1)(A) (Regular Cap); § 1184(g)(5)(C) (Master's Cap). Certain H-1B petitions are cap-exempt based on the nature of the petitioning employer or work location, meaning that they are not subject to the numerical limits set by Congress in § 1184(g)(1). *See* 8 U.S.C. § 1184(g)(5)(A) and (B). The demand for initial H-1B status invariably exceeds the Congressionally imposed numerical limitations, and as such, DHS regulations provide rules for the administration of an H-1B cap selection process, commonly referred to as a "lottery." *See* 8 C.F.R. § 214.2(h)(8)(iii).

Before a petitioning employer is eligible to submit a Form I-129, Petition for a Nonimmigrant Worker, requesting H-1B classification on behalf of a beneficiary who is subject to the H-1B cap ("an H-1B cap-subject petition"), the petitioner must register for the H-1B cap lottery through the USCIS website. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A)(1) (discussing the registration requirement). Once the registration period closes, USCIS then determines whether it has received registrations for a sufficient number of unique beneficiaries projected as needed to meet the caps. *See* 8 C.F.R. §§ 214.2(h)(8)(iii)(A)(5)-(6). If a beneficiary is selected, USCIS sends a notification to the online account of each prospective petitioner who submitted a registration for the selected beneficiary along with petition filing instructions. 8 C.F.R § 214.2(h)(8)(iii)(C); *see also id.* § 214.2(h)(8)(iii)(D).

The employer must then file a Form I-129 to request the classification of the alien as an H-1B nonimmigrant worker (known as an "H-1B petition") and obtain authorization to employ the

beneficiary. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1). Under the applicable regulations, USCIS shall notify the petitioner of the approval, denial, intent to revoke, and revocation of any H-1B petitions. 8 C.F.R. § 214.2(h)(9)(i), (h)(10)(ii), (h)(11).

### III.    Presidential Proclamation 10973

President Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." 90 Fed. Reg. at 46,027. H-1B workers account for an outsized share of the labor market in Science, Technology, Engineering, and Mathematics (STEM) fields, and that the information technology (IT) sector, and particularly outsourcing firms, have abused the H-1B system, providing H-1B workers for entry-level positions at a 36% discount over American workers. *Id.*

As the number of H-1B workers in STEM fields has increased, the unemployment rate for recent college graduates in those fields has also increased, and companies have at times laid off thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

Not only are H-1B program abuses detrimental to American workers, the Proclamation also explains that such abuses are a national security threat because they reduce American wages and "discourage[s] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an

immediate response" and that "unrestricted entry into the United States of certain foreign workers
… would be detrimental to the interests of the United States because such entry would harm
American workers, including by undercutting their wages." *Id.* The President accordingly
determined that it was "therefore necessary to impose higher costs on companies seeking to use
the H–1B program in order to address the abuse of that program while still permitting companies
to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed entry restrictions on H-1B workers pursuant to the
President's authority §§ 1182(f) and 1185(a). In particular, it restricted entry to only petitions
accompanied by or supplemented by a payment of $100,000. *Id.* It permitted the Secretary of
Homeland Security to grant exceptions in her discretion if entry of an alien is "in the national
interest and do not pose a threat to the security or welfare of the United States." *Id.* at 46,029.

The Proclamation instructed the Secretary of Homeland Security to restrict decisions on
H-1B petitions not accompanied by the $100,000 payment, and it instructed the Secretary of State
to confirm payment of the $100,000 before addressing any visa application. *Id.* at 46,028-29. It
also instructed the Department of State and the Department of Homeland Security to take all
necessary steps to implement the Proclamation and deny entry to the United States of any H-1B
nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also
instructed the Department of Labor and the Department of Homeland Security to engage in
rulemaking on issues relating to the prevailing wage levels and the H-1B lottery. *Id.* The
restrictions are set to expire after 12 months, absent an extension. *Id.* at 46,028.

## IV.  Agency Guidance and Memoranda

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining
the contours of the Proclamation. Doc. No. 84-3 at 3. USCIS explained that the Proclamation
applied prospectively, to those petitions not yet filed and did not impact the ability of any current

visa holder to travel to or from the United States. *Id.* Subsequently, on October 20, 2025, USCIS issued a short news alert on its website stating that proof of payment must be submitted with any petition subject to the Proclamation or such petition would be denied and linking to its updated website. Doc. No. at 84-3 at 9-15. On its website, USCIS explained that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa." *Id*. It explained that the $100,000 payment can be submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS", that "petitioners must submit proof that the payment has been scheduled" or evidence that they received a waiver, and that [p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." *Id.* It further provided information on where to submit a request for an exception. *Id.*

U.S. Customs and Border Protection ("CBP") also issued brief guidance on September 20, 2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens who are the beneficiaries of approved petitions or who hold valid H-1B visas. Doc. No. 84-1 at 11. It explained that "[t]he Proclamation does not impact the ability of any current visa holder to travel to or from the United States" and that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." *Id.*

The State Department issued two paragraphs of guidance on its website explaining that the Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000." Alderette Ex. 1. The State

Department unequivocally stated, "No visas have been revoked pursuant to the Proclamation." *Id.* In FAQs, the State Department referenced the USCIS and CBP guidance and stated that it had "posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance." Doc. No. 84-3 at 4.

## V.    Procedural History

Nearly three months after the Proclamation issued, Plaintiffs filed this action challenging that Proclamation and the payment it requires. Doc. No. 1 (Compl.) (Dec. 12, 2025). The Complaint asserts four causes of action. Counts I-III allege that the agency guidance and memoranda are arbitrary and capricious, ultra vires, and procedurally improper, in violation of the "APA", 5 U.S.C. §§ 706(2)(A), (2)(C), (2)(D). Doc. No. 1 at ¶¶ 189-98, 199-207, 208-19. Count IV alleges a claim in equity that the Proclamation and thus the agency guidance and memoranda implementing it, are *ultra vires* and violate separation of powers. Doc. No. 1 at ¶¶ 220-37. The Plaintiffs seek to enjoin implementation and enforcement of the agency guidance and memoranda and the Proclamation, as to Plaintiffs, their agencies, and their political subdivisions, declare the implementation of the Proclamation unlawful, and to have any such actions vacated and set aside. Prayer ¶¶ I-IV.

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "However, in cases involving review of agency action under the [Administrative Procedure Act ("APA")], the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record." *President & Fellows of Harv. Coll. v. United States HHS*, 798 F.Supp. 3d 77, 102 (D. Mass. Sept. 3, 2025) (citation omitted). As such, "for summary judgment motions under the APA, the Court's

review is ordinarily 'limited to the administrative record,' *Lovgren v. Lock*, 701 F.3d 5, 20 (1st Cir. 2012), and [t]he 'entire case on review is a question of law,' *Am. Biosience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)." *Id.* at 102-03. "Judicial review of an APA claim 'is narrow' because the APA standard affords great deference to agency decisionmaking and because the [agency's] action is presumed valid." *Id.* (quoting *Associated Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

On a motion to dismiss for lack of subject matter jurisdiction, the court must "construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). The court may consider materials outside the complaint to the extent they shed light on the jurisdictional analysis. *See Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). On a Rule 12(b)(6) motion to dismiss, the Court must accept as true, in the light most favorable to the non-moving party, all well pled facts that are "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 55 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

The United States opposes Plaintiffs motion for summary judgment, cross-moves for summary judgment on all claims, and also moves to dismiss the Complaint for lack of jurisdiction and failure to state a claim. As another court has already found, Plaintiffs' claims fail on the law.

## I.    Plaintiffs' Challenges to the Proclamation Are Not Justiciable

The Proclamation is not reviewable under principles of consular nonreviewability. The Supreme Court has long held that "[t]he admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Department of State v. Muñoz*, 602 U.S. 899, 907-08 (2024) (quotations omitted). Indeed, the authority to regulate

the entry of aliens is "inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see also Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) for same reasoning). Review of entry decisions is "not within the province of any court, unless expressly authorized by Congress." *Muñoz*, 602 U.S. 899, 907-08. On the flip side, "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." *Id.* (quotations omitted).

Plaintiffs' claims challenging the President's Proclamation are non-justiciable on both fronts. Congress has clearly not authorized the review of entry decisions. *Knauff*, 338 U.S. at 543. Instead, Congress has delegated sweeping "discretionary authority" over whether to admit aliens to the executive branch. *Muñoz*, 602 U.S. 899, 907-08. Congress made a policy choice in 8 U.S.C. §§ 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions." *Hawaii*, 585 U.S. at 682, 684. So, where, as here, "the President acts pursuant to an express or implied authorization of Congress"—e.g., 8 U.S.C. §§ 1182(f) and 1185(a)(1)—the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Nor does it matter which agency is enforcing the

President's Proclamation in the first instance.[1] Since Plaintiffs are challenging the Executive's admission decisions, such claims are nonreviewable.

## II.    Plaintiffs Lack a Cause of Action

Defendants are entitled to summary judgment because Plaintiffs fail to state a viable APA or non-statutory *ultra vires* claim.

### A.    Plaintiffs Cannot Challenge the Proclamation or its Implementation Under the APA

#### 1.    The Proclamation is Not Reviewable Under the APA, and its Implementation Does Not Create Reviewable Agency Action

The President is not an agency, and a Presidential Proclamation cannot be challenged or enjoined under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994). Plaintiffs cannot circumvent that rule by challenging the agencies' implementation of the Proclamation. Compl. ¶¶ 198, 207, 219, Prayer ¶¶ II, III.

The challenged agency implementations are not reviewable under the APA because the implementations are merely an "extension of the President's action" that "carry[] out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001). It is true that agencies must implement the Proclamation, but that is always true, as the President cannot deny each entry on his own. *Cf. Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020) ("[N]o single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."). If the fact that an agency is simply enacting the President's Proclamation allowed for an APA challenge, this would effectively nullify the

---

[1] Consular non-reviewability is not limited to consular officials, it can apply to any executive official involved in entry determinations. *See e.g., Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("enforced exclusively through executive officers, without judicial intervention," including the Attorney General); *Rahmani v. Yellen*, No. 24-0285 (RC), 2024 WL 1701681, at *14–15 (D.D.C. Apr. 19, 2024) (Treasury); "Secretary of Commerce and Labor," *United States v. Ju Toy*, 198 U.S. 253, 261 (1905) ("Secretary of Commerce and Labor"); *Matushkina v. Nielsen*, 877 F.3d 289, 295-96 (7th Cir. 2017) (CBP).

President's exemption from the APA. Realizing this, courts have found no APA review is available where the agency's action (if any) is an "extension of the President's action" and "merely carrying out directives of the President." *Tulare*, 185 F. Supp. 2d at 21 ("Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President.").

Though Plaintiffs group all of the agency guidance together into a single "Policy," those guidance documents consist of a two-paragraph Memorandum issued by USCIS that explains the Proclamation and clarifies that it only applies prospectively, USCIS's website guidance that explains how to pay the $100,000 and requiring a petition to show "proof that the payment has been scheduled" or evidence that they received a waiver, a two-paragraph memorandum from CBP explaining the Proclamation, reiterating that it applies prospectively, and stating that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures," and a State Department two-paragraph website posting explaining the Proclamation, that its prospective, and that USCIS and CBP had issued similar guidance. *See* Doc. No. 84-1, Doc. No. 84-3, Alderette Ex. 1. The challenged agency guidance does not reflect independent decision-making beyond the terms of the Proclamation. *See id.; see generally* 90 Fed. Reg. 46,027. Indeed, the Proclamation ordered the agencies to implement it and an agency "may not simply disregard' a binding presidential directive." *Chamber of Com. of United States v. United State Department of Homeland Sec.*, No. 25-cv-3675 (BAH), 2025 U.S. Dist. LEXIS 265244, at *76 (quoting *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012)).

Treating such ministerial agency memoranda as a reviewable agency action would "suggest the absurd notion that all presidential actions must be carried out by the President him or herself

in order to receive the deference Congress has chosen to give to presidential action." *Tulare,* 185 F. Supp. 2d at 28-29. This is not to say any implementation of a presidential directive is unreviewable; rather, there is no reviewable action when the agency is merely carrying out the President's proclamation and has no independent decision-making as here. *Id.* That is doubly true here given the broad discretionary nature of the statute and the intersection of foreign affairs, national security, and immigration issues.

Plaintiffs' paltry citations do not support their assertion that the challenged agency implementations are reviewable under the APA. Doc. No. 87 at 18 ("Br."). In *Chamber of Com. v. Reich*, the court evaluated agency regulations that had gone through notice and comment rulemaking and were more than a mere ministerial implementation of the president's executive order. 74 F.3d 1322, 1324 (D.C. Cir. 1996). Plaintiffs also rely on a footnote in an emergency stay denial saying the district court could review agency actions pursuant to an executive order. Br. 18 (citing *New York v. Trump*, 133 F.4th 51, 70 n. 17 (1st Cir. 2025)). That is a thin reed. Unlike the executive order there, Congress explicitly granted the President the authority to issue proclamations under §§ 1182(f) and 1185(a) that themselves carry the force of law. *See Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234 (8th Cir. 1975); *Bradford v. United States DOL*, 101 F.4th 707, 731 (10th Cir. 2024) (agencies cannot disregard binding order). As the court in *Chamber* held in considering the same agency implementations challenged here, "[t]he lawfully authorized nature of the Proclamation, which directed immediate implementation, carries over to the limited, ministerial actions taken to date by defendants to comply with its terms and, as such, those actions are not in violation of the APA." 2025 U.S. Dist. LEXIS 265244, at *5.

### 2.    There is No Final Agency Action

Even if implementing a Presidential Proclamation did not preclude APA review by itself, the agency memoranda cannot constitute "final agency action." Only "final agency action" is

reviewable under the APA. 5 U.S.C. § 704.  Whether an action is final "implicates the jurisdiction

of the federal courts[.]" *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007). To be final

(1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather

than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which

'rights or obligations have been determined,'" or from which "'legal consequences will flow[.]'"

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S.*

*Corp.*, 333 U.S. 103, 113 (1948)).

The challenged agency documents do not qualify. First, courts cannot "postulat[e] the

existence of an agency decision wholly apart from any 'agency statement of general or particular

applicability ... designed to implement' that decision." *Biden v. Texas*, 597 U.S. 785, 809 (2022)

(quoting 5 U.S.C. § 551(4)). The challenged agency memoranda and website guidance are general

statements regarding the Proclamation and not final actions on their own.  *See Detroit Int'l Bridge*

*Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016). Nor are Plaintiffs injured by those

statements, because they do nothing more than reiterate and explain the Proclamation; no rights or

consequences flow from the memoranda themselves. *See Sierra Club v. Env't Prot. Agency*, 955

F.3d 56, 62-65 (D.C. Cir. 2020). Absent the memoranda, Plaintiffs would face the same alleged

harms from the Proclamation itself, which dictates how employers must comply. 90 Fed. Reg.

46029 § 2.  Because the agency memoranda and guidance are not final agency actions, Plaintiffs'

APA claims necessarily fail.

### 3.    Any Agency Action Would be Committed to Agency Discretion

Even if APA review were generally available for Presidential actions, it would still be

unavailable here for at least two reasons. First, the APA's cause of action expressly leaves intact

"other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding

limitation on review of Executive decisions to deny entry to aliens, *see supra* § I; *Allen v. Milas*,

896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). Second, the APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Where Congress has supplied no judicially manageable standards and has instead committed the matter to executive judgment, review is barred under § 701(a)(2). *See Norton*, 542 U.S. at 64. There is no meaningful statutory standard against which to measure the agencies' implementation of the Proclamation. The only governing law is the President's Proclamation issued pursuant to §§ 1182(f) and 1185(a)(1), which "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. That discretion is carried over to the agencies that implement the Proclamation, thus foreclosing APA review. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06 (President had discretion and his order delegated discretion to Secretary, so no APA review of Secretary's decision since that was also committed to agency discretion). Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in 8 U.S.C. §§ 1182(f) and 1185(a)(1)—"is not a matter for [ judicial] review." *Dalton*, 511 U.S. at 476.

### B.    Plaintiffs Fail to State an *Ultra Vires* Claim

Plaintiffs seek to challenge the Proclamation and its implementation as *ultra vires*, seemingly just as a violation of separation of powers. Compl. ¶¶ 220-37; Br. 10-17. It is doubtful that *ultra vires* review is available to challenge presidential actions at all. *See Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam). Furthermore, parties cannot transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were ipso facto unconstitutional" there would be "little need" for "specifying unconstitutional and *ultra vires* conduct as separate categories." *Dalton*, 511 U.S. at 472 (1994). Making pure separation of powers concerns based on

statutory limits is impermissible because "plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Glob. Health Council v. Trump*, 153 F.4th 1, 14-15 (D.C. Cir. 2025). That is precisely what Plaintiffs are trying to do here.

Even if Plaintiffs are bringing statutory *ultra vires* challenges, such challenges still fail for a myriad of reasons. First, "longstanding authority holds" that *ultra vires* review of executive action is "not available" when, as here, "the statute in question commits the decision to the discretion of the President." *Dalton*, 511 U.S. at 474; *see also Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *2 (per curiam). § 1182(f) provides a grant of broad, unreviewable discretion to the President to exercise powers to suspend or restrict the entry into the United States of any aliens or class of aliens "[w]henever the President finds" that entry of such aliens or class of aliens "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f) (emphasis added). As the Supreme Court has held, "[b]y its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684; *Chamber*, 2025 U.S. Dist. LEXIS 265244, at *8. Similarly, § 1185(a)(1) allows the President to set "reasonable rules, regulations, and orders, and subject to such limitations and exceptions as *the President may* prescribe." 8 U.S.C. § 1185(a)(1) (emphasis added)*; see Chamber*, 2025 U.S. Dist. LEXIS 265244, at *34-37 (discussing history and breadth of sections). Such statutes "fairly exude[] deference" to the President and cannot be reviewed as *ultra vires*. *Webster v. Doe*, 486 U.S. 592, 600 (1988).

Judicial review is particularly inappropriate here because the President's determination involves the intersection of immigration and national security issues, both of which are outside the province of the courts to review. "[T]he power to expel or exclude aliens as a fundamental sovereign attribute" that is "largely immune from judicial control." *Fiallo*, 430 U.S. at 792

16

(quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)); *see also id* at 796. Likewise, "[n]ational-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Dakota Central Telephone Co.*, 250 U.S. at 184 (refusing to consider claim that President abused discretion where statute granted President power to control telephone lines if he "deem[ed] it necessary for the national security or defense"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*, 582 U.S. at 143, and an *ultra vires* claim like Plaintiffs assert here necessarily lacks congressional authorization.

Second, though conceding this is the proper standard, Plaintiffs fail to identify any "specific prohibition in a statute" that that would render the Proclamation "entirely in excess of [the President's] delegated powers." *Nuclear Regul. Comm'n (NRC) v. Texas*, 145 S. Ct. 665, 666, 681 (2025) (internal quotation marks omitted); Br.10-17. That alone is fatal to their claims.

## III.   Plaintiffs' Claims Fail on the Merits

Even if Plaintiffs' claims were justiciable, this Court's review "must be exceedingly deferential" because the delegation in §§ 1182(f) and 1185(a)(1) "invokes the President's discretion in exercising core Article II responsibilities" addressing immigration, foreign affairs, and national security. *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3. § 1182(f) states, in

relevant part, "[w]henever the President finds that entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem appropriate." 8 U.S.C. § 1182(f); *Hawaii*, 585 U.S. at 684. The "*sole prerequisite*" to the President's exercise of authority under this "comprehensive delegation" is the determination that entry of the covered aliens into the United States "would be detrimental to the interests of the United States." *Id.* at 685 (emphasis added). Likewise, § 1185(a) states that "it shall be unlawful ... for any alien to depart from or enter ... the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a). These authorities independently support the Proclamation.

### A.    The Proclamation Does Not Impermissibly Regulate Domestic Conduct

Plaintiffs argue that the Proclamation and its implementation regulate domestic conduct by undermining Congress's polices regarding employment of foreign workers, making the H-1B program "pay to play," and imposing a policy of allegedly vast economic significance to address a problem—fraud—of which Congress was already aware. Br. 13, 16-17.

Fundamentally, the Proclamation restricts the entry of aliens because their entry to occupy certain jobs is detrimental to American workers and national security. 90 Fed. Reg. at 46027. Regardless, as the D.C. District Court found when considering the same challenges to the Proclamation, "the distinction between foreign and domestic policy finds no support in the statutory text which simply speaks in terms of restricting entry of aliens 'detrimental to the United States' and contains no limitation to any particular sphere, foreign or domestic." *Chamber*, 2025

U.S. Dist. LEXIS 265244, at *51-52 (cleaned up).[2] The Ninth Circuit made this clear, holding that "it makes no difference whether the additional entry restrictions are imposed under § 212(f) based on assertedly domestic policy concerns… [as] all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree." *Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated on denial of reh'g en banc sub nom. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (collecting examples). Indeed, the proclamation upheld in *Hawaii* was concerned about public safety and national security consequences within the United States. 585 U.S. at 677-80. If Plaintiffs' arguments were credited, it would mean that no visas with domestic sponsors could be restricted, which is not the case. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students, which require a domestic sponsor). The Proclamation and implementing guidance suspend entry absent satisfaction of specified conditions, regardless of the identity of any sponsoring employer, and thus operates as an entry restriction rather than a domestic economic regulation.

**B.    The Proclamation and Implementing Memoranda Do Not Override the INA**

§§ 1882(f) and 1185(a)(1) "vest[] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684.

---

[2] Nor is the President's authority limited to measures addressing exclusively foreign or national security concerns. Indeed, during House floor consideration of H.R. 5678, to be enacted as the (McCarran-Walter) Immigration and Nationality Act of 1952, the bill's author, Rep. Walter debated with Rep. Multer over Rep. Multer's amendment (which was decisively defeated) to limit the bill's conferral of 1182(f) powers to the President, remarking, "We believe that this language 'whenever the President finds that the entry of any aliens or class of aliens in the United States would be detrimental to the interests of the United States' is absolutely essential . . . . [S]uppose we have a period of great unemployment? In the judgment of the committee, it is advisable at such times to permit the President to say that for a certain time we are not going to aggravate that situation." 98 Cong. Rec. 4490-4491 (Apr. 25, 1952).

Plaintiffs cannot prevail on their claims because the Proclamation does not directly conflict with any part of the INA or any other law.

First, to the extent Plaintiffs argue that only Congress has the power to set admission standards, the Supreme Court has already rejected that argument. *Hawaii*, <u>585 U.S. at 682</u>, <u>684</u>. The "right" to exclude aliens "stems not alone from legislative power but is *inherent* in the executive power to control the foreign affairs of the nation." *Knauff*, <u>338 U.S. at 542</u> (emphasis added). That makes sense. "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government"—all core executive functions. *Harisiades*, <u>342 U.S. at 588-89</u>. Against this backdrop, "Congress may in broad terms authorize the executive to exercise the power" over entry. *Knauff*, <u>338 U.S. at 543</u>. That is exactly what Congress did in §§ 1182(f) and 1185(a), by providing a "comprehensive delegation" to suspend, restrict, or regulate the entry of any aliens. *Hawaii*, <u>585 U.S. at 685</u>. Given the President's inherent authority over immigration and Congress's "express . . . authorization," the President's "authority is at its maximum" here. *Youngstown Sheet & Tube Co.*, <u>343 U.S. at 635</u> (Jackson, J., concurring).

Second, as the court in *Chamber* already held, the Proclamation adds a restriction to what INA requires; it does not override provisions of the INA. <u>2025 U.S. Dist. LEXIS 265244, at *70-71</u>. It does not, for example, change the H-1B numerical caps or alter the requirements for cap-exemption, nor does it modify the occupation requirements. All of that remains in place. *Id*. at *67-70. Instead, the Proclamation supplements the INA by temporarily imposing a $100,000 payment for certain petitions to "impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program." *Id.* at *64. Moreover, the fact that Congress incorporated anti-abuse and anti-fraud provisions, if anything, indicates that the Congressional

20

intent was that the H-1B program not be abused – an abuse that Plaintiffs do not contend has been successfully countered by Congressional guardrails. But more to the point, a nearly identical argument that Congress already imposed a sufficient vetting system was rejected in *Hawaii* because "plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting" system. 585 U.S. at 689. And while Plaintiffs claim "vast" economic effects, they cite no evidence in support of that claim.  Br. 17.

Under the Plaintiffs' theory, the President could never add a restriction in an area where Congress already imposed some legislation, but that would eviscerate § 1182(f) and is contrary to *Hawaii*, 585 U.S. at 689. Nor is such a theory consistent with past proclamations issued pursuant to §§ 1182(f) and 1185(a), which have included visa program. *See id.* at 693 (describing past proclamations); 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students). Moreover, the Ninth Circuit recently rejected a similar argument that a proclamation overrode the reticulated statutory scheme for refugees by fully suspending their entry indefinitely despite a cap and specific provisions. *Pacito v. Trump*, No. 2:25-cv-00255-JNW, 2026 WL 620449, at *14-16 (9th Cir. Mar. 5, 2026). If the proclamation there did not unlawfully override the INA then surely neither does this. *Id.*[3]

---

[3] Plaintiffs rely on the decision in *Doe v. Trump*, 957 F.3d 1050 (9th Cir. 2020), but that was a stay decision. The merits panel disagreed, holding that there was no conflict and the Proclamation satisfied § 1182(f) despite domestic impacts. *Doe #1*, 984 F.3d at 868, 870. That opinion was vacated in the denial of en banc because administrations changed, mooting the case. *Biden*, 2 F.4th 1284 (9th Cir. 2021). The Ninth Circuit in *Pacito* made clear the stay decision has no force. 2026 WL 620449, at *15 n.8. And while Plaintiffs cite *Refugee and Immigrant Center for Education and Legal Services v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) for the proposition that courts enjoin proclamations that exceed the authority of § 1182(f), the D.C. Circuit stayed that decision as to the challenged proclamation's impact on the entry of those seeking asylum, and only denied the stay for removals, which is irrelevant here. *RAICES v. Noem*, 25-5243, (D.C. Cir. Aug. 1, 2025). In addition, *Pres. & Fellows of Harvard Coll. v. DHS*, is inapposite to the case at bar

Third, the Proclamation and agency implementing memoranda also do not override the fee provisions of § 1356(m). Br. 12-13, 15. § 1356(m), gives the Attorney General discretion to impose "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." Br.25. The Proclamation does not impose a fee to cover costs, does not displace that fee, and is not collected or used in the same manner. *See, e.g.,* Alderette Ex. 7. *Chamber*, 2025 U.S. Dist. LEXIS 265244, at *65-66. Moreover, 1356(m) uses the permissive word "may" and in no way precludes different payments. *Biden*, 597 U.S. at 802 ("'may' clearly connotes discretion."). The legislative history supports this, as the fee was increased to cover costs without congressional funds, so it "would be passing strange" for that provision to cap other payments or restriction imposed under §§ 1182(f) or 1185(a)(1). *Id.* Furthermore, subsection (m) is a general provision, not a fee schedule specific to H-1B petitions. It would be a significant limit to suggest that § 1356(m) foreclosed any payment restriction under 1182(f) or 1185(a)(1) absent an express prohibition.

To the extent Plaintiffs suggest that existence of *some* statutory fee provisions precludes *all* other payments, that is an astonishing claim that would eviscerate § 1182(f). Other fees do exist for H-1B visas. And they are expressly non-exhaustive. For example, § 1356(u) "authorize[s]" the Secretary to "establish and collect a premium fee" and acknowledges payments "in addition to any other fees authorized by law." 8 U.S.C. § 1356(u)(1). Another provision, 8 U.S.C. § 1184(c)(12), likewise says a fee "shall" be imposed for fraud prevention, but acknowledges this is "[i]n addition to any other fees authorized by law." By contrast, Congress knows how to create a specific

---

because the Proclamation at issue does not focus solely on any domestic entity with constitutional issues. 788 F. Supp. 3d 182, 196 (D. Mass. 2025). Nor did the court in *Harvard* rule on the statutory arguments, much less the ones at issue here. *Id.* at 197. Nor were the threshold arguments raised.

prohibition when it wants to. § 1356(e)(3), for example, says that a specific fee "shall not apply" to certain immigrants arriving by ferry. 8 U.S.C. § 1356(e)(3). When Congress intends a specific prohibition to apply to immigration fees, it makes it express. So the fees that can be charged for H-1B are not limited to subsection (m) nor are any of them exclusive or prohibitory on the payment here. §§ 1182(f) and 1885(a)(1) allow for such payments "in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. There is no clear conflict other than those manufactured by Plaintiffs. *Chamber,* 2025 U.S. Dist. LEXIS 265244, at *61-65.

Fourth, to the extent Plaintiffs claim the Proclamation improperly applies to visa issuance rather than entry, they are wrong. The authority under §§ 1182(f) and 1185(a) are not limited to border entries, as the President has used this authority to erect naval blockades in international waters. *See Sale v. Haitian Centers Council, Inc*., 509 U.S. 155, 187 (1993). In any event, the entire purpose of a visa is to gain entry; the two are inherently comingled. *See* 8 U.S.C. § 1361. As the court in *Chamber* said, limiting the restrictions to entry is a "myopic view of the process for legally entering the United States." *Chamber,* 2025 U.S. Dist. LEXIS 265244, at *55-56. And the Ninth Circuit just rejected an identical argument. *Pacito*, 2026 WL 620449, at *14-16. Altogether, none of Plaintiffs' arguments that the Proclamation overrides or exceeds any power has merit.

### C.    The Proclamation is Not a Tax and Does Not Violate the Taxing Clause

Plaintiffs' last gasp is to claim that the Proclamation usurps Congress' taxing power. Br.15, 22-23. First, a regulatory payment is not the same as a tax. The Supreme Court continues to recognize that not all payments are taxes, distinguishing them, in part, on how high the payment is and who collects it. *NFIB v. Sebelius*, 567 U.S. 519, 565–66 (2012) (citing *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 36–37 (1922)). Unlike *NFIB*, the fee here is collected by DHS, not the IRS, making it more similar to the penalty in *Drexel* collected by Labor. *See id.*; *see also* Alderette

Ex. 7. And in *NFIB* the tax could never be more than insurance, but here Plaintiffs' argument is the payment is excessive in relation to H-1B application fees (purposefully so). *Id.* Plaintiffs cannot have it both ways, if the payment is so large it can be "prohibitory," it is not a tax. *Id. Learning Resources* does not alter this analysis, as according to the Supreme Court a tariff is a quintessential tax to "raise[] revenue," which is "the defining feature of a tax." *Learning Res., Inc. v. Trump*, No. 24-1287, 2026 U.S. LEXIS 714, at *16 (2026). The payment here is not a historic tax like a tariff, it is a restriction on the entry of aliens, which includes authority "inherent in the executive power." *Knauff*, 338 U.S. at 542. And its purpose is to incentivize the hiring of American workers, not raise revenue, as H-1B revenue is down by millions. Alderette Ex. 6. That cuts against it being a tax.

Second, even if the payment is a tax, the payment is justified under the immigration and commerce powers as well. U.S. Const. Art. I, § 8, cl. 3-4. The Supreme Court previously struck down a head count fee imposed on immigrants by states because the laws intruded on Congress's power over foreign *commerce*, not taxing. *See Smith v. Turner*, 48 U.S. 283, 421 (1849); *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875). The power can also stem from "the political branches" near-plenary authority in the immigration context. *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The "right" to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542 (emphasis added). Inherent in "sovereignty is the power to exclude," which "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax." *Merrion v. Jicarilla Apache Tribe*, 455 U.S.

24

130, 141, 144, 148 (1982). So the Government's authority over immigration can include the power to impose a payment, even a tax. At a minimum, § 1182(f) includes a delegation from Congress of its commerce and immigration powers, which both allow for a tax here.

Last, even if the payment is a tax solely under the taxing clause, the Supreme Court has made clear that Congress can delegate that authority just as it can with any other power. *Skinner v. Mid-American Pipeline Co.*, 490 U.S. 212 (1989). Indeed, the Supreme Court has just reiterated that there is no special clarity required for a delegation of the taxing power. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025); *Chamber*, 2025 U.S. Dist. LEXIS 265244, at *54.[4] The payment here falls well within Congress's broad delegation to impose "*any restrictions he may deem to be appropriate*" in the realm of "immigration" and "foreign affairs." *Hawaii*, 585 U.S. at 684, 708 (quoting § 1182(f)) (emphasis added). *Learning Resources* is not to the contrary. The Court's interpretation of the authority to "regulate . . . importation" under IEEPA, has no bearing on the "sweeping" authority under the statutes here. *Hawaii*, 585 U.S. at 64. *Learning Resources* distinguished IEEPA from § 232(b) at issue in *Algonquin*, which allowed for tariffs despite not expressly listing them because it authorized the President to "adjust . . . imports. . . as he deems necessary," which the Supreme Court similarly character as "sweeping." 2026 U.S. LEXIS 714, at *33. §§ 1182(f) and 1185(a) more closely mirror the language of § 232(b) than IEEPA and thus *Learning Resources* supports a broad delegation here. Similar to § 232(b), §§ 1182(f) and 1185(a)(1) grant "sweeping, discretion conferring language" providing that the President may impose "any restrictions he may deem to be appropriate" or set "reasonable rules,

---

[4] To the extent Plaintiffs briefly argue there is no intelligible principle, the statute requires that the entry of aliens must be detrimental to the interests of the United States, which more than suffices. Even *Thein* called such a claim absurd. *Thein v. Trump*, 2026 LX 38164, at *19 (D.D.C. Jan. 23, 2026) (noting "standards such as 'detrimental to the interests of the United States' and as 'he may deem to be appropriate' convey an expansive grant of power, but they are no more capacious than the broad standards deemed sufficiently intelligible by the Supreme Court in all but two of its cases.'" (internal citations omitted)), *appeal dismissed*, 2026 LX 41947 (D.C. Cir. Feb. 17, 2026).

regulations, and orders" governing entry and departure "as the President may prescribe." *Id*. The *Chamber* court thus correctly observed that "Congress could have, but did not, impose a limit on presidential authority." 2025 U.S. Dist. LEXIS 265244, at *49. Courts have routinely defined the broad scope of "any,' reminding that 'any . . . means any.'" *Id*. (cases collected). If anything, the clear distinctions between *Learning Resources* and some of these cases demonstrate that the restriction here is lawful. Thus, the $100,000 payment falls within the scope of "any restriction" under § 1182(f) and does not contravene the Taxing Clause.

Plaintiffs argue that the major questions doctrine also precludes the Executive from imposing a monetary condition pursuant to §§ 1182(f) and 1185(a). Br.16-17. However, Plaintiffs fail to address the context in which that delegation was made or to explain how that context informs the proper interpretation of the statutes. There must be a "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute. *Biden v. Nebraska*, 600 U.S. 477, 517-518 (2023) (Barrett, J., concurring). The opposite is true here. As explained, §§ 1182(f) and 1185(a) confer "sweeping proclamation power." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). But it is not unlimited. It generally only applies (1) temporarily to (2) aliens (3) whose entry would be (4) detrimental to the United States. 8 U.S.C. § 1182(f). Again, if anything, *Learning Resources* reinforces this conclusion. *Learning Resources* described the power asserted as "the independent power to impose tariffs on imports from any country, of any product, at any rate, for any amount of time." 2026 U.S. LEXIS 714, at *15. By contrast, like *Yoshida*, the Proclamation here is limited to a one-time payment on the entry of H-1B applications for one year. Nor is there any evidence that the Proclamation comes anywhere near the $15 trillion at issue there. And the Supreme Court in *Hawaii* rejected Plaintiffs' argument

that the lack of historical precedent for this precise restriction cuts against. *Hawaii*, 586 U.S. at 693. Therefore, there is no basis to cabin Congress's sweeping delegation here.

### D.    Notice and Comment Rulemaking was Not Required

Plaintiffs' claim that the agency guidance and memoranda—which reiterate and implement the Proclamation—should have undergone notice and comment rulemaking, is likewise unavailing. Br.18-19; *see* 5 U.S.C. § 553(b)(A). First, as explained, §§ 1182(f) and 1185(a)'s powers belong to the *President* alone, and the agencies lack authority to either disobey or disregard that exercise pending a meaningless notice-and-comment process that does not excuse them from following the Proclamation. *See Trump v. Orr*, 223 L.Ed.2d 180, 181(2025); *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100. Indeed, the D.C. Circuit rejected an almost identical argument that the Secretary of Homeland Security needed to go through notice and comment rulemaking to expand expedited removal because the statute gave the Secretary "sole discretion" to change the rule "at any time," thus he "would be free to ignore the comments" and "notice-and-comment procedure would be an empty, yet time-consuming, exercise." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020). The laws here "exude[] deference to the President in every clause." *Hawaii*, 585 U.S. at 684. So there is no basis to require the agencies to engage in notice and comment rulemaking to implement the Proclamation, as they must. They would have to ignore the comments and it would be a meaningless barrier. *See Make The Rd. N.Y*, 962 F.3d at 635. Plaintiffs were therefore not prejudiced by being unable to submit comments that the agencies could not have followed in any event. *Id.*; *See Bradford*, 101 F.4th at 731.

Second, notice and comment rulemaking only apply to legislative rules, which "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citation omitted). The agency guidance and memoranda fail that test. The Proclamation has the force of law and creates

new obligations, not the agencies' ministerial implementation. *See, e.g,* 8 U.S.C. §§ 1182(f), 1185(a) (granting authority to president); *Chamber*, 2025 U.S. Dist. LEXIS 265244, at *76-77. The basic tenor of the agency guidance and memoranda *is* already outlined in the Proclamation itself. *See supra* § IV Agency Guidance and Memoranda (discussing agency ministerial implementation). As such, the agency guidance is more akin to interpretive or internal procedural rules, which do not require notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(b)(A)).

Third, several notice-and-comment exceptions apply. The "good cause exception" applies because it would be "impracticable" to announce rulemaking for a temporary one-year Proclamation and would undermine its very purpose. 5 U.S.C. § 553(b)(B). §§ 1182(f) and 1185(a) permit the president to take swift yet temporary action. Rulemaking could encompass many months, delaying the implementation of the Proclamation, which is not what Congress intended. The "foreign affairs" exception also applies, 5 U.S.C. § 553(a)(1), because "[t]he exclusion of aliens ... is inherent in the executive power to control the foreign affairs of the nation," *Knauff*, 338 U.S. at 542; *Hines v. Davidowitz*, 312 U.S. 52, 65 (1941) (immigration and foreign affairs are closely linked). §§ 1182(f) and 1185(a) inherently deal with foreign affairs functions. *See Hawaii*, 585 U.S. at 708.

Finally, even if notice and comment rulemaking had been required, any failure to conduct it would be harmless error because the agencies were required by the Proclamation to collect the $100,00 payment. *See Chamber*, 2025 U.S. Dist. LEXIS 265244, at *77-78; *see also Conservation Law Foundation v. Evans*, 360 F.3d 21, 29 (1st Cir. 2004) (any failure to engage in notice-and-comment was harmless because it "clearly had no bearing on the procedure used or the substance of the decision reached" (citations omitted)). Plaintiff has the burden of showing any error causes

harm, and here they cannot do so. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). As in *Chamber*, Plaintiffs cannot satisfy their burden to show that "they could have mount[ed] a credible challenge" to the agencies' memoranda through notice and comment. 2025 U.S. Dist. LEXIS 265244, at *78 (internal quotations omitted). Nor could additional procedure have altered the outcome. *Id*. Because the agencies lacked discretion to deviate from the Proclamation's $100,000 payment requirement, "no amount of procedure would have remedied" Plaintiffs' alleged harm. *Id*.; *see Ctr. for Biological Diversity v. United States Int'l Dev. Fin.Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023); *Bradford*, 101 F.4th at 731. Plaintiffs therefore cannot establish arbitrary and capricious error on this basis.

## E.    The Proclamation is Not Arbitrary and Capricious

Plaintiffs contend that the challenged agency memoranda and guidance are arbitrary and capricious because they fail to acknowledge the agencies' change in position, they fail to consider reliance interests, and they relied on factors Congress did not intend, such as domestic economic policy. Br.19-22. Even if APA review were available—and as discussed *supra*, it is not—an agency does not act "arbitrarily and capaciously" or "contrary to law" when it implements a legally permissible presidential directive. *Chamber*, 2025 U.S. Dist. LEXIS 265244, at *76; *Bradford*, 101 F.4th at 731 (cannot be arbitrary and capricious for agency to rescind guidance pursuant to mandate in executive order). Here, §§ 1182(f) and 1185(a) give the President authority to issue a Proclamation in his discretion and "defendants here had no other course of action: ...an agency 'may not simply disregard' a binding presidential directive." *Chamber*, 2025 U.S. Dist. LEXIS 265244, at *76 (quoting *Sherley*, 689 F.3d at 784-85); *Orr*, 223 L.Ed.2d at 181. That is true even if the agency, in implementing the directive, does not consider alternatives or acknowledge its change in position. *Bradford*, 101 F.4th at 731. For the same reasons, even if the agencies had been required to consider the factors Plaintiffs identify, a failure to do so would be harmless error

because the agencies were required to implement the Proclamation as directed. *See Chamber*, 2025 U.S. Dist. LEXIS 265244, at \*77-78; *see also Conservation Law Foundation*, 360 F.3d at 29.

In any event, § 1182(f) does not permit litigants to "challenge" a Presidential entry-suspension order "based on their perception of its effectiveness and wisdom," because Congress did not authorize courts to substitute their own assessments "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Hawaii*, 585 U.S. at 708 (citations and quotations omitted). Whether the President's chosen method of addressing a perceived risk to the national interest "is justified from a policy perspective" is irrelevant, because he need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Id*. at 686-87 (citations omitted). Plaintiffs' arbitrary and capricious argument attempts and end run around this, ultimately challenging the President's reasoning and chosen remedy. Such judicial second guessing "would amount to a clear invasion of the legislative and executive domains." *United States v. George S. Bush & Co., Inc*., 310 U.S. 371, 380 (1940); *see Sale*, 509 U.S. at 165 ("[t]he wisdom of the policy choices" reflected in Presidential Proclamations are not "matter[s] for our consideration"). And much of their arguments, such as reliance on the § 1356(m) fees and domestic policy concerns fail for the reasons explained earlier.

## IV.   Defendants Department of Justice and Department of Labor Should be Dismissed

Plaintiffs name the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor as defendants, but do not plead *any* facts against them. *See generally* Doc. No. 1. Indeed, the accused agency policies and memoranda were issued by the Department of Homeland Security and Department of State. Doc. No. 1 at ¶¶ 106-12 (allegations only against USCIS). This is because the only role they have in the Proclamation is to advise the President on whether to extend the expiration date (which is months away). While the Proclamation directs the

30

Department of Labor to engage in rulemaking, that process remains ongoing. *See* 90 Fed. Reg. at 46,028 (Notice of Proposed Rulemaking). Without any factual allegations to "state a claim to relief that is plausible on its face" against these defendants, they must be dismissed from the case. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.)*, 263 F. Supp. 2d 140, 148 (D. Mass. April 30, 2003) ("The court will not read causes of action into the complaint which are not alleged.").

## V.    Plaintiffs Are Not Entitled to Relief

Plaintiffs seek a declaratory judgment that the agency guidance and memoranda are "unlawful in violation of the APA and Constitution," APA vacatur of the memoranda, and "to the extent vacatur does not provide Plaintiffs sufficient relief," an injunction. Br. 22. Even if Plaintiffs had viable claims (and they do not), they are not entitled to the relief they seek.

### A.    Vacatur Is Inappropriate

First, vacatur under the APA is not an appropriate remedy here. Any relief must be tailored to injured parties before the Court. *Trump v. CASA, Inc.*, 145 S. Ct. 145, 2562–63 (2025). The same is true for vacatur under the APA. *See United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring); *Cf. Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (applying *CASA* to APA § 705 stay stating that the proper focus as to scope is whether it will afford "complete relief to the *plaintiffs before the court*" not to "*everyone* potentially affected."). Plaintiffs invoke § 703 of the APA which permits "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus," but makes no mention of vacatur. 5 U.S.C. § 703. And while some courts employ vacatur as a remedy, the government believes remedies under the APA should reflect historical equitable remedies with the same limits. *Id*. Even so, vacatur is not a mandatory remedy; remand without

vacatur is within the court's discretion. *Town of Weymouth v. Mass. Dep't of Envtl. Prot.*, 961 F.3d 34, 58 (1st Cir. 2020); *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023).

Vacatur is especially inappropriate here because there are obvious collateral estoppel and *res judicata* concerns, as many of the state universities' alleged injuries are being litigated in two other cases challenging the Proclamation. First, the court in *Chamber* granted judgment to the government against the Chamber of Commerce and the AAU on behalf of their members, which are predicated on the same purported injuries to the universities that are claimed here, again, this time by the States. 2025 U.S. Dist. LEXIS 265244, at *27. AAU's members include some of the allegedly injured entities here, especially many of the state universities. Alderette Exs. 2, 3. There has been "a final judgment on the merits" in *Chamber*. *Chamber*, 2025 U.S. Dist. LEXIS 265244. The causes of action in *Chamber* are also identical to the causes of action in this case and in *Global Nurse Force*. *Waithaka*, 404 F. Supp. 3d at 351 (The issues and parties only need to be similar, not identical); Doc. No. 1; Alderette Exs. 2, 5. The alleged injuries to the universities are already being litigated in both the AAU's action in *Chamber* and *Global Nurse Force's* class action litigation. Alderette Exs. 2, 3, 5. The relief in this case would be duplicative, which would run afoul of the principles of res judicata. *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 873 F.3d 21, 29 (1st Cir. 2017) ("Res judicata is a protection … from the anguish of being dragged through interminable litigation solely because an adversary has the will or means to continue endlessly."). Indeed, *Chamber* found for the government, and this litigation provides the States and their universities with a second bite at the apple after having their claims fully litigated.

Second, in *Global Nurse Force* plaintiffs seek a (b)(2) class of all employers who are or might be subject to the Proclamation. *Global Nurse Force, et al. v. Donald J. Trump, et al.*, 4:25-cv-08454-HSG (N.D. Cal. 2025); Alderette Ex. 4. If that class is granted, it will bind Plaintiffs and

32

likely require dismissal or a severe limiting of this case. *Haag*, 589 F.3d at 45. At the very least, relief should exclude the universities that already challenged the Proclamation in the *Chamber* case.

**B.    Plaintiffs Have Not Established that they are Entitled to an Injunction**

Plaintiffs seek an injunction "to the extent vacatur does not provide Plaintiffs sufficient relief" but do not explain the scope of the injunction they seek, only that it is something beyond vacatur to provide "sufficient relief."  Br.22. To establish entitlement to an injunction, Plaintiff must show irreparable injury, an inadequate remedy at law, and that the balance of hardships and public interest weigh in their favor.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). Plaintiffs have not met those threshold showings.

First, Plaintiffs have not shown irreparable harm. Plaintiffs complain that they should not have to pay $100,000 to participate in the optional H-1B program within the next seven months (the current timeframe of the Proclamation), whether through a cap-exempt petition or through the lottery. Plaintiffs allege that the new $100,000 fee to continue using that program is a concrete harm. However, Plaintiffs' own declarations indicate that only a few of them have actually paid that fee (which prospective relief would not redress). For those who paid the fee, "it is well settled that economic loss does not, in and of itself, constitute irreparable harm," *Doe Co. v. Cordray*, 849 F. 3d 1129, 1134 (D.C. Cir. 2017) (quotations/citations omitted). For those who have decided to forego using the H-1B program, they cannot allege an irreparable injury based upon their own decision not to participate, in the program, because such an injury is self-inflicted. *See S.F. Real Estate Inv'rs v. Real Estate Inv. Tr.*, 692 F.2d 814, 818 (1st Cir. 1982). For those who allege that they may not be able to hire the persons of their choice, such an injury is entirely speculative because there is no guarantee that they would find a foreign worker who could get approved for an H-1B petition and visa even without the fee. *Ross-Simons of Warwick, Inc. v. Baccarat*, Inc.,

102 F.3d 12, 19 (1st Cir. 1996) ("tenuous or overly speculative forecast of anticipated harm" insufficient to show irreparable harm). For those who claim they must divert resources or adjust budgets, that too is an economic injury that is hardly irreparable. *See Coney Island Prep v. HHS*, 506 F. Supp. 3d 203, 215 (S.D.N.Y. 2020) (diversion of resources often is not an injury much less an irreparable one). Moreover, while some Plaintiffs claim no Americans applied for posted positions, it is not apparent that Plaintiffs cannot hire Americans to fulfil their labor needs if for example, they adjusted their job postings or raised their salaries. There is no concrete, non-economic, non-self-inflicted, *irreparable* harm in their motion.

A claim for injunctive relief also requires showing that remedies at law are inadequate. Plaintiffs do not even attempt such a showing. Indeed, the funds are set up to allow reimbursements if a payment is made for a petition but the visa is ultimately not awarded. The fact that Plaintiffs chose to bring causes of action that cannot award damages was their choice and does not entitle them to an injunction.

Last, the balance of hardships and public interest weigh in favor of the Government. Where the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). By challenging the Proclamation, Plaintiffs seek to block an exercise of the President's broad authority to suspend or regulate the entry of aliens whose entry he determined would be detrimental to the nation's interests. Here, the Proclamation is directed at resolving "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." 90 Fed. Reg. 46,027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* Those are quintessential national

interests, and an injunction severely impedes the Executive's ability to safeguard them. As the D.C. Circuit has explained, such relief "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). And while Plaintiffs have failed to show irreparable harm, the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *CASA, Inc.*, 145 S. Ct. at 2562 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Every day an injunction is in place, the President loses valuable time to implement his policies. So the balance of equities and public interest weigh decidedly in Defendants' favor.

Thus, Plaintiffs are not entitled to an injunction on their claims. For those who are subject to the cap and thus must use the lottery, those claims will also be moot soon. *See Goodluck v. Biden*, 104 F.4th 920, 927 (D.C. Cir. 2024).

Finally, a declaratory judgment alone would not redress Plaintiffs' alleged injuries because even if the agency memoranda and guidance implementing the Proclamation were declared unlawful, that judgment would not affect the Proclamation nor would it enjoin any future action. *See Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987) ("A declaratory judgment states the existing legal rights in a controversy, but does not, in itself, coerce any party or enjoin any future action.").

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment on all counts and enter summary judgment for Defendants. In addition, the Court should dismiss the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor as defendants. Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney
General

**Glenn Girdharry**
Acting Deputy Director

**Alexandra McTague**
Senior Litigation Counsel

By: */s/ Jeffrey Alderette*
**Jeffrey Alderette**
Trial Attorney (D.C. No. 1738711)
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 860-9941
Jeffrey.Alderette@usdoj.gov
*Counsel for Defendants*

36