# Exhibit 5

1    Karen C. Tumlin (CA Bar No. 234691)
2    Esther H. Sung (CA Bar No. 255962)
     Laura Flores-Perilla (CA Bar No. 355645)
3    Hillary Li (GA Bar No. 898375)*
     Brandon Galli-Graves (TX Bar No. 24132050)*
4    **JUSTICE ACTION CENTER**
     P.O. Box 27280
5    Los Angeles, CA 90027
6    (323) 450-7272
     karen.tumlin@justiceactioncenter.org
7    esther.sung@justiceactioncenter.org
     laura.flores-perilla@justiceactioncenter.org
8    hillary.li@justiceactioncenter.org
     brandon.galli-graves@justiceactioncenter.org
9

10   *Counsel for Plaintiffs*

11   *\* Motion for pro hac vice to be filed*

12   [Additional co-counsel on signature page]
13

14                   **UNITED STATES DISTRICT COURT**
15                   **NORTHERN DISTRICT OF CALIFORNIA**

16

17   GLOBAL NURSE FORCE; INTERNATIONAL          **Case No. 3:25-cv-8454**
     UNION, UNITED AUTOMOBILE, AEROSPACE
18   AND AGRICULTURAL IMPLEMENT
     WORKERS OF AMERICA LOCAL 4811;
19   INTERNATIONAL UNION, UNITED                 **COMPLAINT FOR**
     AUTOMOBILE, AEROSPACE AND                   **DECLARATORY AND**
20   AGRICULTURAL IMPLEMENT WORKERS OF           **INJUNCTIVE RELIEF**
     AMERICA; SERVICE EMPLOYEES
21   INTERNATIONAL UNION, AFL-CIO                **Administrative Procedure Act Case**
     COMMITTEE OF INTERNS AND RESIDENTS;
22   AMERICAN ASSOCIATION OF UNIVERSITY
     PROFESSORS; GLOBAL VILLAGE ACADEMY
23   COLLABORATIVE; SOCIETY OF THE DIVINE
     WORD – CHICAGO PROVINCE; FATHERS OF
24   ST. CHARLES; CHURCH ON THE HILL, *D/B/A*
     *ALGOOD FIRST BAPTIST*; JOHN SMITH;
25   PHOENIX DOE,
26
27          *Plaintiffs*,
28

                                    2

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF HOMELAND SECURITY;
KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; JOSEPH B. EDLOW, in his official
capacity as Director, U.S. Citizenship and
Immigration Services; U.S. CUSTOMS AND
BORDER PROTECTION; RODNEY SCOTT, in
his official capacity as Commissioner of U.S.
Customs and Border Protection; U.S.
DEPARTMENT OF STATE; MARCO RUBIO, in
his official capacity as Secretary of State,

   *Defendants*.

COMPLAINT                                3

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  JURISDICTION AND VENUE ....................................................................... 5

III. DIVISIONAL ASSIGNMENT ....................................................................... 6

IV. PARTIES ........................................................................................................... 6

V.  LEGAL BACKGROUND ............................................................................... 12

     A.   Congress Created the H-1B Visa to Ensure the U.S. Could Attract
          Necessary Workers in Specialty Occupations ......................................... 13

     B.   In Designing the H-1B Program, Congress Included Protections for
          U.S. Workers ........................................................................................... 14

     C.   Congress Created a Detailed Statutory Scheme to Govern the H-1B
          Process That Balances Private and Public Sector Needs.......................... 16

         1.   H-1B Registration and Lottery for Cap-Subject H-1B Visas ..................... 16

         2.   Cap-Exempt H-1B Visas ........................................................................ 17

         3.   H-1B Petition Process ............................................................................ 17

         4.   Visa Issuance and Entry ......................................................................... 18

     D.   Congress Established a Detailed Fee System for H-1Bs That Sets
          Parameters on Fees and Dictates Their Use ............................................ 19

     E.   The President's Ability to Restrict Entry Under the INA Does Not
          Authorize Him to Override Congress's Comprehensive H-1B Statute ................. 21

VI. FACTUAL ALLEGATIONS ........................................................................... 22

     A.   The President's Proclamation ..................................................................... 22

         1.   The Proclamation is Based on Multiple Errors of Fact and
             Ignores the Benefits of the H-1B Program to the American
             Economy ................................................................................................ 24

         2.   The Proclamation's Exorbitant $100,000 Fee Is Unprecedented
             and Unjustified, and the Exception Process is Ripe for Abuse ................. 25

         3.   After the Ill-Planned Proclamation Caused Immediate Harm,
             the Government Began to Backtrack ........................................................ 26

COMPLAINT                         i

B.      The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions .................................................................................. 28

C.      The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest ............................................................................................. 30

      1.      Health care ............................................................................ 30

      2.      K-12 school systems ............................................................ 35

      3.      Religious organizations ........................................................ 39

      4.      Research and academic institutions ...................................... 48

VII.    CAUSES OF ACTION ................................................................................ 52

VIII.   PRAYER FOR RELIEF .............................................................................. 60

COMPLAINT                             i

# I.    INTRODUCTION

1.    The H-1B visa program was established by Congress to provide a pathway for American employers to hire skilled non-U.S.-workers in specialty occupations. There are around half a million H-1B workers in the United States[1] across a range of specialty fields, including researchers and workers in the science, technology, engineering, and mathematics (STEM) fields; doctors, other healthcare providers, and medical researchers; university professors and K-12 educators; and religious leaders. The standards for granting an H-1B petition focus on the worker's specialized knowledge and academic credentials. While many H-1B workers are employed in the computer technology industry, more than a third of all H-1B workers are in other fields.[2]

2.    The H-1B visa program is a critical pathway to hiring educators and healthcare workers—two categories in high demand in the U.S.—who comprise 10% of all H-1B workers.[3] The United States faces a projected shortfall of nearly 86,000 physicians in the next decade, particularly in medically underserved areas of the United States and places with health professional shortages, where nearly two-thirds of all foreign-trained physicians in the United States—including almost 23,000 H-1B workers, between 2001 and 2024—practice.[4] Nurses, too, are in short supply, particularly after the COVID-19 pandemic drove many nurses out of the profession and insufficient staffing raises nurses' stress level. K-12 school districts also rely on the H-1B visa program to fill critical vacancies, especially in rural areas facing acute staffing

---

[1] Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Wash. Post (Sept. 24, 2025), https://perma.cc/4YEH-DGLY.
[2] *Id.*
[3] *Id.*
[4] *AMA urges DHS to exempt physicians from new $100,000 H-1B visa fee*, Am. Med. Ass'n (Sept. 25, 2025), https://perma.cc/T69U-67BY.

shortages,[5] and the H-1B visa program allows colleges and universities to hire talented scholars and researchers from around the world, enabling American students to learn from and research under the supervision of these experts in specialized fields.[6]

3.  The H-1B program also allows religious organizations to retain priests and pastors who have the language skills, cultural competency, and religious training needed to minister to underserved populations, including poor refugee and migrant communities and economically distressed Appalachian communities.

4.  The H-1B program drives innovation and economic growth in the United States. It allows employers to fill labor shortages in specialized fields and fuels workers to invest additional dollars in the U.S. economy. It supports immigrants in creating new businesses that expand the U.S. labor market.

5.  H-1B visas are issued for an initial three-year term, and workers who hold these visas can have either immigrant or nonimmigrant intent—meaning Congress intended there to be a path to permanent residency for some H-1B workers, who may ultimately become lawful permanent residents (i.e. "green card" holders)—and may freely travel in and out of the United States.

6.  The Immigration and Nationality Act ("INA") sets forth a comprehensive and detailed scheme for the H-1B program and process, specifying qualitative and numeric limits on the number of H-1B visas to be granted, the standards for approving an H-1B petition from an

---

[5] *Administration Announces Changes to H-1B Visa Program*, The School Superintendents Association (Sept. 24, 2025), https://perma.cc/ZT2K-BB2T.
[6] Ellie Davis, *What Trump's $100,000 Fee for Skilled-Worker Visas Could Mean for Higher Ed*, Chron. Higher Educ. (Sept. 22, 2025), https://perma.cc/J6J5-UDAM.

employer, the standards for detecting and addressing unlawful use of the program by employers, and the fees to be charged and allocation and use of those funds by the government.

7.    Without warning on Friday, September 19, 2025, President Trump issued a Proclamation titled "Restriction on Entry of Certain Nonimmigrant Workers"[7] (the "September 19 Proclamation"). The Proclamation "restricted" entry into the United States of workers on H-1B visas, conditioning it on their employers making a $100,000 "payment" to the federal government, starting less than 36 hours after issuance, at 12:01 am ET on Sunday, September 21, 2025.

8.    At the Oval Office ceremony unveiling the Proclamation, Commerce Secretary Howard Lutnick stated that it would be "a hundred-thousand dollars a year for H-1B visas" and that "[e]ither the person is very valuable to the company and America, or they are going to depart and the company is going to hire an American."[8]

9.    The broad language of the Proclamation and the unprecedented changes to this long-standing program caused a widespread panic, with employers instructing employees to return to the United States before 12:01 am ET on Sunday, September 21, and/or not to leave the country at all. Workers rushed back to the United States, abandoning family events and vacations, while others frantically requested to de-plane flights they had already boarded before they left the United States.

10.    Government agencies scrambled to respond to the chaos. Three agencies issued public statements over the weekend, in the days and hours after the Proclamation: the United States Citizenship and Immigration Services ("USCIS") which adjudicates the employer

---

[7] Proclamation No. 10,973, <u>90 Fed. Reg. 46,027</u> (Sept. 19, 2025).

[8] Johana Bhuiyan, *Trump signs proclamation imposing annual $100,000 fee on H-1B visas*, The Guardian (Sept. 19, 2025), https://perma.cc/GQ23-AX3U.

petitions; the United States Department of State ("State" or "State Department") which adjudicates visa applications submitted by H-1B nonimmigrant workers; and United States Customs and Border Protection ("CBP") which inspects and admits foreign nationals seeking to enter the United States.

11.     Collectively, the agencies' statements reflected the new policies the agencies quickly adopted to implement the Proclamation: A one-time payment of $100,000 is required "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025 ("$100,000 Requirement"). Payment is a condition for adjudication of any such H-1B petition, consular processing for H-1B visas, and entry into the United States for H-1B workers.

12.     While the agencies' policies limit the $100,000 Requirement to new petitions and carve out renewals, the new policies do not differentiate between petitions for workers who are outside of the United States and those for workers who are already inside the United States, seemingly expanding the Proclamation's "entry" ban to include individuals who have already entered the country, not just those "currently outside the United States" as stated in the Proclamation.

13.     Defendants' abrupt imposition of the $100,000 Requirement is unlawful. The President has no authority to unilaterally alter the comprehensive statutory scheme created by Congress. Most fundamentally, the President has no authority to unilaterally impose fees, taxes or other mechanisms to generate revenue for the United States, nor to dictate how those funds are spent. The Constitution assigns the "power of the purse" to Congress, as one of its most fundamental premises. Here, the President disregarded those limitations, asserted power he does not have, and displaced a complex, Congressionally specified system for evaluating petitions and granting H-1B visas. The Proclamation transforms the H-1B program into one where employers

must either "pay to play" or seek a "national interest" exemption, which will be doled out at the discretion of the Secretary of Homeland Security, a system that opens the door to selective enforcement and corruption.

14.     Executive Branch agencies similarly cannot act contrary to or beyond the authority conferred by statute, nor can they act beyond or contrary to their own regulations. In immediately adopting the $100,000 Requirement without notice and comment, the agencies failed to go through required regulatory processes. The $100,000 Requirement is also arbitrary and capricious. The government failed to consider how extorting exorbitant fees will stifle innovation. The government failed to consider harms to hospitals, churches, schools and universities, and small businesses and non-profits, or how the fee will harm communities across the nation. Indeed, economic data and studies confirm that the new $100,000 Requirement will harm, not help, the U.S. economy and workers and their families in the United States.

15.     Plaintiffs are a health care business that helps hospitals across the country fill critical vacancies with qualified nurses from abroad, schools, religious organizations, labor unions, and workers, who are all facing the sudden $100,000 Requirement. Plaintiffs bring this action against President Donald J. Trump, the U.S. Department of Homeland Security ("DHS"), its subagencies USCIS and CBP, the State Department, and the heads of these agencies (collectively, "Defendants"), to challenge the legality and implementation of the Proclamation. Plaintiffs seek declaratory relief and injunctive relief because the Proclamation and the agencies' subsequent actions exceed the President's Constitutional authority and contravene the statutory H-1B process and program.

## II.    JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C). Plaintiff

Local 4811 of the International Union, United Automobile, Aerospace, and Agricultural

Implement Workers of America ("UAW Local 4811"), maintains its principal place of business in

Berkeley, California. Plaintiff Phoenix Doe also resides in the Northern District of California.

There is no real property at issue in this case.

18.     Joinder is proper in this action as the questions of law are identical to all Plaintiffs

in this action.

### III.     DIVISIONAL ASSIGNMENT

19.     Per N.D. Cal. Civ. L.R. 3-2(c), this action shall be assigned to the San

Francisco/Oakland Division, because Plaintiff UAW Local 4811 is headquartered in Alameda

County and has affected members at UCSF.

### IV.     PARTIES

20.     **Plaintiff Global Nurse Force** is a limited liability company with its principal

place of business in Laguna Beach, California. For the past decade, Global Nurse Force has been

connecting talented international nurses with healthcare facilities around the world. Global Nurse

Force has placed over 10,000 nurses at more than 175 hospitals throughout the UK, Ireland,

Canada, Australia and the Middle East.  In the United States, where there has been a growing

nursing shortage, Global Nurse Force has assisted U.S. health systems to recruit highly skilled

and experienced international nurses on H-1B specialty worker visas. Global Nurse Force

operates a direct-hire model where the nurses come in as permanent employees of the hospital

and receive the same pay and benefits as the hospital's regular staff.  Global Nurse Force takes

care of the logistics, including recruitment, credentials verification, licensing, immigration and

relocation.  Although Global Nurse Force operates in various countries, its business model for its

U.S. operations relies on the H-1B system and the ability of U.S. healthcare facilities to sponsor nurses for H-1B visas.

21.     **Plaintiff International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811 ("UAW Local 4811")** is a labor union headquartered in Berkeley, California that, jointly with the UAW International, is the exclusive collective bargaining representative for 48,000 workers at the University of California ("UC") across three distinct bargaining units and has a membership comprised of graduate student employees and non-student academic employees at UC. The Academic Student Employees unit, represented by UAW International and Local 4811, consists of over 36,000 UC employees working in positions such as graduate student researcher, teaching assistant, reader, and tutor. The Postdoctoral Scholars unit represented by UAW International and UAW Local 4811 consists of over 7,000 UC non-student employees working as postdoctoral scholars, who are early career scientists with doctorate degrees that perform research. The Academic Researchers unit represented by UAW International and UAW Local 4811 consists of over 5,000 UC non-student employees working in positions such as researcher, project scientist, specialist, and coordinator of public programs.

22.     **Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International")** is one of the largest and most diverse unions in North America. Headquartered in Detroit, Michigan, the UAW International has members in the United States, Canada, and Puerto Rico, and in virtually every sector of the economy. From its earliest days, the UAW International has been a leader in the struggle to secure economic and social justice for all people. The UAW International has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher

COMPLAINT                                      7

education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country including the University of California, California State University, University of Southern California, California Institute of Technology, UC Law San Francisco, California Institute of the Arts, University of Oregon, University of Washington, Washington State University, Columbia University, New York University, Harvard University, University of Pennsylvania, Princeton University, and Johns Hopkins University, among many others.

23.     **Plaintiff Service Employees International Union, AFL-CIO Committee of Interns and Residents ("Committee of Interns and Residents, SEIU" or "CIR")** is a local union of the Service Employees International Union, AFL-CIO ("SEIU"). CIR is headquartered in Long Island City, New York, and represents more than 40,000 interns, residents, and fellows in hospitals throughout the United States including California, Delaware, Florida, Idaho, Illinois, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, Vermont, Washington, and Washington, D.C. CIR and CIR members are dedicated to improving residency training and education, advancing patient care, and expanding access to healthcare.

24.     **Plaintiff American Association of University Professors ("AAUP")** is a non-profit membership association and labor union of faculty and academic professionals throughout the country. AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. The AAUP has approximately 50,000 members on college and university campuses across the country. AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic

professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and

research in higher education; to help the higher education community organize to make its goals

a reality; and to ensure higher education's contribution to the common good. The AAUP has

helped to shape American higher education by developing the standards and procedures that

maintain quality in education and academic freedom in this country's colleges and universities.

25.     **Plaintiff Global Village Academy Collaborative ("GVAC")** is a public, non-

profit organization established in 2013, authorized under Colorado statute, and headquartered in

Thornton, Colorado. For over a decade, GVAC has operated similar to a school district,

providing centralized operational and educational support services to its member schools (the

Global Village Academies, or "GVA") and its staff across Colorado. Global Village Academies

are tuition-free, public charter schools providing English and second language immersion

instruction (K-8) in Spanish, Mandarin Chinese, Russian, or French to its students. There are

currently 3 Global Village Academy schools across the cities of Aurora, Thornton, and Parker,

Colorado, which currently serve around 2,200 students collectively.

26.     **Plaintiff Society of the Divine Word—Chicago Province (also known as**
**"Societas Verbi Divina," "SVD," and the "Divine Word Missionaries")** is a religious

missionary order of Roman Catholic priests and brothers presently serving in almost eighty

countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the

Provincial Superior of the province—is a non-profit, tax-exempt organization employing several

hundred employees. Because of the diverse communities, cultures, and nationalities that Society

of the Divine Word serves, it depends on the availability of H-1B visas for foreign religious

workers with specialized skillsets including Polish, Spanish, and Vietnamese language abilities.

27.     **Plaintiff Fathers of St. Charles** is a non-profit, tax-exempt religious organization and part of the Congregation of the Missionaries of St. Charles – Scalabrinians, a Roman Catholic international religious community dedicated to serving migrants and refugees of different cultures, religions and ethnicities in thirty-five countries on five continents. The Congregation was founded on November 28, 1887, by Saint John Baptist Scalabrini (1839-1905), the bishop of Piacenza, Italy, who at that time recognized the far-reaching social and religious implications of the massive emigration from Europe toward the Americas occurring at that time. Fathers of St. Charles, whose province (the St. John the Baptist Province) covers the United States, Canada, Mexico, Guatemala, and El Salvador, keeps its provincial office in Oak Park, Illinois, and has been serving migrants for well over a century. It is a non-profit, tax-exempt religious organization that employs approximately thirty-five people in the United States. Fathers of St. Charles' missionary focus for the last twenty-five years has been to be in mission with migrants, with a focus on the very poorest migrants. This mission compels Fathers of St. Charles to provide all pastoral activities, including sacramental and liturgical activities, Bible study, and formation, in the native languages of the people they serve.

28.     **Plaintiff Church on the Hill d/b/a Algood First Baptist ("Church on the Hill")** is a non-profit 501(c)(3)-approved religious organization. The church was formed seventy years ago, but officially incorporated in its current structure in 2003. It has approximately five employees located in the Appalachia region. In 2021, the church branched out and established a new church congregation, which began with twenty members and has since grown to over 200 members. The new church is in a different location and serves an underserved, economically disadvantaged region in Appalachia. Both Church on the Hill and the new church have

established ministries for children, youth, families and students, as well as community outreach that meets both practical and spiritual needs.

29.    **Plaintiff John Smith ("Pastor John Smith" or "Pastor Smith"))** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. Pastor Smith arrived in the United States in 2022 on an R-1 nonimmigrant visa for foreign nationals in religious vocations and is currently working full-time at a church as a pastor in the Appalachia region. His R-1 nonimmigrant visa will expire next year.  He has been instrumental in overseeing the expansion of the church's congregation to a second location, and provides essential pastoral and spiritual services and guidance to the congregation's members and the local community.

30.    **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B change-of-status petition has been halted due to the $100,000 Requirement, putting at risk her work on detecting and treating blinding conditions and disrupting the laboratory that relies on her.

31.    **Defendant Donald J. Trump** is the President of the United States and is sued in his official capacity.

32.    **Defendant U.S. Department of Homeland Security ("DHS")** is a federal Department headquartered in Washington, D.C. It is responsible for administering immigration law, including H-1B adjudications through USCIS**.**

33.    **Defendant Kristi Noem** is the Secretary of Homeland Security and is sued in her official capacity.

34.     **Defendant U.S. Citizenship and Immigration Services ("USCIS")** is a
component agency of DHS, headquartered in Camp Springs, MD. It is responsible for
adjudicating H-1B petitions and other immigration petitions.

35.     **Defendant Joseph B. Edlow** is the Director of USCIS and is sued in his official
capacity.

36.     **Defendant U.S. Customs and Border Protection ("CBP")** is a component
agency of DHS, headquartered in Washington, D.C. It is responsible for inspecting and admitting
foreign nationals into the United States.

37.     **Defendant Rodney Scott** is the Commissioner of CBP and is sued in his official
capacity.

38.     **Defendant U.S. Department of State ("State" or "State Department")** is a
federal Department headquartered in Washington, DC. It is responsible for administering U.S.
visa programs, including consular processing for H-1B visas.

39.     **Defendant Marco Rubio** is the Secretary of State and is sued in his official
capacity.

## V.     LEGAL BACKGROUND

40.     The purpose of the H-1B provisions is to "help employers who cannot otherwise
obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary
employment of qualified individuals who are not otherwise authorized to work in the United
States." *MadKudu Inc. v. USCIS*, No. 20-CV-02653-SVK, 2020 WL 7389419, at *1 (N.D. Cal.
Nov. 17, 2020); 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(1)(i).

41.     The H-1B visa has been the subject of more legislation than any other visa
category and has been repeatedly modified and changed over the last 35 years. Congress has

created a complex, but consistent, visa category to give U.S. employers access to the talent they need from every part of the world for jobs in any field that require at least a bachelor's degree as an entrance requirement.

42.     While many H-1B employers and workers are in the information technology ("IT") industry, H-1B workers are a diverse group, and do not solely reside in Silicon Valley. There are H-1B employers and workers living across the United States, including Texas, New York, California, Colorado, and Illinois.[9] They work in religious organizations like churches, rural medical clinics, and local high schools. Some are entrepreneurs while others serve the public or work in non-profits. All pay taxes and bring value to their communities.

43.     As set forth in more detail below, Congress carefully designed the H-1B program to attract highly skilled workers to the United States while also protecting workers already in the United States. For example, Congress set annual limits on the number of H-1B workers and requires that employers pay a mandated prevailing wage and abide by other worker-protection rules. Congress also established detailed filing fee provisions. Congress crafted this framework to balance the interests of workers inside the United States and employers needing to fill vital roles, support innovation, and provide services in communities that would not be possible without H-1B workers.

## A. Congress Created the H-1B Visa to Ensure the U.S. Could Attract Necessary Workers in Specialty Occupations

44.     The United States offers a range of visa categories that Congress created and spelled out in the INA. H-1B visas are awarded to individuals who are sponsored by employers to work temporarily in qualified specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).

---

[9] *See, e.g.*, Carolyne Im, et al., *What we know about the U.S. H-1B visa program*, Pew Research Center (Mar. 4, 2025), https://perma.cc/GCE3-3AG7.

Typically, they are initially granted for three years and can be extended to six years. 8 U.S.C. § 1184(g)(4), 8 C.F.R. § 214.2(h)(13)(iii)(A).

45.     A "specialty occupation" is an occupation that "requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor." 8 C.F.R. § 214.2(h)(4)(ii). These fields include, but are not limited to, "architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts." *Id.*; *see also* 8 U.S.C. § 1184(i)(1). To qualify as a "specialty occupation," the occupation must require a bachelor's or higher degree in a directly related specific specialty, as a minimum for entry. 8 U.S.C. § 1184(i)(1); 8 C.F.R. § 214.2(h)(4)(ii). A medical doctor, for example, is a specialty occupation because generally one must obtain a medical degree to work as a doctor.

**B.  In Designing the H-1B Program, Congress Included Protections for U.S. Workers**

46.     Congress has highly regulated the H-1B visa category, particularly since 2000, to ensure that the United States enjoys the benefits of bringing in highly-skilled workers from abroad while ensuring that all workers—both workers coming to the U.S. and workers already in the U.S.—are protected from depressed wages and exploitation.

47.     For example, Congress sets numerical limits on the annual number of H-1B workers, except for those employed by higher education or research institutions, who are exempt from the statutory "cap" on the number of visas available per fiscal year. 8 U.S.C. § 1184(g)(1)(A), (5). The statutory cap is 65,000, plus an additional 20,000 available only for individuals who have earned a master's or higher degree from a United States institution of higher learning. *Id.* § 1184(g)(1)(A)(vii), (5)(C).

COMPLAINT                                    14

48.     Congress also requires that the employer pay the H-1B worker the higher of: (1) the actual wage the employer already pays to similar workers in that occupation; or (2) the prevailing wage for the occupation in the geographic area of intended employment. 8 U.S.C. § 1182(t)(1)(A)(i); 20 C.F.R. § 655.731(a). This prevailing wage requirement is designed to ensure that employers cannot undercut the U.S. labor market by hiring H-1B workers and paying them lower wages than those typical for their job in the U.S. labor market.

49.     The employment of the H-1B worker also cannot adversely affect the working conditions of similarly employed workers, and the Department of Labor ("DOL") must certify that there is no such adverse impact. 8 U.S.C. § 1101(a)(15)(H)(i)(b), 1182(t)(1)(A)(ii). Likewise, an employer may not bring in H-1B workers to work during a strike or lockout. 8 U.S.C. § 1182(t)(1)(C); 20 C.F.R. § 655.733.

50.     Employers may not discriminate against U.S. citizens based on citizenship status. See 8 U.S.C. § 1324b(a)(1).

51.     Another safeguard is the anti-displacement provision that applies to employers considered "H-1B dependent"[10] and those considered "willful violators" of employment protections.[11] Such employers must attest that the employment of a U.S. worker will not result in

---

[10] The statute and corresponding regulations include a very specific definition of H-1B dependence: an employer that has 25 or fewer full-time equivalent employees and employs more than 7 H-1B workers; or an employer that has 26 to 50 full-time equivalent employees and employs more than 12 H-1B workers; or 51 or more full-time equivalent employees and at least 15 percent of its workforce are H-1B workers. See 8 U.S.C. § 1182(n)(3)(A); 20 C.F.R. § 655.736(a).

[11] An employer is classified as a willful violator if, during the preceding five years, the Secretary of Labor has found, after notice and opportunity for a hearing, that the employer has committed either: willful failure to meet the conditions of the Labor Condition Application; or a willful misrepresentation of a material fact in the LCA. 8 U.S.C. § 1182(n)(1)(E)(ii); 20 C.F.R. § 655.736(f).

the displacement of a U.S. worker either 90 days before, or 90 days after, the filing of such a petition. An employer placing an H-1B worker at a third-party worksite must attest that it has made a good faith effort to determine that the employee's placement will not displace a U.S. worker. 8 U.S.C. § 1182(n)(1)(E)-(F); 20 C.F.R. § 655.738(c)-(d).

52.    When an employer misuses the H-1B program, it can face orders to pay back wages, civil monetary fines, and debarment, among other penalties. 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.810. A debarred employer is prohibited from receiving approval for future H-1B petitions and other employment-based visa petitions. 8 U.S.C. § 1182(n)(2)(C); 20 C.F.R. § 655.810(d). This penalty is intended to protect both American and foreign workers from exploitation and unlawful practices.

**C. Congress Created a Detailed Statutory Scheme to Govern the H-1B Process That Balances Private and Public Sector Needs**

**1. H-1B Registration and Lottery for Cap-Subject H-1B Visas**

53.    As discussed above, the INA sets a statutory "cap" on the number of new H-1B petitions each fiscal year. "Cap-subject" employers generally are for-profit companies in the private sector.

54.    To petition for H-1B status for a worker, cap-subject employers must first register the prospective employees in an annual lottery that is generally held in March of each year for employment starting at the beginning of the federal fiscal year in October. 8 C.F.R. § 214.2(h)(8)(iii).

55.    After the close of the registration period, USCIS performs a computer-generated lottery selection. *Id.* § 214.2(h)(8)(iii)(A)(5)(ii), (6)(ii).

COMPLAINT                                    16

56.     USCIS then notifies those petitioners whose registrations were selected that they are eligible to file a H-1B cap-subject petition and sends them filing instructions. *Id.* § 214.2(h)(8)(iii)(C). The selected petitioners may then file a petition. *Id.* § 214.2(h)(8)(iii)(D).

### 2. Cap-Exempt H-1B Visas

57.     Certain types of employers are "cap-exempt," meaning they are not subject to the numeric cap specified in the statute. Institutions of higher education, non-profit organizations (*e.g.*, certain hospitals, K-12 schools) affiliated with institutions of higher education, non-profit research organizations, and government research organizations are not subject to the annual numerical limitations. 8 U.S.C. § 1184(g)(5)(A)-(B); 8 C.F.R. § 214.2(h)(8)(iii)(F)(1), (2) and (3).

58.     Cap-exempt employers do not need to register or to participate in the annual lottery, but they do need to establish, to the satisfaction of USCIS, their cap-exempt status. They can file petitions directly and are not limited to filing on a particular cycle.

### 3. H-1B Petition Process

59.     Whether "cap-subject" or "cap exempt," an employer must petition for an H-1B employee by first submitting a Labor Condition Application ("LCA") to DOL. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730.

60.     In the LCA, the employer attests that it will follow the wage and working condition requirements. *See* 20 C.F.R. § 655.730(d). DOL then reviews these forms and must certify them. DOL typically does so in seven working days. 20 C.F.R. § 655.730(b).

61.     Once DOL certifies the LCA, the employer files a Form I-129 petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. *See* 6 U.S.C. § 271(b)(5); 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i), (2)(i)(A).

62.     An employer can petition on behalf of workers who are physically located inside or outside of the United States. *See ITServe All., Inc. v. United States*, 122 F.4th 1364, 1366 (Fed. Cir. 2024); *see also* 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a), (c). The individual may already be in the United States if, for example, their employer is petitioning to change their status from another immigration status to H-1B visa status. For example, many of the Plaintiff Unions' members are currently in the United States in lawful student or exchange status, including on F-1 visas, F-1 OPT, STEM OPT, or J-1 programs, and—until the Proclamation—expected that a current or prospective employer would be able to file H-1B petitions on their behalf, either to change their status within the United States or through consular processing abroad.

### 4. Visa Issuance and Entry

63.     Once USCIS approves an H-1B petition, if the worker is outside the United States, the worker generally must then obtain an H-1B visa from a United States consulate abroad before traveling to the United States. *ITServe*, 122 F.4th at 1367. Even some workers who are inside the United States when their H-1B petition is approved, depending on the specific case circumstances, may have to go abroad to receive consular processing in order to effectuate their H-1B status. The individual may then travel to a port of entry for inspection by CBP and, if authorized, be admitted in H-1B nonimmigrant status and enter the United States. *See* 8 U.S.C. §§ 1101(a)(13)(A), 1184(a)(1), 1225(a)(1); 8 C.F.R. § 212.1(a)(1).

64.     Workers who are able to change to H-1B status from within the United States may still need to travel abroad for work, for family emergencies, or to renew a passport. These workers typically must obtain an H-1B visa stamp at a U.S. consulate abroad before reentering. 8 U.S.C. § 1184(a).

65.     Once an H-1B worker is in the United States, employers may need to file additional petitions with USCIS if there is a material change in the worker's employment conditions, such as a change in worksite, or if the worker changes employers. 8 C.F.R. § 214.2(h)(2)(i)(D)-(E), 8 C.F.R. § 274a.12(b)(9). As the initial three-year work authorization period expires, employers can petition for an extension of another three years, and additional extensions are possible, beyond the 6 years, under limited circumstances. 8 CFR § 214.2(h)(13)(iii)(D).

### D. Congress Established a Detailed Fee System for H-1Bs That Sets Parameters on Fees and Dictates Their Use

66.     Congress has established a clear framework for fees charged to H-1B petitioning employers. These include the adjudication fees that USCIS sets by regulation, as authorized by 8 U.S.C. § 1356(m), and certain statutory fees charged to certain H-1B employers, authorized in 8 U.S.C. § 1184(c)(9)-(14). Required fees must be paid by H-1B employers, not by the H-1B workers or their families. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C)(10).

67.     DHS may charge fees for adjudication of petitions under 8 U.S.C. § 1356(m), but Congress limited those fees. The statute provides that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.*

68.     DHS sets the amounts of adjudication fees through notice-and-comment rulemaking. *See*, *e.g.*, *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194 (Jan. 31, 2024). Under the latest 2024 rule, for instance, H-1B employers must pay a fee to register for the lottery, a fee to file Form I-129, and

an "asylum program fee," meant to subsidize USCIS's costs for processing asylum applications. 8 C.F.R. § 106.2(a)(3), (c)(11), (c)(13). At full price, these fees for adjudication total $1,595. *Id.*

69.     Because DHS has historically factored in an employer's ability to pay, the adjudication fees are discounted for small employers (25 or fewer full-time employees) and non-profits. *See id.* § 106.2(a)(3), (c)(13).

70.     Congress, through the INA, set additional mandatory statutory fees to be paid by employers:

       a.   An American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA") fee of $1,500. The statute effectively requires consideration of ability to pay; there is a discount for employers with 25 or fewer employees, who pay $750, and cap-exempt employers are exempt. The ACWIA fee is required only for the first two petitions filed on behalf of each individual. *See* 8 U.S.C. § 1184(c)(9)-(14).

       b.   A fraud prevention and detection fee of $500. The fraud fee is required with initial petitions and petitions to change employers. *Id*; *see* 8 U.S.C. § 1184(c)(12)(A)(i)-(ii).

71.     Congress spoke clearly as to where these fees should go and for what purpose. For example, in establishing the ACWIA fee, Congress intended to support the American labor market by upskilling its workforce to "address a growing shortage of skilled worked for certain high technology positions important to American business." 144 Cong. Rec. S10877 (daily ed. Sept. 24, 1998). The INA directs that ACWIA fees be segregated into a special account and used for specified purposes. *See* 8 U.S.C. § 1356(s). The revenue is primarily split among: (1) DOL workforce training programs (50%), (2) National Science Foundation low-income STEM

scholarships (30%), and (3) National Science Foundation K-12 stem initiatives (10%). 8 U.S.C. § 1356(s)(2)-(4).

72.     The fraud prevention and detection fee's name indicates its purpose. The revenue is split equally among the three agencies responsible for administering the H-1B program: DOL (who oversees the Labor Condition Application and wage payment to the H-1B worker), DHS (who adjudicates requests for H-1B status), and the State Department (who decides whether to issue visas). 8 U.S.C. § 1356(v)(2)(A)-(C).

73.     Additionally, certain employers pay enhanced fees. For example, currently, a "50/50 employer" must pay an additional "Public Law 114-113 Fee" of $4,000. 8 C.F.R. § 106.2(c)(8); USCIS, H and L Filing Fees for Form I-129.[12] A "50/50 employer" is an entity that employs over 50 employees with over half comprising nonimmigrant workers in H-1B or L-1 status.[13] ITServe, 122 F.4th at 1367 n.2; 8 C.F.R. § 106.2(c)(8).

74.     An employer that pays the full amount of these regulatory and statutory fees would pay a total of $7,595, nowhere near the $100,000 Defendants now demand.

75.     The $100,000 Requirement does not account for ability to pay, unlike many of the regulatory and statutory fees, which are discounted for small employers and non-profits.

**E. The President's Ability to Restrict Entry Under the INA Does Not Authorize Him to Override Congress's Comprehensive H-1B Statute**

76.     The Proclamation invokes two provisions of the INA: sections 212(f) and 215(a), 8 U.S.C. §§ 1182(f) and 1185.

---

[12] See USCIS, H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker, https://perma.cc/5RRV-26DG.

[13] The L-1 visa "allows multinational corporations to sponsor visas for temporary intra-company transfers to the United States" for individuals working in a managerial, executive, or specialized knowledge capacity. Nat'l Ass'n of Manufacturers v. DHS, 491 F. Supp. 3d 549, 556 (N.D. Cal. 2020); 8 U.S.C. § 1101(a)(15)(L).

77.     Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides:

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

78.     This statutory provision is designed to "regulate and influence conduct abroad, rather than at home," and does not authorize the President to effectuate "domestic policy as opposed to foreign policy or national security." *President & Fellows of Harvard Coll. v. DHS*, No. 25-cv-11472, --- F. Supp. 3d-----, 2025 WL 1737493, at *10 (D. Mass. June 23, 2025). The Proclamation makes clear that it is concerned with domestic policy—charging domestic employers unprecedented fees, changing the conduct of employers and workers inside the United States, and raising revenue for domestic purposes. But 8 U.S.C. § 1182(f) does not permit the President to restrict entry for these purposes.

79.     In addition, section 215(a), 8 U.S.C. § 1185(a)(1), allows the President to "prescribe" "reasonable rules, regulations, and orders" governing who may "enter ...... the United States." *Id.* (emphasis added).

80.     Nothing in either statute authorizes the President to rewrite Congress's comprehensive H-1B statute by denying entry to all H-1B workers unless an employer pays $100,000 or is granted an exemption at the discretion of the Secretary of DHS.

## VI.     FACTUAL ALLEGATIONS

### A.  The President's Proclamation

81.     Late in the day on Friday, September 19, 2025, the White House issued a Presidential Proclamation pursuant to 8 U.S.C. § 1182(f) and § 1185(a) conditioning the

adjudication of H-1B petitions and entry of H-1B beneficiaries into the United States on a $100,000 payment.

82.     Among other things, the Proclamation requires a $100,000 payment in connection with any H-1B petition for workers currently outside the U.S. seeking entry under the H-1B program, stating: "[e]ntry into the United States of [H-1B workers] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." Proclamation § 1(a). The Proclamation directs DHS to "restrict decisions on petitions not accompanied by a $100,000 payment," *id.* § 1(b), and directs State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment," *id.* § 2(b). DHS and State must "deny entry to the United States to any H-1B nonimmigrant" whose employer has not made the $100,000 payment. *Id.* § 2(c).

83.     The Proclamation made these new requirements effective as of 12:01 am ET Sunday, September 21, 2025. But the Proclamation does not specify to which agency the $100,000 "payment" should be made, how it should be paid, where it will be deposited, or how it will be used.

84.     The President's key advisor on this Proclamation appears to be Howard Lutnick, who outlined the scope and rationale of the Proclamation when it was issued. Speaking alongside the President at an Oval Office ceremony unveiling the Proclamation on September 19, Lutnick said: "a hundred-thousand dollars a year for H-1B visas, and all of the big companies are on board. We've spoken to them."

85.     Lutnick also stated that current visa-holders would be subject to the fee and would have to leave the country if it was not paid: "Either the person is very valuable to the company and America, or they are going to depart and the company is going to hire an American," Lutnick

said at the briefing. "And that's the point of immigration. Hire Americans and make sure the people coming in are the top, top people. Stop the nonsense."[14]

86.     Lutnick also made clear that the fee would be charged annually: "The company needs to decide . . . is the person valuable enough to have a $100,000-a-year payment to the government, or they should head home, and they should go hire an American."[15]

### 1. The Proclamation is Based on Multiple Errors of Fact and Ignores the Benefits of the H-1B Program to the American Economy

87.     The Proclamation's preamble solely identifies concerns with the program's use in the information technology fields, but employers seek and obtain H-1B visas for workers in a wide range of specialty occupations, including healthcare workers, researchers, clergy, university professors, K-12 teachers, and more. The Proclamation does not identify widespread fraud and misuse of the program in those fields nor otherwise justify why a market-wide penalty is an appropriate remedy.

88.     Even as to the IT industry, the Proclamation ignores pertinent facts reflecting that the H-1B program supports economic growth. Indeed, from 1990 to 2010, H-1B holders caused 30-50 percent of all productivity growth in the U.S. economy.[16] As one economist explained, "workers on H-1B visas cause dynamism and opportunity for natives. They cause more patenting of new inventions, ideas that create new products and even new industries. They cause entrepreneurs to found more (and more successful) high-growth startup firms. The resulting productivity growth causes more higher-paying jobs for native workers, both with and without a

---

[14] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025), https://perma.cc/N7PP-Y53G.
[15] *Id.*
[16] Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S1(2) S225, S250-52 (2015), https://perma.cc/PK6F-KN6K.

college education, across all sectors. American firms able to hire more H-1B workers grow more, generating far more jobs inside and outside the firm than the foreign workers take."[17]

89.     The Proclamation also ignores other benefits of bringing H-1B workers to the United States, where they consume goods and services and pay taxes in the United States. Cutting off employers' ability to employ H-1B workers will likely push some employers to outsource their work to other countries.

90.     The Proclamation claims, without evidence or explication, that abuses of the H-1B program are so serious as to be a threat to national security. But the government's own enforcement reflects otherwise: DOL is charged with investigating fraud and abuse of the Labor Condition Application portion of the H-1B program and maintains a database of companies that abused the H-1B program and were banned from it. *See* 8 U.S.C. § 1182(n)(2), 20 C.F.R. 655.800 *et seq.*; *H-1B Willful Violator List of Employers*, U.S. Dep't Lab., https://perma.cc/4RPD-X7JT (effective as of Sept. 1, 2025). There are just eight companies on this list and only two were added in 2025, while tens of thousands of employers have used this program in recent years.

### 2. The Proclamation's Exorbitant $100,000 Fee Is Unprecedented and Unjustified, and the Exception Process is Ripe for Abuse

91.     The Proclamation's imposition of a draconian fee is unprecedented. No President has, without Congressional authorization and by fiat, imposed a market-wide penalty for purported misuse of a program—disregarding and overriding an existing, complex statutory scheme—on employers seeking to hire workers under a visa program Congress created

---

[17] Michael A. Clemens, *New US curb on high-skill immigrant workers ignores evidence of its likely harms*, Peterson Inst.Int'l Econ. (Sept. 22, 2025), https://perma.cc/Y4DL-VSRQ.

specifically for that purpose. Nor may Presidents impose a tax or other general revenue-generating requirement without Congressional authorization.

92.     Here, the President appears determined to raise general revenue using the $100,000 Requirement, suggesting that this is a tax, not a fee for use of the program. While announcing the Proclamation, the President alluded to the ultimate use of the revenue generated from these $100,000 payments: "The main thing is we're going to have great people coming in and they're going to be paying. We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt."[18]

93.     The Proclamation also provides an exception to the payment requirement in section (c), which states that "[t]he restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States."

94.     The Proclamation includes no guidance, direction, or parameters for this purported national interest exception, which was created from whole cloth. As drafted, the standardless exception process is an open invitation for selective and arbitrary treatment. It invites lobbying; it permits favoritism, ideologically based bias, and corruption.

**3.     After the Ill-Planned Proclamation Caused Immediate Harm, the Government Began to Backtrack**

95.     Shortly after this announcement, current H-1B workers that were outside the country started receiving urgent messages from their employers to return to the United States

---

[18] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, *supra*, note 14.

before the Proclamation became effective at 12:01 am ET on Sunday, September 21. Many were advised to remain in the United States until further notice.[19] Some workers spent thousands of dollars on return travel to the United States.[20] Others cancelled planned trips, and some workers who had already boarded flights made panicked requests to deplane after receiving news of the Proclamation.[21]

96.    As this chaos unfolded on Saturday, September 20, the Administration began to backtrack. An unnamed White House source, speaking on condition of anonymity to the press, contradicted Lutnick's statements from the Oval Office and stated that the new requirement was a "one-time fee" and "currently does not apply to renewals but that policy is under discussion."[22] The source did not say whether existing visa-holders would be prevented from returning to the country, under the Proclamation's language broadly barring entry of individuals for whom the fee had not been paid.

---

[19] Madeleine Ngo, Lauren Hirsch & Pranav Baskar, *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, N.Y. Times (Sept. 22, 2025), https://perma.cc/EJ5T-RK6F.
[20] Emma Rossiter & Ishadrita Lahiri, *I spent $8,000 to get back to US after fears over Trump visa deadline*, BBC (Sept. 20, 2025), https://perma.cc/3NHM-JD39.
[21] Aditya Soni & Echo Wang, *'Fast and furious': H-1B workers abroad race to US as Trump order sparks dismay, confusion*, Reuters (Sept. 21, 2025), https://perma.cc/J82X-GHGH.
[22] *White House clarifies $100K H-1B visa fee won't apply to existing holders as Trump stirs anxiety*, PBS News (Sept. 21, 2025), https://perma.cc/SN9S-435A.