97.     At 4:16 pm ET on Saturday, September 20, White House Press Secretary Karoline Leavitt posted another attempt at re-writing the Proclamation on the social media platform X:[23]



**B.  The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions.**

98.     The Proclamation tasked DHS, including its component agencies USCIS and CBP, and the State Department (collectively with the heads of those agencies and components, the "Agency Defendants") with the implementation of its requirements.

99.     The Agency Defendants issued a series of public statements in the hours and days following the Proclamation's late Friday issuance.[24]

---

[23] Karoline Leavitt (@PressSec), X (Sept. 20, 2025, 4:16 PM), https://perma.cc/Y7WY-NHN9?type=image.
[24] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025), https://perma.cc/U54U-4UWD; Matthew S. Davies, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, USCBP (Sept. 20, 2025), https://perma.cc/K9VG-QCYS; *H-1B FAQ*, U.S. Dep't State (Sept. 21, 2025), https://perma.cc/6DYF-9SCE; *H-1B FAQ*, White House (Sept. 21, 2025),

100.     Collectively, these documents reflect the new policies the Agency Defendants have adopted to implement the Proclamation.

101.     The Agency Defendants require a one-time payment of $100,000 "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025. Payment is a condition for adjudication of "any" new H-1B petition, as well as for consular processing and entry into the United States of any beneficiary of a new petition (the "Agency Policies").

102.     The Agency Policies are in some ways narrower than the Proclamation. They specify, for example, that the $100,000 Requirement only applies to new petitions and not to "renewals"[25]—a term that is not used in the existing statutory and regulatory scheme. The Agencies have also chosen not to condition entry into the United States on receipt of the $100,000 payment for existing H-1B visa holders or beneficiaries of petitions submitted before the effective date.[26]

103.     However, the new Agency Policies sweep more broadly than the Proclamation in that they appear to apply to *any* new H-1B petition submitted on or after September 21, 2025. They do not clearly differentiate between petitions for workers who are "currently outside the United States" and those for workers who are already inside the United States. This means that the $100,000 Requirement applies even where workers are already lawfully present in the United States under, for example, a student visa or another immigration status, and are seeking to change to H-1B status.

---

https://perma.cc/G37A-W3AK; *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.
[25] *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.
[26] *Id*.

**C. The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest**

104.    The Proclamation and new Agency Policies harm both Plaintiffs and the broader public.

### 1. Health care

105.    For over a decade, Plaintiff **Global Nurse Force**, a California limited liability company, has connected healthcare systems across the globe with highly skilled and experienced nurses to ensure their staffing needs are met. Global Nurse Force has placed over 10,000 nurses at leading hospitals around the world.  In the United States, Global Nurse Force's clients include healthcare systems in Washington, Ohio, Louisiana, California and the District of Columbia who have used Global Nurse Force's "direct hire" model to hire hundreds of nurses on H-1B visas to fill critical staffing shortages.

106.    The United States has been suffering from a nursing shortage for decades, and this shortage will only intensify as the Baby Boomer generation ages and their need for health care grows. The COVID-19 pandemic drove many nurses out of the profession; nursing schools suffer from a faculty shortage as well as depressed enrollment; and insufficient staffing itself raises the stress level of nurses, has a negative impact on their job satisfaction, and motivates many nurses to retire or otherwise leave the profession. Inadequate levels of nurse staffing lead to errors and increased mortality rates, a decrease in the quality of patient care, and unit or full hospital closures, especially in rural areas.

107.    Global Nurse Force offers a direct hire model to U.S.-based healthcare systems that allows these healthcare systems to hire the experienced and specialized nurses they need by sponsoring them for H-1B specialty worker visas. Global Nurse Force provides "end to end" services that include facilitating the employer's interview and selection process, which usually

involves preliminary online interviews followed by international travel that allows the employer to meet, interview, and select in person the nurses needed; providing support for the H-1B application process; and providing logistical travel support for the hired nurses, including arranging travel, airport pickup, and temporary housing for nurses and their families arriving in the United States. Directly hiring skilled nurses on H-1B visas allows healthcare systems to meet their staffing needs without relying on short-term hiring of so-called "travel nurses," which is a far more expensive staffing solution that, in a year, can cost healthcare systems millions of dollars more in fees paid to staffing providers.

108.    Global Nurse Force's business model for its U.S. clients is entirely based on the H-1B visa system and the ability of healthcare facilities to sponsor for H-1B visas the specialized nurses they need. As a result, the harmful impact of the Proclamation and the $100,000 Requirement on Global Nurse Force and its healthcare system clientele has been immediate. A health system in Louisiana, for example, recently went through the interview and selection process with Global Nurse Force and selected over two hundred nurses. When the Proclamation was issued, Global Nurse Force was in the process of assisting the hospital with preparing the H-1B applications for these nurses to be filed over the next two quarters. But that healthcare system, like most of Global Nurse Force's clients, cannot afford to pay an additional $100,000 fee for each nurse, and the healthcare system is now at a loss for how to fill the staffing shortages that are affecting its patients now. Indeed, many of Global Nurse Force's clients hire over a hundred nurses through each interview and selection cycle, which would translate into millions of dollars in extra fees required by the Proclamation. Many of Global Nurse Force's clients are non-profit hospitals operating on thin margins and cannot absorb the $100,000 fee per nurse. If

required to pay this fee, they will be forced to cancel international recruitment, leaving their

positions unfilled.

109.     If the $100,000 Requirement remains in effect, it would force Global Nurse Force

to close its U.S.-based operations, which would translate into a loss of millions of dollars in

revenue. Without access to international nurses, their clients will be forced to reduce capacity in

ICUs, emergency rooms and surgical units. Wait times will increase and patient outcomes will

worsen. This proclamation directly threatens Global Nurse Force's operations and forces

hospitals towards staffing models that are significantly more expensive – raising healthcare costs

rather than reducing them, so that the ultimate victims are patients, especially in rural and inner-

city communities.

110.     **Plaintiff CIR**, whose membership consists of medical interns, residents, and

fellows, has numerous members who plan to seek H-1B visas and who have applications for H-

1B visas pending with their employers and may lose their ability to live and work in the United

States as a result of the Proclamation.

111.     For example, a Pakistani physician and member of CIR is currently completing a

fellowship in palliative care at a hospital that is part of an academic health care system on the

East Coast.  The physician is married and has a two-year-old son who is a U.S. citizen. As our

population ages, the United States is facing an acute shortage of palliative care doctors, who

provide end of life care; his expertise is therefore particularly valuable.

112.     This CIR member holds a J1 visa. Foreign physicians come to the United States

on J1 visas to complete their medical training. Generally, J1 visa holders must return to their

country for two years at the end of their training, unless they obtain a waiver of this requirement.

Foreign physicians generally apply for a waiver program, which allows them to change their

immigration status from a J1visa to an H-IB visa while remaining in the United States, if they commit to practicing in communities with the greatest need. The United States provides these waiver programs as a way to help address severe physician shortages in underserved areas.

113.    This CIR member is currently applying and interviewing with facilities located in federally-designated Health Professional Shortage Areas and Medically Underserved Areas, the first step toward securing the employment offer needed to apply for a waiver. Because of the new $100,000 Requirement, however, employers who would normally petition for an H-1B visa on his behalf are unable to do so. If the physician is unable to secure a position with H-1B visa (as is likely), his years of training and his specialization will be for naught, and the United States will lose a physician trained in a critical field who is ready to serve in precisely the communities that need him most. He will be forced to return to Pakistan, where he is unlikely to find employment adequate to support himself and his family.

114.    A Canadian CIR member is in his third year of a residency program in internal medicine in a city on the East Coast. Like many foreign physicians, he is training in the United States on a J1 visa, which requires him to pursue a waiver in order to remain and serve after completing his residency.

115.    This member will complete his residency next year, apply for positions in underserved areas and apply for a waiver. Like many current and former CIR members before him, his prospective employer would then file an H-1B petition on his behalf. The new $100,000 Requirement, however, places sponsorship entirely out of reach for the very medical facilities Congress intended to benefit from these programs. If such facilities had the resources to pay this fee, they would not be struggling to recruit physicians through waiver programs in the first place.

COMPLAINT                                33

116.    The Proclamation will harm the career prospects and lives of this CIR member and others similarly situated. Since sponsoring organizations are unlikely to be able to afford to pay $100,000, this member will likely face a two-year separation from his U.S. citizen fiancée and would need to incur costs to get recredentialed as a physician in his home country of Canada. This would set him back 1-2 years professionally.

117.    The loss of these medical workers will harm communities around the United States. The American Medical Association ("AMA") has expressed grave concerns about the impact of the $100,000 Requirement on the availability and quality of medical care in the United States. In a September 25, 2025, letter to DHS Secretary Kristi Noem urging DHS to exempt foreign-trained physicians from the fee, the AMA, along with more than 50 national specialty societies and state medical associations, noted that the United States is projecting a shortfall of 86,000 physicians by 2036.[27] This is especially concerning because America's population is aging, and there will not be enough doctors to care for older adults, many of whom suffer increased rates of chronic disease and have other complex medical needs.[28] Noting that of the 23% of physicians in the United States who are foreign trained, 65% practice in Medically Underserved Areas or Health Professional Shortage Areas and of those, 46% practice in rural areas, the letter explains that the fee endangers access to quality care for some of the Americans who most need it.[29]

118.    Many of the hospitals that hire foreign trained physicians are non-profits and will not be able to afford this fee. As the President of the AMA explained, "[i]f a hospital needs 50

---

[27] *Letter to Kristi Noem from National Medical Societies and State Medical Associations* (Sept. 25, 2025), https://perma.cc/2VP2-B6Q5.
[28] *Id.*
[29] *Id.*

foreign residents, and it's $100,000 each for each one, that's $5 million, and that's not going to happen ........ There will be shortages." The consequences, he explained, are that "spots at hospitals will not be filled. Wait times will go up, and people will wait even longer at emergency departments." The fee, coupled with cuts in health insurance subsidies and reduced Medicaid payments, will exacerbate the financial stress many hospitals are already experiencing.[30]

119.    A 2023 study by the National Bureau of Economic Research found that foreign-born doctors help serve rural and low-income communities without reducing the employment of U.S.-trained physicians.[31] The study notes that while about 20% of the U.S. population lives in rural areas, only about 11% of physicians practice in these locations; and disparities in access to physicians contribute to disparities in population health.[32] After examining the data, the study concluded that foreign-born doctors were not "crowding out" U.S. born physicians, but rather that foreign-born physicians were filling essential gaps in coverage, particularly in rural areas.[33]

### 2.    K-12 school systems

120.    At a time when communities around the country are facing acute teacher shortages, the $100,000 Requirement means that school districts risk losing valuable teachers in both urban areas suffering from staffing shortages and in rural districts where teachers are difficult to recruit. For example, Texas public schools, which have historically employed more H-1B visa holding teachers than any other state education system, currently employ about 500

---

[30] Roni Caryn Rabin, *Medical Groups Warn Against Visa Fees for Foreign Doctors*, N.Y. Times (Sept. 26, 2025), https://perma.cc/Q243-3LTU.
[31] Breno Braga, Gaurav Khanna & Sarah Turner, *Migration Policy and the Supply of Foreign Physicians: Evidence from the Conrad 30 Waiver Program*, Nat'l Bureau of Econ. Research Working Paper No. 32005 (Dec. 2023), https://perma.cc/V8HK-LANH.
[32] *Id.*
[33] *Id.* at 3.

COMPLAINT                                35

teachers on H-1B visas.[34] The $100,000 Requirement is approximately double the average

teacher salary in Texas.[35] A spokesperson for the Alief Independent School District ("ISD"),

outside Houston, said the $100,000 Requirement "would be a significant financial barrier for

public school districts and an unsustainable cost for Alief ISD."[36] Similarly, school officials in

North Carolina expressed concern about how the new fee would impact their ability to hire

teachers in a state that started the new school year with 2,155 teaching vacancies.[37] A

spokesperson for a charter school system that operates schools across North Carolina said the

$100,000 Requirement "would create a significant barrier for non-profit, tax-exempt, and public

institutions such as ours. Simply put, most schools could not sustain such costs."[38] She

concluded that "without an exemption, the results could be a severe shortage of qualified

teachers at a time when schools nationwide already face staffing challenges."[39] The

Superintendent of the Kodiak Island Borough School District in Alaska, which relies on H-1B

workers to fill staffing gaps, was more direct, saying "[w]ith a pen stroke, we have possibly

ruined the future of education for Alaska students."[40]

      121.   **Plaintiff Global Village Academy Collaborative ("GVAC")** is headquartered in

Thornton, Colorado and operates similar to a school district and provides operational and

educational services to its member schools (Global Village Academies, or "GVA"), including,

---

[34] Isaac Yu & Nusaiba Mizan, *Hundreds of Texas teachers are on H-1B visas. Could that change after Trump's new $100k fee?*, Hous. Chron. (Sept. 25, 2025), https://perma.cc/ED5L-9U28.
[35] *Id.*
[36] *Id.*
[37] T. Keung Hui & Brian Gordon, *New $100,000 fee for H-1B Visas Could Hurt Teacher Recruitment for NC Schools*, Herald Sun (Sept. 23, 2025), https://perma.cc/T3MQ-LYY7.
[38] *Id.*
[39] *Id.*
[40] Brian Venua, *The White House Upped the Cost of H-1B Visas. Alaska Schools Could Face Major Consequences*, KXMT (Sept. 24, 2025), https://perma.cc/6LDV-SHD2.

but not limited to, staff recruitment, legal services, human resources, facilities and site support, curriculum and material development, and financial management.

122.     GVAC's mission is to provide these essential services to its Global Village Academies to cultivate academic excellence, high levels of linguistic proficiency, and cultural competences in all of its students, starting as early as kindergarten and through the eighth grade, so that these students may achieve a higher level entrance in their language of choice by high school and develop the global perspectives and 21st century skills necessary to live and work with others internationally.

123.     The Global Village Academies are tuition-free, public charter schools (K-8) providing English and second language immersion instruction to about 2,200 students across its schools in Aurora, Thornton, and Parker, Colorado. The Global Village Academies are centered on providing second language instruction in Spanish, Mandarin Chinese, Russian, or French using an immersion model. Parents select the language, or "village," their child begins learning, and for at least half of their school day, students learn all their core subjects immersed in their chosen language or village and taught by GVA's world language teachers. For the other half of the day, students receive this instruction in English.

124.     Global Village Academies heavily rely on recruiting and retaining native-speaking world language teachers from all over the globe to provide their students with second language instruction through an immersion model that is consistent with an internationally benchmarked curriculum. GVA world language teachers are highly qualified, experienced teachers with native-language skills who also bring their unique cultural perspectives and competencies from their home countries into the classroom.

COMPLAINT                                    37

125.     Since 2007, GVAC has regularly relied on and engaged in the H-1B visa process by filing H-1B petitions to recruit, hire, and retain world language teachers for its three GVA schools. Each year, GVAC recruits roughly 2-5 new world language teachers, but sometimes more, across their GVA schools. For the current 2025-2026 academic year underway, GVAC sponsored eleven world language teachers through H-1B petitions. Without the H-1B visa system, GVAC would not be able to continue hiring qualified world language teachers to carry out its educational model and provide the level of instruction it has in the past.

126.     The $100,000 Requirement would significantly hinder GVAC's ability to recruit new and qualified teachers for the upcoming academic year, particularly given the challenging teacher recruitment market and the need for world language teachers with both native-language skills and cultural competencies to achieve their mission. Given that GVAC's schools do not charge tuition and have a limited budget, paying $100,000 for each new H-1B petition GVAC anticipates filing for the 2026-2027 academic year would have a significant financial impact on GVAC and its schools. GVAC could not afford to pay upwards of $500,000 or more in H-1B fees to continue hiring qualified world language teachers through H-1B petitions in line with its mission and model. As a result, GVAC would have to take significant, drastic measures to offset such a cost, like cutting down on current staffing or placing a cap on enrollment, which would have a vast impact on GVAC's funding.

127.     The $100,000 Requirement would also harm GVAC's programmatic work. If GVAC cannot afford to hire world language teachers through the H-IB visa process, GVAC would be forced to fundamentally change its unique educational model that sets its schools apart for parents and students, undermining GVAC's schools' ability to provide the quality language immersion instruction and cultural competencies they are known for.

COMPLAINT                                         38

### 3. Religious organizations

128.    **Plaintiff Society of the Divine Word** (also known as "Societas Verbi Divina," "SVD," and the "Divine Word Missionaries") is a religious missionary order of Roman Catholic priests and brothers presently serving in almost eighty countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the Provincial Superior of the Province—is a non-profit, tax-exempt organization employing several hundred employees.

129.    There are approximately 195 Divine Word Missionaries in the Chicago Province. The Divine Word Missionaries work in the states of Illinois, Iowa, Wisconsin, Ohio, Missouri, Tennessee, New Jersey, and Washington D.C; in several island nations in the Caribbean including Antigua, Jamaica, B.V.I., Montserrat, St. Kitts, and St. Maarten; as well as in various provinces in Canada. Divine Word Missionaries are involved in a variety of ecclesiastical duties—or ministries—including parish administration and communications, Catholic formation, Catholic Biblical Apostolate, spiritual direction, vocation recruitment, fundraising, and other specialized ministries.

130.    SVD has three formation centers which educate future SVD members in the pre-novitiate, novitiate, and post-novitiate formation programs: Divine Word College in Epworth, Iowa; Divine Word Theologate in Chicago, Illinois; and Catholic Theological Union in Chicago, Illinois. Divine Word Missionaries oversee and implement each of these programs.

131.    As an international religious missionary order, SVD's members can be assigned to other countries by the SVD Generalate in Rome. Each year, Rome assigns newly final professed members to various countries around the world where the Society works, including the United States. Additionally, the Chicago Province often invites foreign Divine Word Missionaries to come to the United States to maintain its missionary outreach. Many of the members who are

assigned to the United States will remain in this country for years, including members who eventually become U.S. citizens or lawful permanent residents.

132.     Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it is critical that Divine Word Missionaries have the cultural and language skills to properly perform their duties. In the Chicago Province alone, Society of the Divine Word has particularly large Spanish-, Polish-, and Vietnamese-speaking populations that require Divine Word Missionaries with those language skills to receive spiritual guidance and instruction, ministry, and sacraments. Individuals with the proper skillset and experience for these roles are hard to find and hard to replace. Additionally, given the ongoing changing realities in the American Catholic Church, such as an aging native-born clergy and religious community, and fewer American (born and naturalized) candidates becoming priests, many dioceses and religious orders, including SVD, are becoming increasingly dependent on foreign born priests. This trend is expected to worsen in the near future.

133.     Three SVD Divine Word Missionaries currently hold an H-1B visa. Each of these Divine Word Missionaries were carefully selected for their unique skills, spoken languages, and expertise, and they are critical for their respective ministries. This includes pastoring parishes, performing administrative work, mentoring newly professed members working in the parish, providing spiritual counsel and guidance in a variety of languages, and serving as church canon law consultants (which requires further specialized training). These individuals' skills are necessary to serve their ethnically diverse parishes.

134.     Although the Chicago Province of SVD has at least eight priests working in nonimmigrant status with an R-1 visa—an immigration status which allows a nonimmigrant worker in a religious occupation to temporarily live and work in the United States, under certain

conditions—there are key limitations on this status that prevent it from being a long-term solution for SVD's ministerial needs. For example, an individual in R-1 status can only maintain that status for up to five years. Although there is a path to a green card from R-1 status, it is a long, involved process and currently has a lengthy backlog for an immigrant visa to become available. Given this backlog, the ability to change nonimmigrant status to H-1B status is the only lawful alternative available to SVD to maintain its priests' legal status in the United States. SVD planned to petition for H-1B status for each of these individuals prior to the expiration of their R-1 status, to ensure they could continue their work uninterrupted. If this is not possible because of the prohibitive fee under the Proclamation, a Divine Word Missionary would need to leave the U.S. and wait abroad for at least one year before he could receive another R-1 visa. This would cause significant disruption and severely impact the parishes where these priests perform vital services.

135.    The H-1B visa is the lawful pathway SVD must use to continue its critical religious services ministry in the United States. As a non-profit, paying the $100,000 fee per employee would create a crippling burden on the Chicago Province, and would pose serious barriers to the continuity of its ministry in key areas.  If SVD is unable to apply for H-1B visas for its staff, it will be unable to continue providing critical language- and culturally-accessible religious services to its congregants, impacting its congregants' spiritual needs and interfering with SVD's religious exercise. In other words, SVD's inability to employ these professionals will harm not only the organization, but also the communities it serves, especially those which require the unique skillset of the individuals who would otherwise apply for H-1B visas. Furthermore, SVD had already begun plans and reserved the fees already required to apply for H-1B visas for its necessary religious workers, to fill roles for which U.S. citizens are simply not

COMPLAINT                                          41

available. These plans must now be placed on hold since SVD cannot afford to pay the extravagant $100,000 fee for each necessary individual.

136.     **Plaintiff Fathers of St. Charles** is a part of the Congregation of the Missionaries of St. Charles – Scalabrinians, an international community of brothers who have felt the call to consecrate themselves to a missionary life in service of migrants. The Congregation serves migrants and refugees all over the world and is divided into several provinces or regions, each responsible for serving certain countries. The province of Fathers of St. Charles is the St. John the Baptist Province, whose jurisdiction covers the United States, Canada, Mexico, Guatemala, and El Salvador. The provincial office is located in Oak Park, Illinois and supports a membership of brothers hailing from thirteen different countries who minister in locations all over the province.

137.     Because Fathers of St. Charles are called by their faith to be in mission with migrants and refugees, with a special priority for the poorest migrants, it is critical for the members of Fathers of St. Charles to be able to perform all sacramental and liturgical activities in a linguistically and culturally appropriate manner for the communities they serve. For the St. John the Baptist Province, this requires the language and cultural competency to be able to minister to Latin American, Vietnamese, and Brazilian communities throughout the province's jurisdiction. Most members of Fathers of St. Charles speak at least two to three different languages and rotate to different locations both within the province as well as to other Scalabrinian provinces and regions outside the province as part of their calling and mission to be in community with migrants and refugees.

138.     The unique mission of the Congregation of the Missionaries of St. Charles and the Fathers of St. Charles requires the St. John the Baptist Province be able to bring members of the

Congregation into the United States on visas so that they can work with and serve the ethnic communities in the parishes entrusted to Fathers of St. Charles by the bishops. In the past, Fathers of St. Charles has used (and continues to use) R-1 religious worker visas to enable its members to live and work in the United States, and it has also subsequently sponsored its members for permanent residency so that they may remain with the province on a long-term basis. But because R-1 visas are valid only for five-year periods before the recipient must leave the United States for at least a year, and due to processing backlogs that have made it nearly impossible for R-1 visa holders to adjust status to lawful permanent residency before the five-year term of their visa expires, it has recently become necessary for Fathers of St. Charles to sponsor its members already in the United States on R-1 visas for H-1B visas so that they may maintain legal status and continue their work here.

139.    Fathers of St. Charles currently has three members here on R-1 visas that will expire imminently, and for whom Fathers of St. Charles had planned to petition for H-1B visas in the next few months. The mission and religious calling of Fathers of St. Charles depends heavily on the H-1B visa system and the ability of Fathers of St. Charles to be able to bring members of the Congregation from abroad to work in the United States on H-1B visas on a regular basis.

140.    The Proclamation and the $100,000 Requirement is therefore devastating to Fathers of St. Charles and their religious calling. Fathers of St. Charles cannot afford to pay $100,000 for each new H-1B visa application. The province's many humanitarian duties would be severely impacted if the province had to find hundreds of thousands of dollars within its budget to cover new H-1B visa applications on an ongoing basis in future years. If the Proclamation remains in effect, Fathers of St. Charles will not be able to maintain the legal status of the three members currently here on R-1 visas and would be forced to send them abroad, with

no ability to fill the positions those members would leave vacant. In turn, the communities in those parishes would not be able to convene and worship in their own language and would be deprived of spiritual guidance and service, in contravention of the mission and spiritual calling of Fathers of St. Charles. The $100,000 Requirement substantially burdens Fathers of St. Charles's mission and ability to serve the poorest of migrants, and it currently unclear how Fathers of St. Charles will be able to continue their spiritual work if they cannot access the H-1B visa system going forward.

141.    **Plaintiff Church on the Hill** is a religious institution located in the Appalachia region of the United States. The church congregation was formed seventy years ago but was officially incorporated in its current structure in 2003.

142.    In 2021, Church on the Hill decided to branch out and establish a new church, also known as a "church plant." The church plant, which began with twenty members from Church on the Hill, formed a new congregation in a nearby city. The new church serves an underserved, economically disadvantaged region in Appalachia and now has approximately 200 members in its congregation.

143.    Both Church on the Hill and the church plant have established ministries for children, youth, families, and students, as well as community outreach that meets both practical and spiritual needs. Some of the ministries in the church plant work with local schools to support parents who are financially struggling and teachers who work with these low-income families. Church members regularly visit sick and elderly community members in the hospital and in their homes. Through these efforts, the church has become a trusted presence in the community, standing alongside families in hardship and serving as a stabilizing and hope-filled influence in a region marked by economic challenge.

144.     The church would not be what it is today if it had not hired foreign talent through the visa system to assist with establishing this second church. Several years ago, Church on the Hill hired a pastor from the United Kingdom on an R-1 visa, a temporary non-immigrant visa available for religious workers. Prior to working for Church on the Hill, this pastor shared with the Church Board his vision and calling to start a new church. The Board found this vision so compelling that they offered a job to the pastor and then became the sponsor for his new petition for nonimmigrant worker status and green card petition, which allowed him to adjust to legal permanent residency from his R-1 visa. This pastor was and is integral to the church's mission and work.

145.     To help make this vision of a second church a reality, Church on the Hill sponsored for an R-1 visa a second pastor from the United Kingdom, Plaintiff John Smith ("Pastor John Smith"), who was a colleague of the first pastor the church had sponsored for an R-1 visa. The two pastors' work has allowed Church on the Hill to expand to its second location. Pastor John Smith's relationship to the first pastor, their long history, their common vision, their complementary qualifications, skills, and giftings create a unique synergy so that together they can co-pastor the church plant and its local community.

146.     Pastor John Smith is a native of England and is currently present in the U.S. on an R-1 visa. It was important to hire Pastor John Smith with an R-1 visa because of his unique qualifications and partnership with the first pastor. In addition, he brings extensive experience and training in cross-cultural mission work, having served and trained in diverse contexts overseas. This background has shaped his ability to minister effectively across generational, cultural, and socioeconomic boundaries within the Appalachian Highlands. Combined with his theological preparation, pastoral leadership, and long history of shared vision with the first

pastor, his contribution could not be replicated by hiring unrelated local talent. Pastor Smith's leadership is critical for the growth and development of the church plant.

147.    Pastor John Smith's R-1 visa is set to expire on November 1, 2026, at which time he will have reached the maximum five-year stay on his R-1 visa in the United States. The church has sponsored Pastor John Smith for a green card, and that application has been approved, but there is a long processing backlog that is delaying his ability to adjust status to lawful permanent residency. Prior to the Proclamation, Church on the Hill planned to apply for an H-1B visa for Pastor John Smith so that he could remain in the U.S. and continue his ministry with the church while he waits to be able to adjust status. The church had retained immigration counsel to apply for an H-1B visa for him just prior to the Presidential Proclamation at issue.

148.    After the $100,000 Requirement was instituted, the church was forced to notify Pastor Smith that it cannot afford to pay this fee. Without an H-1B visa, Pastor John Smith will be unable to continue working for Church on the Hill after November 2026.

149.    The required fee will directly harm Church on the Hill, their mission, and their members. The church is worried that the fee will prevent them from retaining the pastoral leadership that is central to their mission and the stability of their congregation. The fee has created real concern about the future of the church and the community that depends on it.

150.    If the H-1B fee continues in force, the church and its members will face a staffing shortage. Pastor John Smith has played a pivotal role growing the church, including shepherding the church plant in a nearby city. Pastor Smith leads many of the church's ministries and participates in preaching, teaching and mentoring new leaders. He also plays a key role in developing religious education programs for the church, leading worship and performing outreach to underserved families in the community. As part of Pastor John Smith's ministry, he

COMPLAINT                                   46

has developed important and meaningful relationships with members of Church on the Hill's congregation and community that would be immediately weakened, if not severed completely, if he and his family no longer had legal status in the United States and were forced to leave the country. Many of the church's ministries and programs will be paused or cut back if Church on the Hill is unable to change Pastor John Smith's status to H-1B. Church on the Hill's existing church staff would not be able to fill the hole in our workforce that Pastor John Smith would leave if it cannot convert his status to continue his employment.

151.    If Pastor John Smith is unable to lawfully remain and work in the United States, the essential services he provides to the congregations and the community will be critically impacted, leaving a vulnerable population and community without the support it needs. Because the other pastor who co-leads the church is dealing with significant health issues, Pastor John Smith's absence would place considerable strain on him and on the church as a whole. Instead of continuing to expand and develop new ministries and outreach, the church would be forced into a position of simply trying to maintain what already exists. This would prevent further growth, limit innovation, and hinder the broader impact the church has been having.

152.    **Plaintiff John Smith** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. Pastor John Smith came to the United States in 2022 on an R-1 nonimmigrant visa for foreign nationals in religious vocations, and is currently working as a full-time pastor at a church in his area. In addition to his rewarding and important work with the church, Pastor Smith's family have also established deep roots in their local community, where his children attend school, and have developed meaningful connections with their church and broader community.  Pastor Smith's elderly mother and step-father also live close by, which allows Pastor Smith and his family to be close to them and

continue these familial relationships. Pastor Smith and his wife are in the process of purchasing a home for their family.

153. Pastor Smith's R-1 visa allows him to reside in the United States for up to five years until November 1, 2026, but his church offered him a permanent position if he could continue maintaining legal immigrant status in the country, and sponsored him for a green card with an I-360 petition. This I-360 petition was approved last year; however, due to an extreme backlog in visa processing, Pastor Smith cannot file to adjust his status to lawful permanent residency before his R-1 visa will expire. Thus, Pastor Smith's church retained immigration counsel to file an H-1B petition on Pastor Smith's behalf so he can continue working at the congregation while he waits for the opportunity to adjust his status.

154. Before the church could file Pastor Smith's H-1B petition, however, the Proclamation went into effect. It is not possible for the church to pay such a high fee. The news has left Pastor Smith heartbroken and filled with uncertainty. He too cannot afford to pay this fee, and without the H-1B visa process, he will lose his job at the church and will not be able to remain in the United States beyond his five-year maximum stay on his R-1 visa. This would undermine his ability to continue providing the essential pastoral and community to his church. The new $100,000 fee would not only upend Pastor Smith's plans to remain in the United States and much of the spiritual work he has devoted himself to for the past several years, but also his family's lives and the relationships and plans they had for their future.

### 4. Research and academic institutions

155. **Plaintiff UAW International** represents 120,000 members in higher education, and **Plaintiff UAW Local 4811** represents nearly 50,000 members employed at the University of California. These members include post-doctoral researchers, graduate students, and teaching

assistants who drive innovation and advances in multiple fields. Plaintiffs UAW International and Local 4811 have numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

156.    For example, one UAW International and Local 4811 member is a 31-year-old Indian post-doctoral researcher at a major U.S. research institution whose work focuses on biomedical modeling and developing tools to simplify and accelerate drug discovery. His current projects support advances in treatment for tuberculosis and breast cancer and he is the only person in his lab working on these projects. He is presently employed on a STEM OPT extension, but his projects will not be completed by the time it expires, and his laboratory recommended that the research institute file an H-1B petition on his behalf. The imposition of a $100,000 fee imposed by the Proclamation would be extremely burdensome on the research institution and thus jeopardize both his research and the institution's investment. Since he found out about the Proclamation, he has felt depressed and hopeless about his own future and the future of his work and is finding it difficult to concentrate on his research.

157.    A European UAW International member is currently in a postdoctoral position at a major research institution on the East Coast. He is a neuropharmacologist who studies the impacts of opioids generally and fentanyl specifically on pain management, in an effort to identify ways to reduce the risk of addiction. He chose to do his postdoctoral work in the United States specifically because he is aware of the acuity of the opioid epidemic here and hopes to find ways to reduce it. He is currently in the U.S. through a J-1 visa and his current institution planned to sponsor him for an H-1B visa so he could continue this critical work. He is also preparing to submit a major grant application for funding to continue and expand his work at that

institution, on which he would be the primary investigator. If he is unable to obtain an H-1B visa, his institution will lose access to any potential grant funding, and he will not be able to continue this critical research.  When he became aware of the Proclamation, he was also personally devastated and has suffered from anxiety and insomnia because his entire career and the future of his research are now up in the air.

158.    **Plaintiff AAUP** has 50,000 members who are faculty and other academic professionals. Plaintiff AAUP has numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

159.    For example, one AAUP member had an offer from the major research university where that member is currently completing a postdoc. The university intended to seek an H-1B visa for this member, and they expected the H-1B process to be completed this fall. However, the university has placed the processing of this member's H-1B visa on hold indefinitely due to the $100,000 fee.

160.    The potential loss of these postdoctoral researchers, scientists, and academics will not just harm the individuals and the institutions that employ them. It will result in significant and potentially catastrophic setbacks to research that benefits the American public and ensures the United States remains a leading source of innovation and expertise. For example, the fee will likely result in sharp cutbacks in the employment of highly talented foreign workers and severe setbacks for university research, graduate programs, and clinical care, compounding an anticipated shortfall of 5.3 million skilled workers over the next decade.[41]  Faculty search

---

[41] Michael T. Nietzel, *Universities May Face Huge Costs From Trump's $100,000 H-1B Visa Fee*, Forbes (Sept. 26, 2025), https://perma.cc/FB3Y-LNJ4.

committees are already being told they have to exclude top candidates if those candidates would need H-1B visas. Andrea Liu, a physicist at the University of Pennsylvania, said the fee would damage the future of her research group and described the impact as "an utter disaster—yet another body blow to science."[42]

161.    **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B petition has been halted due to the $100,000 fee imposed by the Proclamation. Her research focuses on identifying the genetic and epigenetic causes of vision loss due to aging, diseases such as diabetes, and rare inherited genetic abnormalities of unknown etiology, with the goal of finding new ways to diagnose and treat blinding conditions. Her laboratory relies on her as its first postdoctoral scholar to build and advance its research program, and her ongoing work requires a minimum of two more years. Due to the value of her skills and research expertise in both computational biology as well as wet-lab bench research, her university employer approved her for H-1B sponsorship, and she expected the process to be completed by this December, allowing her to visit her home country for the first time in six years. Instead, as a result of the Proclamation, her university has indefinitely paused moving forward with the processing of her application. She is suffering debilitating stress and anxiety due to the uncertainty of her position, which exacerbates the PTSD from which she suffers. Without relief, Plaintiff Phoenix will be forced to leave her postdoctoral position the United States within four months, causing serious professional and personal harm.  Her departure will set back the crucial research she is conducting, disrupting the lab's ongoing work and ability to secure future research funding,

---

[42] Natasha Gilbert, *Trump's $100K Visa Fee for Foreign Talent: How Will It Affect Researchers?*, Nature (Sept. 24, 2025), https://perma.cc/2BUK-T49N.

preventing her department from getting any future funding through her, and potentially delaying

the availability of treatment for the conditions that are the focus of her research.

## VII. CAUSES OF ACTION

### COUNT 1
### Against Defendant Trump
### Actions *ultra vires*, in excess of statutory authority

162. Plaintiffs incorporate the factual allegations above as if set forth herein.

163. The Proclamation cites Sections 212(f) and 215(a) of the Immigration and

Nationality Act (INA), 8 U.S.C. §§ 1182(f) and 1185(a), as providing statutory authority for

imposing a requirement that employers submitting a petition for an H-1B visa make a "payment"

of $100,000 to the United States.

164. Neither INA § 212(f) nor § 215(a) authorizes the President to impose the

$100,000 Requirement.

165. Nor has Congress or the Constitution otherwise authorized the President to

impose this fee, tax, or other revenue-generating requirement on H-1B petitioners. To the

contrary, under the Constitution, the power of taxation belongs to Congress. U.S. Const. art. I,

§ 8, cl. 1.

166. The cited statutes, INA §§ 212(f) and 215(a), cannot be reasonably interpreted to

be a delegation of Congress's tax power.

167. If these provisions were interpreted to provide this authority, they would violate

the nondelegation doctrine because they contain no intelligible principles to guide decision-

making on the amount of money that can be raised or the use of the money collected.

168. That interpretation would also violate the major questions doctrine because these

provisions contain no clear Congressional authorization for this action of great political and

economic significance. And, there is no basis for delegated authority for the President to raise and spend money as he sees fit.

169.    INA § 212(f) and § 215(a) also do not authorize the President to override other provisions of the INA. *Trump v. Hawaii*, 585 U.S. 667, 689 (2018).

170.    In separate provisions, the INA sets standards for and limits on the entry into the United States of H-1B visa recipients and authorizes DHS—not the President—to impose limited fees in connection with H-1B visa petitions:

> a.    The INA sets specific requirements for approval under the H-1B visa program. See 8 U.S.C. § 1101(a)(15)(H)(i)(b). It also sets specific caps on the number of people who may be admitted under this program, see 8 U.S.C. § 1184(g), reflecting a careful balancing of policy interests between employers' need to hire foreign workers for certain kinds of roles and the interests of American workers in the labor market.
>
> b.    The INA also limits the fees that DHS may impose under 8 U.S.C. § 1356(m) for adjudication and naturalization services. Such fees "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). In accordance with the APA, DHS sets the amounts of these fees through notice-and-comment rulemaking. *See*, *e.g.*, 89 Fed. Reg. 6194.

COMPLAINT                                53

c. Beginning with the passage of the American Competitiveness and Workforce Improvement Act of 1998, Congress (via the INA) imposed additional fees on employers specifically in connection with H-1B visa petitions. *See* 8 U.S.C. § 1184(c)(9)-(14). The INA also directs that these fees be segregated into a special account and used for specified purposes. 8 U.S.C. § 1356(s). Congress set these limits for the purpose of balancing impacts to the labor market for American workers while permitting foreign workers in this category to be hired for certain kinds of roles.

171.    The INA also includes detailed provisions to address misuse of the H-1B visa program. *See* 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.800 *et seq.*

172.    In directing DHS to require a $100,000 "payment" to an unspecified account and for unspecified uses, in connection with H-1B visa petitions, the Proclamation conflicts with and supplants the structure Congress has established for approval and entry into the United States of H-1B visa recipients, including the fee structure for adjudication services in general and for the H-1B visa program in particular.

173.    Nor does the President have authority under 8 U.S.C. § 1182(f) to restrict workers from entering the United States because their employers failed to make this payment.

174.    The Proclamation's requirement to pay $100,000 as a condition of entry or re-entry to the United States, combined with the expansive and effectively standardless discretion of the Secretary of Homeland Security to disregard the Proclamation's dictates and Congressional intent, adds novel eligibility requirements, conflicts with, and supplants the structure Congress has established for the adjudication of H-1B petitions, issuance of H-1B visas, and entry into the United States for those with H-1B visas.

COMPLAINT                                        54

**COUNT 2**
**Against Agency Defendants**
**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A), (C)**
*Not in Accordance with Law, In Excess of Statutory Authority*

175.     Plaintiffs incorporate the factual allegations above as if set forth herein.

176.     Agency Defendants require a $100,000 fee as a mandatory requirement upon submission of any new H-1B petition received after 12:01 a.m., September 21, 2025.

177.     The new $100,000 Requirement, an extortionate fee, constitutes final agency action under 5 U.S.C. § 704.

178.     Agency Defendants each lack statutory authority to impose the $100,000 Requirement.

179.     The $100,000 Requirement is contrary to and/or in excess of the authority provided in provisions of the INA, including (1) the standards for approval and entry into the United States of H-1B visa applicants, as set forth in 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 U.S.C. § 1184(g); (2) the fees to be charged to employers submitting petitions for H-1B visa applicants, including the amount of those fees and the purposes for which they may be used, as set forth in 8 U.S.C. § 1184(c)(9)-(14) and 8 U.S.C. § 1356(s); and (3) the fees to be charged generally for adjudication and naturalization services, as set forth in 8 U.S.C. § 1356(m).

180.     Nor do the Agency Defendants have the statutory authority to stop adjudicating petitions and visas or to bar individuals from entering the country unless their employers have paid $100,000.

181.     The $100,000 Requirement is contrary to law and in excess of statutory authority and must be set aside under 5 U.S.C. § 706(2).

182.     In the alternative to the APA, Plaintiffs bring this claim pursuant to the Court's inherent equitable authority to declare unlawful and enjoin unlawful agency action.

### COUNT 3
**Against Agency Defendants**
**Violation of the Administrative Procedure Act – <u>5 U.S.C. § 706(2)(A)</u>**
*Arbitrary and Capricious*

183.    Plaintiffs incorporate the factual allegations above as if set forth herein.

184.    Under the APA, a court shall set aside an action if it is arbitrary and capricious. <u>5 U.S.C. § 706(2)(A)</u>. An action is arbitrary and capricious if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, <u>463 U.S. 29, 43</u> (1983). "When an agency changes course . . . , it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, <u>140 S. Ct. 1891, 1913</u> (2020).

185.    Agency Defendants failed to consider the carefully crafted fees and factors Congress intended for DHS to consider when adjusting fees for adjudication of H-1B petitions. <u>8 U.S.C. § 1356(m)</u>, for example, calls for DHS to consider the costs of providing adjudication and naturalization services. But the $100,000 payment is untethered from the cost of adjudicating H-1B petitions or any other petitions.

186.    Agency Defendants failed to consider the adverse impacts of the $100,000 requirement on small businesses, non-profits, and governmental jurisdictions, as required by the Regulatory Flexibility Act. <u>5 U.S.C. §§ 603-604</u>. Agencies are required to consider small entities' ability to pay and to consider creating exemptions, discounts, or other alternatives for small entities, and DHS typically has required small and non-profit employers to pay less in fees. But

here, the Agency Defendants did not consider ability to pay the $100,000 Requirement or explain its unreasoned departure from that framework.

187. Agency Defendants failed to consider the substantial burden that the $100,000 Requirement places on religious organizations who cannot afford to pay that exorbitant amount and, as a result, will lose their pastors and priests.

188. Agency Defendants failed to consider the negative impacts of the $100,000 Requirement on schools, hospitals, and communities, especially in underserved areas where school districts and hospitals struggle to hire teachers and doctors and rely on the H-1B program to ensure effective health care and educational services for their communities.

189. Agency Defendants failed to consider the reliance interests of regulated parties like Plaintiffs and their members. The agencies have never increased H-1B fees by six figures in one go and have never done it without warning. Agency Defendants should have considered the chaos that this enormous and sudden fee would predictably create for regulated parties, who were caught by surprise and had no opportunity to prepare for it.

190. Agency Defendants failed to consider alternative ways to address the purported problems with the H-1B program, such as more closely scrutinizing any employers who may be abusing the program, under the existing statutory enforcement mechanisms, rather than imposing a blanket $100,000 fee on all employers.

191. Agency Defendants did not consider how the $100,000 Requirement could encourage employers to improperly lower wages for their workers—U.S. workers or H-1B workers—in order to maintain needed staff but recoup additional costs paid to the government.

192. While employers must provide a $100,000 payment "to accompany any new H-1B visa petitions submitted after 12:01 a.m....... on September 21, 2025," *H-1B FAQ*, USCIS

(Sept. 21, 2025), https://perma.cc/9UKN-ZYDG, Agency Defendants have failed to consider that, as of September 21, 2025, there was no mechanism by which petitioners could submit such a fee.

193.    Agency Defendants have also failed to coherently explain other key information. For instance, the agencies have not explained what will happen to employers who file petitions before a payment system is set up, where the money will go, or how the money will be used. Nor have Agency Defendants explained the impact of the $100,000 Requirement on individuals residing in the United States under another visa program who seek to convert to an H-1B visa while inside the United States.

194.    DHS has also failed to explain what criteria or factors it will consider in determining whether an individual, an employer, or an industry will be exempt from the $100,000 requirement. This failure invites arbitrary, selective enforcement of the new requirement.

**COUNT 4**
**Against Agency Defendants**
**Violations of the Administrative Procedure Act,**
**Regulatory Flexibility Act – 5 U.S.C. §§ 603-604, 706(2)(D)**
*Failure to Conduct Notice and Comment Rulemaking;*
*Rulemaking Without Observance of Procedure Required by Law*

195.    Plaintiffs incorporate the factual allegations above as if set forth herein.

196.    *Notice and comment.* The APA requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. See 5 U.S.C. §§ 553(b)-(c). The agency must "consider and respond to significant comments received." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). When the final rule is promulgated, the agency must provide "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

COMPLAINT                                    58

197.     The new requirement of a $100,000 payment is a legislative rule within the meaning of the APA. It "imposes new obligations" on H-1B petitioners, as the $100,000 payment must "accompany" their petition and the petitions will not be adjudicated and their workers will not be granted visas or be allowed to enter the United States without it. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). Legislative rules like the new $100,000 payment requirement must go through notice and comment rulemaking. See 5 U.S.C. § 553(b)-(c). USCIS has always provided notice and comment when adjusting fees for H-1B petitions except where Congress provided for the fees by statute. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194 (Jan. 31, 2024), *as corrected,* 89 Fed. Reg. 20101 (Mar. 21, 2024).

198.     Agency Defendants failed to provide notice and an opportunity for comment as required by the APA and have thus violated 5 U.S.C. §§ 553(b), (c) and 706(2)(D).

199.     *Effective date.* Agency Defendants also violated the APA by making the new $100,000 Requirement effective immediately without good cause. The APA requires that a substantive rule be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). If an agency claims good cause for making the rule effective in less than 30 days, it must publish its good cause explanation with the rule. *Id.* § 553(d)(3). Here, however, the new requirement became effective immediately. Agency Defendants failed to publish any good cause finding.

200.     *Regulatory Flexibility Act.* Agency Defendants have violated the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 *et seq.* Whenever an agency is required to conduct notice and comment rulemaking, an agency must "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small

entities." <u>5 U.S.C. § 603(a)</u>. The initial analysis must discuss significant alternatives such as establishing different compliance requirements or timetables "that take into account the resources available to small entities" or "exemption from coverage of the rule, or any part thereof, for such small entities." *Id.* § 603(c). A final rule must include a final regulatory flexibility analysis that discusses, among other things, significant issues raised by the public or the Chief Counsel for Advocacy of the Small Business Administration and the steps the agency has taken to "minimize the significant economic impact on small entities." *Id.* § 604(a). Agency Defendants never published an initial analysis for public comment and did not publish a final analysis either, even though the $100,000 requirement will have an enormous impact on small entities.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare unlawful and set aside sections 1, 2, and 3(a) of the Proclamation;

B.  Declare unlawful and set aside enforcement and implementation of sections 1, 2, and 3(a) of the Proclamation, including the requirement to make a $100,000 payment as a prerequisite to adjudicate an H-1B petition or as a condition for visa issuance or entry into the United States for H-1B beneficiaries;

C.  Declare unlawful and set aside any agency guidance, procedures, or determinations made pursuant to, or in implementation of, sections 1, 2, and 3(a) of the Proclamation, including the Agency Policies;

D.  Enjoin Defendants from requiring the $100,000 payment and from conditioning H-1B petition adjudications, visa issuance, or entry on such payment;

E.  Order Defendants to process H-1B petitions under existing law, without the $100,000 payment condition;

F.  Grant such other and further relief as the Court deems just and proper.

Date: October 3, 2025                                  Respectfully submitted,

/s/ Karen C. Tumlin                                   /s/ Cynthia Liao
Karen C. Tumlin (CA Bar No. 234691)                   Cynthia Liao (CA Bar No. 301818)*
Esther H. Sung (CA Bar No. 255962)                    Johanna N. Hickman (D.C. Bar No. 981770)*
Laura Flores-Perilla (CA Bar No. 355645)              Elena Goldstein (D.C. Bar No. 90034087)*
Hillary Li (GA Bar No. 898375)*                       **DEMOCRACY FORWARD**
Brandon Galli-Graves (TX Bar No.                      **FOUNDATION**
24132050)*                                            P.O. Box 34553
**JUSTICE ACTION CENTER**                             Washington, DC 20043
P.O. Box 27280                                        (202) 808-1982 (Liao)
Los Angeles, CA 90027                                 cliao@democracyforward.org
(323) 450-7272                                        hhickman@democracyforward.org
karen.tumlin@justiceactioncenter.org                  egoldstein@democracyforward.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org          /s/ Kalpana Peddibhotla
hillary.li@justiceactioncenter.org                    Kalpana Peddibhotla (CA Bar No. 200330)
brandon.galli-graves@justiceactioncenter.org          **SOUTH ASIAN AMERICAN JUSTICE**
                                                      **COLLABORATIVE (SAAJCO)**
/s/ Charles H. Kuck*                                  333 W. San Carlos Street, Suite 600
GA Bar No. 429940                                     San Jose, CA 95110
**KUCK BAXTER LLC**                                   (408) 550-9240
365 Northridge Rd., Suite 300                         kalpana@saajco.org
Atlanta, GA 30350
404-949-8154                                          /s/ Jesse M. Bless
Ckuck@immigration.net                                 JESSE M. BLESS*
                                                      MA Bar # 660713
/s/ Zachary R. New                                    **BLESS LITIGATION LLC**
Zachary R. New*                                       6 Vineyard Lane
Atty. Reg. No. (Colorado): 53992                      Georgetown MA 01833
**JOSEPH & HALL, P.C.**                               781-704-3897
12203 East Second Ave.                                jesse@blesslitigation.com
Aurora, CO 80011
(303) 297-9171                                         /s/ Greg Siskind
zachary@immigrationissues.com                         Greg Siskind*
                                                      TN Bar No. 14487
                                                      **SISKIND SUSSER**
                                                      1028 Oakhaven Road
                                                      Memphis, TN 38119
                                                      (901) 682-6455
                                                      gsiskind@visalaw.com
                                                      *Counsel for Plaintiffs*
                                                      * Motion to appear *pro hac vice* forthcoming

COMPLAINT                                    61