### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>*Defendants*. | Case No. 1:25-cv-13829-LTS<br>Judge Leo T. Sorokin<br><br><br>Leave to file granted on March 17, 2026 |

### BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

MATTHEW JAMES O'BRIEN
Federation for American Immigration Reform
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
(202) 328-7004
mobrien@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## FEDERAL RULE OF CIVIL PROCEDURE 7.1 CORPORATE
## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and the applicable local rules of this Court, *amicus curiae* Federation for American Immigration Reform ("FAIR") makes the following disclosures:

1. Parent Corporations.
FAIR has no parent corporation.

2. Publicly Held Companies.
No publicly held corporation owns 10% or more of FAIR's stock.
FAIR is a nonprofit membership organization.

3. Organizational Structure.
FAIR is a 501(c)(3) nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C.

4. Counsel Participation and Funding.
No counsel for a party authored this brief in whole or in part, and no person or entity— other than FAIR, its members, or its counsel—contributed money intended to fund the preparation or submission of this brief.

5. Interest of Amicus Curiae.
FAIR files this disclosure to assist the Court in evaluating potential conflicts under Rule 7.1 and to confirm compliance with requirements governing organizational amici.


Dated: March 17, 2026                    Respectfully submitted,

                                         /s/ Matthew James O'Brien

                                         Counsel for *Amicus Curiae*
                                         Federation for American Immigration Reform

i

**INTEREST OF *AMICUS CURIAE***

*Amicus curiae* Federation for American Immigration Reform ("FAIR") is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to advocate for immigration policy that is in America's best interest. FAIR has been involved in more than 100 legal cases since 1980, either as a party or *amicus curiae*, with the aim of advancing this mission.

The decision in this case, which concerns the imposition by the President of a $100,000 fee on H1-B visas, will impact the ability of the federal government to protect American workers. *Amicus* FAIR thus has a direct and vital interest in the outcome of this case.

**SUMMARY OF THE ARGUMENT**

The Constitution vests Congress and the President with the responsibility to superintend immigration, naturalization, foreign policy, and national security. Courts have long recognized that the authority of these branches over these subjects is plenary and, generally, not subject to review when they exercise discretion.

Consistent with that allocation of authority, nothing in the statutory scheme alters the President's power under the INA to impose conditions on the entry of noncitizens, notwithstanding Congress's regulation of agency filing fees. The H-1B program falls within the President's authority to exclude aliens or place conditions on their admittance. In fact, by requiring program participants to secure a visa, Congress has placed them initially within the class of inadmissible aliens. Only when individuals meet very specific requirements may they qualify for a visa. Even then, the Immigration and Naturalization Act (INA) grants the President very broad authority to exclude or "suspend the entry of all aliens or any class of aliens" "or impose on the entry of aliens any restriction he may deem to be appropriate." The only

1

prerequisite to exercising this power is that the President issue a proclamation finding that the entry of such aliens would be detrimental to the interests of the United States. Because Congress left these determinations to the President's judgment and provided no judicially manageable standards for review, the Court may not substitute its own judgment for that of the President. The fee is a substantive condition of entry that falls squarely within the President's delegated authority under § 1182(f).

Even if the President's action was subject to judicial scrutiny, the Proclamation easily satisfies the statutory standard. The United States faces an immigration crisis caused, in part, by the H-1B nonimmigrant visa program. Most alien H-1B guestworkers are employed in computer occupations, and the number of H-1B workers imported each year exceeds the number of computer jobs created in the entire country. The saturation of the job market with foreign workers creates unacceptably high unemployment for American graduates and the displacement of experienced Americans.

Additionally, Congress's fee provisions do not affect the President's separate authority under § 1182(f) to set conditions on entry.

## ARGUMENT

The Immigration and Nationality Act allocates authority over immigration across multiple provisions that address distinct subjects. Congress has enacted detailed statutes governing the fees executive agencies may charge in administering immigration benefits. Separately, the President has broad inherent authority to exclude aliens, including by suspending or conditioning entry when he finds that their admission would be detrimental to the interests of the United States.

The President's authority over immigration flows from constitutional provisions empowering him to regulate in the areas of foreign commerce, foreign relations, and national security. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 607 (2024) (holding that immigration falls within the president's "important foreign relations responsibilities" conferred on him by the Constitution); *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (noting that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"); *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (recognizing that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government."); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) (recognizing that the right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation"); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs.").

Properly exercising his power under 8 U.S.C. § 1182(f), President Trump issued Proclamation 10973 (published at 90 Fed. Reg. 46027), finding that the H-1B visa program was adversely affecting American workers, and imposed a $100,000 fee on new H-1B admissions to restrict H-1B visas to highly skilled workers.

3

## I.    The President is not subject to the APA, nor are his actions here otherwise reviewable.

The President's authority to impose conditions on entry pursuant to the INA is not subject to review under the Administrative Procedure Act (APA). The APA applies only to agencies. *E.g. Lincoln v. Vigil*, 508 U.S. 182, 190–92 (1993); *Webster v. Doe*, 486 U.S. 592, 599 (1988) (holding that the APA applies only to a "final agency action"). The President, though, is not an agency, and thus the APA does not apply to him or his actions. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Am. Foreign Serv. Ass'n v. Trump*, 2025 U.S. App. LEXIS 15297, *45 (D.C. Cir. 2025).

Because the President is not an "agency" under the APA, the H-1B fee imposed by Proclamation 10973 is not an "agency action" subject to the Act's procedural or substantive constraints. The fee is a self-executing condition of entry mandated by the President pursuant to his express authority under 8 U.S.C. § 1182(f). In this context, the Department of Homeland Security's role is not the creation of policy, but the mechanical execution of a Presidential directive that is "conclusive and preclusive" in the realm of border entry. *See Trump v. United States*, 603 U.S. 593 (2024). Consequently, the underlying policy is an exercise of the President's non-reviewable discretion to protect the national interest.

To permit judicial review of a President's discretion would invade both his executive authority—in this case, his inherent authority over the conduct of foreign affairs and the related interests of the United States—and the measured judgment of Congress to recognize his authority. *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940). Thus, where the Constitution delegates a power to the President and where the statute defers to the President's discretion, judicial review is not available. And that the President may not be compelled to

4

perform his responsibilities as others see fit applies equally when individuals challenge the unconstitutionality of an executive action. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866).

In this case, Congress, recognizing the President's inherent authority under the Constitution to exclude aliens, enacted legislation that "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Specifically, under 8 U.S.C. § 1182(f), the President, when he "finds that the entry of any alien or of any class of aliens … would be detrimental to the interests of the United States" may "by proclamation … impose on the entry of any alien *any restriction* he may deem to be appropriate" (emphasis added). *See also Hawaii*, 585 U.S. at 685 (recognizing that the statute's "sole prerequisite" is that the entry of the aliens "would be detrimental to the interests of the United States").

The President exercised his discretion when determining, among other things, that the H-1B program has been "deliberately exploited to replace, rather than supplement American workers." The results of the program have "undermined both our economic and national security" by "artificially suppress[ing] wages, resulting in a disadvantageous labor market for American citizens" and "ma[king] it even more challenging for college graduates to find IT jobs." Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 24, 2025).

Courts cannot review this exercise of Presidential discretion. Decisions about whether to exclude aliens or place preconditions on their entry are, fundamentally, foreign policy decisions. *Harisiades*, 342 U.S. at 588-589 (observing that immigration and naturalization policies are "interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). The First Circuit has recognized that "the conduct of foreign relations is committed by the Constitution to the political

departments" and that the "propriety of the exercise of that power is not open to judicial inquiry." *United States v. Li*, 206 F.3d 56, 67 (1st Cir. 2000) (quoting *United States v. Pink*, 315 U.S. 203, 222-23 (1942)). Courts will also lack jurisdiction, whether under the APA or otherwise, where Congress drafted a statute "so that a court would have no meaningful standard against which to judge" the exercise of discretion. *Lincoln*, 508 U.S. at 191. When, as here, a statute deprives the court of a meaningful standard, "the statute can be taken to have committed the decision-making to the agency's judgment absolutely." *Id*.

**II.    Even if the President's judgment were subject to judicial scrutiny, it would clearly meet the statutory standard.**

The H-1B visa is a nonimmigrant guestworker visa for specialty occupations. 8 U.S.C. § 1101(a)(15)(H)(i)(B). A specialty occupation is defined as an occupation that requires "theoretical and practical application of a body of highly specialized knowledge" and "attainment of a bachelor's or higher degree in the specific specialty." 8 U.S.C. § 1184(i).

While Proclamation 10973 lacks citations to sources, every grim claim it makes is easily verifiable. Even under the false premise that a proclamation made under 8 U.S.C. § 1182(f) is judicially reviewable, the facts conclusively support the findings made in Proclamation 10973.

The President found that "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." 90 Fed. Reg. at 46028. The available data clearly supports such a finding. The majority of H-1B beneficiaries are in computer occupations. *Characteristics of H-1B Specialty Occupation Workers*, USCIS, Apr. 25, 2025, p. 9.[1] In fiscal year 2025, about 77,000

---

[1]  Available at: https://www.uscis.gov/sites/default/files/document/reports/ola_signed_h1b_characteristics_congressional_report_FY24.pdf  (last visited Mar. 12, 2026).

H-1B visas were approved for computer workers. *Id*. at 10. This figure has no basis in economic need. Between May 2023 and May 2024, the United States *lost* over 18,000 jobs in computer occupations. Bureau of Labor Statistics, *Occupational Employment and Wage Statistics*, May 2024 & May 2023.[2]

The saturation of the computer job market by H-1B and other similar programs has had a devastating impact on recent graduates. Recent computer science graduates have an unemployment rate of 6.1% and recent computer engineering graduates are unemployed at a rate of 7.5%. Federal Reserve Bank of New York, *The Labor Market for Recent College Graduates*, Dec. 17, 2025.[3] These unemployment rates are more than double that of art history majors (3%). *Id*. When the H-1B program is importing more than enough foreign workers to fill every new computer job in the country, the massive unemployment for Americans in that field is a natural consequence, and that job environment is likely to discourage Americans from pursuing study in that field. *E.g.*, Erica Blom *et al.*, *Investment over the Business Cycle: Insights from College Major Choice*, IZA Discussion Paper No. 9167, July 2015 (explaining that, when unemployment rises, students tend to shift into fields that historically have better employment prospects.). Right now, 25% of unemployed Americans have four-year college degrees, the highest percentage since tracking began. Matthew Boesler, *Americans With Four-Year Degrees Now Comprise a Record 25% of Unemployed Workers*, Bloomberg, Nov. 21, 2025.

Likewise, Proclamation 10973 quotes a study (without citation) that found H-1B workers are paid 36% less than Americans. 90 Fed. Reg. at 40027. Indeed, a study supports that assertion.

---

[2]  Compare the employment numbers for "Computer Occupations (151200)" for May 2024 (available at: https://data.bls.gov/oes/#/industry/000000 ) with employment numbers for the same occupation for May 2023 (available at: https://www.bls.gov/oes/2023/may/oes_nat.htm#15-1200) (last visited Mar. 12, 2026).

[3]  *See also* 90 Fed. Reg. at 46027.

Daniel Costa & Ron Hira, *H-1B visas and prevailing wage levels, Economic Policy Institute*, May 4, 2020. This is consistent with a plethora of other studies finding H-1B workers are paid substantially less than Americans. *E.g.*, Crisil, *Bulging staff cost, shrinking margins*, May 2019 (finding local workers cost 25–30% more than H-1B workers); Thomas Bourveau *et al., H-1B Visas and Wages in Accounting: Evidence from Big 4 Payroll and the Ethics of H-1B Visas*, Journal of Business Ethics (2024). Proclamation 10973 states that "[o]ne software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees." 90 Fed. Reg. at 46027-28. Microsoft received 5,198 H-1B visas in fiscal year 2025. Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Washington Post, Sept. 24, 2025. Microsoft had laid off over 15,000 employees during that time period. Jim Edwards, *Microsoft lays off 9,000 in AI drive, bringing total job cuts to 15,000 this year*, Fortune, July 2, 2025. The proclamation also states that "[o]ne other IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July." 90 Fed. Reg. 46028. Indeed, Intel announced it was laying off 2,400 Americans in Oregon. Allison Frost, *Mass Intel layoffs will hit Oregon economy hard*, Oregon Public Radio, July 24, 2025. Likewise, Intel received 1,698 H-1B visas in FY 2025. Economic Times, *Amazon leads H-1B visa approvals in early 2025*, Sept. 27, 2025.

The proclamation describes the direct displacement of Americans by H-1B workers, and how the Americans have to train their foreign replacements. 90 Fed. Reg. at 46028. Replacements of Americans by H-1B workers on a massive scale have been extensively documented. *E.g.*, Reuters, *Lawmakers seek answers from major US firms over H-1B visa use amid layoffs*, Sept. 25, 2025 (Members of Congress questioned why Apple, Amazon, and JP

8

Morgan were laying of thousands of Americans while hiring thousands of H-1B workers.); Julia Preston, *Laid-Off Americans, Required to Zip Lips on Way Out, Grow Bolder*, NY Times, June 11, 2016 (describing Americans replaced by H-1B workers at Abbott Labs and Eversource Energy).

The restriction on H-1B workers imposed by Proclamation 10973, moreover, is eminently reasonable. Rather than imposing a total ban on H-1B visas, as permitted under 8 U.S.C. § 1182(f), the Proclamation attempts to limit such visas only to workers who truly are highly skilled and thus will "supplement" the U.S. workforce. 90 Fed. Reg. at 46027. The obvious way to separate the wheat from the chaff flowing into the labor market is to impose a fee.

It is not as though the companies cannot afford the fee. Amazon currently is the largest user of H-1B visas. Harriet Torry *et al. Who Uses H-1B Visas the Most, in Charts*, Wall Street Journal, Sept. 30, 2025. Amazon's CEO was compensated $40.1 million in 2024. Amazon, Notice of 2025 Annual Meeting.[4] The disputed H-1B fee amounts to less than one fourth of one percent of Amazon's CEO compensation.

The story is the same among the top U.S. employers of H-1B workers. In 2025, Microsoft's CEO was compensated $96.5 million. Jessica Coacci, *Microsoft CEO Satya Nadella's pay hits a record $96.5 million*, Fortune, Oct. 22, 2025. Apple's CEO compensation was $74.6 million in 2025. Apple, Inc., Proxy Statement Pursuant to Section 14(a), p. 61. And million-dollar salaries are not uncommon among senior technology workers in the United States. *E.g.*, Anna Tong & Kenrick Cai, *OpenAI, Google and xAI battle for superstar AI talent, shelling out millions*, Reuters, May 21, 2025; Times of India, *Microsoft salary packages leaked: From*

---

[4] Available at: https://s2.q4cdn.com/299287126/files/doc_financials/2025/ar/Amazon-2025-Proxy-Statement.pdf (last visited Mar. 12, 2026).

*entry-level to multi-million dollar paychecks*, Aug. 2, 2025 (top level engineers can earn $2.7 million a year). By industry compensation standards, the $100,000 fee is entirely reasonable to restrict H-1B visas to highly skilled workers that supplement—rather than displace—American workers.

### III.   Congress's regulation of agency filing fees does not limit the President's independent authority to impose conditions of entry.

Congress has regulated the fees executive agencies may charge to administer immigration benefits, including by authorizing DHS to set cost-recovery fees through rulemaking. *See* 8 U.S.C. § 1356(m). That agency fee authority, however, is separate from the President's inherent authority to regulate admission and entry. Congress expressly recognized that authority in 8 U.S.C. § 1182(f), which permits the President, upon a finding of detriment to the national interest, to "impose on the entry of aliens any restriction he may deem to be appropriate." 8 U.S.C. § 1182(f); *see also Trump v. Hawaii*, 585 U.S. 667, 683–84 (2018). The Supreme Court has recognized that Congress's detailed regulation of visa categories and immigration administration does not narrow the President's separate authority under § 1182(f). *See Trump v. Hawaii*, 585 U.S. at 687-88.

The Proclamation at issue does not purport to amend Congress's H-1B fee schedule or to exercise DHS's fee-setting authority under § 1356(m). It instead imposes entry conditions pursuant to § 1182(f). And immigration law has long recognized that entry conditions may be imposed by executive officials. See United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950) ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General.").

10

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' cross-motion for summary judgment.

Dated: March 17, 2026

Respectfully submitted,

/s/ Matthew James O'Brien

MATTHEW JAMES O'BRIEN
Federation for American Immigration Reform
25 Massachusetts Ave., N.W., Ste. 330
Washington, D.C. 20001
(202) 328-7004
mobrien@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

11

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2026, a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Matthew James O'Brien