**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>       *Plaintiffs,*<br><br>  v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al.*,[*]<br><br>       *Defendants.* | No.: 1:25-cv-13829-LTS<br><br>*Leave to File Granted on January 26, 2026 (Doc. No. 85) (Granting Joint Motion for Summary Judgment Briefing Schedule)* |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT AND MOTION TO DISMISS**

---

[*] Pursuant to Fed. R. Civ. P. 25(d), Markwayne Mullin has been automatically substituted for Kristi Noem as Secretary of Homeland Security.

**TABLE OF CONTENTS**

Page

Introduction...................................................................................................................1

Argument .....................................................................................................................2

    I.      Plaintiffs' claims are reviewable...............................................................2

           A.      The doctrine of consular non-reviewability does not apply here..............2

           B.      The Policy is subject to review under the APA. .......................................3

                1.      The fact that the Policy implements a presidential proclamation does not insulate it from review.............................3

                2.      The Policy constitutes final agency action.....................................5

                3.      The Policy is not committed to agency discretion by law. ..............5

            C.      The Policy is reviewable as *ultra vires*. .................................................6

    II.     The Policy violates the Constitution and is *ultra vires*. ............................7

           A.      The Policy effectively nullifies the INA.....................................................8

            B.      The Policy imposes an unauthorized tax—not a "regulatory payment" or "penalty." .....................................................................11

            C.      The provisions cited by defendants do not confer authority for the tax levied under the Policy or the effective suspension of the INA's H-1B Provisions.................................................................13

                 1.      Section 212(f) does not authorize the Policy. ...............................13

                 2.      Section 215(a)(1) does not authorize the Policy. ...........................16

    III.    The Policy violates the APA.....................................................................17

            A.      Defendants failed to comply with required notice-and-comment procedures. ..................................................................17

            B.      The Policy is arbitrary and capricious. .....................................................18

    IV.    Plaintiffs are entitled to the requested relief. ..........................................18

           A.      Congress provided vacatur as the appropriate remedy for a violation of the APA. .....................................................................18

            B.      Defendants' supposed "*res judicata* concerns" do not pose an obstacle to vacatur...................................................................19

            C.      Plaintiffs are entitled to an injunction.......................................................19

Conclusion ..................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. School of Magnetic Healing v. McAnnulty*
  187 U.S. 94 (1902)..................................................................................................................6

*Bailey v. Drexel Furniture Co.*
  259 U.S. 20 (1922)..............................................................................................................11, 12

*Biden v. Texas*
  597 U.S. 785, 809 (2022)........................................................................................................5

*Blackman v. D.C.*
  185 F.R.D. 4 (D.D.C. 1999)..................................................................................................19

*California v. IntelliGender, LLC*
  771 F.3d 1169 (9th Cir. 2014) ..............................................................................................19

*Chamber of Com. v. DHS*
  No. 25-CV-3675, 2025 WL 3719234 (D.D.C. Dec. 23, 2025)...........................................4, 15

*Chamber of Com. v. Reich*
  74 F.3d 1322 (D.C. Cir. 1996)...........................................................................................3, 6, 7

*Chamber of Com. v. Whiting*
  563 U.S. 582 (2011)................................................................................................................9

*Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*
  529 U.S. 193 (2000)..............................................................................................................10

*Counterman v. Colorado*
  600 U.S. 66 (2023).................................................................................................................16

*Dalton v. Specter*
  511 U.S. 462, 474 (1994).........................................................................................................7

*Dep't of State v. Muñoz*
  602 U.S. 899 (2024).................................................................................................................2

*E. Bay Sanctuary Covenant v. Trump*
  932 F.3d 742 (9th Cir. 2018) ................................................................................................17

*EEOC v. Pemco Aeroplex, Inc.*
  383 F.3d 1280 (11th Cir. 2004) ............................................................................................19

# TABLE OF AUTHORITIES
## (continued)

**Page**

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009)......................................................................................................18

*FCC v. Prometheus Radio Project*
   592 U.S. 414 (2021)......................................................................................................17

*Galvan v. Press*
   347 U.S. 522 (1954)........................................................................................................8

*Harisiades v. Shaughnessy*
   342 U.S. 580, 588-589 (1952) ........................................................................................8

*John T. v. Delaware County Intermediate Unit*
   2000 WL 558582 (E.D. Pa. May 8, 2000) ....................................................................20

*Kleindienst v. Mandel*
   408 U.S. 753 (1972).....................................................................................................7, 8

*Learning Resources, Inc. v. Trump*
   146 S. Ct. 628 (2026) ............................................................................................ *passim*

*Massachusetts v. NIH*
   770 F. Supp. 3d 277 (D. Mass. 2025) ...........................................................................18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983)........................................................................................................18

*Murphy Co. v. Biden*
   65 F.4th 1122 (9th Cir. 2023) .........................................................................................6

*N. D. v. Reykdal*
   102 F.4th 982 (9th Cir. 2024) .......................................................................................19

*N.H. Hosp. Ass'n v. Azar*
   887 F.3d 62 (1st Cir. 2018)...........................................................................................17

*Nat'l Cable Television Ass'n, Inc. v. United States*
   415 U.S. 336 (1974)........................................................................................................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
   567 U.S. 519 (2012)................................................................................................11, 12

**TABLE OF AUTHORITIES**
(continued)

Page

*Nebraska v. Su*
121 F.4th 1 (9th Cir. 2024) ...................................................................................................3

*New York v. Trump*
133 F.4th 51 (1st Cir. 2025) .................................................................................................3

*Nieves-Marquez v. Puerto Rico*
353 F.3d 108 (1st Cir. 2003) ...............................................................................................19

*Oceanic Steam Nav. Co. v. Stranahan*
214 U.S. 320 (1909) ..............................................................................................................8

*Orr v. Trump*
778 F. Supp. 3d 394 (D. Mass. 2025) ...................................................................................3

*Pacito v. Trump*
No. 25-1313, 2026 WL 620449 (9th Cir. Mar. 5, 2026) .....................................................10

*Pietersen v. Dep't of State*
138 F.4th 552 (D.C. Cir. 2025) .............................................................................................2

*Planned Parenthood of N.Y.C. v. HHS*
337 F. Supp. 3d 308 (S.D.N.Y. 2018) .................................................................................20

*Ramos v. Davis & Geck, Inc.*
167 F.3d 727 (1st Cir. 1999) ...............................................................................................16

*Roe v. Mayorkas*
No. 22-cv-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023) ................................17

*SEIU Loc. 200 United v. Trump*
420 F. Supp. 3d 65 (W.D.N.Y. 2019) ...................................................................................4

*Sig Sauer, Inc. v. Brandon*
826 F.3d 598 (1st Cir. 2016) .................................................................................................5

*Strickland v. Washington*
466 U.S. 668 (1984) ............................................................................................................16

*Taylor v. Sturgell*
553 U.S. 880 (2008) ............................................................................................................19

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Teles de Menezes v. Rubio*
  156 F.4th 1 (1st Cir. 2025)..................................................................................2

*Toll v. Moreno*
  458 U.S. 1 (1982)..............................................................................................16

*Trump v. CASA, Inc.*
  606 U.S. 831 (2025)...........................................................................................19

*Trump v. Hawaii*
  585 U.S. 667 (2018)..............................................................................10, 14, 16

*Tulare Cnty. v. Bush*
  306 F.3d 1138 (D.C. Cir. 2002)...........................................................................4

*Tulare County v. Bush*
  185 F. Supp. 2d 18 (D.D.C. 2001).......................................................................4

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
  578 U.S. 590 (2016)............................................................................................5

*U.S. Commodity Futures Trading Comm'n v. Kratville*
  796 F.3d 873 (8th Cir. 2015) .............................................................................19

*U.S. ex rel. Knauff v. Shaughnessy*
  338 U.S. 537, 543 (1950)....................................................................................8

*U.S. v. Kahriger*
  345 U.S. 22 (1953).............................................................................................12

*U.S. v. Texas*
  599 U.S. 670 (2023)...........................................................................................18

*W. Watersheds Project v. Bureau of Land Mgmt.*
  629 F. Supp. 2d 951 (D. Ariz. 2009) ...................................................................4

*Washington v. Trump*
  No. 2:25-CV-00602-JHC, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026).................6

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*
  586 U.S. 9 (2018)................................................................................................6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

STATUTES

5 U.S.C. § 553(d) ..............................................................................................................17

5 U.S.C. § 701(a)(2) ...........................................................................................................5

5 U.S.C. § 704 ....................................................................................................................3

5 U.S.C. § 706(2)(A) .........................................................................................................18

8 U.S.C. § 1101(a)(15)(H)(i)(b) .......................................................................................13

8 U.S.C. § 1182(f) (INA § 212(f)) ........................................................................... *passim*

8 U.S.C § 1184(c)(9) ..........................................................................................................9

8 U.S.C. § 1184(g)(5) .........................................................................................................9

8.U.S.C. § 1185(a)(1) (INA § 215(a)(1)) .............................................................1, 6, 7, 16

8 U.S.C. § 1356(m) (INA § 286(m)) .............................................................................10, 11

OTHER AUTHORITIES

146 Cong. Rec. S9449 (daily ed. Sep. 28, 2000), 2000 WL 1434331 ...............................9

Black's Law Dictionary (12th ed. 2024)........................................................................15, 16

H.R. Rep. No. 100-979 (1988)...........................................................................................11

Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90
    Fed. Reg. 46027 (Sept. 24, 2025) ................................................................................4

S. Rep. No. 106-260 (2000) ................................................................................................9

U.S. Citizenship and Immigration Services, Fiscal Year 2025: H-1B Petitions:
    Annual Report to Congress (Feb. 11, 2026) at 4, 7 .....................................................1

**INTRODUCTION**

Last fiscal year, 456,725 H-1B petitions were filed, including at least 26,949 for higher education, 6,536 for primary and secondary education, and 12,641 for clinical training.[1] Yet in the roughly five months following the imposition of the $100,000 tax challenged here on September 21, 2025, *only 85 petitions in total* were completed with payment of the tax. Doc. No. 93-11 at 2. The H-1B visa program—which Congress has maintained for three quarters of a century and upon which Plaintiffs have for years relied to address severe shortages of teachers, nurses, doctors, and other providers of vital public services—has effectively been shuttered on the whims of an executive branch bent on destroying it. But Defendants lack both constitutional and statutory authority to set contrary policy for noncitizen admissions and to levy taxes.

In opposing Plaintiffs' summary judgment motion and seeking dismissal of Plaintiffs' claims, Defendants demand that this Court defer to a vision of executive power so broad that the other branches of government are at best vestigial. To them, agency action escapes scrutiny merely on the President's say-so. A statute delegating authority to restrict noncitizen admissions in urgent situations becomes a license for executive agencies to upend longstanding policies set by Congress and impose ruinous taxes on public employers with no ability to pay them. And powers unequivocally vested in Congress are now shared by the "political branches"—meaning executive agencies can partake of legislative authority whenever they wish, and the courts can only watch from the sidelines.

This extraordinary power-grab boldly reaches for the stars even as it has no legal ground to stand on. This Court *is* empowered to review the Policy. Sections 212(f) and 215(a)(1) do not use vague or ambiguous words like "restrictions" and "regulations" to confer extraordinary authority on the executive to impose taxes on domestic employers, and Defendants' self-serving interpretations are not entitled to any special deference. *See Learning Res., Inc. v. Trump*, 146 S.

---

[1] U.S. Citizenship and Immigration Services, Fiscal Year 2025: H-1B Petitions: Annual Report to Congress (Feb. 11, 2026) at 4, 7, https://perma.cc/JF5Z-JTWJ

Ct. 628, 635–46 (2026). And powers that are vested in Congress by the Constitution are not there for the taking—only Congress can confer them upon the coordinate branches of government.

The Policy is *ultra vires* and violates the APA,[2] and the Court should enter judgment for Plaintiffs.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE REVIEWABLE.

Defendants raise a bevy of threshold arguments in an effort to insulate the Policy from this Court's review. None is persuasive.

### A.    The doctrine of consular non-reviewability does not apply here.

Defendants first argue that "consular non-reviewability" bars this lawsuit. Doc. No. 93 at 21-23. As the D.C. Circuit recently explained, however, "it is well settled" that the doctrine applies to challenges to "*particular* visa determinations by a consular officer"—not "challenges to the lawfulness of regulations or policies governing consular decisions." *Pietersen v. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025) (emphasis added); *cf. Teles de Menezes v. Rubio*, 156 F.4th 1, 10 (1st Cir. 2025) (cataloguing cases declining to apply the doctrine).[3] This case plainly falls into the latter category. Plaintiffs have challenged the lawfulness of an agency policy taxing employers; they do not challenge any individual decision to award or withhold a visa. Moreover, as Plaintiffs previously discussed, the statutes invoked by Defendants concern admissibility rather than visa issuance. *See* Doc. No 87 at 25 (citing *Trump v. Hawaii*, 585 U.S. 667, 695 (2018)).

Defendants cite no authority to the contrary. They primarily rely on *Dep't of State v. Muñoz*, 602 U.S. 899 (2024), but that case held only that "the action of an executive officer to admit or to exclude *an* alien is final and conclusive"—and even then, only when "Congress [] delegate[s] . . . the discretionary authority to admit noncitizens immune from judicial inquiry or interference." *Id.* at 907-08 (emphasis added). Tellingly, Defendants have not identified *any*

---

[2] Abbreviations in this reply carry the same meaning as in Plaintiffs' opening memorandum.

[3] Internal citations and quotation marks are omitted unless otherwise noted.

*case* in which a court has abstained from reviewing an agency policy that has the force of law on the basis of the consular non-reviewability doctrine.

## B.    The Policy is subject to review under the APA.

### 1.    The fact that the Policy implements a presidential proclamation does not insulate it from review.

Defendants argue that, because the Policy implements a presidential directive, any actions taken by federal agencies to implement the Policy are immune from APA review. Doc. No. 93 at 23-25. That is a radical assertion: Defendants' theory would permit the executive to shield any agency action from review through the simple expedient of a presidential decree. But the APA is not so easily circumvented; it plainly authorizes review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

Indeed, the APA fully applies to "final agency action" implementing a presidential directive. In *New York v. Trump*, the First Circuit distinguished between a decision purporting to "review the *President's* actions for consistency with the APA" and a decision that "reviewed— and ultimately enjoined—the *Agency Defendants'* actions under the Executive Orders." 133 F.4th 51, 70 n.17 (1st Cir. 2025). Defendants dismiss *New York* as a "thin reed," Doc. No. 93 at 25, but they fail to dispute that it is controlling precedent in this circuit and echoed in others. There is simply no basis in law to "except[] a final rule from APA review because it carried out a presidential directive." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *accord Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (expressing "doubt" that agency actions can be "insulate[d] . . . from judicial review under the APA" on the ground that they "are based on the President's Executive Order").[4] And numerous district court decisions—including recent decisions in this district—have held that "[t]he APA contains no exception for agency actions . . . that carry out an executive order." *See, e.g., Orr v. Trump*, 778 F. Supp. 3d 394, 419 (D. Mass. 2025). Put simply, "agency actions implementing a presidential action may be reviewed under

---

[4] The D.C. Circuit ultimately declined to address the availability of APA review in *Reich* because the plaintiffs had not pled an APA claim; they instead brought—and the D.C. Circuit allowed them to pursue—a direct *ultra vires* action against the executive order. *Id.* at 1326–32.

the APA, even when the agency action accomplishes a presidential directive." *SEIU Loc. 200 United v. Trump*, 420 F. Supp. 3d 65, 75 (W.D.N.Y. 2019).[5] That principle controls here as well. Contrary to Defendants' suggestion, Plaintiffs have never argued that the actions of the President are reviewable under the APA and have not sought review of the Proclamation itself. Rather, Plaintiffs have appropriately identified and challenged specific agency action pursuant to, but distinct from, the Proclamation.[6]

Even if there were a legitimate basis for arguing that the Proclamation somehow insulates the Policy from review, the Proclamation by its own terms makes clear that the ensuing Policy is not just the Proclamation writ large. The Proclamation repeatedly discusses the implementing agencies' role in promulgating the Policy's substantive terms setting the rights and obligations of affected parties. *See, e.g.*, 90 Fed. Reg. at 46,028-29 (§§ 1(c), 2(c)) (directing the Secretary of Homeland Security to determine when to impose the Policy's tax with respect to individual noncitizens, employers, and industries; directing DHS and the Department of State ("DOS") to "take all necessary and appropriate action"). Moreover, as Plaintiffs previously discussed, DHS and DOS revised the Policy through a series of substantive terms not found in the Proclamation; for example, a month after the Proclamation was issued Defendants substantively revised the Policy to clarify that the employers of certain existing visa-holders in the United States would not be subject to the Policy's tax—a distinction found nowhere in the Proclamation. *See* Doc. No. 87 at 14-15.

---

[5] Defendants rely heavily on *Tulare County v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), for their assertion that the Policy is "merely an extension of the President's action." Doc. No. 93 at 23. But other courts have strongly questioned the district court's reasoning in *Tulare County*, in part because the D.C. Circuit affirmed for failure to state a claim but declined to affirm the district court's reasoning on subject-matter jurisdiction. *See Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002); *see also W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 961 (D. Ariz. 2009) (citing discussion in *Zurich Ins. Co. v. Amcor Sunclipse North America*, 241 F.3d 605, 608 (7th Cir.2001), that district court opinion "has negligible authority" in such circumstances). And the court's observation in *Chamber of Com. v. DHS* that an agency "may not simply disregard a binding presidential directive," No. 25-CV-3675, 2025 WL 3719234 at *25 (D.D.C. Dec. 23, 2025), was not an endorsement of Defendants' argument that the Policy is not reviewable under the APA, as the court assumed that the claims were reviewable, *id.* at *11.

[6] Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 24, 2025).

## 2. The Policy constitutes final agency action.

Defendants also claim that the agency memoranda that make up the Policy do not constitute "final agency action" under the APA. Doc. No. 93 at 25-26. But, as Plaintiffs have explained, Doc. No. 87 at 26, the Policy bears both hallmarks of finality.

First, the Policy "mark[s] the consummation of the agency's decisionmaking process." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Defendants do not argue otherwise; they cannot seriously dispute that their decisionmaking process—however abbreviated it may have been—has resulted in a policy under which they levy a $100,000 tax on employers of H-1B petitioners.

Second, the Policy carries "legal consequences." *Id.* The First Circuit has held that, where an agency action imposes "stringent requirements" that have a "direct effect on . . . day-to-day business," this second prong of the finality inquiry is met. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016). The Policy carries legal consequences in the same way.[7] Defendants respond that their actions merely "reiterate and explain the Proclamation," and that "no rights or consequences flow from the memoranda themselves." Doc. No. 93 at 26. But that is just a different way of arguing that the APA does not allow review of agency actions that flow from presidential directives—which is wrong for the reasons already stated. *See supra* § I-B-1.

## 3. The Policy is not committed to agency discretion by law.

Defendants finally argue, Doc. No. 93 at 27, that Plaintiffs cannot bring an APA claim because "[t]here is no meaningful statutory standard against which to measure the agencies' implementation of the Proclamation." *See* 5 U.S.C. § 701(a)(2) (precluding review of decisions "committed to agency discretion by law"). But the Supreme Court has read that exception "quite narrowly, restricting it to those rare circumstances" in which "a court would have *no meaningful*

---

[7] Defendants cite the Supreme Court's statement in *Biden v. Texas* that the lower court erred in "postulating the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)) (ellipses in original). But that statement supports Plaintiffs: as the Supreme Court recognized, an agency statement of general applicability that implements an agency decision—like the Policy here—is a reviewable final action. *See id.*

*standard*" to apply. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (emphasis added).

This is not one of those "rare" cases, because Defendants themselves argue that Sections 212(f) and 215(a)(1) provide the framework against which the Court should evaluate the scope of the authority they claim to have been delegated by Congress. Defendants assert that these statutes confer boundless discretion on the executive, *see* Doc. No. 93 at 27, but that is an argument that the Policy complies with the statute—not an argument that there is "no meaningful statutory standard against which to measure." Regardless, Defendants' reading of those statutes is wrong. *See infra* § II-C.

### C.    The Policy is reviewable as *ultra vires*.

Defendants next argue that Plaintiffs have failed to state an *ultra vires* claim, and that *ultra vires* review is not available to challenge presidential actions. Doc. No. 93 at 27. Again, Plaintiffs do not challenge a presidential action. Plaintiffs are not, as Defendants claim, seeking to "avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." Doc. No. 93 at 28.  To the contrary, it is "well established" that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Reich*, 74 F.3d at 1328; *see Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) (acts by federal officials "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."). Courts "have repeatedly held that a plaintiff may challenge an executive order or other executive act using an implied, equitable cause of action." *Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866, at *21 & n.45 (W.D. Wash. Jan. 9, 2026) (collecting cases); *see also Murphy Co. v. Biden*, 65 F.4th 1122, 1129-30 (9th Cir. 2023) (recognizing a court's power to review *ultra vires* actions and rejecting the government's claim that an executive action is unreviewable because of a lack of a statutory cause of action); *Reich*, 74 F.3d at 1327-30 (recognizing cause of action and rejecting

6

government's claim that an executive action is unreviewable in the absence of a statutory cause of action).

Defendants repeatedly characterize Plaintiffs' claim as a "challenge [to] the Proclamation," citing *Dalton v. Specter* to argue that "longstanding authority holds" that *ultra vires* review of executive action is "not available" when "the statute in question commits the decision to the discretion of the President." Doc. 93 at 27-28 (quoting 511 U.S. 462, 474 (1994)). But *Dalton* concerned the opposite of the situation at hand; in that case, the ultimate action being challenged was a decision by the President himself, following an agency's recommendation—not a Policy promulgated by an agency, following the President's proclamation. That is to say, the Policy is at least one step removed from whatever discretion the President may have (and as discussed below, no relevant discretion is conferred by Sections 212(f) and 215(a)(1)).

## II.    THE POLICY VIOLATES THE CONSTITUTION AND IS *ULTRA VIRES*.

Defendants claim that Plaintiffs have failed to identify any "specific prohibition in a statute" that would render the Proclamation "entirely in excess of [the President's] delegated powers." Doc. No. 93 at 29 (citing *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 666 (2025)). For purposes of Plaintiffs' *ultra vires* claim, Plaintiffs need not identify a specific statutory prohibition, as Defendants suggest. To the contrary, the only query at hand is whether Defendants exceeded their delegated authority, if any. *See Reich*, 74 F.3d at 1327. Even if Plaintiffs were held to the heightened *ultra vires* standard raised by the Defendants, however, Plaintiffs' motion has identified just such a prohibition—where the Constitution confers upon Congress alone the powers to regulate the admission of noncitizens, *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972), and to levy taxes, *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974), action taken by an agency both without authorization and contrary to the INA is *ultra vires*.  While Defendants claim that any action they tether to foreign affairs and national security is at the total discretion of the President, *see* Doc. No. 93 at 28-29, Congress has repeatedly exercised its constitutional authority by regulating the admission of H-1B workers, Doc. 87 at 12-14. Defendants cannot simply recite the words "foreign affairs" and

7

"national security" as a substitute for demonstrating that Congress clearly intended to give the President authority to shut down the program they enacted and shepherded through numerous updates over more than seven decades. *See Learning Res.*, 146 S. Ct. at 642 ("And whatever may be said of other powers that implicate foreign affairs, we would not expect Congress to relinquish its tariff power through vague language, or without careful limits").

### A.    The Policy effectively nullifies the INA.

Defendants cannot genuinely dispute that Congress has "*plenary power* to make rules for the admission of aliens," and that the executive branch's rulemaking power here is only pursuant to Congress's delegation. *Kleindienst*, 408 U.S. at 766 (emphasis added); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government"); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 335 (1909) ("Repeated decisions of this court have determined that Congress has the power . . . to prescribe the terms and conditions on which [noncitizens] may come in . . . and to commit the enforcement of such conditions and regulations to executive officers.")

Seeking to muddy this clear separation of powers, Defendants suggest that Congress's exclusive control over the admission of noncitizens is shared between the "political branches"— that is, available on demand to the executive branch but conveniently unreviewable by this Court. Doc. No. 93 at 36. But the cases they cite for this peculiar view of our government's structure are among the "[r]epeated decisions," *Oceanic Steam*, 214 U.S. at 335, confirming that the executive branch only has the rulemaking power that Congress gives it. When the Court in *U.S. ex rel. Knauff v. Shaughnessy* described the admissions power as an "executive power," it meant only that "the decision to admit or to exclude an alien may be lawfully placed with the [executive]," 338 U.S. 537, 543 (1950), which no one disputes. Similarly, the Court in *Harisiades v. Shaughnessy* held that "any policy toward aliens is . . . largely immune from judicial inquiry or interference," 342 U.S. 580, 588–589 (1952), but did not question that the power to set such policy always lies with Congress in the first instance. Defendants insist that the

8

President has "inherent authority over immigration," Doc. No. 93 at 32, but their sweeping vision of that authority is inconsistent with the powers reserved to Congress in this area.

The INA is "a comprehensive federal statutory scheme for regulation of immigration and naturalization and set[s] the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011). As Defendants acknowledge and as Plaintiffs previously discussed, it includes multiple provisions explicitly governing the fees that may be charged in connection with an H-1B application under a wide range of circumstances. *See* Doc. No. 93 at 34-35, Doc. No. 87 at 12-14. Moreover, Congress has gone to great lengths to ensure that public and nonprofit employers are not affected by the most significant restrictions built into the H-1B program, such as the annual cap on available visas. *See, e.g.*, 8 U.S.C. § 1184(g)(5) (exempting certain government and nonprofit employers from the annual 65,000-visa cap); S. Rep. No. 106-260, at 21–22 (2000) (explaining that the cap exemption supports "people working in universities," who "are necessarily immediately contributing to educating Americans"). More specifically, Congress sought to ensure that cash-strapped public and nonprofit employers would be afforded relief from the full slate of fees it has imposed by statute on H-1B applications. *See, e.g.*, 8 U.S.C. § 1184(c)(9) (exempting education institutions and nonprofits from H-1B fee); 146 Cong. Rec. S9449 (daily ed. Sep. 28, 2000), 2000 WL 1434331 (discussing importance of excluding educational institutions, nonprofits, and governmental research organizations from the ACWIA fee).

Defendants argue that the tax imposed by the Policy does not "override" Congress's efforts because it merely "supplements the INA" by "add[ing] a restriction to what [the] INA requires."[8] Doc. No. 93 at 32. But this coy understatement ignores both Supreme Court precedent and the real and inevitable effects of the Policy on Plaintiffs and other employers lacking the means to

---

[8] Quoting the Proclamation, Defendants further describe the Policy as "impos[ing] higher costs on companies," Doc. No. 93 at 32, again underscoring their unwillingness to acknowledge the Policy's effects on public and nonprofit employers even as they wipe out the cost-relief Congress intended to provide to these employers.

pay $100,000 for a new hire. The Supreme Court has been clear that the executive branch may not run roughshod over Congress's efforts to address a particular problem. Here, not only has "Congress . . . stepped into the space" with legislation aimed at curbing the abuse of the H-1B program that Defendants now claim prompted the Policy, *see* Doc. No. 87 at 12, but it has also directly and repeatedly addressed the problem of ensuring that the program is not cost-prohibitive to government and nonprofit employers. *See Hawaii*, 585 U.S. at 690-91 (contrasting situation where "Congress [did not] attempt" to address problem identified in proclamation). Defendants do not and cannot dispute that the Policy simply wipes out Congress's efforts to protect such access. After all, what is the value of public employers being spared a $750 or $1500 ACWIA fee if Defendants can just tack on a tax for an amount that is 133 times the savings that Congress intended to provide?[9]

Congress's efforts to limit the most significant costs associated with H-1B applications bear particular attention. Section 286(m) of the INA, 8 U.S.C. § 1356(m), governs the core "fees for providing adjudication and naturalization services" in connection with H-1B (and other) visa petitions, and it is the only financial assessment for which Congress has delegated authority to the executive branch to determine the amount. Not only does Congress require that such fees be set through notice-and-comment rulemaking, but it caps them at the amount necessary for the federal government to provide this category of services: they "may be set at a level that will ensure recovery of the full costs of providing all such services." Defendants latch onto the word "may" as a "permissive word" conferring "discretion," Doc. No. 93 at 34, but of course "may" is a word that must instead be interpreted according to "legislative intent" and "obvious inferences from the structure and purpose of the statute." *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 198-99 (2000).

---

[9] Defendants' citation to *Pacito v. Trump* is misplaced at best. Doc. No. 93 at 33 (citing No. 25-1313, 2026 WL 620449 (9th Cir. Mar. 5, 2026)). That case involved the suspension of admissions of a class of noncitizens pursuant to Section 212(f), which is precisely the subject addressed by that provision.

10

Here, Defendants' interpretation of Section 1356(m) as permitting the executive branch to exact any further payments it wishes would render the statute's requirements meaningless. It would be inane for Congress to require the executive to limit fees to its own costs, and to ensure the accuracy of that fee-setting through a lengthy public process, if the executive could simply pencil in another line on the bill and assess a 5,000%, 10,000%, or greater tax on the transaction.[10] The requirements imposed by Section 1356(m) reflect that "the Framers gave Congress alone access to the pockets of the people," *Learning Res.*, 146 S. Ct. at 638, and that the statute delegates a purposefully limited authority that the executive may exercise *up to* the specified limit—for when Congress "relinquish[es]" the "power of the purse," it is explicit and deliberate in doing so, *id.* at 639.

B.    **The Policy imposes an unauthorized tax—not a "regulatory payment" or "penalty."**

Defendants argue that the $100,000 supplemental excise demanded of employers for each H-1B application submitted is not a "tax" but rather a "regulatory payment"—a term that unsurprisingly appears nowhere in the U.S. Code. Doc. No. 93 at 23-24. They rely principally on *National Federation of Independent Business v. Sebelius* ("*NFIB*"), and specifically the Court's analysis of its earlier decision in *Bailey v. Drexel Furniture Co.*, to argue that this "regulatory payment" is more akin to a "penalty" than a tax. Doc. No. 93 at 35-36 (citing 567 U.S. 519, 565-66 (2012) (discussing 259 U.S. 20 (1922)). Defendants first assert that the Policy cannot be a tax because the amount charged is so high that Plaintiffs cannot afford it—such a heavy price must surely be a penalty instead. Doc. No. 93 at 35-36. But *NFIB* and *Drexel* do not support this view. The penalty in *Drexel* was levied on employers at a rate of "10 percent of a company's net income—on those who employed children, no matter how small their infraction." *NFIB,* 567 U.S. at 565. By contrast the tax imposed under the Policy is not a flat penalty on each employer

---

[10] Of course, the legislative history only underscores Defendants' failure to acknowledge that Section 1356(m) places strict limits on the revenue that the executive branch may collect in connection with H-1B applications. *See, e.g,* H.R. Rep. No. 100-979, at 38 (1988) ("The conferees expect that funds generated by this Account shall not be used for any purpose other than enhancing naturalization and adjudication programs.").

like in *Drexel*; rather, it is a per-transaction tax imposed with each new H-1B petition. Further, the penalty in *Drexel* was characterized as such because it only applied to "knowing[]" misconduct consistent with "punitive statutes." *Id.* at 565-66. By insisting that the Policy is akin to a penalty, Defendants seem to concede that their aim is to punish American employers— including state and local governments—for availing themselves of a program duly enacted and actively maintained by Congress.

Defendants further rely on *NFIB* and *Drexel* to argue that, because the charge levied under the Policy is collected by DHS rather than the Internal Revenue Service, it is not a tax. Doc. No. 93 at 35-36. But this does not help Defendants: DHS is also responsible for assessing the tariffs that the Supreme Court recently held to be unlawful taxes. *See Learning Res.*, 146 S. Ct. at 641. Finally, recognizing that the Policy has brought the H-1B program to a halt, Defendants argue that the Policy cannot be a tax because the total monies collected by the United States in connection with H-1B applications has dropped. Doc. No. 93 at 36. However, while a tax by definition raises revenue, the amount is not material. *U.S. v. Kahriger*, 345 U.S. 22, 28 (1953). Taxes can be imposed with the primary aim of influencing conduct, *see, e.g.*, *Learning Res.,* 146 S. Ct. at 643; *NFIB*, 567 U.S. at 567, and something like a tobacco tax will see revenue plummet as it fulfills its purpose. Here, as Defendants have repeatedly admitted, the tax imposed by the Policy is likewise intended to shape the hiring practices of American "companies," Doc. No. 93 at 18, 32, and it is no less of a tax because of this aim.

Recognizing the impossibility of defending their position that the Policy imposes a "regulatory payment" that is not a tax, Defendants seem to suggest that the taxation power is not exclusive to Congress but instead is shared with the executive branch. Their argument is not clear, but appears to go like this: (1) taxes may be imposed under "immigration and commerce powers" in addition to under Congress's taxation power; (2) the immigration power is shared between the "political branches"; (3) the rights of "sovereignty" include the power to tax as a condition of entry; and so, (4) "the Government," with no distinction between Congress and the executive, may levy taxes as part of its "authority over immigration." Doc. No. 93 at 36-37.

Setting aside that H-1B visas do not concern "immigration" and are identified as "nonimmigrant visas" in the statute creating them, *see* 8 U.S.C. § 1101(a)(15)(H)(i)(b), this argument is more creative than correct. As the Supreme Court recently explained:

> Recognizing the taxing power's unique importance, and having just fought a revolution motivated in large part by taxation without representation, the Framers gave Congress alone access to the pockets of the people. They required All Bills for raising Revenue [to] originate in the House of Representatives. And in doing so, they ensured that only the House could propose the supplies requisite for the support of government, thereby reducing "all the overgrown prerogatives of the other branches. *They did not vest any part of the taxing power in the Executive Branch.*

*Learning Res.*, 146 S. Ct. at 638 (emphasis added). There is simply no debate that the taxing power is commended to Congress and Congress alone by the Constitution.

**C.    The provisions cited by defendants do not confer authority for the tax levied under the Policy or the effective suspension of the INA's H-1B Provisions.**

**1.    Section 212(f) does not authorize the Policy.**

Defendants assert two broad reasons that Section 212(f) confers upon the executive authority to implement a $100,000 tax on employers who avail themselves of the longstanding and lawful H-1B program by submitting a single visa petition. First, Defendants claim that the executive branch is entitled to deference whenever it utters the phrases "national security" or "foreign affairs." Doc. No. 93 at 29. Second, they propose that any statute—no matter how vague—that might possibly be read to confer a power to tax or undermine a duly enacted statute must be understood as conferring that power. Doc. No. 93 at 37.

Both arguments fail when confronted with the actual text of Section 212(f), particularly in light of the Supreme Court's recent guidance in *Learning Resources*, which forecloses reading vague or ambiguous statutory language as indicating Congress's intent to delegate its fundamental constitutional powers—like taxation or setting noncitizen admissions policy contrary to existing statute. Section 212(f) provides as relevant here:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

13

8 U.S.C. § 1182(f).

Five times Defendants remind this Court that Section 212(f) has been described as "exud[ing] deference" to the President. Doc. No. 93 at 15, 22, 27, 28, 39 (quoting *Hawaii*, 585 U.S. at 684). But repetition fails to transmute a passing characterization of the statute in a different context into support for their actions in this case. The Supreme Court has been exceedingly clear that, whatever deference the executive may be due in exercising the powers vested in or delegated to it, no deference is due to the executive's own interpretation of a statute as delegating a "core" power vested in Congress. *Learning Res.*, 146 S. Ct. at 642. Where "[t]he Framers gave that power to Congress alone—notwithstanding the obvious foreign affairs implications," only Congress' intent as to any purported delegation matters. *Id.* In any event, and as Plaintiffs have explained, *see* Doc. No. 87 at 24-25, whatever deference *Hawaii* recognizes does not seep outside the "sphere" of "defin[ing] the universe of aliens who are admissible." 585 U.S. at 695. It cannot reach a power to tax or to nullify the H-1B policy that Congress duly enacted as part of the INA. *Id.* at 689.

The Supreme Court has also foreclosed any reading of Section 212(f) that would confer a taxing power or authority to upend the H-1B provisions of the INA by requiring that purported delegations of congressional authority be read with a commonsense respect for what words mean and how Congress uses them. In *Learning Resources*, the Court held that the phrase "regulate . . . importation" cannot be read to confer a taxing power (in this case, to impose tariffs). 146 S. Ct. 642-43. In particular, the Court explained that "regulate" *just does not mean* "tax," and Congress does not say "regulate" when it means to confer a taxing power. *See* 146 S. Ct. at 643 ("[T]he facial breadth of 'regulate' places in stark relief what the term is not usually thought to include: taxation. . . . . [T]he Government cannot identify any statute in which the power to regulate includes the power to tax."); *accord id.* at 675-76 ("[T]he meaning of 'regulate,' both in common parlance and as Congress uses the word, does not encompass taxing.") (Kagan, J., concurring).

The same commonsense approach applies to Section 212(f)'s phrase "impose . . . restrictions." The word restriction is ordinarily defined as "[c]onfinement within bounds or

14

limits; a limitation or qualification," Black's Law Dictionary (12th ed. 2024)—nothing even approaching levying taxes or assessing a fee on one's employer. Defendants have not identified any circumstance in which Congress referred to a taxing power as a power to "impose restrictions," and one struggles to imagine a circumstance in which it would—given that "terms like 'duty,' 'tariff,' or 'surcharge'" are readily available. *See Learning Res.*, 146 S. Ct. at 676 (Kagan, J., concurring). Likewise, no reasonable reading of "impose restrictions" would indicate that Congress is granting the executive license to pull the rug out from under Congress's repeated efforts to ensure that the H-1B program is accessible to employers like Plaintiffs and not a dead letter.

Plaintiffs discussed in their earlier brief, *see* Doc. No. 87 at 25-26, that the major questions doctrine further counsels against discovering a "purported delegation [that] involves [a] core congressional power," *Learning Res.*, 146 S. Ct. at 639, and the Court's reasoning in *Learning Resources* redoubles that guidance where, as here, Congress's plenary powers are at issue. As with the statute purported to confer a tariff power in that case, Section 212(f) has never been invoked to impose a tax. *See id.* at 640 ("It is also telling that in IEEPA's half century of existence, no President has invoked the statute to impose any tariffs—let alone tariffs of this magnitude and scope."); *Chamber of Com. v. DHS*, No. 25-CV-3675, 2025 WL 3719234, at *16 (D.D.C. Dec. 23, 2025) (discussing Defendants' concession that Section 212(f) has never been invoked to "impose a monetary form of restriction"). And as with the taxing power claimed in *Learning Resources*, the Policy's tax, effectively suspending the H-1B provisions of the INA, carries great economic and political significance. While 456,725 H-1B petitions were filed in FY 2025,[11] over the course of nearly five months after the Policy was put into place only eighty-five $100,000 tax payments were made under the Policy. Doc. No. 93-11. Plaintiffs' earlier brief documents the monumental harms imposed on our nation's education and healthcare systems. Doc. No. 87 at 16-19.

---

[11] *See supra* n. 1.

Of further concern, while Section 212(f) authorizes action directed at individual "aliens" or a "class of aliens," the Policy, by contrast, imposes its tax only on domestic employers.[12] Even if the effects of the Policy are generously understood as directed toward noncitizen applicants, it stretches the term "class" far beyond its ordinary meaning to define a class based on whether members' prospective employers have yet paid a specific tax. *See* Black's Law Dictionary (12th ed. 2024) (defining "class" as a "group of people . . . that have common characteristics or attributes"); Calvin Gibson, et al., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (2024) at 3-23, available at www.congress.gov/crs-product/LSB10458 (cataloging past suspensions of noncitizen entry); *cf. Toll v. Moreno*, 458 U.S. 1, 13 (1982) ("The [INA] recognizes two basic classes of aliens, immigrant and nonimmigrant.").

### 2.    Section 215(a)(1) does not authorize the Policy.

For these same reasons, Section 215(a)(1) also cannot be read to confer the core powers Defendants claim. It provides that the President may impose on aliens departing or entering the United States "reasonable rules, regulations, and orders" and "limitations and exceptions," and no fair reading of those words includes the power to render the H-1B program inaccessible by imposing an unthinkably large tax on employers.[13]

---

[12] Defendants also incorrectly read *Hawaii* as extending Section 212(f)'s sphere from foreign affairs to domestic conduct, arguing that "the proclamation upheld in *Hawaii* was concerned about public safety and national security consequences within the United States." Doc. No. 93 at 31 (citing 585 U.S. at 677-80). This is not accurate. In *Hawaii*, the Court observed that the proclamation's "restrictions" were intended "to 'address' the identified 'inadequacies and risks' within the covered nations." *Id*. at 669. That is, the President claimed they were intended to respond to foreign activity. Here, Defendants admit *in the very first sentences of their brief* that the Policy is "[r]esponding to" domestic activity by American employers. *See* Doc. No. 93 at 13.

[13] Notably, Congress has further cabined the executive's discretion by requiring that such actions be "reasonable." The term imposes an objective standard on such action and invites inquiry into more than just the President's stated assessment. *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) ("reasonable person" assessment of speech is "objective standard"); *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("objective standard of reasonableness" for performance of counsel); *Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 731 (1st Cir. 1999) ("objective standard of constructive discharge" is "reasonable person" test). While the lawfulness of the unauthorized Policy ultimately does not turn on any particular definition of reasonableness, the inclusion of that language is one more indication that Congress did not intend for the executive branch to have unfettered discretion when acting with respect to the admission of noncitizens.

16

### III.    THE POLICY VIOLATES THE APA.

Plaintiffs are also entitled to summary judgment because Defendants failed to comply with the APA's notice-and-comment requirements and because the Policy is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

#### A.    Defendants failed to comply with required notice-and-comment procedures.

Defendants advance four arguments that the Policy was exempt from the notice-and-comment rulemaking process. Doc. No. 93 at 27-29. Most of these arguments can be reduced to some variation on Defendants' argument that the mere fact of a Presidential proclamation shields agency action from all APA review: for example, that their failure to follow the requirements of notice-and-comment rulemaking was harmless error because "the agencies were required by the Proclamation to collect the $100,000." Doc. No. 93 at 39-40. As already discussed, these arguments are wrong. *See supra* § I-B-1.

Defendants contend that the Policy is not a legislative rule requiring notice-and-comment rulemaking because all "new obligations" created by the Proclamation flow from the Proclamation itself. Doc. No. 93 at 40.[14] Yet the Policy explicitly imposes new obligations on filers of H-1B visa petitions—obligations that are nowhere specified in statute or regulation and require agency action to be implemented. The threshold for a legislative rule is a low bar: such a rule must "create[] rights, assign[] duties, or impose[] obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018). The Policy easily clears that bar.

---

[14] Defendants issued the Policy with immediate effect—without articulating any "good cause" for doing so. 5 U.S.C. § 553(d) (providing that "a substantive rule shall be made not less than 30 days before its effective date," unless, *inter alia*, an agency publishes a statement of "good cause" with the rule). No such statement was made, and Defendants posture in litigation cannot fix that. Likewise, the "foreign affairs" exception is not available in the immigration context as here absent the implication of "core foreign policy functions" like military actions or foreign diplomacy. *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, *17 (D. Mass. May 12, 2023). "[T]he foreign affairs exception applies… only when ordinary application of the 'the public rulemaking provisions [will] provoke definitely undesirable international consequences.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775-76 (9th Cir. 2018).

### B.    The Policy is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside" final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Defendants spend little time refuting the arbitrary nature of the Policy, instead repeating their arguments that the effects and implementation of a presidential directive are inevitable, and that an agency can *never* act "arbitrarily and capaciously [*sic*]" or "contrary to law" when it implements a legally permissible presidential directive. Doc. No. 93 at 41.

Defendants fail to engage with the points in Plaintiffs' opening brief. Doc. No. 87 at 28-31. The Policy represents a significant divergence from both past and current stated priorities of the Administration. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 523-25 (2009). Defendants "entirely failed to consider" or address Plaintiffs' significant reliance interests. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And Defendants "relied on factors which Congress has not intended [them] to consider" by basing the Policy on domestic economic policy considerations and failing to consider the statutory scheme Congress enacted. *Id.*

## IV.    PLAINTIFFS ARE ENTITLED TO THE REQUESTED RELIEF.

### A.    Congress provided vacatur as the appropriate remedy for a violation of the APA.

"The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025) (collecting authority) *aff'd*, 164 F.4th 1 (1st Cir. 2026). Defendants struggle to explain why vacatur, the specific remedy provided for by Congress in the APA, is suddenly outside of this Court's power; the best they can muster is their bare opinion that "while some courts employ vacatur as a remedy, the government believes remedies under the APA should reflect historical equitable remedies with the same limits."[15] Doc. No. 93 at 43. Plaintiffs

---

[15] Defendants argue that "vacatur under the APA" "must be tailored to injured parties before the Court." Doc. No. 93 at 43. For support they cite a non-precedential concurrence in *U.S. v. Texas*, 599 U.S. 670 (2023), but fail to address the Supreme Court's more recent observation that it has not "resolve[d] the distinct question whether the Administrative Procedure Act authorizes federal

(continued…)

maintain, as they have in the pages above, that Congress's lawful exercise of its powers should control over Defendants' whims.

**B.      Defendants' supposed "*res judicata* concerns" do not pose an obstacle to vacatur.**

In arguing against vacatur, Defendants gesture vaguely toward "collateral estoppel and *res judicata* concerns." Doc. No. 93 at 44. But those defenses are unavailable where, as here, there is neither identity nor privity among the parties in the earlier and later actions. *See Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008). Defendants' assertion that there may be some small overlap between agencies of Plaintiffs and either members of an organization not party to this case or hypothetical future class members in another action is not sufficient. In any event, "[i]t is a well-established general principle that the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests." *U.S. Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873, 889 (8th Cir. 2015); *see also California v. IntelliGender, LLC*, 771 F.3d 1169, 1177 (9th Cir. 2014); *EEOC v. Pemco Aeroplex, Inc*., 383 F.3d 1280, 1291 (11th Cir. 2004).

**C.      Plaintiffs are entitled to an injunction.**

Defendants' arguments that Plaintiffs cannot show irreparable harm underscore Defendants' lack of awareness or concern for the harm that the Policy is wreaking on the basic services that Americans depend on for survival. As just one example, countless school districts will be unable to fill vital roles, often those tasked with educating the most vulnerable students. Any disruption to education or development poses a threat of irreparable harm to children, for whom "a few months can make a world of difference." *Blackman v. D.C*., 185 F.R.D. 4, 7 (D.D.C. 1999); see also *N. D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm"); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 122–23 (1st Cir. 2003) (lack of student access to disability support personnel would

---

courts to vacate federal agency action." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025).

cause irreparable harm); *John T. v. Delaware County Intermediate Unit*, 2000 WL 558582 at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time").  Such harms as speak to the balance of hardships and the public interest, especially as "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (collecting cases).

Defendants fail to consider the challenges school districts, hospitals, and other affected employers now face on Defendants' account. To Defendants, schools that simply cannot afford their tax "cannot allege an irreparable injury based on their own decision not to participate, [*sic*] in the program, because *such injury is self-inflicted*," further suggesting that "they adjust[] their job postings or raise[] their salaries." Doc. No. 93 at 45-46 (emphasis added). But even a cursory glance at Plaintiffs' declarations should have shown Defendants that Plaintiffs have come to rely on noncitizen workers because they lack real alternatives, particularly given budgetary limits.

Defendants further argue that an adequate remedy at law is available because the $100,000 tax is reimbursable if a visa is not awarded. Doc. No. 93 at 46. The idea that public schools and hospitals have hundreds of thousands or millions of dollars sitting idle would be laughable if the real harms at issue were not so dire. State and local governments have turned to H-1B visas to meet their residents' needs in the absence of other options. Defendants' failure to reckon with these circumstances and the Policy's effects only underscores the Policy's remove from the existing statutory order against which it blindly thrashes.

## CONCLUSION

The Court should enter judgment in favor of Plaintiffs.[16]

---

[16] Defendants represent that the role of the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor in connection with the Policy is limited to (1) providing advice to the President at a later date and (2) developing regulations that they have yet to promulgate. Doc. No. 93 at 42-43. On the basis of that representation, Plaintiffs do not object to the dismissal of those four Defendants from this suit, without prejudice to Plaintiffs' ability to challenge any future actions taken by those Defendants.

April 2, 2026

Respectfully submitted.

**ROB BONTA**
 *Attorney General of California*

 /s/ *James E. Richardson*
MICHAEL L. NEWMAN*
 *Senior Assistant Attorney General*
MARISSA MALOUFF*
JAMES E. STANLEY*
 *Supervising Deputy Attorneys General*
DENISE LEVEY*
LORRAINE LOPEZ*
JAMES E. RICHARDSON*
JEANELLY OROZCO ALCALÁ*
  *Deputy Attorneys General*
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6341
james.richardson@doj.ca.gov


**KRISTIN K. MAYES**
 *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
JOSHUA G. NOMKIN*
 *Assistant Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

**ANDREA JOY CAMPBELL**
 *Attorney General of Massachusetts*

 /s/ *Julia S. Canney*
MICHELLE PASCUCCI (BBO No. 690889)
NITA K. KLUNDER (BBO No. 689304)
 *State Trial Counsels*
GERARD J. CEDRONE (BBO No. 699674)
 *Deputy State Solicitor*
JULIA S. CANNEY (BBO No. 717328)
 *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2851
Julia.S.Canney@mass.gov


**PHILIP J. WEISER**
 *Attorney General of Colorado*

 /s/ *David Moskowitz*
DAVID MOSKOWITZ*
 *Deputy Solicitor General*
NORA PASSAMANECK*
 *Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

21

**WILLIAM TONG**
 *Attorney General of Connecticut*

 /s/ *Francesca Testa*
FRANCESCA TESTA*
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5210
francesca.testa@ct.gov

**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
IAN R. LISTON*
 *Director of Impact Litigation*
VANESSA L. KASSAB*
JENNIFER KATE AARONSON*
 *Deputy Attorneys General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**ANNE E. LOPEZ**
 *Attorney General of Hawai'i*

 /s/ *Kaliko'onālani D. Fernandes*
DAVID D. DAY*
 *Special Assistant to the Attorney General*
KALIKO'ONĀLANI D. FERNANDES*
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KWAME RAOUL**
 *Attorney General of Illinois*

 /s/ *Aleeza Strubel*
ALEEZA STRUBEL*
 *Complex Litigation Counsel*
ELIZABETH MORRIS*
 *Deputy Chief, Special Litigation Bureau*
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
(312) 814-3000
aleeza.strubel@ilag.gov

**ANTHONY G. BROWN**
 *Attorney General of Maryland*

 /s/ *Virginia A. Williamson*
VIRGINIA A. WILLIAMSON*
 *Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

**DANA NESSEL**
 *Attorney General of Michigan*

 /s/ *Neil Giovanatti*
NEIL GIOVANATTI*
 *Assistant Attorney General*
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

22

**KEITH ELLISON**
 *Attorney General of Minnesota*

 /s/ *Joseph R. Richie*
JOSEPH R. RICHIE*
 *Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

**AARON D. FORD**
 *Attorney General of Nevada*

 /s/ *K. Brunetti Ireland*
K. BRUNETTI IRELAND*
 *Chief of Special Litigation*
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

**JENNIFER DAVENPORT**
 *Attorney General of New Jersey*

 /s/ *Max G. Lesser*
MAX G. LESSER*
 *Deputy Attorney General*
MELINA MENEGUIN LAYERENZA*
 *Assistant Attorney General*
25 Market Street
Trenton, NJ 08625
(609) 696-5366
max.lesser@law.njoag.gov

**LETITIA JAMES**
 *Attorney General of New York*

 /s/ *Zoe Levine*
ZOE LEVINE*
 *Special Counsel for Immigrant Justice*
VICTORIA OCHOA*
 *Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(212) 416-8329
zoe.levine@ag.ny.gov

**JEFF JACKSON**
 *Attorney General of North Carolina*

 /s/ *Daniel P. Mosteller*
DANIEL P. MOSTELLER*
 *Associate Deputy Attorney General*
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

**DAN RAYFIELD**
 *Attorney General of Oregon*

 /s/ *Thomas H. Castelli*
THOMAS H. CASTELLI*
 *Senior Assistant Attorney General*
100 S.W. Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

**PETER F. NERONHA**
*Attorney General of Rhode Island*

 /s/ *Kyla Duffy*
Kyla Duffy*
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov


**NICHOLAS W. BROWN**
*Attorney General of Washington*

 /s/ *Sara L. Wilmot*
Sara L. Wilmot*
 *Assistant Attorney General*
Kate S. Worthington*
 *Assistant Attorney General*
7141 Cleanwater Drive S.W.
P.O. Box 40111
Olympia, WA 98504
(360) 709-6470
sara.wilmot@atg.wa.gov


\* admitted *pro hac vice***CHARITY R. CLARK**
*Attorney General of Vermont*

 /s/ *Jonathan T. Rose*
Jonathan T. Rose*
 *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov


**JOSHUA L. KAUL**
*Attorney General of Wisconsin*

 /s/ *Faye B. Hipsman*
Faye B. Hipsman*
 *Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707
(608) 264-9487
faye.hipsman@wisdoj.gov

24