**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-13829-LTS |
| MARKWAYNE MULLIN, *et al.*, | |
| Defendants. | |

**<u>DEFENDANTS' MOTION TO STAY ORDER PENDING APPEAL MEMORANDUM</u>**
**<u>AND AUTHORITIES</u>**

**TABLE OF CONTENTS**

INTRODUCTION.............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

LEGAL STANDARD ....................................................................................................... 3

ARGUMENT.................................................................................................................... 3

I.          Defendants' Are Likely to Prevail on the Merits ............................................... 4

         A.     The Proclamation Does Not Violate the Taxing Clause. ………….…..….…………………………………………………………….. 4

         B.     Plaintiffs' *Ultra Vires* Cause of Action Fails......................................... 10

         C.     Plaintiffs' APA Claims Fail.................................................................... 12

II.        The Remaining Factors Support a Stay Pending Appeal................................. 15

**INTRODUCTION**

After reviewing evidence of abuse and exploitation in the H-1B nonimmigrant worker visa program causing substantial harm to American workers and national security, President Trump issued a Proclamation restricting the entry of new H-1B petitioners absent a payment of $100,000. Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation"). The President issued this Proclamation by invoking his sweeping authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to impose "any restrictions he may deem appropriate." This Court vacated the brief memoranda and guidance documents of the various agencies implementing the Proclamation. As a result, thousands of aliens may be able to petition and enter the country without making the payment. The Court's order thus threatens American workers' wages and jobs, undermining the American economy and national security. This Court should immediately stay its order.

Defendants are likely to succeed on the merits on appeal. The Court ruled the Proclamation was unlawful by concluding that the payment imposed a tax that was not properly delegated in Sections 1182(f) and 1185(a). That was wrong in several respects. First, tax or not, the payment is justified as an exercise of the foreign commerce or immigration powers. Congress's delegation clearly encompasses such powers. Second, tax or not, the delegations are broad enough to include the power to tax and there is no heightened standard for the delegation of the taxing power. Third, ultimately the payment is like a head count payment, not a tax, in purpose and function. The rest of the Court's analysis rises or falls with that merits determination, including all of the APA analysis. In addition, Plaintiff States cannot bring constitutional *ultra vires* claims that challenge the Proclamation as an excess of statutory authority. Nor can they bring APA claims to challenge the mere implementation of the Proclamation, as that is not a separate final agency action. Even if it was, the agencies could not deviate from the Proclamation, and thus notice and comment and

1

arbitrary and capricious review are meaningless. Moreover, several exceptions clearly apply to notice and comment procedures.

The United States will suffer immediate irreparable harms if this Court's order is not quickly stayed. Every day that passes more aliens can petition and enter the country despite the President's determination that their entry would be detrimental to the United States' interests absent a payment. In doing so, they will take important jobs from American workers and suppress their wages, even threatening national security. And even if Defendants ultimately prevail on appeal, it will be difficult to revoke those visas and remove aliens who did not pay. The Proclamation will functionally be thwarted if an immediate stay is not in place. On the other hand, the harm to the States is minimal and economic at best.

This Court should stay its order pending appeal or at least administratively stay the order to allow Defendants to seek emergency relief from the First Circuit. Regardless, Defendants respectfully request a ruling no later than June 16, 2026 or at least as expeditiously as possible so Defendants can quickly seek appellate relief.

## BACKGROUND

On September 19, 2025, President Trump signed Proclamation 10973 ("Proclamation"), which requires a $100,000 payment for certain H-1B petitions as a restriction on entry of alien beneficiaries. *See* Proclamation 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46027 (Sep. 24, 2025). Soon after, the implementing agencies issued short memoranda and website guidance to implement the Proclamation. On December 12, 2025, Plaintiffs commenced this action bringing four separate counts that alleged procedural and substantive violations under the Administrative Procedure Act (APA) and *ultra vires* claims challenging the validity of the Proclamation.

On June 8, 2026, the Court entered an Opinion and Order resolving the merits entirely in Plaintiffs' favor. The Court granted Plaintiffs' requested remedies of vacatur and declaratory relief, nullifying the agency actions implementing the $100,000 H-1B payment obligation. Doc. Nos. 106 (Op.), 107. In evaluating Count IV of the Complaint, the Court adopted Plaintiffs' separation-of-powers theory, ruling that the Proclamation impermissibly exacted a tax on H-1B petitioners absent an explicit statutory delegation from Congress. As a result, the Court also held that the agencies' faithful implementation of the entry restriction violated the APA. Specifically, the Court determined that the agencies acted in excess of statutory authority, that the payment constituted a legislative rule promulgated without mandatory notice-and-comment procedures, and that the rule was substantively arbitrary and capricious.

## LEGAL STANDARD

In considering whether to grant a stay pending appeal, courts ask "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *State v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors . . . are the most critical." *Id*. When the government is a party, its harms and the public interest "merge." *Nken*, 556 U.S. at 435.

## ARGUMENT

The Court should stay its Order pending appeal in the United States Court of Appeals for the First Circuit.[1]

---

[1] Pursuant to Local Rule 7.1(a)(2), Defendants conferred with Plaintiffs who oppose this motion to stay pending appeal.

3

I.      **Defendants' Are Likely to Prevail on the Merits.**

The President's Proclamation is a lawful exercise of his authority under 8 U.S.C. §§ 1182(f) and 1185(a). The agencies' dutiful implementation of the Proclamation was thus also lawful. This Court should stay its order pending appeal as a result.

### A. The Proclamation Does Not Violate the Taxing Clause.

This Court vacated the implementation of the Proclamation based on an erroneous ruling that the payment was a tax without a proper congressional delegation. That error infected the rest of the Court's analysis, from reviewability, to the cause of action, to the procedural APA claims. Defendants incorporate all of their arguments from previous briefing to support likelihood of success on the merits. Doc. Nos. 93, 100. Still, it is worth directly responding to some of the Court's rulings.

1.      First, even if the payment could be classified as a tax, that is irrelevant because the payment is justified under the immigration and commerce powers. For example, the Supreme Court invalidated several state "head count" payments imposed on aliens because the laws intruded on Congress's power over foreign *commerce*, not taxing. *See Smith v. Turner*, 48 U.S. 283, 421 (1849); *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875). The Proclamation's payment is nearly identical to those head count payments (though narrower in scope) and thus can be justified as part of the foreign commerce or immigration powers.

The Court attempted to discount those cases as turning on federalism and claimed the Supreme Court did not say such a tax could be justified federally as part of the commerce or immigration power. Op.23-24.  But less than a decade later the Supreme Court relied on those cases to make that exact "leap" regarding a federal "head count" payment imposed on every alien entering a U.S. port through "An Act to Regulate Immigration." *Edye v. Robertson*, 112 U.S. 580, 594–95 (1884) (citing Pub. L. 47–376). There, American companies sued, arguing the law was a

4

tax that violated the various limits on Congress's taxing power, such as the uniformity required for a direct tax. *Id.* The Supreme Court rejected these arguments, holding that:

> [T]he power exercised in this instance is *not the taxing power*. The burden imposed on the ship-owner by this statute is the mere *incident of the regulation of commerc*e—of that branch of foreign commerce which is *involved in immigration*. The title of the act, 'An act to regulate immigration,' is well chosen. It describes, as well as any short sentence can describe it, the real purpose and effect of the statute. Its provisions, from beginning to end, relate to the subject of immigration, and they are aptly designed to mitigate the evils inherent in the business of bringing foreigners to this country, as those evils affect both the immigrant and the people among whom he is suddenly brought and left to his own resources. *Id.* at 595–96. (emphasis added).

The Proclamation's payment requirement is virtually identical. It applies to certain aliens seeking to enter the United States in a particular way, can (but need not) be paid by an American company, and is designed to mitigate the external costs of bringing such aliens into the country. Thus the Proclamation's payment requirement stems from the foreign commerce power or immigration power. At a minimum, Sections 1182(f) and 1185(a) include a "sweeping" and "comprehensive delegation" of the foreign commerce power and immigration power to exclude aliens. *Trump v. Hawaii*, 585 U.S. 667, 685 (2018).

The "right" to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). And inherent in "sovereignty is the power to exclude," which "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 144, 148 (1982). The power to impose a payment to offset harms is thus incident to the power to exclude aliens from entry, which is the core delegation of Sections 1182(f) and 1185(a). As such, those broad delegations encompass the payment here as part of the commerce or immigration powers.

This Court's primary response was to discount these alternative sources of authority because the payment also involves the taxing power and Congress did not clearly delegate that authority. Op.23-24. But nothing the Court cites stands for the proposition that when an action implicates multiple fonts of authority it must be clearly delegated under all of them rather than just one. *See Edye*, 112 U.S. at 594–95 (head payment could satisfy Taxing Clause but did not need to because it was an exercise of the commerce power). The fact that Section 1182(f) clearly delegated part of the commerce and immigration power in sweeping language by itself justifies the limited payment requirement in the Proclamation.

2.      At a minimum, the sweeping congressional delegations in Sections 1182(f) and 1185(a) clearly encompass the payment here, whether it is a tax or not. Congress granted the President a "sweeping" delegation to impose "any restrictions he may deem to be appropriate" in Section 1182(f) and to set "reasonable rules, regulations, and orders… subject to such limitations and exceptions as [he] may prescribe" in Section 1185(a). *Hawaii*, 585 U.S. at 683-84 n.1. A "restriction" includes "[a] limitation imposed upon a person or thing; a condition or regulation of this nature." *Restriction*, The Oxford English Dictionary (2d. Ed. 1989). The Court's definition includes "[c]onfinement within bounds or limits; a limitation or qualification" Op.21 (quoting *Restriction*, Black's Law Dictionary (12th ed. 2024)). That term is expanded by the modifier "any," which means "of whatever kind… any means all." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999); s*ee also United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007) ("The word 'any' means 'without restriction or limitation.'"); *Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009). Thus there is no limit on the form the restriction may take, such as a tax.

The payment required by the Proclamation clearly places a limitation, qualification, or confinement on a person: an alien subject to the restriction on entry is limited from entering the

United States as an H-1B nonimmigrant worker unless they satisfy the additional qualification of a $100,000 payment. Fed. Reg. at 46,028 § 1. While many taxes are assessed after the fact, like on income or property, the payment here is a prerequisite to entering the United States and thus operates to restrict entry.

To get around this, the Court and Plaintiffs rely on *Skinner* and *Learning Resources* to argue that a delegation of the taxing power must be particularly clear and specific. Op.20-21. There are at least three problems with this logic. First, as explained, the power that authorized the payment is either the commerce or immigration power. The delegations in Sections 1182(f) and 1185(a) clearly include those authorities, and there is no special clear statement rule for those powers. Second, even if the payment is solely a tax, the Supreme Court has made clear that the taxing power does not "create a special nondelegation rule for revenue-raising legislation." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025) (citing *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 220–221 (1989)). That is precisely what the Court and Plaintiffs seek to impose—a heightened clarity standard that uses the magic word "tax." Absent such a heightened standard, the plain language of the Sections clearly includes the power to impose a tax as long as it restricts the entry of aliens. *See Chamber of Com. of United States v. United States Dep't of Homeland Sec.*, 815 F. Supp. 3d 73, 100 (D.D.C. 2025) (finding the delegation sufficient for a tax).

Third, even if those cases do require additional clarity for taxes, those very same cases prove that the delegations here are sufficient. Start with *Learning Resources*, which was careful to "not speculate on hypothetical cases not before us" and to limit its holding to IEEPA. 2026 WL 477534, at *11 n.4. The Supreme Court rejected the argument that "[t]he power to 'regulate . . . importation'" included a power to tax, explaining that "regulate[]" appears sixteen words away

7

from "importation," and noted that a broad construction of "regulate" to swallow the eight verbs in the remainder of the statute would render them "wasted ink." *Id.* at \*10–11. By contrast, Section 1182(f) contains no list of ways the President may "suspend" or "restrict" entry that would narrow the power conferred. Indeed, the Supreme Court distinguished IEEPA from Section 232(b) at issue in *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976), which did permit tariffs despite not expressly mentioning duties. *Id.* at \*13. The Supreme Court distinguished the delegation in Section 232(b) as "sweeping" because it "authorizes the President not only to 'adjust . . . imports,' but [] to take such action . . . as he deems necessary' to adjust the imports of a good." *Id.* (emphasis added). *Skinner* also relied on *Algonquin* as an example of a sufficient delegation of the power to impose "fees." *Skinner*, 490 U.S. at 224. No magic words required.

Sections 1182(f) and 1185(a) more closely mirror the language of the statute in *Algonquin* than IEEPA, as they too provide a "sweeping" delegation to impose "any restrictions he may deem to be appropriate." *Hawaii*, 585 U.S. at 684. Indeed, the modifier "any" makes Section 1182(f) broader than law in *Algonquin*.

The Court attempted to distinguish *Algonquin* because another part of the statute mentions duties. Op.22 (citing *Learning Res., Inc.*, 146 S. Ct. at 645–46). That section says "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction," 19 U.S.C. § 1862(a), so it certainly does not imply that the ability to "adjust . . . imports" includes modifying duties those duties. Indeed, neither *Algonquin* nor *Skinner* relied on that provision. Ironically, as Plaintiffs point out, other parts of the INA do allow for fees on visas "in addition to any other fees authorized by law." *See, e.g.*, 8 U.S.C. § 1356(u)(1); 8 U.S.C. § 1184(c)(12). So by the same logic, the context and delegation in Section 1182(f) should include the power to tax as a restriction on entry.

8

**3.**       While the delegation here is sufficient to justify the payment whether it is a tax or not, the payment is not a tax and thus should not be subjected to any heightened clear statement rule. Instead, it is a head count or regulatory payment that does not implicate the taxing power. *See Edye*, 112 U.S. at 595 (immigrant head count payment was not a tax); *State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983) ("deduction" on milk profits was a regulation payment, not a tax). The "functional" test from *NFIB v. Sebelius*, 567 U.S. 519, 565–66 (2012) confirms this. Unlike *NFIB*, the fee here is collected by DHS, not the IRS, making it more similar to the payment in *Drexel* collected by Labor. *Id*. And in *NFIB* the tax could never be more than insurance, but here Plaintiffs' argument is the payment is excessive in relation to H-1B petition fees (purposefully so). *Id.* Finally, "the defining feature of a tax" is to "raise[] revenue." *Learning Res., Inc.*, 146 at 638. Unlike *NFIB*, neither the purpose nor effect of the Proclamation is to raise revenue. The purpose is to incentivize the hiring of American workers and as a result H-1B revenue is predictably down by millions. Fed. Reg. at 46,027; ECF 93-11. Every factor cuts against the payment being a tax.

The Court disagreed by taking each factor in isolation and noting that taxes can be labeled various things, collected by DHS, and can serve regulatory purposes. Op.18-20. That misses the point of the functional test, which is that no one fact is dispositive, but all of them weighing against a payment being a tax (as here) strongly suggests it is not a tax. That is especially true where, as here, there are other powers that support the payment. The Court said that any money being received increases revenue and that is the purpose even if it is ineffective. Op.19. That would render any payment a tax. It is also false. Again, the Supreme Court found that a similar payment was not a tax because the "real purpose and effect of the statute" is to regulate immigration to "mitigate" the harms to the public and provide "for the protection of the citizens among whom

9

they are landed." *Edye*, 112 U.S. at 595–96; *see also State of S.C. ex rel. Tindal*, 717 F.2d at 887

("If regulation is the primary purpose of a statute, revenue raised under the statute will be

considered a fee rather than a tax."); *Brock v. Washington Metro. Area Transit Auth.*, 796 F.2d

481, 488 (D.C. Cir. 1986) (collecting similar cases). That mirrors the purpose of the

Proclamation—the only evidence of purpose here—which says the payment is to restrict entry of

H-1B nonimmigrant workers for national security and economic purposes, not to raise revenue.

Fed. Reg. at 46,027. Taken together, these factors establish the payment is not a tax. But even if it

was, other powers justify the payment and the comprehensive delegations in Sections 1182(f) and

1185(a) clearly encompass such a payment. For the same reasons, the APA excess of statutory

authority claim fails as well. Op.32-33. The Court was wrong to conclude otherwise or at least the

issue is debatable enough to warrant a stay.[2]

### B. Plaintiffs' *Ultra Vires* Cause of Action Fails.

Plaintiffs brought an *ultra vires* claim that the Proclamation exceeded Congress's

delegation of authority and thus violated the separation of powers. Doc. No. 1 Count 4. But parties

cannot transform a violation of a statute into a constitutional claim because "if all executive actions

in excess of statutory authority were i*pso facto* unconstitutional" there would be "little need" for

"specifying unconstitutional and ultra vires conduct as separate categories." *Dalton v. Specter*, 511

U.S. 462, 470 (1994). Making pure separation of powers arguments based on statutory limits is

impermissible because "plaintiffs would otherwise be able to avoid statutory limits on review by

---

[2] Plaintiffs also argued the major question doctrine, that the Proclamation overrode the H-1B program and associated fees in violation of the INA, usurped Congress's authority over immigration, and exceeded the statutory requirements of Section 1182(f). Doc. No. 87 at 11-13, 15-17. The Court did not rule on these arguments apart from ruling that a tax exceeds the authority under § 1182(f). Defendants thus do not readdress these alternative arguments at the stay stage but incorporate their previous arguments. Doc. Nos. 93, 100.

reframing any alleged statutory violation by the President as a constitutional one." *Glob. Health Council v. Trump*, 153 F.4th 1, 14-15 (D.C. Cir. 2025). That is precisely what Plaintiffs have attempted here.

The Court attempted to distinguish those cases by claiming Plaintiffs bring distinct statutory and constitutional claims. Op.14-16. But the claims are identical: Plaintiffs argue the President violated the separation of powers by exercising a taxing power that exceeded the authority delegated in the statutes. Doc. No. 1 ¶¶ 229-236 (making clear the question turned on whether the statutes delegated the power). In assessing the *ultra vires* claim, the Court itself said "the relevant inquiry here is whether the provisions of the INA granting the President discretionary powers to regulate the entry of noncitizens reflect a delegation of Congress's taxing power" and then analyzed the text of the statute. Op.20-23. Indeed, the Court concluded the payment "exceeds the scope of the President's discretionary authority under the INA." Op.29, 32-33 (excess of statutory authority is same analysis). So the fundamental question has always been whether the Proclamation exceeded Congress's delegation in Sections 1182(f) and 1185(a), which is precisely the type of constitutional claim several courts have said is impermissible. *See Glob. Health Council*, 153 F.4th at 14-15; *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026). Otherwise, exceeding the scope of a statutory delegation could always be reframed as a separation of powers claim.[3]  Moreover, Section 1182(f) is the type of statute "commits the decision to the discretion of the President" and thus the exact nature of the restriction is not subject to judicial review. *Dalton*, 511 U.S. at 474. Thus Plaintiffs' *ultra vires* claim fails at the outset.

---

[3] As a result, Plaintiffs must meet the heightened standard in *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 666, 681 (2025), which they have never attempted to satisfy.

11

### C.  Plaintiffs' APA Claims Fail.

In ruling that Plaintiffs succeeded on their APA claims, the Court made clear that its analysis all flowed from its ruling that the Proclamation exercised the taxing power without an adequate delegation. Op.29. The Court made clear that the "excess of statutory authority" claim is the exact same analysis. Op.32-33. Because the premise is wrong, the conclusion is flawed. Regardless, the APA claims fail on their own.

1.     To start, when an agency is simply implementing a power delegated to the President, that implementation is not challengeable as a separate final agency action. *See Chamber*, 815 F. Supp. 3d at 109 (collecting cases including *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001); *Detroit International Bridge Company v. Government of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016)). That is the case here, as Sections 1182(f) and 1185(a) delegate the force of law to the President directly in his discretion. The agencies are merely implementing that discretion. In ruling otherwise, the Court impermissibly collapsed its merits analysis with this distinct question of who is exercising the legal authority at issue.

2.     Similarly, the challenged memoranda are not "final agency actions" because no "rights or obligations have been determined'" by the memoranda from which "'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Nor did the agencies consummate any "decisionmaking process." *Id.* The Court disagreed, concluding the brief memoranda "resulted in a policy imposing a $100,000 payment." Op.29. But the memoranda did not set or impose the payment. The Proclamation itself did. By making it clear that the final agency action is the imposition of the $100,000 payment, the Court lays bare that Plaintiffs' claims are an impermissible challenge to the Proclamation itself. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (finding that the President is not an "agency" for purposes of the APA). The agencies

12

made no separate decision. To hold otherwise would be to circumvent the APA's limited waiver of sovereign immunity that excluded the President.

**3.** The Court also faulted the agencies for not engaging in notice and comment rulemaking for their brief memoranda because the President lacked discretion to impose the purported tax. Op.30-31. If the Court is wrong about the delegation (which it is), the Court seems to admit that the agencies would not have to go through notice and comment. *Id.*; *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012); *Bradford v. United States DOL*, 101 F.4th 707, 731 (10th Cir. 2024) (agencies cannot disregard binding order). Even so, the Court was wrong that exceptions to notice and comment did not apply because evidence was not provided to support them. Op.31-31. Nothing requires specific evidence that notice and comment will cause international harms. Regardless, the harms here are obvious for the foreign affairs exception, as aliens would flood into the country during this period causing chaos abroad as they attempted to do when the Proclamation was announced. *See* Doc. No. 1 ¶ 107 (recounting this situation); Ex.A ¶ 6. The same is true for good cause, as Section 1182(f) allows the President to restrict entry "whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" *Hawaii*, 585 U.S. at 683 (quoting 1182(f)). Subjecting implementation of such Proclamation to a long period of notice and comment rulemaking would undermine the entire statutory scheme and the time-limited Proclamation.

Regardless, Plaintiffs lack standing to bring a purely procedural claim and any failure to conduct notice and comment would be harmless. While redressability for a procedural injury is relaxed, a favorable ruling must be "substantially probable" to redress the injury if the procedures are followed. *Ctr. for Biological Diversity v. United States Dep't of the Interior*, 144 F.4th 296, 304, 314 (D.C. Cir. 2025). Similarly, failing to conduct notice and comment is harmless error when

13

the mistake had "no bearing on the procedure used or the substance of decision reached." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023) (quotation omitted). The Court simply concluded, without basis, that the procedures "could" have changed the decision. Op.31. But as explained, the agencies had no discretion to disregard the Proclamation. So not only "would [the agencies] be free to ignore the comments" meaning the "notice-and-comment procedure would be an empty, yet time-consuming, exercise," *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020), the agencies could *not* alter their decision, *Chamber*, 815 F. Supp. 3d at 111.

    **4.**    For the arbitrary and capricious claim, the Court again determined it collapsed with the analysis of whether the Proclamation properly exercised delegated authority. Op.33-34. Because it did, for all the reasons previously explained, the agencies' implementation of that Proclamation cannot be arbitrary and capricious. *See Bradford*, 101 F.4th at 731; *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (no arbitrary and capricious agency action where agency followed "Presidential rules that Congress expressly required it to follow"). The Court seems to agree that conclusion would follow. Op.33-34. In any event, Sections 1182(f) and 1185(a) do not permit litigants to "challenge" a Proclamation "based on their perception of its effectiveness and wisdom," nor does the does the Proclamation need to be "justified from a policy perspective" because the President need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Hawaii*, 585 U.S. at 686-87, 708 (citations and quotations omitted). Plaintiffs' arbitrary and capricious argument attempts an end run around this, ultimately

14

challenging the President's reasoning and chosen remedy. That is impermissible and requires a stay.[4]

## II.       The Remaining Factors Support a Stay Pending Appeal.

1.        The irreparable harm to the movant and public interest weigh in favor of the Government. Where the Government is the defendant, these factors "merge." *Nken*, 556 U.S. at 435. By vacating the implementation of the Proclamation, the purpose and effect of the Court's order is to block an exercise of the President's broad authority to suspend or regulate the entry of aliens whose entry he determined would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The Proclamation is directed at resolving "[t]he large-scale replacement of American workers," "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." 90 Fed. Reg. at 46027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields," instead replacing them with aliens with foreign loyalties. *Id.* Those are quintessential national interests, and the Court's order severely impedes the Executive's ability to safeguard them.

Indeed, every day the district court's order remains in effect, additional aliens will rush to seek classification and entry as an H-1B nonimmigrant worker. Ex.A ¶¶ 5-7. That is especially true of aliens abroad seeking cap-exempt jobs, who likely waited for their sponsoring employer to file a petition until an order like this and now can petition in droves. *Id.* It is also likely true of some of the 85,000 aliens who were selected in the lottery but whose employers have waited to

---

[4] It did not make sense for the Court to opine on these APA procedural challenges when they rise or fall with the delegation question. They do no independent work.

petition until closer to the upcoming June 30 deadline. *Id.* Those aliens will take vital jobs from Americans and depress their wages, undermining the Proclamation. And once those aliens enter the country, it is extremely difficult to revoke their visas, statuses, benefits, and remove them. *Id.* ¶¶ 7-13. Once they enter legally, they can raise various additional claims, are not subject to expedited removal, and are entitled to substantial procedures prior to removal. *See Id.*; 8 U.S.C. § 1229a. This could include the aliens family members who entered as well. Ex.A ¶ 10. In addition, the timing is especially important here where the Proclamation will lapse in three months absent an extension. As a result, without an immediate stay from this Court, the district court's order will be the final word on this important and consequential presidential policy.

Relatedly, the Government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). That is especially true where, as here, the district court's nationwide vacatur undermines the Executive Branch's constitutional and statutory authority over immigration and constitutes an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013). These factors decisively favor a stay.

**2.** The harm to Plaintiffs from a stay, on the other hand, is minimal. At most, their claims are economic and such injuries are not irreparable because courts (in theory) could order the one-time payments returned. *Cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021). Moreover, it is hard to credit the severity of the harm to these States that have multi-billion-dollar budgets and have emphasized the needs of their universities, which in turn have multi-billion-dollar endowments. As the district court in *Chamber* noted, the very universities that should be training and hiring American workers are heavily reliant on H-1B aliens. 815 F.

16

Supp. 3d at 94, n.4. The shortage of qualified workers is a problem of their own creation that they are perpetuating. At bottom, Plaintiffs' harms are based on conjecture that their efforts to train and recruit domestically will fail.

Likewise, it is difficult to credit the States' harms when they waited until December 12 to file a suit, nearly three months after the Proclamation went into effect. Doc. No. 1. Even still, the States waited until February 6 to move for any relief, nearly five months after the Proclamation went into effect and well over a month after the Government had prevailed in an identical case. Doc. No. 87; *Chamber*, 815 F. Supp. 3d at 112. That case was argued in the D.C. Circuit in March. The States' long delay and attempt to jump the line after another court rejected the identical claims of some of the same universities reflects gamesmanship, not an irreparable harm. *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (denying injunction due to delay, showing lack of irreparable harm). The equitable factors thus all favor an immediate stay.

## CONCLUSION

This Court should stay its order pending appeal or at least enter an administrative stay so Defendants can promptly seek emergency relief from the First Circuit. Regardless o, Defendants respectfully request a ruling no later than June 16, 2026 or at least as expeditiously as possible so Defendants can quickly seek appellate relief.

17

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

**David Byerley**
Senior Litigation Counsel

By: */s/ Jeffrey Alderette*
**Jeffrey Alderette**
Trial Attorney (D.C. No. 1738711)
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 860-9941
Jeffrey.Alderette@usdoj.gov
*Counsel for Appellants-Defendants*

18