UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, et al., Plaintiffs,

v.

MARKWAYNE MULLIN, et al., Defendants.

Civil Action No. 25-13829-LTS

BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES DISTRICT JUDGE

MOTION HEARING

May 29, 2026

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts 02210

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts 02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiffs:

Gerard J. Cedrone
Michelle R. Pascucci
Nita Kumaraswami Klunder
Julia Suzanna Canney
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108
617-963-2394
gerard.cedrone@mass.gov
michelle.pascucci@mass.gov
nita.klunder@mass.gov
julia.s.canney@mass.gov

James Everett Richardson
Office of The Attorney General
Civil Rights Enforcement Section
1515 Clay Street
Oakland, CA 94612
510-879-0285
james.richardson@doj.ca.gov

Marissa Malouff
Office of the Attorney General of the State of California
Civil Rights Enforcement Section
300 S. Spring Street
Ste 1702
Los Angeles, CA 90026
719-252-2589
marissa.malouff@doj.ca.gov

Counsel on behalf of Defendants:

Tiberius T. Davis
DOJ-Civ
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001
202-514-4357
tiberius.davis@usdoj.gov

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Leo T. Sorokin United States District Judge for the District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 13, Boston, Massachusetts, on May 29, 2926.)

(Case called to order.)

COURTROOM CLERK: Will counsel state your name for the record.

10:00 MR. RICHARDSON: James Richardson for plaintiff states.

THE COURT: Say again.

MR. RICHARDSON: James Richardson for plaintiff states.

MS. MALOUFF: Marissa Malouff for plaintiffs.

MS. PASCUCCI: Good morning, Your Honor. Michelle Pascucci for the plaintiffs.

MR. CEDRONE: Good morning. Gerard Cedrone from the Massachusetts Attorney --

10:00 THE COURT: Say your last name, again.

MR. CEDRONE: Gerard Cedrone from the Mass AG's Office.

MS. KLUNDER: Good morning. Nita Klunder from the Massachusetts Attorney General's Office.

MS. CANNEY: Good morning. Julia Canney, also from

the Massachusetts Attorney General's Office.

THE COURT: What's your last name?

MS. CANNEY: Canney.

THE COURT: Canney.

MS. CANNEY: Thank you.

MR. DAVIS: Tiberius Davis on behalf of the United States.

THE COURT: You're outnumbered.

MR. DAVIS: Seems like a fair fight then.

10:01 THE COURT: Sure.

Okay. So I've read all the papers. I'll hear you. A couple just observations about sort of argument and the way I think about arguments. I say this in just about every motion hearing, which is to say this: You don't have to say everything that's in your papers. I will and intend to consider everything in your papers. This will come as no shock to you, but I don't expect to rule from the bench. I expect to take this under advisement and issue a written opinion resolving all the pending motions.

10:02 So if you don't say it, you didn't waive it. Today the only way you're going to waive something is if you say, "I waive." So if you walked out right now, everything in your briefs is before me. I will consider all of it, and I'll resolve the pending motions. You won't be able to address everything that's in your briefs, so don't fret about that.

There's cross-motions, so I think what we'll do is I'll hear from the plaintiffs first because it's your case about whatever you want to say about any of the issues before me, and then I'll hear from you, Mr. Davis, about whatever you want to say about whatever the issues are, and then we'll see if there's anything else. Okay. So, go ahead.

MR. RICHARDSON: Your Honor, do you prefer that I stay here or use the podium?

THE COURT: Right there is fine.

10:02 MR. RICHARDSON: Good morning. Jimmy Richardson for the plaintiff states. I'd like to address the issues at the center of this case, although I'm also happy to address any concerns the court may have.

First, the H-1B policy is a tax. This is a much more straightforward analysis than the defendants suggest. The policy imposes a financial assessment on American employers in an effort to coerce behavior and without providing reciprocal benefit.

Second, the H-1B tax upends the Immigration and 10:03 Nationality Act, specifically with respect to Congress's consistent efforts not just to make visas available but, more importantly, to ensure that H-1B visas are accessible to public employers like plaintiffs.

Third, neither Section 212(f) nor 215(a)(1) of the INA delegated to the Executive authority to levy a tax on American

employers or to undermine the H-1B program. This should be clear from simple principles of statutory interpretation.

COURT REPORTER: I'm sorry, I'm sorry. Can you pull the whole microphone to you. It moves, so you don't have to lean in.

MR. RICHARDSON: I haven't been here for a long time.

Third -- oh, that is so much better -- neither Section 212(f) nor 215(a)(1) of the INA delegates to the Executive authority to levy a tax on American employers or to undermine the H-1B program. This should be clear from simple principles of statutory interpretation, but *Learning Resources* is especially helpful here in really driving home the point at the center of this case.

No matter how far defendants might argue that you could theoretically stretch the meaning of the statute's text, Congress does not bury extraordinary powers inside of generic or ambiguous language, and the court should rely on common sense and a healthy degree of skepticism rather than deferring to the Executive's latest attempt to see just how much it can get away with by claiming authority under 212 and 215.

Now, to begin, the H-1B policy imposes an unauthorized tax on American employers. Defendants have sought to re-brand the 100,000-dollar tax as a, quote, "regulatory payment," but the Supreme Court has been explicit as recently as last year in *FCC v. Consumers' Research* that whether an assessment by the

government constitutes a tax turns principally on whether there is some kind of exchange or equivalence between the amount charged and a benefit received by the payer.

By comparison, a good example of fees that are not taxes are the charges that are levied in connection with the adjudication of visas, including H-1B visas, pursuant to 8 U.S.C. 1356(m), which by statute are limited to the government's costs. So you kind of have this very clear counterpoint. Of course, a quintessential form of tax is a tax 10:05 implemented with the purpose of coercing behavior. And the Supreme Court discusses this in *Learning Resources* and *NFIB v. Sebelius* and *National Cable Television Association*. In that case, the court talks about how the government makes an assessment heavy in order to discourage behavior, explained that this is in the nature of taxes that are traditionally levied by Congress.

And defendants have been quite explicit that this is their formal goal with the H-1B tax policy. It is to curb the abuse of the H-1B program by making any use of the program 10:06 extraordinarily expensive. Indeed the proclamation itself summarizes the aims of the policy by asserting that it is, quote, "necessary to impose higher costs on companies seeking to use the program in order to address the abuse of the program."

Defendants go on at some length about how the H-1B tax

cannot possibly be a tax because by having its intended effect of barring employers like plaintiffs from accessing the H-1B program, the overall revenue to the United States from payments made in connection with the H-1B visas has decreased. This is not a meaningful inquiry.

A tax is defined in large part simply by the fact that it raises some amount of revenue, and defendants do not dispute that the amount of revenue raised by the H-1B tax has gone from zero last September to some millions or tens of millions of dollars today, even if defendants' efforts to make the program less accessible overall have had the obvious effect of decreasing the number of applications and the number of associated fees.

A helpful point of comparison might be a traditional sin tax, like a tax on cigarettes. If a jurisdiction imposed a significant tax on cigarettes, the government's aim would normally be for fewer and fewer people to buy cigarettes because they're discouraged and they can't afford the increased cost. So once a cigarette tax is imposed, overall tax revenue from the purchase of cigarettes, and that includes both the existing sales tax and the extra tax that's added on to just cigarettes, the overall revenue might actually decrease. And in the long run, if the tax has its intended effect, the total revenue from the purchase of cigarettes might fall to zero. But that doesn't mean the cigarette tax is no longer a tax just

because the amount of money coming into the government has gone down. The secondary effects here do not define the nature of the assessment itself.

The H-1B tax policy also contravenes Congress's clear intent, particularly with respect to access by public sector employers like plaintiffs. We discussed it in the briefs, so I won't go into great detail about how the power to administer policies regarding the admission of noncitizens is vested in Congress. There is a great deal of case law on this point.

10:08 While defendants repeatedly insist that the courts have no role in policing the separation of powers, Congress has never indicated its intent to exempt its delegations of admissions authority from judicial review. This is a situation where the power is vested with Congress in the first place. The Executive is claiming to have a share of that portion, and there's really nothing in Congress's intent to suggest that the court does not have a role in identifying what that boundary is.

Now, to that end, I think it's important to look
10:08 closely on Congress's purpose in implementing the H-1B program, specifically with respect to plaintiff states. I think our example helps to elucidate some of the issues here. But with respect to plaintiff states, they're universities or schools or hospitals and other instrumentalities.

Here Congress has gone to great lengths to ensure not

only that the program is available in the abstract but that it is accessible to plaintiff states and to our instrumentalities. For example, you know, Congress has exempted the annual H-1B cap -- exempted from the cap both government and nonprofit employers in higher education and research. Congress has also exempted these employers from various fees in an effort to keep costs down. Congress has taken a deliberate multi-pronged approach to ensuring that neither the H-1B cap, nor exorbitant costs, get in the way of obtaining H-1B visas for public 10:09 employers.

I think this is also supported by the way that Congress has maintained this approach. Even public sector employers have increasingly been forced to rely on H-1B workers due to the simple fact that the United States faces a severe labor shortage with respect to the core services that Americans need to survive and are often entitled to as a matter of right.

I think an especially glaring example here is a need for skilled professionals to support students with disabilities. Support for these students, they're entitled to 10:10 this support under federal and often under state law. This is not discretionary on the part of the schools. The students have the right to have this kind of disability support, but we have countless school districts that are unable to recruit special ed teachers, unable to recruit sign language interpreters, unable to recruit special education aids and

other personnel that are necessary to accommodate the needs of these students. So these school districts, they have to turn to overseas workers in order to meet their legal obligations and to ensure that their students have their needs met.

Now, this is a very unfortunate situation that we as a nation face these shortages of workers, but it is a situation that has developed over the past few decades for reasons that are complex and outside of the scope of this case. And the H-1B program has come to function as a sort of backstop that 10:10 allows our schools and our hospitals and our universities to fulfill their obligations when they are unable to obtain personnel through domestic means. And Congress has been well aware of the role that this program plays for public employers. And Congress has continued to maintain the H-1B program, and Congress has continued to adjust the H-1B program, adjust the INA in ways that preserve the accessibility of H-1B visas that our public employers are relaying on in order to fulfill their obligations.

So if defendants are claiming that Congress gave them 10:11 this power 50 years ago and one aspect of that power is that they can pull the rug out from public employers and take away this backstop that allows the schools to hire enough teachers and the hospital to have nurses on staff, you know, then before you get to the text of 212(f) and 215(a), it's already difficult to imagine that this is power that squares with

Congress's intent.

And I think this one point that the parties agree on as the central issue here ultimately is the interpretation of 212(f) and 215(a)(1). This is a statutory interpretation case and, namely, what powers specifically Congress intended to delegate through them.

And I should say from the outset that the only reason that we're discussing 212(f) and 215(a)(1) here is that the President and defendants have claimed that these are a source 10:12 of authority for their actions, which has been something of a reflex now whenever the Administration wants to take any extreme action that implicates noncitizens and where the administration can't find other authority. If someone were to ask us, you know, a year ago whether the President had the authority to impose a 100,000-dollar hiring tax on our schools, you know, we wouldn't have turned to 212(f) and 215(a)(1) instinctively as a source of authority.

The defendants' argument here is simple. 212(f) and 2159(a), quote, "exude deference." And this is a phrase that 10:12 is borrowed from the Supreme Court's decision in *Trump v. Hawaii*. But the defendants' repeated invocations of deference belie two distinct concepts. I think that comparing *Hawaii* and *Learning Resources* really helps us to clarify that difference.

In *Hawaii*, the court considered targeted action by the first Trump administration, also relying on 212(f), to suspend

entry by certain noncitizen foreign nationals originating in eight countries identified as having inadequate information-sharing practices and therefore posing a national security risk. Because 212(f) explicitly confers the power to suspend entry, the question faced by the court was not whether the President had the kind of power that was asserted. This was about suspension of entry, the words are in the statute. Rather the court considered whether the Administration had acted lawfully in how it exercised that power.

10:13 You know, so the court was not looking at what kind of powers the Administration had. It was looking at, in this undisputed power that you have to suspend entry, what is the who, what, when, where, how. And in that context, the court says we give deference to the President. But this was not really an issue of statutory interpretation as to what array of different kinds of powers the Administration could claim.

The deference the defendants demand here is something else entirely. Defendants claim an absolute license to decide what kind of authorities they are permitted to claim under 10:14 212(f) and 215(a)(1) and not just the who, what, where, when, how that are more clearly within the statute. And on this point I think the Supreme Court's recent decision in *Learning Resources* is a much more relevant guide. I won't go into the background of *Learning Resources* because I know Your Honor read the briefing here, but I would like to highlight that there are

I think three key lessons that we can take from *Learning Resources*.

The first is -- actually, I'll take a step back. I apologize. I want to make the point first that I think that, for our purposes, the language that's used in *IEEPA* discussed in *Learning Resources* and the language in 212(f) and 215(a) are materially the same. These are both very ambiguous sorts of terms that are being used to support extraordinary powers and powers that are vested with Congress in the first instance.

10:15 So I think we would submit that the phrase "regulate importation" in IEEPA is, for analytical purposes here, no different than the phrase "impose on the entry of aliens any restrictions" or, you know, "prescribe reasonable rules, regulations and orders," or "subject to limitations and exceptions." These are both phrases that are, you know, they're phrases that are generic enough that there's at least a theoretical way that you could stretch them to cover a whole lot of different actions. What *Learning Resources* is telling us is that you don't have to defer to the Executive when they 10:15 tell you that you have to accommodate the furthest resources that these reaches of what these words could possibly hit.

So three lessons that I think are takeaways from *Learning Resources*. The first is that Congress does not delegate the taxation power through ambiguous language. And whatever the phrase "impose on the entry of aliens any

restrictions" could theoretically be stretched to mean, it does not mean impose taxes on American employers. Taxes are -- I think this is a really important takeaway. Taxes are special. They are unique. And the powers that are conferred solely with Congress have to originate in the House of Representatives. Chief Justice Roberts goes on at great length about how this is a unique power and not something that Congress gives away casually or in terms that are less than clear.

The second point is the statute's past usage is 10:16 important in interpreting ambiguous language. Here we look at 212(f), which has been employed nearly 100 times, but until the second Trump Administration, it had never been used to impose a tax on anybody, let alone an employer, and it had never been used as such a blunt instrument to effectively nullify a program that Congress has repeatedly and consistently demonstrated its commitment to keeping accessible.

And third is that the Executive's invocation of foreign affairs or national security concerns does not counsel deference to the Executive's interpretation of the authority 10:17 that has been delegated.

There may be some deference due to the Executive's foreign policy decisions, but the court is very clear that statutory interpretation is just statutory interpretation, and we don't disregard Congress's wishes as to what authority it delegated in order to make room for the Executive's wishes

about the authority it would like to have been delegated.

So where Congress is vested by the Constitution with the exclusive powers to set admissions policy and the tax and where Congress has exercised the first program to create the H-1B program and deliberately withheld the second power in order to ensure that the H-1B program was accessible, under these circumstances, it defies common sense to think that Congress would bury the power to upend its efforts inside of a phrase like "impose restrictions," waiting for a future Administration 50 years later to discover it.

10:18 And perhaps one level up, I think the court in *Learning Resources* is giving the courts permission to rely more heavily on their common sense when they're faced with assertions of power that the Administration is making. And the phrase "common sense," it appears almost 30 times in the opinion and concurrences in *Learning Resources*. It really is, I think the undercurrent of the opinion is that, you know, I think there's a line of cases, many taking off from *Trump v. Hawaii,* that are focussing on deference. And I think this is maybe be putting the brakes on that and saying, you know, we have deference, we have lots of deference doctrines, but it has to be tempered by common sense. And it's especially tempered by common sense when you have a tax issue like you have here.

10:18 And the H-1B tax policy, it doesn't stand alone when it comes to left-field assertions of power that defendants

purport to have discovered in 212 and 215. I think you have to look at the *Harvard* case, where the Administration asserted the power to block entry to international students solely because they planned to enroll in a degree program across the river. You have to look at the *RAICES* case where the Administration claimed that the power in 212 and 215 to suspend entry also included the power to do the opposite, to remove people.

I think that you have to look at these like Judge Burroughs did, like the D.C. Circuit panel did, and they looked at these and they draw a line. They say, you know, this is not *Trump v. Hawaii.* This is not about a power that is squarely within the statute. And whatever deference the President received in that case, it can't sustain the fiction that Congress gave the President the power to block students from entry because they planned to attend Harvard, and it can't sustain the fiction that it gave him the power to impose this just insane, you know, multiyear salary tax on hiring teachers.

So, Your Honor, we would respectfully submit that defendants' claims of authority to levy taxes on public employers whenever they avail themselves of the H-1B program, these claims defy common sense, and the court is not obligated to defer to them in its interpretation of 212 and 215. Thank you.

THE COURT: Thank you. Let me see what the defendant has to say. Mr. Davis.

MR. DAVIS: Thank you, Your Honor. I think we should start with the language of 1182(f), which says that the President has the authority to impose any restrictions he may deem appropriate. The Supreme Court in *Hawaii* --

THE COURT: Any restrictions on anything in the world or any restrictions -- can he impose restrictions on how the courts operate?

MR. DAVIS: No. It's on the entry --

THE COURT: Okay, so it's limited to that.

10:21 MR. DAVIS: It is limited in time. It is also limited to the entry of aliens. Those are two important restrictions on there. I think that's responsive to the *RAICES* case in the D.C. Circuit where the court said this is an entry restriction power; it doesn't modify removal. That was just about the removal of aliens there.

So it does say, when it comes to the entry of aliens, it's any restrictions he may deem appropriate. And in *Trump v. Hawaii*, the Supreme Court said that every clause exudes deference, it is facially broad, that it is sweeping. And I

10:21 think it well encompasses the payments required here for entry for H-1B applicants. Again, it's just entry. We have had over 125,000 petitions from people within the United States that have not had to pay that because they're within the United States.

THE COURT: Let me ask you this. Does it matter to

your position whether this 100,000-dollar payment is deemed to be or determined to be a tax as opposed to a penalty or regulatory payment?

MR. DAVIS: So I think we win either way, Your Honor. But I do think if you buy the states' arguments, which I take to be -- and this was true in the *Chambers* case and the other cases challenging this -- that a tax has to be especially clear and especially explicit. I think the fact that we don't believe it's a tax makes this an easier case. I think the fact 10:22 that separate fonts of authority --

THE COURT: What is a regulatory payment? What makes something a regulatory payment as opposed to a tax?

MR. DAVIS: So I think one place to start is *NFIB v. Sebelius*, which relied on *Drexel*. It has a functional test, so nothing is dispositive, but it looks at a number of factors to see whether something is a tax or not. It looked at whether it was prohibitory or not, who was collecting the taxes, and is its purpose and effect essentially to raise revenue, which *Learning Resources* also talks about, a tax, a tariff, the point 10:22 is to raise revenue. So as far as whether it's prohibitory or not --

THE COURT: Does something have to have only one purpose?

MR. DAVIS: No. Obviously taxes, as they pointed out, can't have a regulatory purpose. *Learning Resources* says that.

But I think this just goes to the functional tax --

THE COURT: And the tariffs -- putting aside that the Supreme Court has resolved it, but as to tariffs, they have purposes beyond just raising money.

MR. DAVIS: That is correct, but I think *NFIB v. Sebelius* sets out this functional test where not one thing is dispositive but you look at them all together.

THE COURT: How would I think about the purpose? In other words, is it the dominant purpose, or is it just whatever

10:23 -- like, does it only matter, if the dominant purpose is to raise money, that makes it more like a tax, I take it?

MR. DAVIS: I think so, and also the effect. But, again, I don't think that alone is dispositive.

THE COURT: That would just point toward --

MR. DAVIS: Correct. I think who collects it does as well. In *Sebelius* they said, look, in *Drexel* it was labor. Here it's IRS. That counts in favor of it being a tax. Here it's USCIS. That counts against it being a tax. In *Sebelius* they said, look, the fee, the penalty that was placed on child

10:24 labor companies was meant to be prohibitory. It was extremely high. But the insurance there, the cost for the individual mandate could never be more than insurance, so that's by its nature not prohibitory.

The states' entire argument is that this is so high, it's prohibitory. We don't think it's completely prohibitory.

Obviously there are still petitions. We still have gotten people who have paid the petitions, but it has reduced the amount. And the effect is to incentivize companies to hire and train up American workers. And if they really --

THE COURT: Suppose the government decided that they wanted to encourage Americans to marry Americans because it's the greatest nation on Earth, right?

MR. DAVIS: Could they restrict the entry --

THE COURT: Yes or no?

10:24 MR. DAVIS: I mean, I agree it's the greatest nation on Earth.

THE COURT: Okay. And suppose the Administration decided -- it seems like it would be within the scope of the Administration -- decided that the greatest people on Earth are Americans. That would certainly be a reasonable position for a President to take, yes?

MR. DAVIS: Yes.

THE COURT: So if the Administration decided that if a U.S. citizen -- if a person who is outside the U.S. and was not 10:25 a citizen wishes to enter because they are married or are going to marry a United States citizen, say they already are married, to discourage that and encourage people to marry Americans, they said it's a 100,000-dollar regulatory payment. You could do that?

MR. DAVIS: I think under the scope of the statute,

yes. It's entry restriction on aliens. Obviously it doesn't apply to people who might not be citizens who are in the country, but it's an entry restriction on a class of aliens, so I do think that that would be encompassed.

THE COURT: What if it were a million dollars?

MR. DAVIS: Yes. I mean, they can suspend, they can fully say you just can't come in at all. They can also do restrictions they may deem appropriate. And I don't think any restrictions which plaintiffs in these cases have tried to say needs to be a total bar --

10:26

THE COURT: Could they say you have to turn over half your assets to the citizen; in other words, for the noncitizen to enter, the citizen spouse has to turn over half their assets?

MR. DAVIS: I think that's possible, Your Honor. I think this is a very sweeping power because the entry of aliens is something that's inherent in sovereignty. It's something that is partially inherent in the Executive --

THE COURT: But what you're saying is that's not a requirement of the alien. In other words, it's different to say the alien has to turn over half their assets to come in. I'm saying could they say to the alien, the U.S. citizen spouse who wants the alien to come in, who is sponsoring them in the immigration process, you have to turn over half your assets or you have to pay 100,000 or a million or 50,000. Can they

10:26

impose -- does the statute authorize the President -- let's start at the beginning. Absent the statute, the President couldn't require a United States citizen to turn over half their assets in order to have their future or present spouse who is not a citizen come to the United States.

MR. DAVIS: I think that's certainly much harder without a broad delegation from Congress. I do think the President, from *Knauff*, from *Harisiades,* has some inherent ability to restrict the entry of aliens. I think that would be much harder. I think under --

THE COURT: You're not willing to concede that the President couldn't require citizens to turn over half their assets or a huge payment such as 100,000 or a million dollars in order for, say, a spouse or a child, a noncitizen child to come?

MR. DAVIS: I definitely think that's harder, but if it's still a restriction on the entry of aliens and they want to satisfy that restriction, they could choose to do so. He obviously couldn't require in a vacuum just because they're married to an alien, for example --

THE COURT: Could it require that the citizen serve 30 days in jail?

MR. DAVIS: That would probably have criminal implications that would --

THE COURT: Civil detention. It's not punishment.

It's not for misconduct. It's to discourage -- and you could get released from jail the moment you said you weren't going to seek that person's entry.

MR. DAVIS: I think you'd have better arguments that that is punitive and maybe has to go through the Sixth Amendment and Eighth Amendment and things like that, so I think there could be potential limits there. But again, if it's a restriction on the entry of aliens and you're choosing to try to bring these aliens in, I think you have to satisfy those 10:28 restrictions.

THE COURT: So the power is not just the power to impose restrictions on the alien but the power to impose at least restrictions on anyone who is sponsoring or seeking the alien to enter.

MR. DAVIS: So I think that is a restriction on the entry of aliens. They can't enter unless this condition is satisfied. And there's plenty of visas that have domestic sponsors.

THE COURT: Sure, but is it limited, is the scope of 10:29 the authority limited to people who are the sponsor -- say, for example, here H-1B, you have an employer sponsor. So are there restrictions that the President can impose limited to either restrictions on the alien, like you have to fill out certain forms, you have to do certain things or what have you, which really isn't at issue in this case, but there are certain

restrictions in that regard, or what you're saying is the President could also impose restrictions on the sponsoring employer, in the sense that if you want this person to come in, in order for them to come in, you have to pay the 100,000, so the link is the sponsoring employer to that alien.

MR. DAVIS: I think in effect, yes. I think our point is that, regardless of who pays the fee, I mean, theoretically if the alien really wanted to come into the United States with a visa, they can --

THE COURT: They can pay the employer the 100,000.

MR. DAVIS: Right. So it's a restriction on entry, and that's really what matters. Who sort of pays or satisfies that I don't think really matters, as long as it's a restriction on the entry of the alien.

THE COURT: But it does say by its terms it's the employer that pays, doesn't it?

MR. DAVIS: I don't think the proclamation says that. I think that's usually how H-1B works because they're the sponsoring employer. But again, if the alien wanted to give the employer, here is $100,000 --

THE COURT: But your position would be that the Administration could say the employer has to pay.

MR. DAVIS: I think if the alien gave the employer the $100,000, saying, I want to come in, and they're like, okay, you've made the payment and we're submitting it, I think that

would be fine.

THE COURT: That would satisfy -- I mean, in terms of the law, I'm thinking about the scope of the authority. Could the President say, no, the $100,000 has to come from the employer? In other words, the whole point of the incentive is to discourage people to do this, and so the President says, if the employer doesn't pay, if the person just pays, it might discourage people, but it doesn't discourage employers, and I'm focused on American employers not doing this, so I want to 10:30 discourage them, so I want them to pay.

MR. DAVIS: Well, I don't think it is just focused on American employers. I think it's focused on aliens coming in and lowering wages and taking important jobs. So it is the entry of the aliens that is the harm to the national interest. That really is the focus. As Judge Howell pointed out in *Chambers*, the plaintiffs are too focused on what are the causes of the problem, but the restriction and the remedy is on the aliens.

And I do think that the restriction could be that way 10:31 especially because they're sponsors. I think that makes it easier. I think the fact that aliens have to pay it makes it easier, but I do think the restriction could be satisfied by others as long as it is a restriction on the entry of aliens.

THE COURT: Under the rules presently, yes. You're saying the alien could pay the 100,000. But my question is

still could the President say, in order for you to get -- you, XYZ Corporation, to get a visa, you must pay the $100,000, and not be reimbursed by the alien?

MR. DAVIS: I definitely think that's a harder case that you don't have to decide, but as long as it is a restriction on the entry of aliens, if somebody has to satisfy that condition to allow the entry, I do think that's encompassed by 1182(f). I think that would be possible. I think that is a harder case and one that you don't have to get into here.

THE COURT: Sure, I understand. I'm just trying to understand -- I'm not suggesting that's the current position. I'm trying to understand what the scope, the government's position of what the scope of that is. So like one scope is you can impose restrictions on aliens. A broader scope of authority is you can impose restrictions on aliens or on the people sponsoring them. The broader scope is you can impose -- you can say XYZ Corporation wants to bring in an alien. Can you impose a restriction, a regulatory payment on some other American entity that isn't sponsoring an H-1B visa?

MR. DAVIS: It's just completely unrelated?

THE COURT: Yes. In order for this alien to come in, suppose Apple wants an H-1B visa and suppose Google isn't asking for any H-1B visas. Can the President say for that H-1B visa, every tech firm, or some similarity to Apple's business

or what have you, has to pay a fee?

MR. DAVIS: That seems like it would probably functionally just be a suspension, which is obviously allowed.

THE COURT: But it wouldn't be a suspension because if the fee is paid, you can come.

MR. DAVIS: And if another company decides that they want to pay so that their competitor can bring in an alien, I suppose --

THE COURT: Well, can the President just say you have to pay?

10:33

MR. DAVIS: I don't think so. I think it has to be -- it is a condition on entry, and so you have to --

THE COURT: So in that sense --

MR. DAVIS: I don't think --

THE COURT: -- the sponsoring employer can just, as they can now, they can walk away.

MR. DAVIS: Yes, I think so. It has to be a choice on the entry.

THE COURT: The President doesn't have the power to go beyond imposing conditions on sponsoring people. It doesn't generally give them the authority to impose -- he can't say, for example, in order for aliens to -- I'm going to allow people to come in under H-1B visas, but I'm going to impose a fee on all employers in the United States, whether or not they take H-1B visas, and for that, everyone's going to pay, and

10:33

I'll allow them because those people don't have any ability to walk away.

MR. DAVIS: Yes. I think it has to have some connection to the entry of the alien and the purpose of the entry. And here the purpose is to perform high skilled labor. That's built into H-1B. That's sort of the point of them entering the country. That's what the restriction is targeted at.

Just to return to the sort of taxing point, I do think 10:34 its intended purpose and its effect is not to raise revenue. It has decreased the H-1B revenue by a substantial amount, and that's perfectly within the --

THE COURT: Is that the only way it's a tax, if its purpose is to raise revenue?

MR. DAVIS: No. Again, I think it's functional. You have also who is collecting it. It's not the IRS. It's USCIS. The fact that the states say it's prohibitory, that also under *NFIB* and *Drexel* cuts against it being a tax. Even if it could be a tax, and this is something Judge Katsas in the D.C. 10:35 Circuit was focussed on, just like *NFIB v. Sebelius*, there can be different fonts of power that justify this.

And I think even the states would concede that 1182(f) is delegating some either foreign commerce or immigration authority from Congress to the President, and those also can justify this.

THE COURT: As a tax, if it is a -- I know your position -- your position is, one, it's not a tax; but if it is a tax, you can do it anyway.

MR. DAVIS: Yes, because there are different authorities that would allow for this restriction. So one is foreign commerce power, which I don't think the states would contest is partially delegated by 1182(f). And one place you can look at are the head count cases from the 1800s that we cite. There, the states were putting what they called head counts to charge immigration coming into their state, trying to deter it.

And the challenge was saying, well, that's an unconstitutional tax, and also it violates foreign commerce, which is just Congress. One justice said he thought it was a tax, but none of the others could agree that it was a tax, but they said it doesn't really matter because this is implicating foreign commerce, and that's a power for Congress. So that sort of head count on immigration that the states were charging, the Supreme Court said that's really a foreign commerce power to Congress.

The other is obviously on immigration, *Knauff* and *Harisiades* make clear that, yes, Congress has authority here but so does the Executive, and this has been delegated. And part of the power to exclude, the sovereign power to exclude aliens from the country is also to impose restrictions on their

entry, including a tax.

If you look at the *Jicarilla Apache* case from the Supreme Court, that was about the ability of a tribe to tax nonmembers, and the court says, look, inherit in their sovereignty they can tax. But also, even if that wasn't the case, the fact that they can exclude these people means that they can also tax them as an incident of that. So I think that could also separately justify this.

But even if Your Honor thinks this is a tax, we don't think there's a heightened clarity for the delegation here. We think the delegation -- any restrictions you may deem appropriate is about as broad as it gets and encompasses this.

And if you look to *Skinner* and *FCC v. Consumers' Research*, they say there's no special delegation requirement for taxes versus any other power. We don't think that *Learning Resources*, which just came less than a year after *FCC*, changed that.

THE COURT: Any restrictions on the language in your view since you viewed it -- it's clearly broad language, but your view is any restrictions permits the President to impose a tax, at least a tax on the alien and whomever is sponsoring the alien, right?

MR. DAVIS: Right.

THE COURT: And not willing to go so far as to say it allows the President to impose a tax on other people.

MR. DAVIS: Right.

THE COURT: For example, you concede that the President doesn't have the power to impose an income tax on all people in the United States of, say, five percent surcharge in order to allow aliens to enter.

MR. DAVIS: Yes, that seems disconnected from the entry restriction that is just on everybody.

THE COURT: You're not willing to go so far as to concede that he can't do it.

10:38 MR. DAVIS: I don't think he could. I think that would be very hard to justify.

THE COURT: So are there any restrictions on any restrictions? Like, in other words, obviously, that, you would say, imposes conditions, such as filling out forms or it might be you can't come in with communicable diseases, he could say you can't come in unless you took a COVID vaccine.

MR. DAVIS: Yes, there was a COVID proclamation during COVID that required these things.

THE COURT: And you can't come in if you have Ebola.

10:38 MR. DAVIS: Right, yes. Also Title 42, but yeah.

THE COURT: So you could impose a tax at least on the alien or the sponsoring person or company.

MR. DAVIS: Correct, only on the entry of aliens.

THE COURT: Right. We're only talking about the entry of aliens, yes. So is there anything -- I guess you would say

that the other kinds of things that come to mind, you'd say that an incarcerative quarantine of an alien, putting aside Ebola or things like that, that would be within any restriction. The only issue would be does it run afoul of some constitutional provision.

MR. DAVIS: I think that's right. I think it is a very broad power. And I actually think, to shift to *Learning Resources*, where I think even if you sort of filed the arguments down to the point of looking at *Learning Resources*, 10:39 *Learning Resources*, the majority was only about the text there. They made very clear they were only dealing with the text of that statute. A majority didn't join a major questions piece, which we can get to. But the court was looking at the language that said regulation of importations separated by 16 words, and the court said it would read out those words just to have all this weigh on regulate importations. Those words give other powers that are more prescribed that would be swallowed essentially by regulation of importations. And the court said that they couldn't bear the weight of any tariff on any country 10:40 at any time to whatever extent the President wanted.

But the court contrasted that with *Algonquin*, which was another statute that said that the President could impose such actions as he deems necessary to adjust importations. And that section did not say anything about duties or tariffs; yet, the Supreme Court still said that allowed the President to

impose duties on oil coming in. And it described that language in *Learning Resources* there, saying, well, that delegation was more sweeping. In *Hawaii* and in *Abourezk* from the D.C. Circuit with Judge Ruth Bader Ginsburg at the time similarly says that this is sweeping.

And I think the language here is not really like that. It's not regulation of importation separated by 16 words. There are no limits on the types of things he can do with restrictions. There's no list of other powers. It's just suspend or any restrictions he may deem appropriate. 10:40 *IEEPA* and even the statute in *Algonquin* did not have the modifier "any," which the Supreme Court has made clear is a broadening term as well. So any restrictions he deems appropriate --

THE COURT: So could he say, instead of the 100,000-dollar fee, the sponsoring employer has to turn over ten percent of the equity in the company to the United States?

MR. DAVIS: I think if that's the condition on the entry of the alien, I think he could.

THE COURT: Could he say that the restriction on the alien is if you want the H-1B visa, you have to turn over 10 10:41 percent of your company not to the United States but to some third party?

MR. DAVIS: Possibly. Again, I think this is a very broad power in delegation. I'll note that, even at the time that this was being debated, there was pushback trying to limit

this power to just national like foreign affairs issues, problems that happened internationally. And a pushback was, well, what if there are problems with employment in the United States; shouldn't the President be able to suspend the entry of aliens to help employment in the United States. And so that amendment and that restriction on the power didn't pass as a result of that. And I think --

THE COURT: Can I consider the legislative history in terms of the meaning?

10:42 MR. DAVIS: So I don't really think it's particularly important, but I do think it goes to sort of two points. One, they try to argue it can't be domestic at all. I don't think that that's -- can't have any domestic purpose or effect. I don't think that's accurate. I think Congress was aware of this possibility and contemplated it. I also think for major questions doctrine, to the extent they're saying Congress couldn't have possibly imagined anything like this, I think that shows that Congress was contemplating these sorts of issues and these things.

10:42 I also think if you look at 1182, it's about the entry is a harm to national interests. That obviously considers things inside the country. *Hawaii* was considering the safety of national security. They point to a Ninth Circuit case, *Doe*. That was a stayed decision that was then reversed by the panel that said if you look at 1182, there's health restrictions,

there's public ward restrictions, a lot of 1182 is concerned with domestic policy concerns from the entry of aliens. So I don't think this is any different.

But going back to *Learning Resources*, again, they distinguished the case there in *IEEPA* from the statute in *Algonquin*, which again doesn't say duties or tariffs in the operative clause. It says adjust importations as he deems necessary. This is any restrictions. So I think if that allowed for duties, this could clearly allow for a tax.

10:43 If you look at *Skinner*, which is a case that a lot of the plaintiffs have relied on for saying that there's a heightened requirement of clarity for delegating a tax, *Skinner* pointed to *Algonquin* as an example of something that was sufficiently clear.

So I think this is sufficiently clear for at least this power, and Your Honor doesn't have to get into the scopes of all of these parades of horribles that could potentially happen when that is not before the court. I think this is well within the delegation under 1182(f).

10:43 If Your Honor has any more questions about the taxing piece of it --

THE COURT: No.

MR. DAVIS: So I would like to briefly talk also about the argument that this eviscerates H-1B, it undermines the INA. Courts have consistently rejected this sort of argument. The

Ninth Circuit just recently rejected almost identical arguments.

So, in *Pacito*, the President issued a proclamation that suspended the entry of all refugees for an indefinite period of time, and both the district court and the plaintiffs there said Congress created this reticulated scheme, there's a ton of requirements and vetting in it, there's also a cap like there is with H-1B, and so they argued that means Congress wanted some refugees to come in. And the Ninth Circuit said, nope, this is restriction in addition, even if it's sort of indefinite, even if it fully restricts them, it says suspend all aliens, so that's well within the power. *Trump v. Hawaii* says that as well. So that's not really an issue.

And here, I think this is even stronger because it's only a restriction of $100,000 for a year on the entry of some aliens who are --

THE COURT: Could it be 100,000 every year?

MR. DAVIS: I think it would have to be temporary in some sense. Now, almost no proclamation --

THE COURT: It would be a restriction on entry. If you want this person to enter, you have to pay the government $100,000 a year for next 20 years.

MR. DAVIS: That doesn't seem temporary.

THE COURT: Why does it have to be temporary?

MR. DAVIS: Because, well, suspend at the very least

does, and the Supreme Court said as much in *Hawaii*. Now, the Supreme Court also said that no previous proclamation had an end date, and you don't have to have a specific end date, but there needs to be some sort of conditions or ways --

THE COURT: So you're saying any restrictions is cabined by suspend?

MR. DAVIS: The understanding from *Trump v. Hawaii* is that it has --

THE COURT: I'm asking the government's position.

10:45 MR. DAVIS: I do think if you look at the text, that's not obvious because suspend is separated from any restrictions. We have operated under the assumption that it would be temporary, and obviously this is, it's 12 months, and then it can be renewed based on findings sort of similar to the one in *Trump v. Hawaii*. So we've operated under the belief that these restrictions are temporary and they can't exist completely for perpetuity.

THE COURT: Is there a legal position that the scope of authority is temporary? That is, the restrictions -- any 10:46 restrictions is in some way -- for example, the 100,000-dollar payment right now is just a one-time payment, right?

MR. DAVIS: Yeah.

THE COURT: But is the position that we could impose, say, for the future, for the entry of this alien, you're applying for a visa now, it was outside of the United States,

so they're coming in, it's $100,000 a year for 20 years?

MR. DAVIS: I think that is an interesting question I haven't thought a lot about because we've operated under the assumption that this is temporary and they've all been temporary to some extent, and *Trump v. Hawaii* says that. But I think if you do look at the language, the suspension clause is separated from the any restrictions clause, so I don't think it necessarily, based on that, would have to be temporary.

Obviously this one is. We've operated as if it is. 10:47 But, for example -- and the reason I'm saying this is Judge Howell I think persuasively in her decision was dealing with whether this is a class of aliens, and she noted that any class of aliens only modifies suspension. It doesn't actually modify any restrictions he deems appropriate. That just says any restrictions on aliens.

So she said that didn't modify across. And I think that might be the same for suspend. The suspend is inherently temporary by its nature, but maybe any restrictions is not, but we've continually operated on the assumption that it would be 10:47 temporary, that that's how proclamations tend to work, and obviously this one is. But I also note that this is not overriding any part of H-1B. You still have to meet all of the requirements. You still have to pay all the fees. If you paid the fee and you didn't meet the requirements, you would still be rejected. If you're in the United States and you meet the

requirements, you don't have to pay the fee, but you still have to meet the other requirements.

And if you look at -- they focus a lot on 1356, which isn't just about H-1B. It's a much more general provision. That's just about costs, and it has nothing prohibitive of any other fees or taxes or payment requirements. In fact, there are other, as they point to, fees throughout the INA that do apply to H-1B, such as the fraud and the premium processing. And if you look at those, they expressly acknowledge that this is in addition to any other fees.

10:48

So I think Judge Howell got it completely right that those do not prohibit any restrictions in addition, which is what *Hawaii* says 1182(f) is supposed to do. And I think if you take plaintiffs' position seriously that any sort of restriction or requirement in the INA means that there can be no additional requirements or else there's a conflict, that would eviscerate 1182(f) because 1182 is full of admission and admissibility requirements. That was true in *Pacito*. That was true in *Hawaii*.

10:49

The Ninth Circuit in *Hawaii* said there's a reticulated scheme for the entry of aliens. There's reticulated vetting on what's required. There's a visa waiver program for extra restrictions so some countries can come in easier. And the Supreme Court said there's ample authority to add restrictions in addition. That's not overriding anything. There's no

specific contrary restriction there.

And in *Pacito*, the court there I think drew a correct line, which is to say, look, if Congress said you can't do this, then obviously that would be a problem. And the example there was refugees are expressly excluded from the public ward charge. And so the court sort of mused, look, if you try to use a proclamation to impose that public ward charge by any other way, that would be a problem. So we think that that's correct.

10:49 And if you look at 1356(e), Congress has a section that says "where fees shall not be imposed." So Congress knows how to restrict these sorts of fees and has done so explicitly. I don't think we could override or contradict that provision, but Congress didn't do that for any of these other fees. They certainly didn't preclude any other requirements or taxes.

And as far as sort of a cap assumes that some people will come in or the lack of a cap assumes that universities get some special ability to bring people in, they made very similar arguments in *Pacito* that was rejected. The cap is a ceiling. 10:50 And just because Congress contemplated that some people might come in --

THE COURT: I understand. It doesn't preclude the President, for example, from suspending it to zero.

MR. DAVIS: Right, right. That's precisely what the Ninth Circuit said. So if you have any questions on the merits

part -- just briefly on the APA, I want to say Judge Howell went through the long lines of district court cases about merely implementing a Presidential proclamation, that that's not a final agency action. You're essentially just trying to challenge the Presidential action in another way, and that can't be challenged under the APA. I think that has special force here where 1182(f), Congress expressly gave the President the power of law to issue this proclamation.

THE COURT: Does that sort of depend on the merits 10:51 analysis in the sense that if 1182 authorizes what you call a regulatory payment or what they call a tax, either way, you say 1182 authorizes it. If it authorizes it, then you would say it's the President's action they're implementing and so it's not an APA, right?

MR. DAVIS: Yes.

THE COURT: I know this isn't your position, but if it said in 1182, the next sentence said, "And the President may impose no regulatory payments or taxes whatsoever in any way, shape or form under this or any other authority he possesses," 10:51 okay, putting aside that couldn't eliminate any well of constitutional authority he might have, but it certainly would appear to eliminate any statutory authority, so if it said that -- I know it doesn't, but if it did, then he would be stepping into -- to the extent he was doing this, have everything else the same, then wouldn't it be APA because he

would then be essentially directing the agencies to use whatever agency authority they had to do this? There's a question whether they have it or not, but then it would be APA review.

MR. DAVIS: Yeah. If the President had literally no authority and we weren't debating over the scope of it, I think that's right, or that seems like that would be ultra vires, sort of absence of authority.

THE COURT: Sure.

10:52 MR. DAVIS: I don't think it's ultra vires here. One, the count that they have says separation of powers, and the D.C. Circuit in *Global Health* and Fourth Circuit in *Sustainability Institutes* have taken from *Dalton v. Specter* the principle that you can't just bring an ultra vires claim for a violation of separation of powers when you're really fighting over the scope of statutory authority. So I think that forecloses that.

To the extent they're trying to say that it's ultra vires as to the statute, I think *NRC Regulatory*, the Supreme 10:52 Court case pretty recently says it has to be well in excess of the statutory authority and contrary to a specific prohibition. I don't think they have any specific prohibitions here. They just say this is exceeding the authority of 1182(f), and that's I think outside the scope of ultra vires.

THE COURT: Suppose they're right that it is a tax,

and suppose they're right that the President doesn't have the power to make a tax. Then what?

MR. DAVIS: I don't think there's review in this precise case. I think there might be a different situation. For example, *RAICES* in the D.C. Circuit, we didn't make the ultra vires argument because if they're right, you know, removals, just not entry, that's just an absence of authority. It really isn't necessarily about the scope. This is debating literally, as plaintiffs said, the interpretation of this phrase and the scope of that phrase.

10:53

I think that's normal statutory interpretation, and Congress knows how to create causes of action. They didn't do so in the statute. They didn't create a way of review for the statute, and it would be a complete circumvention of that if every time we have a dispute over the scope of the statute they can run to court and say ultra vires, ultra vires.

I would also point out they're not allowed to -- and they admit this -- enjoin the President or attack the proclamation itself. So they're trying to just go around that and say, well, we're going over the agency's implementation of it. But if all the agency is doing is literally ministerially implementing the proclamation, functionally they are going after the proclamation. They even say the thing that they're injured by, the policy, the decisionmaking is the imposition of the $100,000.

10:54

THE COURT: Is that an argument that there's no APA claim or there's no ultra vires claim or no relief at all?

MR. DAVIS: I think that's more APA, but I think the similar problems follow with the ultra vires.

On the APA point, that's not saying that there can never be review of anything. To the extent, for example, this proclamation tells the Department of Labor to engage in rulemaking on the prevailing wage, because the statute requires DOL to do rulemaking, so you can't just get around the rulemaking requirement by putting it in a proclamation. And they will go through notice and comment, and the notice and comment, whatever rule comes out, can be challenged under the APA.

To the extent they're given -- and this is like *Nebraska v. Su* or *Reich v. Chamber of Commerce* which they point to, to the extent they went through notice and comment or they have some discretion in how they implement it, that discretionary choices can be challenged.

But here what they're concerned about is the imposition of $100,000, and that stems solely from the proclamation, which itself has the force of law. And that's I think also different from a lot of Executive Orders, which generally Executive Orders are --

THE COURT: That's a force of law because he's invoking 1182.

MR. DAVIS: Right, that's correct. Without 1182, I don't think, just because he calls it a proclamation, it would make a difference. It's because Congress gave him --

THE COURT: It would just be mere words.

MR. DAVIS: Yeah. Well, so Executive Orders, for example, generally speaking, they direct the agencies to do things within their power, but they generally don't have force outside of the agencies themselves. And I don't think you can just put it in an EO and tell the agencies to engage in some
10:55 action and then escape APA challenge. Like, if the agency has to rule-make, if the agency has the authority, that agency actually can be challenged. I think the difference here is the proclamation --

THE COURT: Exercising authority delegated to the President, and that's why it's not APA.

MR. DAVIS: Correct. I think that's *Dalton v. Specter*. I think that's *Webster v. Doe*. I think these things all sort of follow together.

And I think notice and comments and obviously
10:56 arbitrary and capricious fail for those reasons as well. But notice and comment, in particular, the *Make the Road* decision from the D.C. Circuit says, look, the Secretary of DHS has the sole discretion to expand expedited removal, and it makes no sense to require her to go through notice and comment when it's in her discretion and nobody can do anything different. They

can just ignore the notice and comment.

So there's essentially no prejudice, which is exactly what Judge Howell said. I think the exact same thing is true here, and I think it would also undermine what the Supreme Court said in *Hawaii*, which is that the President has the authority based on 1182(f) --

THE COURT: Isn't the notice and comment the right for the public to be heard, and isn't the prejudice there the absence of being heard? If you have the right to notice and 10:57 comment, isn't that the right to be heard? Rather than just, well, we would have done the same thing anyway?

MR. DAVIS: So standing for those sorts of things, like the procedural standing is a little bit weird. You don't have to --

THE COURT: They --

MR. DAVIS: -- they would come out with a different decision but that they could. But I think here they couldn't because they would have to obey the proclamation, which is what has the force of law. So even if they went through notice and 10:57 comment, they couldn't consider anything different. That's exactly what *Make the Road* from the DC Circuit said.

THE COURT: They couldn't do anything different.

MR. DAVIS: They couldn't do anything different.

THE COURT: They could consider something different.

MR. DAVIS: I mean, they could look at the comments,

but they literally --

THE COURT: Well, first of all, presumably if they had to have notice and comment, they would read the comments. And then, presumably, they would think about whatever they read. And then, presumably, if they thought there was something worthy of consideration, they would report to the President that there's things of worth and consideration. And the President could choose to say, I'm not interested in considering that, right, or he could choose to say -- and 10:58 absent him saying change, they'd have to do what he originally said.

MR. DAVIS: I don't think that's enough even for standing for a notice and comment because there has to be some chance that they would change their mind, the agency itself.

THE COURT: For standing purposes.

MR. DAVIS: Yeah, even for standing purposes, much less for the merits. And I think that that would just sort of blow up *Make the Road*. You're not bound by *Make the Road*, but the D.C. Circuit did say this gave the Secretary sole 10:58 discretion, so it doesn't make sense to say you have to do notice and comment when she doesn't have to consider it.

THE COURT: Because in that circumstance it's solely a discretionary decision.

MR. DAVIS: Right, and here it's --

THE COURT: Not a nondiscretionary decision, you're

saying, so, by analogy, it's the same.

MR. DAVIS: Right. And then here I think it's any restrictions he deems appropriate. It's the power of the President. I also think it's important that, as *Trump v. Hawaii* says, he can do this any time he finds that it's in the nation's interest. So it can be fast. It can be for an emergency. Notice and comment obviously can take a very long time. We think at the very least that gives you good cause for the foreign affairs exception because, as *Knauff v. Shaughnessy* says, *Pacito* also says, there's this intersection with foreign affairs here. Plaintiffs only respond to that in a footnote saying that it just doesn't apply to immigration, but the cases don't reach nearly that far that they cite for that.

10:59

So we don't think notice and comment applies. For arbitrary and capricious, we think similar. They couldn't have made different decisions. Judge Howell says that, relying on *Bradford*, on *Shelly*. And weirdly, plaintiffs rely on the district court case in *Trump v. Orr*, but the Supreme Court there said, well, it's not arbitrary and capricious because they had to follow the President's say. I think that's doubly strong here when it's a proclamation and not just an Executive Order, that Congress gave the President himself the power to do this, not an agency.

10:59

THE COURT: Okay. Thank you. Very briefly, anything else?

MR. RICHARDSON: Yes, Your Honor. If I can respond to just a couple of points here. First, on the ultra vires point, the NRC standard, that applied in a situation where Congress had used the Hobbs Act to limit the scope of redress. That is not the case here, in a situation like this where we are claiming that the Executive is usurping power that rests with Congress, you know, Congress doesn't have to enact a statute saying the Executive can't take its power. And that's been the case going back to the *McAnulty* case.

11:00 I would note that with respect to the APA claims, *New York v. Trump* is the law in the circuit, and that case does make a very clear distinction between the Executive action and the following agency action, regardless of whether or not there's a difference, but here I think there is a very key difference.

We would point out, with respect to plaintiffs in particular, that the proclamation includes an exemption or at least the opportunity to have an exemption for individuals or employers or for entire industries. And nothing would have 11:00 stopped the agencies in this situation from exempting public employers. That wouldn't have been an abuse of their power. It would have been contrary to the proclamation. And it's a change they could have implemented. There were tweaks that are in the agency action that are different from the proclamation.

The agency, you know, made revisions over the course

of weeks following the proclamation, and there's nothing that would have stopped them from putting in place something that would have protected plaintiffs and exempted us from sort of the absurd consequences here.

So just kind of one example of a choice was made by the agency that is distinctive and is the kind of thing that the APA has intended to prevent happening. You know, the APA -- the Supreme Court has told us over and over again that exemptions from the APA are meant to be read extremely narrowly, and there's a presumption that APA review is available here. And I think the fact that the agency is coming in and, you know, using its discretion is a good example of the way that this is a legally distinct action here that is completely reviewable under the APA.

And if I could, I'd like to just also clarify on the *Knauff* and *Harisiades* cases that are discussed. What those cases say in full, they do describe the immigration power as being an Executive power, but they describe it as being an Executive power in nature, not a power that is vested in the Executive. And I think that's a very key difference.

If you look at the passage in *Knauff v. Shaughnessy*, it says that this is a power that is Executive in nature. And what that means is that even though it rests with Congress, Congress can delegate it, and that does not mean that it belongs to the President inherently. It just means that

Congress is allowed to decide the scope of what portion of that power it wants to hand over to the Executive.

THE COURT: Doesn't really your case turn on whether the monetary payment, whatever it is called, fee, payment, regulatory payment or tax, depend upon whether he has under 1182 the power to do that? And if he has the power to do that, then he can pretty much do this, and then he's directed it and they're doing it. If he doesn't have the power to do it, which is your position, different than the government's, then it's a 11:03 different case, right?

MR. RICHARDSON: Your Honor, I agree that that weighs heavily. Again, I think --

THE COURT: How am I to consider, like, the wisdom or lack of wisdom of imposing a 100,000-dollar fee, that is not really -- that's a different question than the authority to impose, as you would frame it, a tax, or as the government would frame it, a regulatory payment, right? But isn't that really the issue?

MR. RICHARDSON: Your Honor, I agree that is the 11:03 central issue, and if we can resolve that issue, it can resolve the case. I think --

THE COURT: I understand why you point out some of these considerations, to the extent there's APA review, why the APA review would be meaningful, and there would be things to consider and talk about, as opposed to -- well, I'll leave it

at that. That's how I'm understanding those facts as their relationship to this case.

MR. RICHARDSON: I don't disagree, Your Honor, that the analysis of the agency's authority is absolutely the central component in understanding the APA claims, especially, you know, the question of being in excess of a statutory authority. It relates to the arbitrary and capricious claim. Although there is more to the arbitrary and capricious claim. As Your Honor mentioned, there is value in hearing from affected parties.

11:04

If there were an opportunity for us to have ensured that our interests were heard, that may have weighed in, especially where the agency was making its decisions over a course of weeks, as it was tweaking this program, it could have exempted the plaintiff states from that.

And so Congress has the power to step in and say, Congress could have said in 1182(f), it could have said in 215(a)(1), if the President invokes these powers, it's not reviewable under the APA. Congress did not say that. And I think, given the pattern here, it's hard to say categorically that, you know, there's any clear law they're exempted from APA review.

11:05

THE COURT: Okay. Thank you.

MR. RICHARDSON: Your Honor, if I may, one more point. I'd just note the *NFIB* and the functional test, we would submit

that it is not this complicated. *NFIB* does not stand for the proposition that you have to look at a whole lot of factors, and there's not a core piece here about something like a transactional tax or a levy on a transaction or a levy on an action that is intended to coerce behavior and is taking money that is not reciprocal for a benefit that's being conferred. That is the entire analysis.

And I think if there's ambiguity on those points, you know, you might look to things like who is collecting the tax, 11:06 but plenty of taxes are being collected by agencies besides the IRS. The tariffs in --

THE COURT: I understand.

MR. RICHARDSON: Your Honor, I'll sit down. If you have any more questions, I'm happy to answer them.

THE COURT: No.

MR. RICHARDSON: Thank you.

THE COURT: One other question, Mr. Davis, I was just thinking about any restrictions. So these are public employers who are applying for H-1B visas, the plaintiffs are public 11:06 employers and they apply for H-1B visas. So could -- I know this isn't exactly the case. I'm just thinking about what's the scope of the authority on any restrictions. Could the government, federal government, impose a restriction that says if a public employer, such as a state or arm in some form of the state wants an H-1B visa, then in order to get that, the

state has to do X. It could be lower taxes, raise taxes, change the minimum wage, do something of that nature. So it would be a restriction. It's on entry. You could walk away because you don't have to ask for an H-1B visa, but if you want an H-1B visa, you have to lower taxes, you have to eliminate your income tax, or you have to raise your income tax, or you have to -- you could think of any numerous of other potential conditions. Could they do that?

MR. DAVIS: I think, two responses. One line you

11:08 could draw is that the restriction has to be connected to the entry of aliens in some way. That seems pretty far afield. I don't think the text necessarily has that in it, but you could infer it from the structure that it's about the entry of aliens.

I think, two, that sounds like, frankly, a Tenth Amendment problem that there could be commandeering or coercion as *NFIB* had the coercion piece on requiring a lot of funding.

THE COURT: But that would be -- in other words, you can do it under 1182, except the Tenth Amendment or their

11:08 inherent sovereign authority or whatever prevents it. But putting aside other considerations such as that, I'm asking -- your answer would be maybe you can't do it under 1182 because maybe given the very nature and structure and purpose of 1182, any restrictions has to have some, whatever the level is, it has to have some relevant connection to the entry of an alien.

Would that be the Department's position, that it's limited that way?

MR. DAVIS: I don't think we would concede that because I don't think the text clearly says that, but I think that would be a reasonable line to draw and one that, if the court was really concerned with that, could draw. But again, I don't think you need to get into that line-drawing problem here.

THE COURT: It isn't a position that the government

11:09 would accede to?

MR. DAVIS: I haven't thought about that particular line enough to be able to represent that on behalf of the government, no.

THE COURT: Okay. Thank you very much. I appreciate the thoughtful argument. Have a good day. I'll take it under advisement. Thank you all.

(Adjourned, 11:09 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 17th day of June, 2026.

/s/ Kelly Mortellite

______________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter