No. 26-1699

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————

State of California, *et al.*,

*Plaintiffs-Appellees*,

v.

Markwayne Mullin, *et al.*,

*Defendants-Appellants*.

———————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————

## EMERGENCY MOTION FOR STAY PENDING APPEAL

———————————————

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant*
*Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue
 NW
Washington, DC 20530
(202)-860-8970

*Counsel for Defendants*

After reviewing evidence of abuse in the H-1B nonimmigrant worker visa program causing substantial harm to American workers and national security, President Donald Trump issued a Proclamation restricting the entry of new H-1B petitioners absent a payment of $100,000. Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (Proclamation). The President issued this Proclamation by invoking his sweeping authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to impose "any restrictions he may deem appropriate." Plaintiffs in another suit quickly sought to enjoin the Proclamation, but the court ably dispatched their claims. *See Chamber of Com. of U.S. v. Dep't of Homeland Sec.*, 815 F. Supp. 3d 73, 100 (D.D.C. 2025). Unsatisfied, and months behind, Plaintiff States here took a second shot.

The district court granted their wishes, vacating the agencies' brief memoranda and guidance documents implementing the Proclamation. As a result, thousands of aliens may be able to enter the country without making the payment. The district court's order thus threatens American workers' wages and jobs, undermining the American economy and national security. This Court should immediately stay the order.

Defendants are likely to succeed on the merits. The district court ruled the Proclamation was unlawful by concluding that the payment imposed a tax that was not properly delegated in Sections 1182(f) and 1185(a). That was wrong in several

1

respects. First, the plain text of the statutory delegations includes "any restrictions," such as a one-time payment. Second, even so, the district court was wrong that the payment could only be justified as a tax and thus the authority was not clearly delegated. Third, tax or not, the payment is justified under the broad delegation.

The rest of the district court's analysis rises or falls with that merits determination, including the APA analysis. In addition, Plaintiff States cannot bring constitutional *ultra vires* claims that challenge the Proclamation as an excess of statutory authority. Nor can they bring APA claims to challenge the ministerial implementation of the Proclamation. The agencies could not deviate from the Proclamation, and thus notice and comment and arbitrary and capricious review are meaningless.

The remaining factors also favor a stay. Defendants will suffer irreparable harm if the district court's order is not stayed. Every day that passes more aliens can petition and enter the country despite the President's determination that their entry would be detrimental. And even if Defendants ultimately prevail on appeal, it will be difficult to revoke those visas and remove aliens who did not pay. The Proclamation will functionally be thwarted if an immediate stay is not in place. On the other hand, the harm to the States is minimal and economic at best. This Court should stay the district court's order.

# BACKGROUND

## I.   Factual Background

On September 19, 2025, President Trump signed the Proclamation requiring a $100,000 payment for certain H-1B petitions as a restriction on the entry of alien beneficiaries. 90 Fed. Reg. 46027. The President issued this Proclamation because he found that the abuse of the H-1B program led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and created "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." *Id*.

The President imposed this restriction under Congress's "sweeping" and "comprehensive delegation[s]" in Sections 1182(f) and 1185(a) of the Immigration and Nationality Act (INA). *Trump v. Hawaii*, 585 U.S. 667, 684-85 (2018). Section 1182(f) "exudes deference to the President in every clause," stating:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. *Id.* (quoting 8 U.S.C. § 1182(f)).

Section 1185(a) allows the President to set "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a).

The Proclamation instructed the Secretary of Homeland Security to restrict decisions on new H-1B petitions not accompanied by the $100,000 payment, instructed the Secretary of State to confirm payment before approving any applications, and directed both Departments take all necessary steps to implement the Proclamation. 90 Fed. Reg at 46,028-29. Soon after, the implementing agencies issued short memoranda and website guidances to implement the Proclamation. ECFs 84-3 (USCIS memoranda); 84-1 (CBP guidance); ECF 84-3 at 4 (State Department FAQ); ECF 93-3 (State Department guidance).

The H-1B program allows for the classification of qualified temporary foreign workers to perform services in a "specialty occupation" based "upon petition of the importing employer." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(c)(1). For some petitioners, Congress capped the number of visas while for other petitioners their petitions are cap-exempt. 8 U.S.C. §§ 1184(g)(1)(A) (Regular Cap of 65,000), 1184(g)(5)(C) (Master's Cap of 20,000), 1184(g)(5)(A)-(B) (cap-exempt). For petitions subject to the cap, a registration-based selection process (lottery) is used in March to select aliens who may be petitioned for by employers. Prospective petitioners who were selected generally have until June 30 to file a petition. 8 C.F.R. § 214.2(h)(8)(iii).

## II.  Procedural History

Nearly three months after the Proclamation issued, on December 12, 2025, 20 States filed this action challenging the Proclamation in four counts alleging that its

implementation was *ultra vires* for intruding on Congress's power over immigration and taxation and for procedural and substantive violations of the Administrative Procedure Act (APA). ECF 1. Two months later, on February 6, 2026, Plaintiffs filed for summary judgment (ECF 87) and Defendants cross moved (ECF 93).

On June 8, 2026, the district court issued an opinion (ECF 106 (Op.)) and order (ECF 107) granting summary judgment for Plaintiffs and vacating the implementation of the Proclamation. The district court first held that consular non-reviewability did not apply because the challenge was to a prospective policy. Op.11. The district court then held that the *ultra vires* claim was proper because it raised a separate constitutional claim. Op.13-16. The district court next ruled that the Proclamation set a tax that was not within scope of Section 1182(f) or 1185(a). Op.17-26. As a result, the district court also ruled that the agencies' implementation of the Proclamation was not merely carrying out a lawful presidential action but was instead a final agency action that could be challenged under the APA. Op.26-30. The district court made clear that most of its analysis flowed from its ruling that the Proclamation imposed an undelegated tax. Op.29, 32-33. Thus, the district court ruled that the Proclamation violated the APA by not following notice and comment rulemaking, exceeding statutory authority, and being arbitrary and capricious. Op.30-36. The district court did not resolve Plaintiffs' alternative arguments that the Proclamation otherwise exceeded the scope of the INA, improperly overrode the H-

5

1B program, or usurped Congress's authority over immigration. The district court ultimately determined that nationwide vacatur of the agencies' implementing documents was proper. Op.36-41.

Defendants quickly appealed (ECF 108) and sought a stay pending appeal (ECF 112). The district court denied a stay pending appeal but granted an administrative stay until this Court ruled on a stay pending appeal. ECF 113.

## ARGUMENT

In analyzing stay requests, courts consider (1) the movant's likelihood of prevailing on the merits, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its injuries and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### I. Defendants Are Likely To Prevail on the Merits.

The President's Proclamation is a lawful exercise of his authority under Sections 1182(f) and 1185(a). The agencies' implementation of the Proclamation was thus also lawful. The district court disagreed and vacated the implementation of the Proclamation based on an erroneous ruling that the payment was a tax without a proper congressional delegation. That error infected the rest of the district court's analysis. This Court should stay the district court's vacatur pending appeal.

6

## A. The Proclamation Falls Within the INA's Delegations.

1. The sweeping congressional delegations in Sections 1182(f) and 1185(a) clearly encompass the payment here. Congress granted the President a "sweeping" delegation to impose "any restrictions he may deem to be appropriate" in Section 1182(f) and to set "reasonable rules, regulations, and orders… subject to such limitations and exceptions as [he] may prescribe" in Section 1185(a). *Hawaii*, 585 U.S. at 683-84 n.1. A "restriction" includes "[a] limitation imposed upon a person or thing; a condition or regulation of this nature." *Restriction*, The Oxford English Dictionary (2d. Ed. 1989). The district court's definition includes "[c]onfinement within bounds or limits; a limitation or qualification" Op.21 (quoting *Restriction*, Black's Law Dictionary (12th ed. 2024)). That term is expanded by the modifier "any," which means "of whatever kind… any means all." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999); s*ee also United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007) ("The word 'any' means 'without restriction or limitation.'"); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("read naturally, the word 'any' has an expansive meaning").

The payment required by the Proclamation clearly places a limitation, qualification, or confinement on an alien's entry: an alien subject to the Proclamation is restricted from entering the U.S. as an H-1B nonimmigrant unless he satisfies the additional qualification of a $100,000 payment. 90 Fed. Reg. at 46,028 § 1. The

7

payment thus falls squarely within the plain text of the sweeping delegations in Sections 1182(f) and 1185(a).

**2.** The district court nevertheless held that the Proclamation exceeds those delegations because the payment is a tax that was not clearly delegated. That reasoning is wrong twice over: the payment is not a tax, and in any event the delegations clearly authorize the payment.

**a.** The payment is not a tax, but instead a standard form of immigration regulation. The Supreme Court explained that when Congress imposed a statutory "duty of fifty cents" per alien passenger arriving by ship, "the power exercised in this instance is *not the taxing power*." *Edye v. Robertson*, 112 U.S. 580, 589, 595 (1884). (emphasis added). Instead, the Court explained, the pertinent statutory provisions "relate to the subject of immigration, and they are aptly designed to mitigate the evils inherent in the business of bringing foreigners to this country." *Id.* at 595. "The sum demanded of [the ship-owner] is not, therefore, strictly speaking, a tax or duty," but instead "the mere incident of the regulation of commerce—of that branch of foreign commerce which is involved in immigration." *Id.* at 595; *see also Smith v. Turner*, 48 U.S. 283, 421 (1849) (invalidating state head count payments as intrusion on Congress's commerce power, not taxation); *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875) (same).

Just like the alien head count payment in *Edye*, the Proclamation imposes a restriction on the entry of a particular class of aliens (namely, those seeking to enter on an H-1B visa) in the form of a per-alien payment that is designed to mitigate the externalities of bringing such aliens into the country. *Edye* teaches that such a payment is an exercise of Congress's foreign-affairs or immigration power, not its taxing power. And Sections 1182(f) and 1185(a) effect a sweeping delegation of Congress's foreign-affairs and immigration powers to the President (supplementing his own inherent Article II authorities in these areas), permitting him to "impose on the entry of aliens *any* restrictions he may deem to be appropriate." 8 U.S.C. §§1182(f), 1185(a)(1) (emphasis added). It follows that those delegations authorize the President to impose any restrictions on entry that Congress itself could impose *under its foreign-affairs or immigration powers*.

Relatedly, the "right" to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). And inherent in "sovereignty is the power to exclude," which "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 144, 148 (1982). The power to impose a payment as a condition on entry to offset the harms of that entry is thus incident to the inherent executive power to exclude aliens

9

from entry altogether. That the congressional delegations in Sections 1182(f) and 1185(a) bolster that inherent executive authority underscores that the Proclamation does not exceed the President's authority under the INA.

The district court, however, erred in relying on *NFIB v. Sebelius*, 567 U.S. 519 (2012), to conclude that the Proclamation's payment is a tax. Op.17-20. *NFIB* held that a provision requiring a payment to the IRS for failing to obtain health insurance could be upheld as an exercise of Congress's taxing power. 567 U.S. at 567-68. But *NFIB* reached that conclusion only after first determining that the mandate could not be upheld under the Commerce Clause. *Id.* at 547-61. In contrast, *Edye* confirms that the payment here is a means of regulating immigration and foreign affairs and can be upheld as such, even if it could not be sustained purely as a tax. 12 U.S. at 594–95 (even if head payment could not satisfy Taxing Clause, it was a proper exercise of the commerce power). Whether the payment might *also* be characterized an exercise of the taxing power is thus irrelevant. If anything, *NFIB* confirms that a payment requirement should be upheld if it can be justified under *any* authority.

In addition, *NFIB's* "functional" test cuts against the payment being a tax. 567 U.S. at 565-66. Unlike *NFIB*, the fee here is collected by DHS, not the IRS. *Id.* And in *NFIB* the tax could never be more than insurance, but here Plaintiffs' argument is the payment is excessive in relation to H-1B petition fees. *Id.* Finally, "the defining

10

feature of a tax" is to "raise[] revenue." *Learning Resources, Inc. v. Trump*, 146 S.Ct. 628, 638 (2026). Unlike *NFIB*, neither the purpose nor effect of the Proclamation is to raise revenue. The purpose is to incentivize the hiring of American workers and as a result H-1B revenue is predictably down by millions. Fed. Reg. at 46,027; ECF 93-11. The district court's attempt to show that each factor in isolation does not preclude something from being a tax misses the point of the functional test. Op.18-20. Even so, the Supreme Court found that they payment in *Edye* was not a tax because the "real purpose and effect of the statute" is to regulate immigration to "mitigate" the harms to the public and provide "for the protection of the citizens among whom they are landed." 112 U.S. at 595–96; *see also State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983) ("If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax."); *Brock v. Washington Metro. Area Transit Auth.*, 796 F.2d 481, 488 (D.C. Cir. 1986) (collecting similar cases). That mirrors the purpose of the Proclamation and thus cuts against it being a tax.

The district court's reliance on *Learning Resources*, was also misplaced. Op.19-22. The Supreme Court there held that a statutory "grant of authority to 'regulate . . . importation'" did not authorize the imposition of duties because the statute "contains no reference to tariffs or duties" and "until now no President ha[d] read [the statute] to confer such power." *Id.* at 646. The opposite is true here. *Edye*

11

confirms that in the immigration context, a per-alien payment is a well-known means of restricting the entry of aliens and "mitigat[ing]" the negative externalities of such entry. 112 U.S. at 595. That is precisely what Sections 1182(f) and 1185(a) authorize the President to address, and precisely what the Proclamation addresses. And unlike the word "regulate" in *Learning Resources*, there are not a slew of other statutes using language similar to that in §§1182(f) and 1185(a).

In that way, Sections 1182(f) and 1185(a) are more like the statute at issue in *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). There, the Court held that a statute authorizing the President to "take such action … as he deems necessary to adjust the imports" of certain goods included imposing "monetary exactions" on those goods. *Id.* at 550-52. As *Learning Resources* explained, that holding was justified because of the "sweeping, discretion-conferring language" in the statute. 146 S. Ct. at 645. The language in Section 1182(f) is even broader due to the modifier "any."

The district court noted that another part of the statute in *Algonquin* mentions duties. Op.22 The Supreme Court did not rely on that section in *Algonquin*, likely because it says "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction," 19 U.S.C. § 1862(a), which hardly implied the authority to modify those duties. In any event, Plaintiffs point to other parts of the INA that do impose fees. Those fees do not limit the President's authority, as they

12

acknowledge they are "in addition to any other fees authorized by law." 8 U.S.C. §§ 1356(u)(1) (premium fee), 1184(c)(12) (fraud fee); *see also* 1356(m) (set levels to cost). If anything, unlike *Learning Resources*, these fees "render[] it natural" for Section 1182(f) to encompass additional exactions. 146 S.Ct. at 646.

**b.** But even if the Proclamation's payment was viewed as some form of tax or duty, Sections 1182(f) and 1185(a) effect a lawful delegation to the President to impose that kind of exaction. As noted, the Supreme Court held that a "duty of fifty cents" per alien is a permissible exercise of Congress's power to restrict the entry of a class of aliens. *Edye*, 112 U.S. at 589. Accordingly, the delegation in §1182(f) to "impose on the entry of aliens any restrictions [the President] may deem to be appropriate" must at a minimum include the imposition of a per-alien "duty" akin to the one at issue in *Edye*. So even if the $100,000 payment here were characterized as a tax or duty, it falls within the delegation in Sections 1182(f) and 1185(a).

That those provisions do not expressly use the word "duty" (as the statute in *Edye* did) is immaterial. The Supreme Court has made clear that the taxing power does not "create a special nondelegation rule for revenue-raising legislation." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025) (citing *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 220–221 (1989)). That is precisely what the district court imposed—a heightened clarity standard requiring the magic word

"tax." Absent such a heightened standard, the plain language of the Sections clearly includes the power to impose a tax if it restricts the entry of aliens. *See Chamber*, 815 F. Supp. 3d at 100 (finding the delegation sufficient for a tax). And even with a heightened clear statement rule, the delegation here is sufficient to include a tax just as it was in *Algonquin*. *Skinner*, 490 U.S. at 224 (citing *Algonquin* as an example of an adequate taxing delegation).[1]

### B. Plaintiffs' Constitutional Claim Fails.

Plaintiffs brought an *ultra vires* claim that the Proclamation exceeded Congress's delegation of authority and thus violated the separation of powers. ECF 1 Count 4. But parties cannot transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were *ipso facto* unconstitutional" there would be "little need" for "specifying unconstitutional and ultra vires conduct as separate categories." *Dalton v. Specter*, 511 U.S. 462, 470 (1994). Making pure separation of powers arguments based on statutory limits is impermissible because "plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a

---

[1] The district court's APA exceeds statutory authority analysis rises and falls on the same analysis. Op.29, 32-33. Plaintiffs also argued the major question doctrine, that the Proclamation overrode the H-1B program and associated fees in violation of the INA, usurped Congress's authority over immigration, and exceeded the statutory requirements of Section 1182(f). ECF 87 at 11-13, 15-17. The district court did not rule on these arguments, so Defendants do not readdress these alternative arguments at the stay stage.

constitutional one." *Glob. Health Council v. Trump*, 153 F.4th 1, 14-15 (D.C. Cir. 2025). That is precisely what Plaintiffs have done here.

The district court attempted to distinguish those cases by claiming Plaintiffs brought distinct statutory and constitutional claims. Op.14-16. But Plaintiffs argue the President violated the separation of powers by exercising a taxing power that exceeded the authority delegated in the statutes. ECF 1 ¶¶ 229-236 (claim turned on whether the statutes delegated the power). In assessing the *ultra vires* claim, the Court itself said "the relevant inquiry here is whether the provisions of the INA granting the President discretionary powers to regulate the entry of noncitizens reflect a delegation of Congress's taxing power" and then analyzed the text of the statute. Op.20-23, 29, 32-33 (excess of statutory authority is same analysis). So the fundamental question has always been whether the Proclamation exceeded Congress's delegation in Sections 1182(f) and 1185(a), which is precisely the type of statutory claim that courts have said may not be repackaged as a constitutional claim. *See Glob. Health Council*, 153 F.4th at 14-15; *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026).[2]  Moreover, Section 1182(f) is the type of statute that "commits the decision to the discretion of the President" and thus the exact

---

[2] As a result, Plaintiffs must meet the heightened standard in *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 666, 681 (2025), which they have never attempted to satisfy.

nature of the restriction is not subject to judicial review. *Dalton*, 511 U.S. at 474. So Plaintiffs' constitutional claim fails at the outset.

### C. Plaintiffs' APA Claims Fail.

In ruling that Plaintiffs succeeded on their APA claims, the district court made clear that its analysis all flowed from its ruling that the Proclamation exercised the taxing power without an adequate delegation, especially for the exceeding authority claim. Op.29, 32-33. Because the premise is wrong, the conclusion is flawed. Regardless, the APA claims fail on their own.

1.      To start, when an agency is simply implementing a power delegated to the President, that implementation is not challengeable as a separate final agency action. *See Chamber*, 815 F. Supp. 3d at 109 (collecting cases including *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016)). That is the case here, as Sections 1182(f) and 1185(a) delegate the force of law to the President directly in his discretion. The agencies are merely implementing that discretion.

2.      Similarly, the challenged memoranda are not "final agency actions" because no "rights or obligations have been determined'" by the memoranda nor did the agencies consummate any "decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The district court disagreed, concluding that the brief memoranda imposed the payment. Op.29. But the Proclamation set the payment, not

the memoranda. The agencies had no decisionmaking regarding the payment. By making it clear that the final agency action is the imposition of the payment, the district court lays bare that Plaintiffs' claims are an impermissible challenge to the Proclamation itself. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

3.     The district court also faulted the agencies for not engaging in notice and comment rulemaking because the President lacked discretion to impose the purported tax. Op.30-31. If the district court is wrong about the delegation (which it is), it seems to admit that the agencies would not have to go through notice and comment. *Id.*; *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012). Even so, the district court was wrong that exceptions to notice and comment did not apply. Op.31-31. The harms for the foreign affairs exception are obvious, as aliens would flood into the country during this period causing chaos abroad as they attempted to do when the Proclamation was announced. *See* ECF 1 ¶ 107 (recounting this situation); ECF 112-2 ¶ 6. The same is true for good cause, as Section 1182(f) allows the President to restrict entry "whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" *Hawaii*, 585 U.S. at 683 (quoting 1182(f)). Subjecting implementation to a long period of notice and comment would undermine the entire statutory scheme and the time-limited Proclamation.

Regardless, Plaintiffs lack standing to bring a purely procedural claim and any failure to conduct notice and comment would be harmless. While redressability for

a procedural injury is relaxed, a favorable ruling must be "substantially probable" to redress the injury if the procedures are followed. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304, 314 (D.C. Cir. 2025). Similarly, failing to conduct notice and comment is harmless error when the mistake had "no bearing on the procedure used or the substance of decision reached." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023) (quotation omitted). The district court simply concluded, without basis, that the procedures "could" have changed the decision. Op.31. But as explained, the agencies had no discretion to disregard the Proclamation. So not only "would [the agencies] be free to ignore the comments," meaning the "notice-and-comment procedure would be an empty, yet time-consuming, exercise," *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020), the agencies could *not* alter their decision, *Chamber*, 815 F. Supp. 3d at 111.

4.      For the arbitrary and capricious claim, the district court again determined it collapsed with the analysis of whether the Proclamation properly exercised delegated authority. Op.33-34. Because it did, for all the reasons previously explained, the agencies' implementation of that Proclamation cannot be arbitrary and capricious. *See Bradford v. United States DOL*, 101 F.4th 707, 731 (10th Cir. 2024) (agencies cannot disregard binding order); *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (no arbitrary and capricious agency action where agency followed

18

"Presidential rules that Congress expressly required it to follow"). The district court seemed to agree that conclusion would follow. Op.33-34. In any event, Sections 1182(f) and 1185(a) do not permit litigants to "challenge" a Proclamation "based on their perception of its effectiveness and wisdom," nor does the does the Proclamation need to be "justified from a policy perspective" because the President need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Hawaii*, 585 U.S. at 686-87, 708 (quotations omitted). Plaintiffs' arbitrary and capricious argument attempts an end run around this, ultimately challenging the President's reasoning and chosen remedy.

## II.     The Remaining Factors Support a Stay Pending Appeal.

**1.**     The irreparable harm to the movant and public interest weigh in favor of the Government. The Government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Here, by vacating the implementation of the Proclamation, the purpose and effect of the district court's order is to block an exercise of the President's broad authority to restrict the entry of aliens whose entry he determined would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The Proclamation is directed at resolving "[t]he large-scale replacement of American workers," "suppress[ed]

wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." 90 Fed. Reg. at 46027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[s] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields," instead replacing them with aliens with foreign loyalties. *Id.* Those are quintessential public interests, and the district court's order severely impedes the Executive's ability to safeguard them.

Indeed, every day the district court's order remains in effect, additional aliens will rush to seek classification and entry as an H-1B nonimmigrant worker. ECF 112-2 ¶¶ 5-7. That is especially true of aliens abroad seeking cap-exempt jobs, who likely waited for their sponsoring employer to file a petition and now can petition in droves. *Id.* It is also likely true of some of the 85,000 aliens who were selected in the lottery but whose employers waited to petition until closer to the upcoming June 30 deadline. *Id.* Those aliens will take vital jobs from Americans and depress their wages, undermining the Proclamation. And once those aliens enter the country, it is extremely difficult to revoke their visas and remove them. *Id.* ¶¶ 7-13. Once they enter legally, they can raise various additional claims, are not subject to expedited removal, and are entitled to substantial process in their removal proceedings. *See Id.*;

20

8 U.S.C. § 1229a. Without an immediate stay from this Court, the district court's order will be the final word on this important and consequential presidential policy.

    **2.**    The harm to Plaintiffs from a stay, on the other hand, is minimal. At most, their claims are economic and such injuries are not irreparable because courts (in theory) could order the one-time payments returned. *Cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021). Moreover, the States can petition for cap-exempt employees at any time. Furthermore, it is hard to credit the severity of the harm to these States that have multi-billion-dollar budgets and have emphasized the needs of their universities, which in turn have multi-billion-dollar endowments. Likewise, it is difficult to credit the States' harms when they waited until December 12 to file a suit, nearly three months after the Proclamation went into effect. ECF 1. The States then waited until February 6 to move for any relief, nearly five months after the Proclamation went into effect and well over a month after the Government had prevailed in an identical case. ECF 87; *Chamber*, 815 F. Supp. 3d at 112. The States' long delay and attempt to jump the line after another court rejected the identical claims of some of the same universities does not evince irreparable harm. *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (denying injunction due to delay, showing lack of irreparable harm). The equitable factors thus all favor an immediate stay.

**3.** At minimum, the Court should stay the nationwide scope of the vacatur to only apply to the Plaintiff States as employers. Even if vacatur was a proper remedy (it is not), it should be guided by the same equitable principles as *CASA*. *See United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., Concurring).

## CONCLUSION

This Court should stay the district court's order pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

 s/ Tiberius Davis

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)-860-8970

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,198 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Tiberius Davis*
TIBERIUS DAVIS

**CERTIFICATE OF SERVICE**

I, Tiberius Davis, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Tiberius Davis*
TIBERIUS DAVIS

Dated: June 18, 2026

Counsel to the Assistant Attorney General